## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| VICTORIA GUSTER-HINES and DOMINECA NEAL, | |
| **Plaintiffs,** | |
| vs. | Case No. |
| McDONALD'S USA, LLC, a Delaware limited liability company, McDONALD'S CORPORATION, a Delaware corporation, STEVEN EASTERBROOK, CHRISTOPHER KEMPCZINSKI, and CHARLES STRONG | Jury Trial Demanded |
| **Defendants.** | |

## COMPLAINT FOR DEPRIVATIONS OF CIVIL RIGHTS

Plaintiffs, Victoria Guster-Hines and Domineca Neal, by attorneys Carmen D. Caruso and Linda C. Chatman, bring suit under the Civil Rights Act of 1870 (42 U.S.C. §1981) against Defendants McDonald's USA, LLC, McDonald's Corporation, Steven Easterbrook, Christopher Kempczinski, and Charles Strong to redress intentional race discrimination, disparate treatment, hostile work environment and unlawful retaliation.

## INTRODUCTION

1.    Plaintiffs Vicki Guster-Hines and Domineca Neal are African American senior executives at McDonald's USA, LLC, the franchisor of the McDonald's

1

restaurant system in the United States. They bring suit to redress McDonald's continuing pattern and practice of intentional race discrimination that should outrage everyone, especially those who grew up going to McDonald's and believing the "Golden Arches" were swell.

2.      Vicki joined McDonald's in 1987 and Domineca joined McDonald's in 2012.   They are highly qualified, high-achieving franchising executives, but McDonald's subjected them to continuing racial discrimination and hostile work environment impeding their career progress, even though they both did great work for McDonald's, which the Company consistently acknowledged in their performance reviews. And then, when they protested internally not only for themselves but for all other similarly situated African Americans, McDonald's subjected them to unlawful retaliation that was irrational, vile, and cruel.

3.      In the United States, the McDonald's restaurant system grew to  over 14,000 franchised restaurants and 683 company-owned McDonald's restaurants across the U.S.A. by the end of 2018.

4.      Over the years McDonald's engaged in systematic but covert racial discrimination impeding the career progress of its African American executives, including these Plaintiffs, but in 2015, things turned sharply for the worse. McDonald's Corporation (the global parent company) imported Defendant Steven Easterbrook from England to be its president and CEO, to replace Don Thompson, who had been the only African American to hold these top positions in the Company's history.  Easterbrook quickly proclaimed McDonald's intent to be "seen as a modern,

2

progressive burger company"[1] and to be "more progressive around our social purpose in order to deepen our relationships with communities on the issues that matter to them."[2]  But instead of "*deepen[ing] [its] relationships with [the African American community] on the issues that matter to them,*" McDonald's vision of "progress" under Easterbrook and Chris Kempczinski, then president of McDonald's USA who had been hand-picked by Easterbrook, intentionally discriminated against African Americans in multiple, interrelated, overt, unmistakable, non-coincidental and highly damaging ways,  severely injuring both Vicki Guster-Hines and Domineca Neal.

### Under Easterbrook and Kempczinski, McDonald's *Expressly* Abandoned Its Commitment to Racial Equality

5.      On its corporate web page, where the Company has total control over its message, McDonald's under Easterbrook and Kempczinski proclaimed a commitment to gender diversity but conspicuously omitted any mention of a corresponding commitment to diversity based on race.  McDonald's stated:

> "Building a gender-balanced organization is a strategic priority for McDonald's, as it helps us better understand and meet the needs of our customers, enables us to access the talent we need to succeed, and is at the heart of our culture, where we want everyone to feel safe, valued, and free to be themselves."[3]

---

[1] https://www.npr.org/2015/05/04/404236476/McDonald's-plans-to-rebrand-itself-as-a-progressive-burger-company (Screenshot November 4, 2019 -- Exhibit A).

[2] https://www.nationalreview.com/2015/06/why-does-McDonald's-want-rebrand-progressive-burger-company-george-will/ (Screenshot November 4, 2019 – Exhibit B).

[3] https://corporate.McDonald's.com/corpmcd/scale-for-good/our-people-and-communities/gender-balance-and-diversity.html  (Screenshot November 4, 2019 – Ex. C).

6.     This omission accurately reflects that under Easterbrook and Kempczinski, McDonald's became *overtly* hostile to African Americans in both words and deeds.  The Company made no effort to "build a [racially] balanced organization" and include African Americans in "*the talent [it]need[ed] to succeed;*" and it did not try to include African American women in the "*everyone*" that McDonald's wants to "*feel safe, valued and free to be themselves.*"  To reiterate this point, at a meeting of the National Black McDonald's Operators' Association (NBMOA) in 2016, and on other occasions, Easterbrook confirmed that "diversity" at McDonald's meant "women", specifically omitting persons of color.  Kempczinski further reiterated this exclusion in April 2019 at a meeting requested by senior African American executives to discuss the lack of African American representation in upper management, when he stated point blank that the "*numbers [of African Americans] don't matter.*"

7.     In making these statements and allowing themselves to be quoted, Easterbrook and Kempczinski were *not merely* making a brazen admission that the Company had become overtly racist. They were purposefully and maliciously insulting the intelligence of everyone within earshot:  it was well-known that Easterbrook and Kempczinski were striving to make McDonald's *a data driven company* in which *number*s are all-important[4] -- *except* when it came to African

---

[4] *See* https://medium.com/@Orcanintell/how-does-mcdonalds-use-big-data-439403bc3fee  (April 18, 2018) (screenshot January 6, 2019) (Ex. D):  "With their daily customer traffic reaching numbers as huge as 60 million in over 100 countries, it's clear that McDonalds has a wealth of data on their customers just waiting to be turned into measurable metrics for analysis.  *McDonalds [has] evolved into a more information-centric company that is inherently driven by data based decisions.* By combining data across every McDonalds store and creating data visualisations, the chain [is] able to create more comparable insights that would help garner a more holistic view of their customers. This meant that they [are] more able to create relevant and actionable outcomes, resulting in time and money saved."  (Emphasis added).

Americans in senior management, when suddenly *"numbers don't matter"* according to Kempczinski, who was acting as a proxy for Easterbrook.  These statements by the Company's leaders were an intentional slap in the face to African American senior executives, franchisees, customers, supply chain members, and other business partners.

8.  McDonald's racist conduct under Easterbrook and Kempczinski matched their racist words.  When Easterbrook replaced Don Thompson, he inherited a Company in which senior African American employees (including Vicki Guster-Hines) had created a vibrant employee group, the McDonald's African American Council (MA2C), that worked hard to develop African American leadership talent in the Company and in the ranks of its franchise owners (by supporting the efforts of the NBMOA), and contributing to the Company's revenues and profitability.  Both Vicki and Domineca Neal had been active in the MA2C.

9.  After Easterbrook and Kempczinski arrived, the MA2C strangely went dormant.  The MA2C's support structure, activities and budgets were rendered useless.  The programs to build and support African American talent development pipeline quietly went away, sending another unmistakable message to all African Americans in the McDonald's community (and anyone else paying attention) that the dream of racial equality was dead and buried at this supposedly All-American iconic company.

10.  No one announced that the MA2C was being put out to pasture, but at McDonald's, no one under the level of Easterbrook or Kempczinski would have dared

diminish the MA2C without their express or tacit approval. Easterbrook and Kempczinski excluded African Americans from their inner circles of trusted advisors, such as Defendant Charles Strong, who they used to carry-out their ruthless humiliation and expulsion of highly qualified African Americans including Vicki and Domineca. In shocking ways difficult to overstate, McDonald's under Easterbrook and Kempczinski declared war against the African American community.

## McDonald's Unprecedented Loss of African American Customers and Franchisees

11.     Nowhere was McDonald's corporate racism under Easterbrook and Kempczinski more plainly visible than by omission at the cash registers of McDonald's restaurants across the United States. Historically, as the result of marketing that cultivated African American patronage (in which talented African Americans marketing personnel had played a role in developing and successfully implementing), African American consumers were *over-represented* at McDonald's cash registers, generating about 20% of all revenue in McDonald's U.S. restaurants (as approximately 13% of the U.S. population in the 2010 Census).

12.     Easterbrook and Kempczinski caused McDonald's to decrease the advertising to attract African American patronage. The plainly foreseeable result was that system-wide purchases by African Americans as a percentage of total U.S. customers declined by six percent (6%) from 20% to 14% in 2019. There was no corresponding decrease in marketing intended to attract Hispanic customers. As a consumer block, African Americans were singled out as less desired by McDonald's.

13.     This staggering loss of approximately 6% of its total U.S. customer base occurred just as McDonald's (a data-driven Company under Easterbrook and Kempczinski) was hypocritically proclaiming in its 2017 "Velocity Growth Plan" that *retaining existing customers* and *regaining lost customers* were key business goals.[5] Losing 6% of its customers would presumably alarm any business, but not McDonald's, which had no rational business justification for accepting these multiyear losses that harmed every McDonald's restaurant in America and harmed the Company, which earns revenue only when consumers purchase its product in a franchised or non-franchised restaurant. As plain as day, McDonald's no longer valued African Americans as paying customers under the Golden Arches (where the Company was simultaneously working to re-image the look and feel of its restaurants to reflect a sleeker and more modern image).

14.     Furthermore, this highly noticeable loss of approximately 6% of its total U.S. customer base coincided with a startling decrease in restaurants owned by African Americans to the point the NBMOA became highly critical of McDonald's in the Easterbrook/Kempczinski years – a fact well-known to Vicki, Domineca and other African American executives at the Company that were appalled by these developments and protested internally.  Nearly one out of three African American franchisees left the McDonald's system since Easterbrook arrived, which was starkly disproportionate to the loss of non-African American franchisees.

---

[5] *See* "Velocity Growth Plan" introduced March of 2017 --
www.corporate.mcdonald's.com/investors/overview (Screenshot November 4, 2019 -- Ex. E).

15.     The disproportionate loss of nearly one-third of the African American franchisees in the Easterbrook and Kempczinski era was intentional or, in the alternative, it was in reckless disregard of plainly foreseeable consequences of business decisions made by Easterbrook and Kempczinski and their minions. Without limitation, McDonald's imposed onerous costs on its franchisees by requiring them to make expensive capital expenditures, most notably through a program known as "Big Bolder Vision 2020" (BBV2020) that McDonald's rolled out in 2017, sparking widespread franchisee discontent.  McDonald's knew or recklessly disregarded the likelihood that BBV2020 (among other financial stresses imposed by the Company) would put disproportionate financial stress on African American franchisees and cause a disproportionate number of them to leave the system. McDonald's knew but did it anyway.

16.     McDonald's uses strong-arm tactics to drive unwanted franchisees out of the system, such as unfairly grading franchised restaurants and jeopardizing a franchisee's rights under his or her franchise agreement; and then preventing an unwanted franchisee from selling his or her restaurants in an open market.  All McDonald's franchisees are vulnerable to these strong-arm tactics (among others) but, on information and belief, African American franchisees were disparately strong-armed, driving them out of the system in record numbers, and damaging them by the loss of equity in their businesses.

17.     The foreseeable disproportionate loss of African American franchisees in the Easterbrook and Kempczinski era occurred simultaneously with a business

decision by McDonald's to reduce its restaurant ownership, significantly increasing franchisee ownership and operations responsibility. In recent filings with the Securities & Exchange Commission, McDonald's acknowledged it is more reliant on "the financial success and cooperation of its franchisees" including their "willingness and ability … to implement major initiatives" including "financial investment[s]" and to "remain aligned with [McDonald's] on operational, promotional and capital-intensive reinvestment plans."[6] However, the Company failed to disclose it was disproportionally excluding African American franchisees from the Owners/Operators it hoped would achieve "financial success" and sought to align with.[7]

### McDonald's Purges African Americans from Senior Leadership

18.     Having publicly abandoned its commitment to racial equality, caused increasing numbers of African American consumers to make their restaurant purchases elsewhere, and driven nearly one out of three African American franchisees out of the system often into financial ruin, McDonald's under Easterbrook and Kempczinski conducted a ruthless purge of African Americans from the ranks of its senior executives. Through the racist eyes of McDonald's leadership, African American senior executives were: (i) *less necessary* since there were fewer African American customers to serve and fewer African American franchisees to work with; and (ii) *less desirable* because African American executives were in positions to see

---

[6] *See https://corporate.McDonald's.com/content/dam/gwscorp/investor-relations-content/company-overview/2Q_2019_Risk_Factors.pdf* (Screenshot November 4, 2019) – Ex. F).
[7] The term Owner/Operator (or just Owner, or just Operator) reflect McDonald's nomenclature and are synonymous with "franchisee" – meaning a person or entity that purchased a franchise as defined by the Federal Trade Commission at 16 CFR 436.1.

the "big picture" systemic discrimination, and potentially blow the whistle.  The fewer African Americans with an inside view of the Company's racist conduct, the better for Easterbrook and Kempczinski and their minions at McDonald's.

19.     Between 2014 and 2019, McDonald's terminated thirty (30) African American Officers and demoted five (5) African American Officers (including Vicki and Domineca) with a commensurate benefit reduction and loss of stature and future opportunities.[8] Combining the dismissals and demotions, McDonald's reduced its total of African American Officers from forty-two (42) to seven (7).

20.     White Officers were not purged in anything close to the same or comparable numbers.

21.     The disproportionate elimination of African Americans from executive leadership at McDonald's (including but not limited to Vicki and Domineca) was race conscious, intentional, undeserved, and not justified by the merits of their comparative job performance or any legitimate business reasons.

22.     The disproportionate elimination of African Americans from executive leadership at McDonald's (including but not limited to Vicki and Domineca) came with a viciously hostile work environment intended to humiliate and punish the targeted African American executives and send them the unmistakable message they are not wanted at McDonald's.  The hostile work environment includes without limitation labelling Vicki and Domineca and other African American women in leadership "Angry Black Women" — an ugly racial stereotype used to silence and

---

[8] At McDonald's the term "Officer" is used to describe anyone holding the title of vice president or higher – but as alleged below, at McDonald's not all Officers are treated equally.

shame Black women and pressure them into being passive, servile, nonthreatening, and unseen.

23.     Plaintiffs Vicki Guster-Hines and Domineca Neal have endured a continuing pattern and practice of racial discrimination in deprivation of their civil rights that has included disparate treatment, hostile work environment, and unlawful retaliation for their audacity in protesting internally against the Company's racism.  They have been repeatedly insulted, marginalized, and humiliated in open and notorious ways, constituting an attempt by McDonald's to constructively terminate them.

24.     To avoid suffering greater damages, and avoid giving McDonald's another undeserved "victory" over its victims, after so many other African Americans were forced out of the Company in demeaning circumstances, these brave Plaintiffs refuse to resign and remain ready, willing and able to perform their jobs in an exemplary way as always.   But, they refuse to be silenced.

25.     On or about September 23, 2019, these Plaintiffs by their attorneys, gave McDonald's written notice, in substance, of their claims, which include:

Count I:        Victoria Guster-Hines' claim for disparate treatment in violation of 42 U.S.C. §1981 (sometimes "Section 1981").

Count II:       Domineca Neal's claim for disparate treatment in violation of 42 U.S.C. §1981.

Count III:      Victoria Guster-Hines' claim for hostile work environment violating 42 U.S.C. §1981.

Count IV:       Domineca Neal's claim for hostile work environment violating 42 U.S.C. §1981.

Count V:    Victoria Guster-Hines' claim for unlawful retaliation in violation of 42 U.S.C. §1981.

Count VI:   Domineca Neal's claim for unlawful retaliation in violation of 42 U.S.C. §1981.

26.     By agreement with the Defendants, all statutes of limitations applicable to Plaintiffs' claims under 42 U.S.C. § 1981 were tolled as of September 23, 2019.

27.     Plaintiffs seek actual and compensatory damages to redress substantial economic injury, severe emotional distress, and related physical suffering; punitive damages to punish these wrongdoers and deter other companies and high-ranking executives from like misconduct; and the recovery of costs and attorneys' fees.

## JURISDICTION AND VENUE

28.     Plaintiffs bring federal claims under 42 U.S.C. § 1981, invoking jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3) and 42 U.S.C. §1988.

29.     Plaintiffs' claims are properly joined under the "permissive joinder" provisions of Fed.R.Civ.P. 20, as their claims arise out of the same series of transactions and occurrences and raise common questions of law and fact.

30.     Venue is proper under 28 U.S.C. § 1391 because the Defendants reside in this District and the unlawful conduct occurred or was orchestrated at McDonald's headquarters within this District.

## PARTIES

31.     Plaintiff Victoria (Vicki) Guster-Hines is an African American female executive at McDonald's USA, LLC, born and raised in Saginaw, Michigan and now residing in Texas and Illinois.

32.     Plaintiff Domineca Neal is an African American woman born and raised in Detroit, Michigan and now residing in Texas and Illinois

33.     Defendant, McDonald's USA, LLC ("McDonald's USA"), is a Delaware limited liability company with its principal place of business in Chicago, Illinois at 110 North Carpenter Street. It is a wholly owned subsidiary of McDonald's Corporation, and the franchisor of the McDonald's restaurant brand in the U.S.

34.     Defendant McDonald's Corporation is a publicly traded Delaware corporation and the sole member of McDonald's USA, and is the worldwide franchisor of the McDonald's restaurant brand.  It has its principal place of business in Chicago, Illinois in the same building at 110 North Carpenter Street.  Collectively McDonald's USA and McDonald's Corporation are "McDonald's" or the "Company" unless otherwise indicated.  This nomenclature reflects the reality that McDonald's Corporation exercises close control over McDonald's USA to the point that in the United States, they *de facto* function as a single company regarding the employment practices challenged here.

35.     Defendant Steven Easterbrook ("Easterbrook"), a native of the United Kingdom, became president and CEO of McDonald's Corporation in March 2015; and in those positions, Easterbrook exercised *de facto* control over McDonald's USA at the policymaking and business planning levels; and without limitation, Easterbrook set McDonald's on the overtly racist course alleged here.  On or about November 3, 2019, McDonald's terminated Easterbrook for the stated reason Easterbrook violated company policy by having an alleged consensual relationship with an employee.  On

13

information and belief Easterbrook resides in Chicago, Illinois; and worked at McDonald's headquarters in Chicago until terminated.

36.     Defendant Christopher Kempczinski ("Kempczinski") became president of McDonald's USA in 2016 after being hired by McDonald's in or about 2015 to lead global strategy, business development, and innovation.  Kempczinski had no position at McDonald's before 2015, when Easterbrook selected Kempczinski to be president of McDonald's USA; and Kempczinski joined Easterbrook in setting McDonald's on the overtly racist course alleged here. On or about November 3, 2019, after the Company received notice of these claims, McDonald's promoted Kempczinski to president and CEO of McDonald's Corporation replacing Easterbrook.   On information and belief Kempczinski resides in Chicago, Illinois; and works at McDonald's headquarters in Chicago.

37.     Defendant Charles ("Charles") Strong was the Company's West Zone President, where he supervised the Plaintiffs, until December 2019, when he was promoted to Chief Field Officer (after the Company received notice of these claims). On information and belief, he resides in Chicago, Illinois and in Florida, and works at McDonald's headquarters in Chicago, where he was a confidant of Easterbrook and Kempczinski.

38.     McDonald's acts through its officers, directors, and employees.  All acts and omissions by McDonald's officers and employees were done in McDonald's business and are imputed to McDonald's under *respondeat superior*.

## FACTS

## Covert Racial Discrimination prior To Easterbrook and Kempczinski

39.     McDonald's did not become a racist company upon the arrival of Easterbrook and Kempczinski.  For many preceding years, McDonald's engaged in covert, continuing racial discrimination amounting to *de facto* Company policy.  The existence of this previously *covert* policy was the foundation that enabled Easterbrook and Kempczinski to embark on the *overtly* racist course of conduct alleged in paragraphs 1-24 not only victimizing these Plaintiffs and other African American employees, but also targeting African American consumers and franchisees for a substantially reduced presence in the McDonald's system.

40.     As elements of McDonald's covert pattern and practice of racial discrimination against African American employees over the years, without limitation:

   a.  The Company had always proclaimed its commitment to racial equality never revealing an intent to discriminate.

   b.  But African Americans were consistently held to double standards requiring them to be more qualified and work harder than White persons in comparable positions, but they were not promoted on par with their White peers.

   c.  McDonald's historically allowed White employees without college degrees (sometimes only with a high school diploma) to rise high. Examples include Bill Garrett (Sr. VP Operations), Charles Strong

15

(West Zone President), Tim Andersen (VP Operations), Gregg Erieo (VP Corporate Owned Restaurants), and Charles Robeson (Chief Restaurant Operating Officer). In contrast, African Americans are invariably required to hold college degrees or advanced degrees to reach the same, or sometimes lower, executive levels as White executives lacking any degree. African Americans frequently wound up reporting to White executives with inferior credentials and experience.

d. McDonald's historically rewarded numerous White executives with the opportunity to become owner/operators of highly desired McDonald's restaurants. Those opportunities were not extended to African Americans on equal terms.

## **Vicki Guster-Hines**

41. When Vicki joined McDonald's in 1987 as a Management Trainee, she was highly qualified. She had graduated from Central Michigan University with three (3) undergraduate degrees, in business, psychology and sociology; and then graduated from Indiana Wesleyan University with an MBA. Before joining McDonald's, she worked for Dow Chemical and as a tax preparer for H&R Block.

42. Throughout her career at McDonald's, which began in 1987, Vicki has been a loyal, talented, hard-working, dedicated and excellent executive performer for McDonald's. In her annual performance ratings, she has been predominantly rated "Exceptional", the highest ranking, and consistently rated either "High Significant" to "Exceptional.

16

43.     Over the years at McDonald's, Vicki rose through the ranks due to her hard work, perseverance, accomplishments and consistently strong reviews and rankings:

    a.     From 1990 through 2003, Vicki held numerous positions in Michigan and Indiana and rose to the level of Field Operations Manager with responsibility for as many as 279 McDonald's restaurants.

    b.     In 2004, Vicki reached the level of "Director" when she was named Director of Operations in its Ohio region with responsibility for as many as 400 McDonald's restaurants, and she held that position from 2004 through 2007.[9]

    c.     In 2007/2008, Vicki participated in a 12-month program called LAMP (Leadership at McDonald's Program) that McDonald's created in or about 2004; and which was intended to accelerate the progress of its "Directors" to vice president and senior vice president levels, and beyond.  Participating in LAMP was by invitation only to those Directors deemed among the top talented 1%.   Meeting that strict criteria, Vicki was invited to participate and successfully completed the LAMP in 2007/2008 and rightfully believed she was on track at McDonald's to become an "Officer" which begins at  the  vice president level, and to

---

[9] At McDonald's the term "director" is a title for executive employees that are one step below a vice-president title, and in this usage, the term "director" should not be confused with membership on the Company's Board of Directors.

progress to senior vice president and beyond in the highest levels of McDonald's leadership.

d. From 2008 to 2010, Vicki worked at McDonald's then-headquarters in Oak Brook, Illinois as Gatekeeper, Strategist and Deployment (System Processes and Procedures); and in this position she affected over 11,000 McDonald's restaurants.

e. From 2010 to 2013, Vicki served McDonald's as its West Division Senior Operations and Technology Director with responsibility for approximately 4,700 McDonald's restaurants.

44. Even before the arrival of Easterbrook and Kempczinski, Vicki should have been promoted higher in the Company based on her qualifications, skills and performance as compared to non-African Americans that were treated better, but she was victimized by McDonald's unwritten policy of racial discrimination that impeded her rise in the Company. Without limitation:

a. From 2004-2007, McDonald's promoted at least three non-African Americans (Laura Ramirez, Jeff Newman and Paula Richards) to the Director or Senior Director level; and

b. From 2008-2012, numerous non-African Americans (Walt Maney, Steve Kerley, William McKernan, Bianca Olivias, Jerry Angelotti, Greg Erieo, Alvaro Bonta, William Armstrong, Mike Ray and Atila Noronha) were promoted to the Vice President level with "Field" responsibility for a regional office; or "McOpCo" responsibility for the restaurants

McDonald's owns and operates through its "operating company" subsidiary (known as McOpCo); and/or at other levels higher than Vicki's.

45. Vicki was equally or better qualified for the promotions alleged in paragraph 44 but was not similarly promoted.

46. When Vicki was promoted to Gatekeeper in January 2009, she became one of only five persons in McDonald's history to hold that position. Each of the other four "Gatekeepers" were White males holding the title of Vice-President. McDonald's did not promote Vicki, the only African American woman to be a Gatekeeper, to Vice-President, even though she performed the same "Gatekeeper" duties that the White men performed when they held this position, and thus she was again subjected to disparate treatment.

47. In 2013, after Don Thompson became the Company's first African American leader, Vicki finally received the title of Vice-President, when she was promoted to Vice President for Franchising & Operations in Houston. As a Vice President, she had significant responsibility including without limitation:

a. Accountability for Field Performance, Franchising, Operating Income, year over year increases in Sales, Guest Counts, and Market Share, and establishing systems and processes to create ease of execution, shown through excellent customer satisfaction.

b. Building a robust Talent Pipeline by leveraging a talent pool both internally and externally for the system and ensuring training and development execution.

c. Responsibility for $2 Billion-plus in annual sales, and Operating Income exceeding $250 Million by collaboratively working with and influencing 150 Franchisees, 63 Staff Team Members, in 870 restaurants in Texas and Louisiana.

d. Collaborating effectively with Franchisees, Staff, and Agency Partners to execute a national plan to grow restaurant visits, market share, cash flow, and operating income, while improving guest satisfaction.

e. Responsibility for creating opportunities for next generation Owners by ensuring only the best of the best candidates enter the system and become properly trained to own and operate multiple restaurants.

f. Conducting annual business reviews to ensure fair and consistent practices with existing Franchisees to ensure they continue to meet the national standards and excel in People, Operations, Building the Business through Guest Satisfaction, Finance, Re-investments and Franchisee Involvement within the communities they serve.

g. Working collaboratively with all support departments, Marketing, HR, Operations, Finance, Business Insights, and Real Estate & Development to build market share and year over year comps.

h.  Responsibility for executing high level gold standard operations in all restaurants; and

i.  Responsibility for ensuring that processes, systems, and routines are in place to drive both internal and external, everyday great customer satisfaction.

48.  Due to disparate treatment, Vicki's career advancement to Director and Senior Director levels had been delayed compared to her White and/or other non-African American counterparts who received favorable treatment compared to African Americans.

49.  Due to disparate treatment, Vicki's career advancement to Vice President levels had been delayed compared to her White counterparts or other non-African American counterparts who received favorable treatment comparable to African American persons.

50.  But by 2013, having attained a promotion to the Vice President level, and with an African American in the Company's highest positions, Vicki reasonably believed she would be treated fairly going forward, e.g., her hard work and perseverance had finally paid off. Vice Presidents are Officers – a significant distinction at McDonald's that for most White persons is a springboard for further success.

51.  As a Vice President, Vicki was rated "Exceptional" (the highest ranking) in each of the last four years (just as she had been an "Exceptional" Director and Senior Director qualifying her for LAMP as alleged in paragraph 43(c)). Therefore,

she had every reasonable expectation of advancing in a reasonable length of time to Senior Vice President and higher.

52. But Vicki did not realize that becoming a Vice President for Franchising & Operations would prove to be a glass ceiling she would not be allowed to rise above, as covert discrimination against Vicki in career trajectory continued. Without limitation:

a. In 2013, three white persons (Greg Erieo, Scott Rockwell and Jim Carras) were promoted to Vice President & General Managers of field offices (a step up from being a Vice President for Franchising & Operations); Vicki had equal or better qualifications but was not similarly promoted; and

b. In 2014, several non-African Americans (Tim Anderson, Robert Garcia, Dan Geheret and Bianca Olivas) were promoted to Vice President & General Manager within McOpCo; and again, Vicki had equal or better qualifications but was not similarly promoted.

**Domineca Neal**

53. Domineca earned a BA in Accounting from Michigan State University and an MBA from the University of Michigan; and she is a Certified Public Accountant. Her scope of professional experience includes practicing as a CPA for a top global accounting firm for five (5) years; brand management/marketing of multi-million-dollar consumer package goods brands for eight (8) years; and running her

own businesses including a Wendy's restaurant franchise, a Cartridge World franchise, and a consulting practice, for eight (8) years.

54.    In 2012, Domineca joined McDonald's as a Director Trainee in the Accelerated Operations Program (AOP) and was based in Chicago.  The AOP was a program to fast track the advancement of mid-level executives to entice them to move laterally to McDonald's.  As a participant in the AOP, Domineca was identified as a highly qualified employee; and her qualifications were more impressive than many other persons in the AOP. In every way, Domineca reasonably believed she was poised for rapid advancement at McDonald's.

55.    Throughout her career at McDonald's, Domineca has been a loyal, talented, hard-working, dedicated and excellent executive performer and leader for McDonald's.   In her annual performance assessments and discussions, she has consistently been designated as "top talent" by U.S. Leadership, and since 2018 she has been ranked #1 out of 19 peers.  She has been highly qualified for the positions she held:

      a. In 2015, as the result of her hard work and perseverance, McDonald's named Domineca the Director of Operations, Indianapolis Region, where she revamped restaurant evaluations including cultural evolution and approach to Owner/Operator engagement for 80+ franchisees with 250+ locations; and

      b. In 2017, as the result of more hard work and perseverance Domineca became an Officer (a Vice President Franchising & Operations),

assigned to the Indianapolis Field Office, with responsibilities for 100+ franchisees representing $1.5 Billion in annual revenue and 500+ locations; and with duties and responsibilities comparable to Vicki's duties and responsibilities alleged in paragraphs 47 (a)-(i).

56. In becoming a Vice President Franchising & Operations in 2017, Domineca achieved near parity with Vicki in position and salary in 2017 despite joining the company in 2012, a full quarter century (25 years) after Vicki joined McDonald's in 1987. Since Vicki had been rated "Excellent" or above throughout her career, this parity in the face of such a huge disparity in length of service, confirmed the existence of an unlawful race-based glass ceiling applied to African Americans , especially women, at McDonald's.

57. Domineca has been a top performer and thus she has consistently been designated as "top talent" during her time at McDonald's, and but for the Company's unlawful discrimination she would have been promoted to the Vice President level in Franchising & Operations (or a comparable Officer position) in 2015 or 2016 and progressed upward from there. That would have been her trajectory had she been treated fairly compared to her White counterparts.

58. The Company's continuing pattern of discriminatory non-promotion (and other slights) before Easterbrook and Kempczinski was done in a covert manner making it impossible for Vicki, Domineca, or other African Americans to isolate and challenge specific instances as discriminatory. For example, the Company did not (and does not) hold out the possibility of executive-level promotions as "open

positions" that interested persons could apply for. Career progress was (and is) discussed behind closed doors. Vicki and other African Americans were repeatedly assured they would receive fair promotions. When those promotions did not arrive, they were left to guess the real reasons.

## Hostile Work Environment

59. As part of the Company's pattern and practice of discrimination, African American employees such as Vicki and Domineca endured racist incidents prior to Easterbrook taking the helm in March 2015; but they persevered in doing excellent work for their employer (as they had always done). For example, in or about 2005, a White VP & GM of the Ohio Region (Marty Ranft) told Vicki and another African American (Joe Woods) that "90%" of what African American franchisees had to say about their experiences in the McDonald's restaurant system was a "goddamn lie" and he (Ranft) told Vicki "You are a [N-Word] like all the rest – you just believe you are better because you are a smart one." Further:

    a. Vicki immediately told Ranft he could not speak to her using that ugly word or in any similar words, but Ranft responded to Vicki he could say whatever he wanted.

    b. Vicki was rightfully outraged and upset, and she reported Ranft to her superiors clarifying that she would not tolerate being called the N-Word within McDonald's.

    c. Ranft was correct in saying that as a McDonald's executive he could call an African American the N-Word to her face, without consequence,

because McDonald's did absolutely nothing in response. Ranft's career with McDonald's was not harmed. McDonald's promoted him to Vice-President of Development for the entire U.S. and later, he was rewarded with the opportunity to become the owner/operator of several McDonald's restaurants.

60. Also in 2005, Ranft called Vicki "stupid" in front of her team. The next day, team member Tom McQuenny apologized to Vicki and expressed his shock at the way Ranft humiliated her in front of her team.

61. As a further example, a White male Field Service Operations Director (Joe Kraft) was openly rude, abrasive, and disrespectful to Domineca on multiple occasions in 2014 and earlier years, causing Domineca to experience substantial stress. However, in the years before Easterbrook and Kempczinki, African Americans in senior leadership were able to intercede and shield Domineca. This changed for the worse in the Easterbrook/Kempczinski years in which Joe Kraft, Charles Strong and other White executives were no longer constrained and openly targeted Domineca for elimination as alleged below.

62. The incidents and courses of hostile conduct alleged in paragraphs 59-61 are examples not intended to be exhaustive. When racist hostile behavior occurs, all African Americans are victimized, not merely the immediate victim. Word of these incidents and similar ones quickly reaches other African American employees, and all persons of color "get the message" that they are second class citizens when a

company like McDonald's allows racist speech and/or racist conduct to occur then go unpunished.

63.     Prior to the Easterbrook/Kempczinski years, Vicki, Domineca and other African Americans at McDonald's dealt with incidents of racial hostility such as those described in paragraphs 59-61 by working harder and seeking to achieve constructive change within McDonald's.  They sought to make White leadership feel comfortable working with them and believed they would eventually succeed.  As African Americans they knew that some racial hostility is an unfortunate fact of American life and to protect their careers, they did not wish to be seen as complainers.  Vicki and Domineca did not view these incidents as cause to sue until more recent events alleged below.

### Overt Racial Bias and Intensified Hostile Work Environment Under Easterbrook and Kempczinski

64.     When they took the helm at McDonald's Corporation and McDonald's USA,  Easterbrook and Kempczinski noticeably surrounded themselves with White subordinates as their most trusted advisors and they embarked on the course of overtly racist speech and conduct alleged in paragraphs 1-24.  The work environment at McDonald's became increasingly hostile for African American employees including but not limited to Vicki and Domineca, who in their positions were eyewitnesses to shocking conduct alleged (without limitation) in paragraphs 1-24, which they found hard to believe, leaving them in the position of either speaking out in protest or appearing to agree with the Company's racist course of action.    In this time period, it was widely known in McDonald's executive circles that (without limitation):

27

a.  Vicki and Domineca, and other African American executives, supported the NBMOA and disapproved of the overtly racially discriminatory policies and practices instituted at McDonald's after Easterbrook and Kempczinski took control of the Company; and

b.  Vicki had been instrumental in founding MA2C, which was silenced by the new regime; and Domineca too was an active participant in MA2C.

65.  Similarly, Vicki and Domineca spoke out when they saw African American franchisees being treated less favorably than Whites. As one example, in or about 2015, Domineca went to bat for an African American Next Generation (NG) potential Owner Operator. His father, James Daughtry, had been a highly successful Nashville Operator with highly coveted stores, who died in or about 2012. His spouse took over as Owner/Operator, but she also died in or about 2015, leaving their son, Jemond, who had worked in the business for years. The day after Mrs. Daughtry died, Vice President, William McKernan (White male) accepted calls from non-African American Owner/Operators regarding her stores and Domineca told McKernan it was disrespectful to entertain those calls even before the lady was buried. McKernan and his friend, Alvaro Bonta did everything they could to prevent Daughtry's son from getting his deceased parents' stores, including besmirching the young man's name and reputation. When Domineca pointed out exceptions he made for a White female Next Generation candidate, Bonta was forced to back off and Jemond Daughtry became a successful Owner/Operator.

66. After Easterbrook and Kempczinski took the helm at McDonald's, incidents of overt hostility towards Blacks, for which White perpetrators suffered no consequence, increased in both frequency and severity. As examples of incidents involving Defendant Charles Strong, the "West Zone President" reporting directly to the president of McDonald's USA (then Kempczinski), without limitation:

    a. In or about December 2016, Vicki reported to her White supervisors including Charles Strong (and also Maureen Mulvhill (McDonald's legal counsel), Troy Brethauer (U.S. VP Franchising – Retired) and Cody Teets (U.S. VP Franchise Relations – Separated) and also to Juan Marcos (Chief People Officer) that a White franchisee (Dan Carmichael) had threatened her personally when she informed Carmichael that McDonald's was exercising a Right of First Refusal to buy certain restaurants Carmichael had wanted to purchase. McDonald's was within its express contractual rights, but Carmichael's words, as Vicki relayed them to her supervisors, were: *"Vicki, I am concerned about your wellbeing and your mental state... You are acting irrational and incompetent and everyone knows it…I am giving you the chance now to change this decision, based upon what I can do to you... I have stuff on you... You would be surprised of what I can do to you… You have no idea what I can do to you Vicki... You will need God when I am done with you."* McDonald's ignored this threat against Vicki and did nothing to protect her from Carmichael.

b. In or about 2017, Charles Strong instructed Domineca not to consult with or take the advice of two African American women (Bridgette Hernandez and Barbara Calloway) that had been promoted over Strong's opposition, stating "[*we) don't need any of that Black woman attitude. They are too angry and aggressive.*"  (To get her promotion, Calloway had to accept a transfer to the East Zone to get away from Strong).

c. In September of 2017, McDonald's placed Vicki under so much stress, that she was forced to take approximately twelve (12) weeks medical leave (September 22nd – December 5th).  She notified Charles Strong, Francisco Gonzalez, and Juan Marcos (Chief People Officer) that her doctor recommended an immediate medical leave.

d. On or about March 21, 2018, Charles Strong told Vicki that five African American women (Chioke Elmore, Barbara Calloway, Regina Johnson, Bridgette Hernandez and Domineca Neal) were "angry Black women" that "always seemed to be mad about something" and asked Vicki if she could explain the source of their anger.  These five African American women that Charles Strong disparaged in offensive racial terms:

   i.   Constituted 40% of the African American female vice presidents at McDonald's *globally* as of March 2018.

   ii.  Constituted 50% (4 of 8) of the African American female vice presidents at McDonald's in the U.S. as of March 2018;

30

iii. Constituted 60% (3 of 5) of the African American female vice presidents reporting to Strong when he made these statements; and

iv. Constituted 75% (3 of 4) of the African American female vice presidents reporting to Strong when he made these statements that McDonald's had not already pushed into taking an early retirement.

e. Strong repeated the same comments alleged in paragraph 69(d) to Vicki and Francisco "Pancho" Gonzalez (VP and GM of the Houston Region) and to Owner/Operators the next day while attending a meeting of the NBMOA (National Black McDonald's Operators Association) in Houston.

f. Even after promoting Dominica to Vice President, Charles Strong warned her to "watch [her] delivery and be "softer"; he still continued to tell staff and franchisees she was "angry."

67. Charles Strong is not the only White executive that calls African American women "Angry Black Women." Using that term or the underlying allegation that African American women are angry without having cause to be angry is common among the White leadership at McDonald's.

68. Ranft's use of the N-Word (paragraph 59) and Strong's use of the stereotypical "Angry Black Women" insult (paragraph 66) was condoned at McDonald's and on information and belief, they are not the only ones using racially

insulting and hurtful language. The fact that hateful language can be used, without consequence to the hateful speaker, is a hostile work environment.

69. Even when they do not use profanity or hurl other racial insults, White executives at McDonald's are free to openly disclose their racial biases without penalty. For example, in or about 2018, Laura Granger, a native South African White woman then serving as the regional HR director in Houston revealed her racial animosity when she told Vicki that Granger's fourteen-year-old daughter was uncomfortable in a school that had too many Black students. Laura Granger told Vicki that when she [Laura] sat outside of her daughter's school, she did not see that many Black students coming or going. But Granger changed her daughter's class to one with fewer Black students to make her more comfortable. Vicki complained to Melissa Kersey, CPO McDonald's USA, that Granger was revealing an innate racist attitude that should disqualify her from working in human resources and affecting the careers of African Americans, but that complaint was ignored and McDonald's promoted Granger to a national HR position as HR Officer of McOpCo (which operates McDonald's company-owned restaurants).

70. Like Charles Strong, who unfairly blocked deserving African Americans from advancement in the Company, in or about June 2018, Laura Granger made false and disparaging statements about an African American employee, Theo Webb, to block Webb from being re-hired for an open position after he retired in good standing. She stated that Theo was not a good employee, he did no good job or have good workplace relationships. None of that was true.

71.     Likewise, and also acting out of racial bias, Vice President William McKernan repeatedly made false and disparaging statements about Domineca that negatively affected her advancement at McDonald's.

72.     The racially hostile incidents alleged in this Complaint are examples and not exhaustive of the events causing a hostile work environment at McDonald's. These incidents reveal that White executives at McDonald's are comfortable openly displaying their hostility to African Americans. This open, "in your face" display of racism is intended by the perpetrators to signal to African Americans they should stay in their place and have no choice but to accept second- or third-class citizenship at McDonald's.

### Intensified Disparate Treatment

73.     In 2016, a white person (Jackie Bunting) was promoted to the Vice President level in the Heartland region.   But Domineca, who was then a Director, had equal or better qualifications but was not similarly promoted.  In addition, but without limitation:

  a. In 2016, McDonald's brought in a non-African American from Australia, Skye Anderson, as a Vice President and General Manager of Pac Sierra, which is a position higher than Vicki and Domineca held; and again, Vicki and Domineca had equal or better qualifications but were not similarly promoted.

  b. From 2017 through 2019, several non-African Americans (Harish Ramalingam, Bill Garrett, Paulo Pena, Luis Quintiliano, Michelle

Borninkhof, Karen Garcia, Medy Valenzuela, and Gianfranco Cuneo) were promoted to Field Vice President / Senior Vice President and/or other positions higher than Vicki's and Domineca's; and again, Vicki and Domineca had equal or better qualifications but was not similarly promoted.

74.    In addition, White male Jeff Wilfong "retired" several times but McDonald's recalled him at least three times to fill positions that both Vicki and Domineca were qualified to fill.

## Vicki and Domineca Continued to Protest McDonald's Racist Policies

75.    On multiple occasions after Easterbrook and Kempczinski took charge, both Vicki and Domineca attended NBMOA meetings and, with the knowledge of their White supervisors in a chain of command reaching Easterbrook and Kempczinski, they expressed empathy with the racial grievances expressed by the African American franchisees, without limitation:

    a.  In 2017, as a Field Service Senior Director, Domineca relayed complaints from African American franchisees to Charles Strong and Finance Director Dave Hatton that McDonald's was grading their African American Consumer Market stores differently, in a negative way. Specifically, when McDonald's previously co-owned these stores in partnership with a franchisee, it gave them a passing grade. But, after McDonald's ended the partnership, McDonald's found the same stores

in the same condition to suddenly be non-compliant and deficient. Domineca also shared her thoughts on this with Strong and Hatton.

b. In the summer of 2018, Domineca sent Melissa Kersey an email suggesting a network of Owner/Operators in AACMs to identify solutions to their unique challenges; Melissa had shared her concern with Domineca that McDonald's was on the cusp of something happening due to diversity concerns and she wanted Domineca's help. Melissa did not respond to Domineca's email; and when Domineca asked her in person, Melissa stated, "It was a good idea but nothing happened."

c. Also in 2018, Vicki learned that, during a world-wide convention in 2018, a White male McDonald's Owner Operator from the Pac Sierra region made highly offensive statements to an African American female McDonald's employee.[10]  The franchisee told her she was a beautiful Black woman; that he wanted to have sex with her right at that moment; and that he believed crossbreeding was good.  Seeking to protect her fellow employee from this racist and sexist behavior, Vicki complained about this incident to a White human resources director, Laura Granger, but to Vicki's knowledge McDonald's did nothing about this incident.

### The Decimation of African American Senior Executives

76.     In July 2018, as part of the Company's announced initiative to be a more data driven company, McDonald's implemented a wide-ranging reduction in force

---

[10] The employee's name is withheld to protect her privacy.

called "Field First Restructure (FFR) under which the number of field offices serving the franchised restaurants was substantially reduced, with each one of the reduced field offices to serve an increased number of restaurants.

77.     Because of the July 2018 FFR, the top eight (8) Officers in McDonald's USA were exclusively White executives.

78.     In the July 2018 FFR, McDonald's demoted both Vicki and Domineca to the level of Senior Director, which is below the Officer levels they held.  Their work responsibilities were not reduced, and McDonald's demanded as much or more from each as it did before the FFR.   However, McDonald's reduced their standing in the Company, and it reduced their benefits, including reduced bonus opportunities and fringe benefits, making their positions less attractive financially, as the benefit package is a key reason executives are attracted to McDonald's.  These demotions carry a loss of stature and loss of future career opportunity at McDonald's.  The demotions were an undeserved insult to both Vicki and Domineca.

79.     Between 2015 and July 2018, the following African Americans were adversely affected by McDonald's intentionally discriminatory conduct in the FFR and other actions:

> a.  **<u>Separated from Employment at McDonald's</u>**: Danitra Barnett; James Collins; Yolanda Cook; James Floyd; Darren Hall; Pat Harris; Steven Hilton; Jacquelyn Howard; Ubong Ituen; Robert Johnson; Cedric Jones; Kelvin McLaurin; Kevin Newell; Robert L. Palmer; Terrence D. Reese; Debbie Roberts; Shirley Rogers-Reese;  Heidi B. Sa Shekham;

Wendell Sconiers; Sharlene M. Smith; Donald Thompson; Greg Watson; Alex Williams; Barbara Calloway-Nebe; Chioke Elmore; Dave Thomas; and Valerie Williams.

b. **<u>Demoted</u>**: Victoria Guster-Hines (Demoted to Sr. Director); Domineca Neal (Demoted to Sr. Director); Bridgette Hernandez (Demoted to Sr. Director); Matt Ajayi (demoted in 2018 but promoted again in 2019); and Barbara Calloway-Nebe and Chioke Elmore, both of whom were demoted before they felt it necessary to leave McDonald's due to the Company's overt racism.

c. **<u>Remaining</u>**: Debra Ballard; Marion K. Gross; William Lowery; Mason Smoot; Harry Thomas, Jr.; Matt Ajayi (Demoted in 2018 but promoted again in 2019); Christa Small (promoted in Q2 2019); Wendy Lewis.

80.     In total, between 2015 and July 2018, McDonald's demoted or severed ties with 31 of the existing 37 African American Officers. Eighty-Three (83%) of African American Officers were demoted or left McDonald's employ involuntarily.

81.     In the July 2018 FFR, White Officers were not dismissed or demoted in the same proportions as African Americans. That is not surprising since Laura Granger, the White South African who moved her daughter to a new class because she thought there were too many African American children in her class, was a decision maker in the July 2018 FFR.

82.     In the July 2018 FFR, and without limitation, White Officers Scott Rockwell, Gianfranco Cuneo and Gregg Erieo were retained and/or promoted even

though objectively their performances would have led to their being dismissed or demoted if McDonald's applied its standards consistently:

   a. Scott Rockwell, Heartland Region General Manager, consistently ranked in the bottom 3rd of the scorecard but during the restructuring he was promoted to VP International Developmental Market Japan.

   b. Prior to the FFR, Gianfranco Cuneo, VP Franchising & Operations, was ranked in the bottom 3rd of the scorecard but prior to FFR was promoted to International Development Licensee Market VP – Chief Officer.

   c. Gregg Erieo was consistently ranked in bottom category (19-21 out of 21) among General Managers and was initially terminated due to poor performance. But even though he was the absolute worst General Manager and initially terminated in the FFR, Charles Strong and Charles Robeson went to bat for him and got Kempczinski to rehire him. Even worse, McDonald's found new and enhanced positions for Erieo; McDonald's put Erieo in charge of an important program affecting every McDonald's restaurant (the Experience of the Future program) and also put him in charge of the "McOpCo" division that operates the approximate 683 company owned restaurants. And, to add insult to injury, to make room for Erieo, McDonald's terminated Alex Williams, an African American that had been in charge of EOTF.

   83.    In the July 2018 FFR, McDonald's also gave undeserved preferential treatment to two White females, Kristy Cunningham and Allyson Peck when

McDonald's "grandfathered" Cunningham and Peck, allowing them to retain their Senior Vice President and QSC VP titles respectively.

84.     McDonald's generally allowed non-African Americans to extend their employment and otherwise leave with dignity including, but not limited to, Mike Soenke, Juan Marcos, Heather Darcy and Mike Andres.  McDonald's did not afford African Americans the same dignified departures and just abruptly terminated and humiliated them including, but not limited to, Darren Hall, Dave Thomas and Debbie Roberts.

85.     If the July 2018 FFR had been free from racial bias, Vicki and Domineca would not have been demoted; and in the FFR or on other occasions, they would have been promoted and would have substantially higher positions in the Company.

86.     If the July 2018 FFR had been free from racial bias, the disparity in the percentage of African American Officers terminated and demoted as opposed to the percentage of White Officers terminated and demoted would not have been so wide.

## Unlawful Retaliation

87.     The demotions given to Vicki and Domineca in the 2018 FFR were discriminatory because Vicki and Domineca were more qualified than many White executives not demoted.

88.     The demotions given to Vicki and Domineca in the 2018 FFR  were in retaliation for their empathy and advocacy to support the National Black McDonald's Owners Association (NBMOA) in their ongoing protests against McDonald's racially unfair conduct.

89.     Vicki and Domineca, along with other African American executives and African American franchisees, protested to Easterbrook and Kempczinski the disproportionate reduction of African American senior executives was unacceptable (particularly when their advancement had been impeded to begin with).  McDonald's, led by Easterbrook and Kempczinski, did not want to listen to any criticism and pursued a racially biased campaign of harassment and retaliation.

90.     The intensified hostile work environment and disparate treatment after Easterbrook and Kempczinski embarked the Company on the overtly racist course of conduct alleged in paragraphs 1-24 were in retaliation against Vicki and Domineca for their advocacy against McDonald's discriminatory conduct against African American employees, franchisees and customers.

91.     Prior to the FFR, Vicki sat on two (2) national teams (Franchising and Restaurant Operations Improvement Process) but, in 2018  just after the FFR, Vicki was unceremoniously removed from both teams, without notice;  McDonald's just stopped inviting her.

92.     In or about August 2018, after Domineca requested a raise in pay, her supervisor, Luis Quintiliano, who had substantially weaker credentials than either Vicki or Domineca, falsely accused Domineca of yelling at him and "offered" Domineca a coach.  This offer was supposedly meant to be helpful.  In fact, the offer of a coach was purposefully insulting and stigmatizing as it implied Domineca had weaknesses for which "coaching" might be helpful.  Given Domineca's performance reviews, the suggestion she needed to be "coached" was objectively false; but she reluctantly

accepted the "suggestion" for a coach because she did not want to be uncooperative. On information and belief, Charles Strong was behind the offer of a coach; and on further information and belief, McDonald's was using Vicki and Domineca to train Quintiliano and/or acclimate him to the Dallas region, and would likely have terminated both Vicki and Domineca in the July 2018 FFR but for its desire for these African American executives to prop up the inferior employee the individual Defendants could rely on to do their bidding.

93.    In or about August 2018, Human Resources manager Carlos Dias admitted to Vicki that the only reason Vicki was merely demoted in the July 2018 FFR (and not dismissed) was to train and acclimate Luis Quintiliano to the Dallas Field office.  Dias predicted McDonald's would terminate Vicki when it determined Quintiliano no longer needed Vicki's assistance.  And, four months later, in or about December 2018, Quintiliano told Vicki that Domineca would be gone (from McDonald's) by March 2019 even though, during this same time period, both the U.S. President (Kempczinski) and the U.S. Chief People Officer (Kersey) had deemed Domineca "top talent".

94.    In February 2019, Domineca was the over-all top performer in the Company when she attended a McDonald's leadership meeting in Chicago where top performers from 2018 and year-to-date 2019 were to be recognized and applauded. But, rather than allow Domineca to receive and enjoy her hard-earned accolade, Bill Garrett (SVP of US Operations) intentionally and repeatedly skipped her name as he publicly read off the list, and then Garrett even recognized White employees who did

not even make the list.[11]  McDonald's would not allow Domineca to have the honor it had allowed all preceding White top performers and Domineca was subjected to intentional humiliation among all her peers who knew she was being subjected to this cruel, undeserved and unprecedented insult.

95.     Shortly after Domineca's humiliation in February 2019, both Vicki and Domineca made personal, desperate pleas for racial equality within McDonald's.  In February 2019, Vicki initiated a meeting with Melissa Kersey (Chief People Officer, a White person) and Kempczinski to discuss her personal situation and to point out the overall lack of African Americans in leadership after the FFR.  Kersey and Kempczinski listened politely but no progress came out of that meeting.  Later, Vicki heard from Quintiliano that behind her back, Kersey was trivializing Vicki by characterizing her as being merely upset she had no secretary.

96.     At about the same time as Vicki approached Kempczinski and Kersey to plead for herself and other African Americans in February 2019, McDonald's was touting its claimed success in promoting gender diversity as indicated by "key performance indicators" (KPI's) the Company was tracking as part of external monitoring on gender diversity under a United Nations program.  When Domineca learned McDonald's was claiming success in diversity, she implored Kersey it was necessary to separately track the progress of African American women instead of lumping all women together.   By May of 2019, Kersey appeared to agree it would make sense to separately track the progress of African American women at

---

[11] Garrett, split the East and West zones so that he could award Tim Fischer (White) top performer in the East Zone.

McDonald's, but Kersey admitted she could not get permission for this from Kempczinski and/or Easterbrook. The race-specific review of McDonald's claimed progress on gender diversity that Dominica requested never occurred (or if it did, the results were kept secret); and it was in April 2019, in the middle of Domineca's effort to obtain a race-specific review of the Company's employment practices that Kempczinski stated bluntly that the "*numbers [of African Americans] don't matter*" as alleged.

97.     Also in February 2019, Domineca shared feedback and concern with Charles Strong regarding negative interactions and poor treatment at the hands of her manager, Luis Quintiliano. Charles Strong ignored Domineca's appeal for help and gave no feedback.

98.     From May through October 2019, McDonald's excluded Domineca from Field First Task Force meetings, which she had been selected and qualified for in Q1 2019 as a result of being a "Top Performer" (despite Garrett's refusal to recognize her as a "Top Performer" as alleged). Two White employees, Allyson Peck and Dan Camp, gave the Field First Task Force update in October 2019, even though their scorecard performance was inferior to Domineca's.

99.     In June of 2019, on information and belief, Charles Robeson told Michael Peaster (African American VP of Security Nationally) that Vicki was "mad" and he didn't understand why because he knew where Vicki came from.

100.     Also in the second quarter of 2019, McDonald's selected two White employees, Doug Lorimer and Charlie Newburger, to be accelerated to the Vice

President level even though their performance and experience was inferior to that of both Domineca and Vicki.

101.   In August of 2019, Luis Quintiliano and HR Director Lorelie Parolin (White) made false and vague accusations against Domineca that "'2 or 3 people were afraid of [her]" but refused to provide any particulars, once again setting Domineca up for the "Angry Black Woman" stereotype.

102.   In August of 2019, Quintiliano and HR Director Lorelie Parolin attempted to violate the confidentiality between Domineca and her personal coach to obtain negative feedback on Domineca; they questioned Domineca's coach and then demanded feedback from Domineca which McDonald's specifically stated would not happen when Domineca accepted the "voluntary" coach.

103.   In October 2019, after Vicki and Domineca through their attorneys brought the substance of this Complaint to McDonald's attention and after McDonald's engaged an outside counsel to respond:

   a.   McDonald's targeted Vicki and Domineca for exclusion from the October 2019 MA2C meeting at the U.S. Executive Leadership Meeting in Chicago. Vicki was one (1) of five (5) founders of the MA2C (McDonald's African American Counsel) which is dedicated to developing and supporting African American employees and increasing the quality and quantity of the Company's commitment to diversity and inclusion. McDonald's exclusion of Vicki and Domineca from this group is tragically ironic.

b. McDonald's placed targets on Vicki's and Domineca's backs and specifically notified their peers of these pending claims and instructed their peers to exclude and isolate them from usual and customary activities having nothing to do with these claims as punishment for speaking out against racism. When Vicki asked Harry Thomas, Jr., the host of the October 2019 MA2C meeting, why she wasn't invited, he stated that McDonald's leadership has specifically instructed him to not invite her because Vicki "had litigation" against McDonald's.

c. The number of company related and peer emails that Vicki and Domineca receive daily has substantially decreased (dried up), dwindling to a fraction of the number of emails received prior to October 2019.

104. McDonald's conduct in 2019 as alleged made it increasingly impossible for Vicki and Domineca to do their jobs and constitutes constructive discharge in retaliation for their complaints. These acts and omissions were sufficiently egregious to establish constructive termination but these Plaintiffs refuse to resign from McDonald's.

## **Injury**

105. Because of continuing discrimination, hostile work environment and unlawful retaliation, both Vicki and Domineca have suffered economic loss in diminished past and future earnings in amounts to be proven at trial.

106. Had Vicki been given the same opportunities as her non-African American counterparts, she reasonably would have been promoted to much higher positions much earlier, would not have been demoted in the 2018 FFR, and would have a substantially higher position today.

107. Over the years the continuing discrimination against Vicki in her career trajectory is estimated to have cumulatively cost her over $2 million in lost pay and benefits to date, including lucrative opportunities to acquire significantly more stock in McDonald's Corporation, as McDonald's subjected Vicki to a race-based glass ceiling she could not rise above despite doing excellent work for this Company since 1987 then unfairly demoted her.

108. Vicki's economic losses will continue and can be projected through her remaining work horizon. Her total damages will be several million dollars and will be proven at trial.

109. Despite earning her advancement to near parity with Vicki in a comparatively short time, Domineca has also suffered discrimination in her career trajectory at McDonald's as she has not advanced as far as Whites that joined the Company in its AOP, many of whom had inferior credentials and did not attain Domineca's "top talent" designation.

110. Had Domineca been given the same opportunities as her non-African American counterparts, she reasonably would have been promoted to much higher positions much earlier, would not have been demoted in the 2018 FFR, and would have a substantially higher position today.

111.    Over the years the continuing discrimination against Domineca in her career trajectory is estimated to have cumulatively cost her hundreds of thousands of dollars in lost pay and benefits (including lucrative opportunities to acquire significantly more stock in McDonald's Corporation) to date and lost opportunities for further promotions.

112.    Domineca's economic losses will continue and can be projected through her remaining work horizon (which is longer than Vicki's). Her total damages are estimated to be several million dollars and will be proven at trial.

113.    Because of continuing discrimination, hostile work environment and unlawful retaliation, both Vicki and Domineca have suffered emotional distress, humiliation and related physical suffering.

### Pattern & Practice Discrimination

114.    Prior to the leadership and control of Easterbrook and Kempczinski, McDonald's pattern and practice of discrimination against African American employees had been the Company's covert *de facto* policy.

115.    Under the leadership and control of Easterbrook and Kempczinski, the Company's previously covert pattern and practice of discrimination became overt and was extended to discrimination against customers and store Owner/Operators.

116.    The disparate treatment, hostile work environment, retaliation and conduct constituting constructive terminations suffered by Vicki and Domineca were intentionally inflicted upon them by McDonald's as part of the Company's pattern and practice of discrimination.

117. Easterbrook intended that McDonald's perpetrate a pattern and practice of discriminatory conduct against African Americans or in the alternative, he ratified that pattern and practice and failed to stop it.

118. Kempczinski intended that McDonald's perpetrate a pattern and practice of discriminatory conduct against African Americans or in the alternative, he ratified that pattern and practice and failed to stop it.

119. In addition, as alleged above, Kempczinski participated directly in one or more discriminatory actions against Vicki and Domineca, including but not limited to approving the 2018 Field First Restructure.

120. Also as alleged above, Charles Strong also participated directly in one or more discriminatory actions against Vicki and Domineca, and he participated at a supervisory level in the Company's pattern and practice of discrimination against African Americans.

## Section 1981 of the Civil Rights Act of 1870 (as amended)

121. Section 1981 of the Civil Rights Act of 1870, 42 U.S.C. §1981 ("Section 1981") was enacted after the Civil War to empower the newly freed slaves and their descendants to participate in the American economy and other aspects of American life on equal terms with White citizens. It provides:

a) **Statement of equal rights:**

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and

exactions of every kind, and to no other.

b) **<u>"Make and enforce contracts" defined:</u>**

For this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

c) **<u>Protection against impairment:</u>**

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

122. Vicki and Domineca are persons within the jurisdiction of the United States.

123. Vicki's and Domineca's employment by McDonald's are "contractual relationships" under Section 1981.

124. Under Section 1981, Vicki and Domineca have the same rights as white citizens to make and enforce her employment contract with McDonald's, including the making, performance, modification, and termination of their contracts, and the enjoyment of all benefits, privileges, terms, and conditions of their employment relationships with McDonald's.

125. The conduct of these Defendants egregiously violates Section 1981 and all other laws intended to promote racial equality in employment. Contrary to the intent of Section 1981 to integrate African Americans into American economic life, McDonald's and the individual Defendants have sought to intentionally exclude or otherwise reduce the visibility of African Americans as executive employees and in

franchise ownership and as paying retail customers. The full weight of 42 U.S.C. §1981 must be brought to bear against these Defendants.

## Count I

### Victoria Guster-Hines' Claim Against All Defendants for Disparate Treatment of 42 U.S.C. §1981

126. Plaintiff Victoria Guster-Hines re-alleges paragraphs 1-125 as though set forth herein.

127. McDonald's violated 42 U.S.C. §1981, by engaging in the disparate treatment toward Vicki by subjecting her to worse terms of employment than comparable White employees.

128. McDonald's further violated 42 U.S.C §1981 by denying Vicki her enjoyment of the benefits, privileges terms of her employment relationship as an executive with the company.

129. Without limitations, as acts or omissions constituting disparate treatment, McDonald's denied Vicki:

      a.     Her right to be treated as an equal in a diverse environment.

      b.     Her right to equality in the work assignments, evaluation of her performance and professional advancement.

      c.     Her right to be treated with respect and dignity.

      d.     Her right to be considered for and receive opportunities, growth and promotion the same as White executives.

      e.     Her right to be fairly evaluated and fairly treated in the 2018 FFR.

    f.    Her right to be protected from being subject to hostile work environment, including but not limited to being called a "N Word" and other racist and stereotypical names at work.

    g.    Her right to be free from and not being subject to unlawful retaliation.

130.   In violation of Section 1981, and without limitation, McDonald's discriminated against Vicki under the doctrine of *respondeat superior* regarding the acts and omissions of its officers and employees as alleged above.

131.   In the ways alleged in the preceding paragraphs, McDonald's and the individual defendants knowingly discriminated against Vicki based on race and knowingly treated White Officers preferably.

132.   The conduct of McDonald's and the individual defendants was intentional or in reckless disregard to Vicki's right to equality.

133.   The conduct of McDonald's and the individual defendants was part of a pattern and practice of discriminatory treatment within McDonald's.

134.   As the direct and proximate result of the Defendants' violations of Section 1981, Vicki has suffered substantial damages, including, without limitation, actual and consequential damages for economic loss in amounts to be proven at trial.

135.   As the direct and proximate result of the Defendants' violations of Section 1981, Vicki has also suffered substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

136.    The discriminatory conduct of the Defendants continued despite protestation by Vicki and other African American employees and owners/operators.

137.    McDonald's discriminatory conduct was intentional and malicious, making punitive or exemplary damages necessary to punish McDonald's and deter other companies from like misconduct.

138.    Steven Easterbrook's discriminatory conduct was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

139.    Chris Kempczinski's discriminatory conduct was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

140.    Charles Strong's discriminatory conduct was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

## **Prayer for Relief**

WHEREFORE, on Count I under 42 U.S.C. §1981 and 42 U.S.C. §1988, Plaintiff Victoria Guster-Hines requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

A.    Actual and consequential damages, both economic and non-economic, to be proven at trial;

B.    Punitive damages sufficient to punish each Defendant and deter other companies and their controlling executives from like

misconduct;

C.    Costs of suit;

D.    Attorneys' fees; and

E.    Such other relief available under law and deemed just and proper.

## Count II

### Domineca Neal's Claim Against All Defendants for Disparate Treatment in Violation of 42 U.S.C. §1981

141.    Plaintiff Domineca Neal re-alleges paragraphs 1-140 as though set forth herein.

142.    McDonald's violated 42 U.S.C.§1981, by engaging in the disparate treatment toward Domineca by subjecting her to worse terms of employment than comparable White employees.

143.    McDonald's further violated 42 U.S.C §1981 by denying Domineca her enjoyment of the benefits, privileges terms of her employment relationship as an executive with the company.

144.    Without limitations, as acts or omissions constituting disparate treatment, McDonald's denied Domineca:

a.  Her right to be treated as an equal in a diverse environment.

b.  Her right to equality in the work assignments, evaluation of her performance and professional advancement.

c.  Her right to be treated with respect and dignity.

d.  Her right to be considered for and receive opportunities, growth and promotion the same as White executives.

e. Her right to be fairly evaluated and fairly treated in the 2018 FFR.

f. Her right to be protected from being subject to hostile work environment, including but not limited to being called racist and stereotypical names at work.

g. Her right to be free from and not being subject to unlawful retaliation.

145. In violation of Section 1981 McDonald's discriminated against Domineca under the doctrine of *respondeat superior* regarding the acts and omissions of its officers and employees as alleged above.

146. In the ways alleged in the preceding paragraphs, McDonald's and the individual defendants knowingly discriminated against Domineca based on race and knowingly treated white officers preferably.

147. The conduct of McDonald's and the individual defendants was intentional or in reckless disregard to Domineca's right to equality.

148. The conduct of McDonald's and the individual defendants was part of a pattern and practice of discriminatory treatment within McDonald's.

149. As the direct and proximate result of the Defendants' violations of Section 1981, Domineca has suffered substantial damages, including, without limitation, actual and consequential damages for economic loss in amounts to be proven at trial.

150. As the direct and proximate result of the Defendants' violations of Section 1981, Domineca has also suffered substantial non-economic damages,

including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

151. The discriminatory conduct of the Defendants continued despite protestation by Dominica and other African American employees and owners/operators.

152. McDonald's discriminatory conduct was intentional and malicious, making punitive or exemplary damages necessary to punish McDonald's and deter other companies from like misconduct.

153. Steven Easterbrook's discriminatory conduct was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

154. Chris Kempczinski's discriminatory conduct was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

155. Charles Strong's discriminatory conduct was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

### Prayer for Relief

WHEREFORE, on Count II under 42 U.S.C. §1981 and 42 U.S.C. §1988, Plaintiff Dominica Neal requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

      A.    Actual and consequential damages, both economic and non-economic, to be proven at trial;

B.  Punitive damages sufficient to punish each Defendant and deter other companies and their controlling executives from like misconduct;

C.  Costs of suit;

D.  Attorneys' fees; and

E.  Such other relief available under law and deemed just and proper.

## Count III

### Victoria Guster-Hines' Claim Against All Defendants
### Hostile Work Environment in Violation of 42 U.S.C. §1981

156.  Plaintiff Victoria Guster-Hines re-alleges paragraphs 1-155 as though set forth herein.

157.  McDonald's violated 42 U.S.C.§1981 by subjecting Vicki to a hostile work environment by allowing and fostering an intolerant atmosphere and failing or refusing to address blatant discrimination, disrespect and disregard for African Americans and their work-place issues.

158.  Without limitation, McDonald's acts or omissions constituting a Hostile Work Environment include:

a.  Steven Easterbrook's and Chris Kempczinski's utter disregard for African American employees' and owner/operator's deep concerns regarding troubling racial trends inside McDonald's.

b.  Taking their lead from the top, White executives at McDonald's are comfortable openly displaying their bigotry and hostility toward African Americans to "keep them in their place" which is

56

subordinate to White. For instance, HR executive Laura Granger felt comfortable telling Plaintiff Vicki that her 14-year-old daughter was afraid to go to school because there were too many Black children there.

c. White executives have called African Americans names, including the N-Word, with no repercussions.

d. White executives threatened African Americans physically with no repercussions.

e. Kempczinski openly stated, in the presence of African American employees, that African American presence and participation in leadership does not matter.

f. McDonald's intentionally and publicly ignored Vicki's top of the chart performance while, publicly lauding the performance of much less successful White executives.

g. McDonald's has repeatedly ignored Vicki's pleas for equal treatment for herself and other African American employees.

h. McDonald's ignores overt and implicit bias against African Americans.

i. Since learning of Vicki's claims against McDonald's, it has notified her peers of the claims and instructed them to exclude her and isolate her from usual and customary activities having

nothing to do with her claims as punishment for speaking out against racism.

159. In further violation of Section 1981, McDonald's subjected Vicki to hostile environment under the doctrine of *respondeat superior* regarding the acts and omissions of Steven Easterbrook, Chris Kempczinski, Charles Strong, Melissa Kersey, Bill Garrett and Luis Quintiliano, among others.

160. In further violation of Section 1981 McDonald's directly discriminated against Vicki and created a severe, pervasive, intimidating, hostile and abusive work environment when it openly stated that African American presence and participation in leadership does not matter and failed or refused to address incidents of verbal assault and physical threats against African Americans at McDonald's; McDonald's intent was to keep African Americans in their place.

161. As the direct and proximate result of the Defendants' violations of Section 1981, Vicki has suffered substantial damages, including, without limitation, actual and consequential damages for economic loss in amounts proven at trial.

162. As the direct and proximate result of the Defendants' violations of Section 1981 Vicki has also suffered substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights; the stress caused her to suffer a severe anxiety attack requiring hospital attention during a McDonald's regional meeting.

163.    McDonald's continued its discriminatory conduct creating a hostile environment despite Vicki's protestations.

164.    McDonald's discriminatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to punish McDonald's and deter other companies from like misconduct.

165.    Steven Easterbrook's discriminatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

166.    Chris Kempczinski's discriminatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

167.    Charles Strong's discriminatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

## **Prayer for Relief**

WHEREFORE, on Count III under 42 U.S.C. §1981 and 42 U.S.C. §1988, Plaintiff Victoria Guster-Hines requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

A.    Actual and consequential damages, both economic and non-economic,

to be proven at trial;

B.      Punitive damages sufficient to punish each Defendant and deter other companies and their controlling executives from like misconduct;

C.      Costs of suit;

D.      Attorneys' fees; and

E.      Such other relief available under law and deemed just and proper.

## Count IV

**Domineca Neal's Claim Against All Defendants**
**Hostile Work Environment in Violation of 42 U.S.C. §1981**

168.    Plaintiff Domineca Neal re-alleges paragraphs 1-167 as though set forth herein.

169.    McDonald's violated 42 U.S.C.§1981 by subjecting Domineca to a hostile work environment by allowing and fostering an intolerant atmosphere and failing or refusing to address blatant discrimination, disrespect and disregard for African Americans and their work-place issues.

170.     Without limitation, McDonald's acts or omissions constituting a Hostile Work Environment include:

a.  Steven Easterbrook's and Chris Kempczinski's utter disregard for African American employees' and owner/operator's deep concerns regarding troubling racial trends inside McDonald's.

b.  White executives have called African Americans names, including the "N Word", with no repercussions.

60

    c.  White executives threatened African Americans physically with no repercussions.

    d.  Kempczinski openly stated, in the presence of African American employees, that African American presence and participation in leadership does not matter.

    e.  McDonald's intentionally and publicly ignored Domineca's top of the chart performance while, publicly lauding the performance of much less successful White executives.

    f.  McDonald's has repeatedly ignored Domineca's pleas for equal treatment for herself and other African American employees.

    g.  McDonald's ignores overt and implicit bias against African Americans.

    h.  Since learning of Domineca's claims against McDonald's, it has notified her peers of the claims and instructed them to exclude her and isolate her from usual and customary activities having nothing to do with her claims as punishment for speaking out against racism.

171.   In violation of Section 1981, and without limitation, McDonald's subjected Domineca to hostile environment under the doctrine of *respondeat superior* regarding the acts and omissions of Steven Easterbrook, Chris Kempczinski, Charles Strong, Melissa Kersey, Bill Garrett and Luis Quintiliano, among others.

172.   In violation of Section 1981 McDonald's directly discriminated against Domineca and created a severe, pervasive, intimidating, hostile and abusive work

environment when it openly stated that African American presence and participation in leadership does not matter and failed or refused to address incidents of verbal assault and physical threats against African Americans at McDonald's; McDonald's intent was to keep African Americans in their place.

173. As the direct and proximate result of the Defendants' violations of Section 1981, Domineca has suffered substantial damages, including, without limitation, actual and consequential damages for economic loss in amounts to be proven at trial.

174. As the direct and proximate result of the Defendants' violations of Section 1981 Domineca has also suffered substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

175. McDonald's continued its discriminatory conduct creating a hostile environment despite Domineca's protestations.

176. McDonald's discriminatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to punish McDonald's and deter other companies from like misconduct.

177. Steven Easterbrook's discriminatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

178.   Chris Kempczinski's discriminatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

179.   Charles Strong's discriminatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

### Prayer for Relief

WHEREFORE, on Count IV under 42 U.S.C. §1981 and 42 U.S.C. §1988, Plaintiff Domineca Neal requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

A.    Actual and consequential damages, both economic and non-economic, to be proven at trial;

B.    Punitive damages sufficient to punish each Defendant and deter other companies and their controlling executives from like misconduct;

C.    Costs of suit;

D.    Attorneys' fees; and

E.    Such other relief available under law and deemed just and proper.

**Count V**

**Victoria Guster-Hines' Claims Against All Defendants**
**Unlawful Retaliation in Violation of 42 U.S.C. §1981**

180.    Plaintiff Victoria Guster-Hines re-alleges paragraphs 1-179 as though set forth herein.

181.    McDonald's violated Section 1981, without limitation, by retaliating against Vicki for speaking out on issues of race, protesting racial discrimination against her and others within McDonald's, and prosecuting her claims against McDonald's.

182.    In violation of Section 1981, and without limitation, McDonald's retaliated against Vicki under the doctrine of *respondeat superior* regarding the acts and omissions of Steven Easterbrook, Chris Kempczinski, and Charles Strong, among others, as stated in paragraphs above.

183.    In violation of Section 1981, and without limitation, McDonald's retaliated against Vicki when she complained that it had discriminated against her by singling her out for demotion when comparable White executives with less credentials, experience at McDonald's and worse performance were not demoted.

184.    In violation of Section 1981, and without limitation, Steven Easterbrook, Chris Kempczinski and Charles Strong specifically retaliated against Vicki for speaking up *for* her rights to be treated equally with comparable White executives and requesting that she be restored to her Officer position after the FFR.

185.    In violation of Section 1981, and without limitation, Steven Easterbrook, Chris Kempczinski, and Charles Strong, among others, retaliated against Vicki when

her counsel notified McDonald's of the claims. Specifically, in October of 2019, after being notified of Vicki's impending claims and during the US Executive Leadership meeting in Chicago, McDonald's leadership intentionally excluded Vicki and Domineca from a MA2C meeting (a group that allowed minority employees to discuss diversity and inclusion issues); and by this and their other acts and omissions the Defendants attempted to constructively terminate Vicki.

186. The conduct of McDonald's and the individual Defendants was intentional and/or in reckless disregard to Vicki's rights.

187. As the direct *and* proximate result of the Defendants' violations of Section 1981, Vicki has suffered substantial damages, including, without limitation, actual and consequential damages for economic loss in amounts proven at trial.

188. As the direct and proximate result of the Defendants' violations of Section 1981, Vicki has also suffered substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of *civil* rights.

189. The unlawful retaliation by Defendants continued despite Vicki's protestations.

190. McDonald's unlawful retaliation was intentional and malicious, making punitive or exemplary damages necessary to punish McDonald's and deter other companies from like misconduct.

191.   Steven Easterbrook's retaliatory conduct was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

192.   Chris Kempczinski's discriminatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

193.   Charles Strong's discriminatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

## **Prayer for Relief**

WHEREFORE, on Count V under 42 U.S.C. §1981 and 42 U.S.C. §1988, Plaintiff Victoria Guster-Hines requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

A.   Actual and consequential damages, both economic and non-economic, to be proven at trial;

B.   Punitive damages sufficient to punish each Defendant and deter other companies and their controlling executives from like misconduct;

C.   Costs of suit;

D.   Attorneys' fees; and

E.    Such other relief available under law and deemed just and proper.

## Count VI

### Domineca Neal's Claims Against All Defendants
### Unlawful Retaliation in Violation of 42 U.S.C. §1981

194.    Plaintiff Domineca Neal re-alleges paragraphs 1-193 as though set forth herein.

195.    McDonald's violated Section 1981, without limitation, by retaliating against Domineca for speaking out on issues of race, protesting racial discrimination against her and others within McDonald's, and prosecuting her claims against McDonald's.

196.    In violation of Section 1981 McDonald's retaliated against Domineca under the doctrine of *respondeat superior* regarding the acts and omissions of Steven Easterbrook, Chris Kempczinski, and Charles Strong, among others, as stated in paragraphs above.

197.    In violation of Section 1981, and without limitation, McDonald's retaliated against Domineca when she complained it had discriminated against her by singling her out for demotion when comparable White executives with less credentials and less experience at McDonald's and worse performance were not demoted.

198.    In violation of Section 1981, and without limitation, Steven Easterbrook, Chris Kempczinski and Charles Strong specifically retaliated against Domineca for speaking up for her rights to be treated equally with comparable White executives and requesting that she be restored to her Officer position after the FFR.

199.   In violation of Section 1981, and without limitation, Steven Easterbrook, Chris Kempczinski and Charles Strong retaliated against Domineca when her counsel notified McDonald's of the claims.  Specifically, in October of 2019, after being notified of Domineca's claims and  during a U.S. Executive Leadership meeting in Chicago, McDonald's leadership told Domineca's and Vicki's peers they were litigating against McDonald's and specifically instructed them to exclude Domineca and Vicki from a MA2C meeting (a group dedicated to developing and supporting African American and increase the quality and quantity of the Company's commitment to diversity and inclusion); and by this and their other acts and omissions the Defendants attempted to constructively terminate Domineca.

200.   The conduct of McDonald's and the individual Defendants was intentional and/or in reckless disregard to Domineca's rights.

201.   As the direct and proximate result of the Defendants' violations of Section 1981, Domineca has suffered substantial damages, including, without limitation, actual and consequential damages for economic loss in amounts proven at trial.

202.   As the direct and proximate result of the Defendants' violations of Section 1981, Domineca has also suffered substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

203.   The unlawful retaliation by Defendants continued despite Domineca's protestations.

204. McDonald's unlawful retaliation was intentional and malicious, making punitive or exemplary damages necessary to punish McDonald's and deter other companies from like misconduct.

205. Steven Easterbrook's retaliatory conduct was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

206. Chris Kempczinski's retaliatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

207. Charles Strong's retaliatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to punish him and deter other corporate executives in similar positions of authority from like misconduct.

## **Prayer for Relief**

WHEREFORE, on Count VI under 42 U.S.C. §1981 and 42 U.S.C. §1988, Plaintiff Domineca Neal requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

     A.     Actual and consequential damages, both economic and non-economic, to be proven at trial;

     B.     Punitive damages sufficient to punish each Defendant and deter other companies and their controlling executives from like

misconduct;

C.      Costs of suit;

D.      Attorneys' fees; and

E.      Such other relief available under law and deemed just and proper.

## JURY TRIAL DEMANDED

208.   Plaintiff Victoria Guster-Hines demands trial by jury in open court.

209.   Plaintiff Domineca Neal demands trial by jury in open court.

January 7, 2020

Respectfully submitted,

**PLAINTIFF VICTORIA GUSTER-HINES**
**PLAINTIFF DOMINECA NEAL**

By:     /s/ Carmen D. Caruso

Carmen D. Caruso (# 6189462)
cdc@cdcaruso.com
CARMEN D. CARUSO LAW FIRM
77 West Washington Street, Suite 1900
Chicago, IL 60602
(312) 626-1160


By:     /s/ Linda C. Chatman

Linda C. Chatman ( #6201236)
lindachatman@chatmanlaw.com
CHATMAN LAW OFFICES, LLC
Two Prudential Plaza
180 N. Stetson Avenue Suite 3500
Chicago, Illinois, 60601

# EXHIBIT A



HOURLY NEWS

WBEZ Chicago
On Air Now

PLAYLIST

     **DONATE**

---

BUSINESS

# McDonald's Plans To Rebrand Itself As A 'Progressive Burger Company'

May 4, 2015 · 4:31 PM ET
Heard on All Things Considered

 YUKI NOGUCHI

**2-Minute Listen**     PLAYLIST    Download

Transcript

The McDonald's turnaround plan is staking its future on being a "progressive burger company." But what does that mean?

MELISSA BLOCK, HOST:

For most of McDonald's's 60-year history, the company has focused on selling cheap, fast food, but that's not working as well as it once did. Today, a plan for a turnaround - NPR's Yuki Noguchi reports that McDonald's executives made clear they want to recast the company as a modern and progressive burger company.

YUKI NOGUCHI, BYLINE: It was a phrase the executives at McDonald's repeated nine times during a conference call and an online video. CEO Steve Easterbrook said in order to shore up flagging sales, the company will manage established and high-growth segments differently. It will convert 3,500 stores it operates into franchises to cut costs, reformulate its food and try to engage customers using better technology.

(SOUNDBITE OF CONFERENCE CALL)

STEVE EASTERBROOK: All of these phases together will culminate in our ability to be seen as a modern, progressive burger company.

NOGUCHI: Reorganizing, he says, will enable it to react better to changing customer demands.

(SOUNDBITE OF CONFERENCE CALL)

EASTERBROOK: We will also seek to modernize and be more progressive around our social purpose in order to deepen our relationship with the communities on the issues that matter to them.

NOGUCHI: Jason Moser is a retail and restaurant analyst with The Motley Fool.

JASON MOSER: When you hear him talking about wanting to become a modern, progressive burger company, well, the big problem there is we already have a lot of those out there.

NOGUCHI: Chains like Five Guys, Shake Shack, Habit Burger and Smashburger are in this category and share things in common.

MOSER: A leaner cost structure, stores that are a bit more modern-looking, a bit more enjoyable to be in, not to mention, really, I think the ingredients and the quality of the food.

NOGUCHI: McDonald's did announce recently it plans to largely eliminate chicken raised with antibiotics from its food. That's a step in the right direction, Moser says, but the company is still behind the curve.

MOSER: McDonald's has communicated value for so long, for them to be able to pivot and start convincing consumers that the brand stands for quality, I think that's a higher hurdle to clear than maybe they think.

NOGUCHI: One key challenge is how the company can use better, more expensive ingredients without raising prices in a way that could alienate regulars who order off its budget-conscious dollar menu. R.J. Hottovy is an analyst with Morningstar.

Case: 1:20-cv-00117 Document #: 1 Filed: 01/07/20 Page 74 of 103 PageID #:74

R.J. HOTTOVY: I think that's what McDonald's has to identify and really focus in on is, you know, who they want their core customer to be.

NOGUCHI: Defining that, he says, requires taking more risks and tough choices than what the company has laid out so far. Yuki Noguchi, NPR News, Washington.

*Copyright © 2015 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.*

*NPR transcripts are created on a rush deadline by Verb8tm, Inc., an NPR contractor, and produced using a proprietary transcription process developed with NPR. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.*

# Sign Up For The Planet Money Newsletter

Just the right amount of economics, sent weekly.

What's your email?

SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy.
This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

# More Stories From NPR

# EXHIBIT B

Case: 1:20-cv-00117 Document #: 1 Filed: 01/07/20 Page 76 of 103 PageID #:76

CULTURE

# Why Does McDonald's Want to Rebrand as a 'Progressive Burger Company'?

**By GEORGE WILL** | June 18, 2015 12:00 AM



In January, McDonald's, leaning against the winds of fashion, said kale would never replace lettuce on its burgers. In May, however, it said it will test kale in a breakfast meal (breakfast is about 25 percent of McDonald's sales). Kale might or might not cause construction workers to turn at 6 A.M. into McDonald's drive-through lines, where approximately two-thirds of McDonald's customers place their orders.

McDonald's also says its milk will soon be without artificial growth hormones, and chicken (McDonald's sells more of it than of beef) will be free of human antibiotics. All these might be good business decisions and as socially responsible as can be. They certainly pertain to McDonald's new mantra about being a "modern, progressive burger company," whatever that means.

The meaning will perhaps be explained by the progressive burger company's new spokesman, Robert Gibbs, formerly Barack Obama's spokesman and MSNBC contributor. McDonald's British-born CEO Steve Easterbrook clarifies things, sort of, while speaking a strange business dialect: McDonald's will be "more progressive around our social purpose in order to deepen our relationships with communities on the issues that matter to them."

Suppose, however, you just want a burger and fries, not social purposes and relationships? You might prefer Five Guys or Shake Shack, where the burgers taste fine even without the condiment of community uplift. Five Guys and Shake Shack are pipsqueaks, with about 1,000 and 63 restaurants, respectively. McDonald's, which has more than 36,000 — 14,300 in the United States — will open more than 1,000 new ones this year.

Although McDonald's burgers ranked 21st in a recent Consumer Reports survey of 21 brands, this $81 billion company will not founder because of the small but growing cohort of customers who like the burger equivalent of microbrews. But another behemoth, Budweiser, is experiencing McDonald's-like difficulties.

> Suppose, however, you just want a burger and fries, not social purposes and relationships?

Budweiser's problem is not just that the number of barrels it sells has declined for 25 years, from almost 50 million in 1988 to 16 million in 2013. (Budweiser has been partly cannibalized by Bud Light, which in 2001 displaced Budweiser as America's top-selling beer.) The ominous fact is that 44 percent of 21- to 27-

Case: 1:20-cv-00117 Document #: 1 Filed: 01/07/20 Page 78 of 103 PageID #:78

year-old drinkers have never tasted Budweiser. They prefer craft beers from microbreweries. A craft brewer is one that ships 6 million or fewer barrels a year. In 2013, craft brewers shipped more than Bud did. Budweiser's response has included this truculent ad:

> Proudly a macro beer. It's not brewed to be fussed over. . . . It's brewed for drinking. Not dissecting. . . . Let them sip their pumpkin peach ale.

This is an interesting approach to potential customers, calling craft beer drinkers ("them") pretentious twits. If this is unavailing, Budweiser could try becoming a modern, progressive beer company with social purposes to deepen relationships with various communities, maybe even including people who just want a beer.

McDonald's has been serving burgers since Ray Kroc opened his first store in Des Plaines, Illinois, in April 1955. Many billions of burgers later, however, it has had an epiphany: Henceforth it will toast the buns longer and sear the beef patties differently. Its 60-year learning curve bends imperceptibly, which helps explains sagging revenues — down almost 15 percent last year.

Recently, McDonald's ("I'm lovin' it") briefly instituted an excruciating policy of inviting randomly selected customers to "Pay with Lovin'" for their meals. Customers could call their mothers, ask another customer to dance, or perform some other act to enlarge the universe's stock of love.

Shortly thereafter, Starbucks, which evidently thinks Americans do not obsess sufficiently about race, tried to enlist customers in conversations about that subject. After six days, this project died of derision from Starbucks customers, many of whom go there for coffee, not a seminar.

McDonald's, deep in an identity crisis, is awakening tardily to Ira Gershwin's truth: The Rockies may crumble, Gibraltar may tumble, they're only made of clay. Everything is perishable, and history is a story of vanished supremacies.

Case: 1:20-cv-00117 Document #: 1 Filed: 01/07/20 Page 79 of 103 PageID #:79

Easterbrook, channeling his inner Hillary Clinton, vows to "reset" McDonald's. Perhaps his reset will go better than hers did with Vladimir Putin.

Progressives are forever telling us who is and who is not on "the right side of history." Many fastidious progressives deplore, and try to control (witness San Francisco's current crusade against soft drinks), other people's food choices. It will be instructive watching the progressive burger company try to persuade its chosen constituents to stop at McDonald's on the way home from Whole Foods, their environmentally responsible, because reusable, shopping bags overflowing with kale.

---



**GEORGE WILL** is a Pulitzer Prize–winning syndicated columnist. His email address is georgewill@washpost.com.

**@georgewill**

# EXHIBIT C



Corporate Careers

ABOUT     SCALE FOR GOOD     INVESTORS     FRANCHISING     NEWSROOM     SEARCH

# Gender Balance and Diversity

**We are committed to creating a workplace where everyone is equally supported and empowered to realize their full potential.**

## Why it matters

Building a gender-balanced organization is a strategic priority for McDonald's, as it helps us better understand and meet the needs of our customers, enables us to access the talent we need to succeed, and is at the heart of our culture, where we want everyone to feel safe, valued, and free to be themselves.

At McDonald's, we believe that the strength and diversity of our talent enable us to build a better, stronger McDonald's. We are committed to creating a workplace where everyone – from crew to c-suite - is equally supported and empowered to realize their full potential.

Learn more about our commitment to supporting diversity and inclusion in our business and our community.

**On this page:**

Our approach | Our actions | Our progress



Corporate Careers

ABOUT  SCALE FOR GOOD  INVESTORS  FRANCHISING  NEWSROOM  🔍 SEARCH

# Our approach

On International Women's Day 2019, McDonald's Corporation launched our new **Better Together: Gender Balance and Diversity** strategy.

**By 2023, we aim to improve the representation of women at all levels of McDonald's, achieve gender equality in career advancement, and champion the impact of women on the business.**





Corporate Careers

ABOUT     SCALE FOR GOOD     INVESTORS     FRANCHISING     NEWSROOM     SEARCH

Our Better Together strategy is built upon four pillars that will guide us as we work to promote gender balance and diversity across the organization:

1. **Representation:** We will aim for the representation of women at every level in our business to be equal to – or better than – the representation of women in the external workforce by investing in the necessary tools, processes, and training.

2. **Rising:** We will enhance equality in career advancement for men and women through targeted education and development programs, and by sustaining a workplace where everyone feels valued, supported, and free to be themselves.

3. **Recognition:** We will celebrate the voices and impact of women in the business and report on progress globally.

4. **Reach:** We will achieve progress on a global scale by encouraging franchisees and suppliers to deliver strategies that drive gender balance and improve diversity in their own businesses, with the goal of reaching millions of women worldwide.

In shaping our strategy, we sought feedback and guidance from key external stakeholders with expert knowledge and experience in gender equality and women's empowerment to ensure our approach will have the greatest reach and most meaningful impact.

To further underscore our commitment to progress, McDonald's also signed on to the UN Women's Empowerment Principles. We are proud to join the other signatories to help accelerate global efforts to address this critical issue.



Our actions



# Our actions

As part of our Better Together strategy, we are piloting a range of development and education initiatives to promote greater gender balance and diversity across our organization.

## Innovating Recruiting and Hiring

Together with our franchisees, McDonald's provides jobs for almost two million people around the world. As we work to improve gender balance in our own business, we are investing in new technologies and processes to support more inclusive and unbiased hiring.

We are partnering with Textio, an augmented writing platform, to ensure that all our job postings are written in a gender-neutral manner for our business. Studies have shown that words with hidden gender bias can affect how people respond to job ads; people are less likely to respond to ads that have words biased in favor of the opposite gender. This initiative will begin in English-speaking countries and expand to our other markets as the technology becomes available.

Additionally, we are committed to increasing diverse candidate slates and interview panels in our own business. To do so, we are building partnerships with specialized recruiting firms and sourcing channels to enable access to a wider, more diverse talent pool, and using artificial intelligence tools that aim to ensure our processes are free from unconscious bias.

our own business. To do so, we are building partnerships with specialized recruiting firms and ing channels to enable access to a wider, more diverse talent pool, and using artificial gence tools that aim to ensure our processes are free from unconscious bias.

## Investing in Development

As part of our Better Together strategy, we will work to enhance equality in career advancement for men and women in our own business. We will achieve this through targeted education and development programs and by sustaining a workplace where everyone feels valued, supported, and free to be themselves.

Through ongoing assessment and management of our talent pipeline and proactive mentoring and sponsorship by senior leaders, we will support the career progression of high-potential women. In 2019, we launched a mentoring program that aims to enable more women to progress to the most senior levels of the organization.

We will also continue to invest in our Archways to Opportunity program, which offers eligible employees from company-owned and participating franchisee restaurants the opportunity to graduate from college, earn a high school diploma, learn English as a second language, complete an apprenticeship and gain access to advising services. Through 2018 in the U.S., women accounted for almost three-quarters (74%) of participants who earned a high school diploma and nearly two-thirds (62%) of those who received college tuition assistance through Archways to Opportunity.

In addition to programs offered through Archways to Opportunity, in 2019 we will introduce our new Women in Tech program, which will help women from company-owned and participating franchisee restaurants learn skills in areas such as data science, data analytics, and artificial intelligence.

## Moving Beyond Bias

To represent the full diversity of women, we also must cultivate a culture of bias-awareness and inclusion. In 2016, we launched McDonald's education platform, Food for Thought: Beyond Bias. We are committed to integrating the Beyond Bias training into existing education platforms, talent management processes, leadership development, and training for talent agency partners.

## Creating Safe Workplaces

McDonald's unwavering commitment to providing a safe work environment that fosters respect, fairness, and dignity, and is free of harassment, discrimination, or fear of retaliation is

Bias. We are committed to integrating the Beyond Bias training into existing educational platforms, talent management processes, leadership development, and training for talent acquisition part...

Corporate Careers

**ABOUT**     **SCALE FOR GOOD**     **INVESTORS**     **FRANCHISING**     **NEWSROOM**     **SEARCH**

## Creating Safe Workplaces

McDonald's unwavering commitment to providing a safe work environment that fosters respect, fairness, and dignity, and is free of harassment, discrimination, or fear of retaliation is imperative to achieving gender balance. We remain committed to assessing and advancing specific policies and practices to ensure we are meeting the current needs of our employees.

In January 2019, we enhanced our discrimination, sexual harassment and retaliation policy and training for U.S. staff and company-owned restaurant employees to provide a more employee-centered approach. Our policy reflects feedback from stakeholders across the organization, as well as non-governmental organizations (NGOs) and other third-party experts.

Additionally, we published our global Human Rights Policy in 2018 with the aim of strengthening our approach and providing greater alignment and clarity across the business. Learn more about our commitment to fostering safe, inclusive, and respectful workplaces.

## Elevating Women's Voices

In an effort to identify barriers to representation and progression of women in the workplace, McDonald's will elevate women's voices through various channels, such as focus groups, corporate surveys, and our employee networks, including the Global Women's Leadership Network and its local chapters.

We are committed to celebrating the voices and impact of women in the business and reporting on progress globally. We will achieve this by enhancing the measurement and communication of women's impact and progression, and by engaging with third-party organizations to provide feedback on our progress.

   

Corporate Careers

... expanding... program... by... communication of women's impact and progression, and by engaging with third-party ...izations to provide feedback on our progress.

ABOUT  SCALE FOR GOOD  INVESTORS  FRANCHISING  NEWSROOM  🔍 SEARCH









**Growing by Example**

**Checking Off the Bucket List**

**Learning on the Farm**

**Confidence to Dream Big**



# Our progress



## Gender Diversity Update

As part of our global Better Together strategy, we have committed to publish our gender diversity representation data.

We are proud of the fact that women account for over half (54%) of our staff employees and over a quarter (26%) of our Officers.

There is, however, more to do. We are investing in the tools, processes, and training required to create a bias-aware hiring environment. Our aim is to ensure our hiring processes – from job descriptions, to applicant sourcing and screening, to interviewing – are free from bias.

### Staff Employees[1]



Year End 2018 Data

from bias.

Corporate Careers

ABOUT    SCALE FOR GOOD    INVESTORS    FRANCHISING    NEWSROOM    🔍 SEARCH

## Company-Owned Restaurant Employees[1]



Year End 2018 Data

A key commitment of our global Better Together strategy is to enhance equality in career advancement for women and men through targeted education and development programs.

The sustained representation of women, from crew to management, in company-owned restaurants demonstrates that we are making good progress in delivering against this commitment.

Our Archways to Opportunity program contributes significantly to this progress. Through 2018 in the U.S., women accounted for 74% of participants who graduated with a high school diploma and 62% of those who received college tuition assistance.

In 2018, we launched a pilot Youth Opportunity program in Chicago offering young people the pre-employment training and support they need to enter the workplace. Of the young people surveyed, 58% of the pilot program graduates were women and 71% of all program graduates were in education or employment 60 days after completion.[2]

1. United States and International Operated Markets (Australia, Austria, Belgium, Canada, Czech Republic, France, Germany, Italy, Netherlands, Poland, Portugal, Russia, Slovakia, Spain, Switzerland, Ukraine, United Kingdom)

2. Percentages were collected from IYF (International Youth Foundation) and include results from Chicago participants who elected to share information with the local organizations that collect education/employment data. Therefore, not all data sets add up to the total enrollment number.

# EXHIBIT D

Case: 1:20-cv-00117 Document #: 1 Filed: 01/07/20 Page 91 of 103 PageID #:91

# How Does McDonalds Use Big Data?

**Orcan Intelligence**   [Follow]

Apr 16, 2018 · 2 min read



**The Contiguous United States**
**Visualized by distance to the nearest McDonald's**

Created by Stephen Von Worley
http://www.weathersealed.com/tags/maps/
Location data courtesy of AggData
http://www.aggdata.com/

Many would associate the use of big data with huge technology corporations such as Google or Microsoft. However, even global food service retailers like McDonalds use their customer's data to create meaningful insights and leverage themselves against their rising competition.

With their daily customer traffic reaching numbers as huge as 60 million in over 100 countries, it's clear that McDonalds has a wealth of data on their customers just waiting to be turned into measurable metrics for analysis.

McDonalds have evolved into a more information-centric company that is inherently driven by data based decisions. By combining data across every McDonalds store and creating data visualisations, the chain were able to create more comparable insights that would help garner a more holistic view of their customers. This meant that they were more able to create relevant and actionable outcomes, resulting in time and money saved.

One aspect of McDonalds that has been optimised thanks to big data and analytics has been the drive-thru experience. By knowing three different factors: design of the drive-thru, information that is provided to the customer during the drive-thru and the people waiting in line to order at a drive-thru, McDonalds are more able to create a more enjoyable drive-thru experience.

For example, knowing what times of day customers are more likely to go through a drive-thru will help them prepare and improve efficiency for the spike in demand ahead of time. Finding the optimal solutions for the design, information and people is an ongoing process that changes over time, context and cultures.

Other information that McDonalds collects includes in store traffic, customer interactions, flow throughs in the drive-thru's, ordering patterns, point-of-sales data, video data and sensor data. These factors impact every part of the McDonalds empire from refining their menu design to optimising their training programmes.

For more insight on big data, data science, and artificial intelligence, follow Orcan on Twitter.

)

Big Data     Food     Data     Data Science     Analytics

About    Help    Legal

# EXHIBIT E



Corporate Careers

ABOUT    SCALE FOR GOOD    INVESTORS    FRANCHISING    NEWSROOM    SEARCH

# Our Growth Strategy

## Growth Strategy

In March of 2017, we introduced our Velocity Growth Plan, named as such because we're moving fast – and in a clearly defined direction.

We know the most meaningful way to grow the business and create value for all of our stakeholders is by serving more customers more often. That's why we're focused on giving customers what they really want: hot, delicious food served quickly – with an overall experience and value for their money that meets their rising expectations.

Velocity makes the most of our competitive advantages, from our unmatched global scale to our iconic brand to our tremendous presence in local markets around the world.

---

The key pillars of our growth strategy are to:

## Retain

Retaining the customers we have, fortifying and extending our areas of strength with focuses on breakfast and family occasions.

## Regain

Regaining the customers we had lost by improving the taste and quality of our food, enhancing convenience and offering strong value.

ABOUT     SCALE FOR GOOD     INVESTORS     FRANCHISING     NEWSROOM     🔍 SEARCH

velocity makes the most of our competitive advantages, from our unmatched global scale to ... onic brand to our tremendous presence in local markets around the world.

The key pillars of our growth strategy are to:

## Retain

Retaining the customers we have, fortifying and extending our areas of strength with focuses on breakfast and family occasions.

## Regain

Regaining the customers we had lost by improving the taste and quality of our food, enhancing convenience and offering strong value.

## Convert

Converting casual customers to more committed customers with coffee and snacks.

---

We also identified three accelerators, intended to drive growth on top of everything we're doing:

## Digital

Re-shaping our interactions with the customer – whether they eat in, take out, drive thru or order delivery.

## Delivery

Bringing the McDonald's experience to more customers – in their homes, their dorm rooms, their workplaces and beyond.

## Experience of the Future in the U.S.

Elevating the customer experience in the restaurants through technology and the restaurant teams who bring it to life.

---

We're proud of the progress we've made the last couple of years – and confident that guided by our Velocity Growth Plan, we will continue becoming a better McDonald's for customers.

# EXHIBIT F

**Risk Factors and Cautionary Statement Regarding Forward-Looking Statements**

The information in this report includes forward-looking statements about future events and circumstances and their effects upon revenues, expenses and business opportunities. Generally speaking, any statement in this report not based upon historical fact is a forward-looking statement. Forward-looking statements can also be identified by the use of forward-looking words, such as "may," "will," "expect," "believe," "anticipate" and "plan" or similar expressions. In particular, statements regarding our plans, strategies, prospects and expectations regarding our business and industry, including those under "Outlook," are forward-looking statements. They reflect our expectations, are not guarantees of performance and speak only as of the date of this report. Except as required by law, we do not undertake to update them. Our expectations (or the underlying assumptions) may change or not be realized, and you should not rely unduly on forward-looking statements. Our business results are subject to a variety of risks, including those that are reflected in the following considerations and factors, as well as elsewhere in our filings with the SEC. If any of these considerations or risks materialize, our expectations may change and our performance may be adversely affected.

**If we do not successfully evolve and execute against our business strategies, including under the Velocity Growth Plan, we may not be able to increase operating income.**

To drive operating income growth, our business strategies must be effective in maintaining and strengthening customer appeal, delivering sustainable guest count growth and driving a higher average check. Whether these strategies are successful depends mainly on our System's ability to:

- Continue to innovate and differentiate the McDonald's experience, including by preparing and serving our food in a way that balances value and convenience to our customers with profitability;

- Capitalize on our global scale, iconic brand and local market presence to enhance our ability to retain, regain and convert key customer groups;

- Utilize our organizational structure to build on our progress and execute against our business strategies;

- Augment our digital and delivery initiatives, including mobile ordering, along with Experience of the Future ("EOTF"), particularly in the U.S.;

- Identify and develop restaurant sites consistent with our plans for net growth of Systemwide restaurants;

- Operate restaurants with high service levels and optimal capacity while managing the increasing complexity of our restaurant operations and create efficiencies through innovative use of technology; and

- Accelerate our existing strategies, including through growth opportunities, investments and partnerships.

If we are delayed or unsuccessful in executing our strategies, or if our strategies do not yield the desired results, our business, financial condition and results of operations may suffer.

**Our investments to enhance the customer experience, including through technology, may not generate the expected returns.**

Our long-term business objectives depend on the successful Systemwide execution of our strategies. We continue to build upon our investments in technology and modernization, including in EOTF (which focuses on restaurant modernization), digital engagement and delivery, in order to transform the customer experience. As part of these investments, we are placing renewed emphasis on improving our service model and strengthening relationships with customers, in part through digital channels and loyalty initiatives, as well as mobile ordering and payment systems. We also continue to refine our delivery initiatives and partnerships, which may not generate expected returns. If these initiatives are not well executed, or if we do not fully realize the intended benefits of these significant investments, our business results may suffer.

**If we do not anticipate and address evolving consumer preferences and effectively execute our pricing, promotional and marketing plans, our business could suffer.**

Our continued success depends on our System's ability to retain, regain and convert customers. In order to do so, we need to anticipate and respond effectively to continuously shifting consumer demographics, and trends in food sourcing, food preparation, food offerings and consumer preferences in the "informal eating out" ("IEO") segment. If we are not able to quickly and effectively respond to these changes, or if our competitors respond more effectively, our financial results could be adversely impacted.

Our ability to retain, regain and convert customers also depends on the impact of pricing, promotional and marketing plans across the System, and the ability to adjust these plans to respond quickly and effectively to evolving customer preferences, as well as shifting economic and competitive conditions. Existing or future pricing strategies, and the value proposition they represent, are expected to continue to be important components of our business strategy; however, they may not be successful in retaining, regaining and converting customers, or may not be as successful as the efforts of our competitors, and could negatively impact sales, guest counts and market share.

Additionally, we operate in a complex and costly advertising environment. Our marketing and advertising programs may not be successful in retaining, regaining and converting customers. Our success depends in part on whether the allocation of our advertising and marketing resources across different channels allows us to reach our customers effectively. If the advertising and marketing programs are not successful, or are not as successful as those of our competitors, our sales, guest counts and market share could decrease.

**Failure to preserve the value and relevance of our brand could have an adverse impact on our financial results.**

To be successful in the future, we believe we must preserve, enhance and leverage the value of our brand. Brand value is based in part on consumer perceptions. Those perceptions are affected by a variety of factors, including the nutritional content and preparation of our food, the ingredients we use, the manner in which we source commodities and our general business practices. Consumer acceptance of our offerings is subject to change for a variety of reasons, and some changes can occur rapidly. For example, nutritional, health and other scientific studies and conclusions, which constantly evolve and may have contradictory implications, drive popular opinion, litigation and regulation (including initiatives intended to drive consumer behavior) in ways that affect the IEO segment or perceptions of our brand generally or relative to available alternatives. Consumer perceptions may also be affected by adverse commentary from third parties, including through social media or conventional media outlets, regarding the quick-service category of the IEO segment, our brand, our operations, our suppliers or our franchisees. If we are unsuccessful in addressing adverse commentary, whether or not accurate, our brand and our financial results may suffer.

Additionally, the ongoing relevance of our brand may depend on the success of our sustainability initiatives, which require Systemwide coordination and alignment. If we are not effective in addressing social and environmental responsibility matters or achieving relevant sustainability goals, consumer trust in our brand may suffer. In particular, business incidents or practices whether actual or perceived, that erode consumer trust or confidence, particularly if such incidents or practices receive considerable publicity or result in litigation, can significantly reduce brand value and have a negative impact on our financial results.

**We face intense competition in our markets, which could hurt our business.**

We compete primarily in the IEO segment, which is highly competitive. We also face sustained, intense competition from traditional, fast casual and other competitors, which may include many non-traditional market participants such as convenience stores, grocery stores and coffee shops. We expect our environment to continue to be highly competitive, and our results in any particular reporting period may be impacted by new or continuing actions of our competitors, which may have a short- or long-term impact on our results.

We compete on the basis of product choice, quality, affordability, service and location. In particular, we believe our ability to compete successfully in the current market environment depends on our ability to improve existing products, develop new products, price our products appropriately, deliver a relevant customer experience, manage the complexity of our restaurant operations and respond effectively to our competitors' actions or disruptive actions from others which we do not foresee. There can be no assurance these strategies will be effective, and some strategies may be effective at improving some metrics while adversely affecting other metrics, which could have the overall effect of harming our business.

**Unfavorable general economic conditions could adversely affect our business and financial results.**

Our results of operations are substantially affected by economic conditions, which can vary significantly by market and can impact consumer disposable income levels and spending habits. Economic conditions can also be impacted by a variety of factors including hostilities, epidemics and actions taken by governments to manage national and international economic matters, whether through austerity, stimulus measures or trade measures, and initiatives intended to control wages, unemployment, credit availability, inflation, taxation and other economic drivers. Sustained adverse economic conditions or periodic adverse changes in economic conditions in our markets could pressure our operating performance, and our business and financial results may suffer.

Our results of operations are also affected by fluctuations in currency exchange rates and unfavorable currency fluctuations could adversely affect reported earnings.

**Supply chain interruptions may increase costs or reduce revenues.**

We depend on the effectiveness of our supply chain management to assure reliable and sufficient supply of quality products on favorable terms. Although many of the products we sell are sourced from a wide variety of suppliers in countries around the world, certain products have limited suppliers, which may increase our reliance on those suppliers. Supply chain interruptions, including shortages and transportation issues, and price increases can adversely affect us as well as our suppliers and franchisees whose performance may have a significant impact on our results. Such shortages or disruptions could be caused by factors beyond the control of our suppliers, franchisees or us. If we experience interruptions in our System's supply chain, our costs could increase and it could limit the availability of products critical to our System's operations.

**Food safety concerns may have an adverse effect on our business.**

Our ability to increase sales and profits depends on our System's ability to meet expectations for safe food and on our ability to manage the potential impact on McDonald's of food-borne illnesses and food or product safety issues that may arise in the future, including in the supply chain, restaurants or delivery. Food safety is a top priority, and we dedicate substantial resources to ensure that our customers enjoy safe food products, including as our menu and service model evolve. However, food safety events, including instances of food-borne illness, occur within the food industry and our System from time to time and, in addition, could occur in the future. Instances of food tampering, food contamination or food-borne illness, whether actual or perceived, could adversely affect our brand and reputation as well as our revenues and profits.

**Our franchise business model presents a number of risks.**

As the Company's business model has evolved to a more heavily franchised structure, our success relies to large degree on the financial success and cooperation of our franchisees, including our developmental licensees and affiliates. Our restaurant margins arise from two sources: fees from franchised restaurants (e.g., rent and royalties based on a percentage of sales) and, to a lesser degree, sales from Company-operated restaurants. Our franchisees and developmental licensees manage their businesses independently, and therefore are responsible for the day-to-day operation of their restaurants. The revenues we realize from franchised restaurants are largely dependent on the ability of our franchisees to grow their sales. Business risks affecting our operations also affect our franchisees. If our franchisees do not experience sales growth, our revenues and margins could be negatively affected as a result. Also, if sales trends worsen for franchisees, their financial results may deteriorate, which could result in, among other things, restaurant closures, or delayed or reduced payments to us.

Our success also relies on the willingness and ability of our independent franchisees and affiliates to implement major initiatives, which may include financial investment, and to remain aligned with us on operating, promotional and capital-intensive reinvestment plans. The ability of franchisees to contribute to the achievement of our plans is dependent in large part on the availability to them of funding at reasonable interest rates and may be negatively impacted by the financial markets in general, by the creditworthiness of our franchisees or the Company or by banks' lending practices. If our franchisees are unwilling or unable to invest in major initiatives or are unable to obtain financing at commercially reasonable rates, or at all, our future growth and results of operations could be adversely affected.

Our operating performance could also be negatively affected if our franchisees experience food safety or other operational problems or project an image inconsistent with our brand and values, particularly if our contractual and other rights and remedies are limited, costly to exercise or subjected to litigation and potential delays. If franchisees do not successfully operate restaurants in a manner consistent with our required standards, our brand's image and reputation could be harmed, which in turn could hurt our business and operating results.

Our ownership mix also affects our results and financial condition. The decision to own restaurants or to operate under franchise or license agreements is driven by many factors whose interrelationship is complex. The benefits of our more heavily franchised structure depends on various factors including whether we have effectively selected franchisees, licensees and/or affiliates that meet our rigorous standards, whether we are able to successfully integrate them into our structure and whether their performance and the resulting ownership mix supports our brand and financial objectives.

**Challenges with respect to talent management could harm our business.**

Effective succession planning is important to our long-term success. Failure to effectively identify, develop and retain key personnel, recruit high-quality candidates and ensure smooth management and personnel transitions could disrupt our business and adversely affect our results.

**Challenges with respect to labor, including availability and cost, could impact our business and results of operations.**

Our success depends in part on our System's ability to proactively recruit, motivate and retain qualified individuals to work in McDonald's restaurants and to maintain appropriately-staffed restaurants in an intensely competitive environment. Increased costs associated with recruiting, motivating and retaining qualified employees to work in our Company-operated restaurants could have a negative impact on our Company-operated margins. Similar concerns apply to our franchisees.

We are also impacted by the costs and other effects of compliance with U.S. and international regulations affecting our workforce, which includes our staff and employees working in our Company-operated restaurants. These regulations are increasingly focused on employment issues, including wage and hour, healthcare, immigration, retirement and other employee benefits and workplace practices. Claims of non-compliance with these regulations could result in liability and expense to us. Our potential exposure to reputational and other harm regarding our workplace practices or conditions or those of our independent franchisees or suppliers, including those giving rise to claims of sexual harassment or discrimination (or perceptions thereof) could have a negative impact on consumer perceptions of us and our business. Additionally, economic action, such as boycotts, protests, work stoppages or campaigns by labor organizations, could adversely affect us (including our ability to recruit and retain talent) or the franchisees and suppliers that are also part of the McDonald's System and whose performance may have a material impact on our results.

**Information technology system failures or interruptions, or breaches of network security, may impact our operations.**

We are increasingly reliant on technological systems, such as point-of-sale and other systems or platforms, technologies supporting McDonald's digital and delivery solutions, as well as technologies that facilitate communication and collaboration, with affiliated entities, customers, employees, franchisees, suppliers, service providers or other independent third parties to conduct our business, including technology-enabled systems provided to us by third parties. Any failure or interruption of these systems could significantly impact our operations and customer experience and perceptions.

Despite the implementation of security measures, those technology systems and solutions could become vulnerable to damage, disability or failures due to theft, fire, power loss, telecommunications failure or other catastrophic events. Our increasing reliance on third party systems also present the risks faced by the third party's business, including the operational, security and credit risks of those parties. If those systems were to fail or otherwise be unavailable, and we were unable to recover in a timely manner, we could experience an interruption in our operations.

Furthermore, security incidents or breaches have from time to time occurred and may in the future occur involving our systems, the systems of the parties we communicate or collaborate with (including franchisees), or those of third party providers. These may include such things as unauthorized access, account takeovers, denial of service, computer viruses, introduction of malware or ransomware and other disruptive problems caused by hackers. Our information technology systems contain personal, financial and other information that is entrusted to us by our customers, our employees, our franchisees and other third parties, as well as financial, proprietary and other confidential information related to our business. An actual or alleged security breach could result in disruptions, shutdowns, theft or unauthorized disclosure of personal, financial, proprietary or other confidential information. Further, the General Data Protection Regulation ("GDPR") requires entities processing the personal data of individuals in the European Union to meet certain requirements regarding the handling of that data. Failure to meet GDPR requirements could result in substantial penalties and materially adversely impact our financial results. The occurrence of any of these incidents could result in reputational damage, adverse publicity, loss of consumer confidence, reduced sales and profits, complications in executing our growth initiatives and regulatory and legal risk, including criminal penalties or civil liabilities.

**The global scope of our business subjects us to risks that could negatively affect our business.**

We encounter differing cultural, regulatory and economic environments within and among the more than 100 countries where McDonald's restaurants operate, and our ability to achieve our business objectives depends on the System's success in these environments. Meeting customer expectations is complicated by the risks inherent in our global operating environment, and our global success is partially dependent on our System's ability to leverage operating successes across markets and brand perceptions. Planned initiatives may not have appeal across multiple markets with McDonald's customers and could drive unanticipated changes in customer perceptions and guest counts.

Disruptions in operations or price volatility in a market can also result from governmental actions, such as price, foreign exchange or changes in trade-related tariffs or controls, sanctions and counter sanctions, government-mandated closure of our, our franchisees' or our suppliers' operations, and asset seizures. The cost and disruption of responding to governmental investigations or inquiries, whether or not they have merit, or the impact of these other measures, may impact our results and could cause reputational or other harm. Our international success depends in part on the effectiveness of our strategies and brand-building initiatives to reduce our exposure to such governmental investigations or inquiries.

Additionally, challenges and uncertainties are associated with operating in developing markets, which may entail a relatively higher risk of political instability, economic volatility, crime, corruption and social and ethnic unrest. Such challenges may be exacerbated in many cases by a lack of an independent and experienced judiciary and uncertainties in how local law is applied and enforced, including in areas most relevant to commercial transactions and foreign investment. An inability to manage effectively the risks associated with our international operations could have a material adverse effect on our business and financial condition.

We may also face challenges and uncertainties in developed markets. For example, as a result of the U.K.'s decision to leave the European Union through a negotiated exit over a period of time, including its formal commencement of exit proceedings, it is possible that there will be increased regulatory complexities, as well as potential referenda in the U.K. and/or other European countries, that could cause uncertainty in European or worldwide economic conditions. The decision created volatility in certain foreign currency exchange rates that may or may not continue. Any of these effects, and others we cannot anticipate, could adversely affect our business, results of operations, financial condition and cash flows.

**Changes in tax laws and unanticipated tax liabilities could adversely affect the taxes we pay and our profitability.**

We are subject to income and other taxes in the U.S. and foreign jurisdictions, and our operations, plans and results are affected by tax and other initiatives around the world. In particular, we are affected by the impact of changes to tax laws or policy or related authoritative interpretations. We are also impacted by settlements of pending or any future adjustments proposed by taxing and governmental authorities inside and outside of the U.S. in connection with our tax audits, all of which will depend on their timing, nature and scope. Any significant increases in income tax rates, changes in income tax laws or unfavorable resolution of tax matters could have a material adverse impact on our financial results.

**Changes in commodity and other operating costs could adversely affect our results of operations.**

The profitability of our Company-operated restaurants depends in part on our ability to anticipate and react to changes in commodity costs, including food, paper, supplies, fuel, utilities and distribution, and other operating costs, including labor. Any volatility in certain commodity prices or fluctuation in labor costs could adversely affect our operating results by impacting restaurant profitability. The commodity markets for some of the ingredients we use, such as beef and chicken, are particularly volatile due to factors such as seasonal shifts, climate conditions, industry demand, international commodity markets, food safety concerns, product recalls and government regulation, all of which are beyond our control and, in many instances, unpredictable. We can only partially address future price risk through hedging and other activities, and therefore increases in commodity costs could have an adverse impact on our profitability.

**Increasing regulatory complexity may adversely affect restaurant operations and our financial results.**

Our regulatory environment worldwide exposes us to complex compliance and similar risks that could affect our operations and results in material ways. In many of our markets, we are subject to increasing regulation, which has increased our cost of doing business. We are affected by the cost, compliance and other risks associated with the often conflicting and highly prescriptive regulations we face, including where inconsistent standards imposed by multiple governmental authorities can adversely affect our business and increase our exposure to litigation or governmental investigations or proceedings.

Our success depends in part on our ability to manage the impact of new, potential or changing regulations that can affect our business plans and operations. These regulations include product packaging, marketing, the nutritional content and safety of our food and other products, labeling and other disclosure practices. Compliance efforts with those regulations may be affected by ordinary variations in food preparation among our own restaurants and the need to rely on the accuracy and completeness of information from third-party suppliers (particularly given varying requirements and practices for testing and disclosure).

Additionally, we are working to manage the risks and costs to us, our franchisees and our supply chain of the effects of climate change, greenhouse gases, and diminishing energy and water resources. These risks include the increased public focus, including by governmental and nongovernmental organizations, on these and other environmental sustainability matters, such as packaging and waste, animal health and welfare, deforestation and land use. These risks also include the increased pressure to make commitments, set targets or establish additional goals and take actions to meet them. These risks could expose us to market, operational and execution costs or risks. If we are unable to effectively manage the risks associated with our complex regulatory environment, it could have a material adverse effect on our business and financial condition.

**We are subject to increasing legal complexity and could be party to litigation that could adversely affect us.**

Increasing legal complexity will continue to affect our operations and results in material ways. We could be subject to legal proceedings that may adversely affect our business, including class actions, administrative proceedings, government investigations and proceedings, shareholder proceedings, employment and personal injury claims, landlord/tenant disputes, disputes with current or former suppliers, claims by current or former franchisees and intellectual property claims (including claims that we infringed another party's trademarks, copyrights or patents). Regardless of whether any claims against us are valid or whether we are found to be liable, claims may be expensive to defend and may divert management's attention away from operations which could have a material adverse effect on our business and financial condition.

Inconsistent standards imposed by governmental authorities can adversely affect our business and increase our exposure to regulatory proceedings or litigation.

Litigation and regulatory action concerning our relationship with franchisees and the legal distinction between our franchisees and us for employment law purposes, if determined adversely, could increase costs, negatively impact our business operations and the business prospects of our franchisees and subject us to incremental liability for their actions. Similarly, although our commercial relationships with our suppliers remain independent, there may be attempts to challenge that independence, which, if determined adversely, could also increase costs, negatively impact the business prospects of our suppliers, and subject us to incremental liability for their actions.

We are also subject to legal and compliance risks and associated liability, such as in the areas of privacy and data collection, protection and management, as it relates to information associated with our technology-related services and platforms made available to business partners, customers, employees, franchisees or other third parties.

Our results could also be affected by the following:

- The relative level of our defense costs, which vary from period to period depending on the number, nature and procedural status of pending proceedings;

- The cost and other effects of settlements, judgments or consent decrees, which may require us to make disclosures or take other actions that may affect perceptions of our brand and products;

- Adverse results of pending or future litigation, including litigation challenging the composition and preparation of our products, or the appropriateness or accuracy of our marketing or other communication practices; and

- The scope and terms of insurance or indemnification protections that we may have.

A judgment significantly in excess of any applicable insurance coverage or third party indemnity could materially adversely affect our financial condition or results of operations. Further, adverse publicity resulting from claims may hurt our business.

**We may not be able to adequately protect our intellectual property or adequately ensure that we are not infringing the intellectual property of others, which could harm the value of the McDonald's brand and our business.**

The success of our business depends on our continued ability to use our existing trademarks and service marks in order to increase brand awareness and further develop our branded products in both domestic and international markets. We rely on a combination of trademarks, copyrights, service marks, trade secrets, patents and other intellectual property rights to protect our brand and branded products.

We have registered certain trademarks and have other trademark registrations pending in the U.S. and certain foreign jurisdictions. The trademarks that we currently use have not been registered in all of the countries outside of the U.S. in which we do business or may do business in the future and may never be registered in all of these countries. The steps we have taken to protect our intellectual property in the U.S. and foreign countries may not be adequate. In addition, the steps we have taken may not adequately ensure that we do not infringe the intellectual property of others, and third parties may claim infringement by us in the future. In particular, we may be involved in intellectual property claims, including often aggressive or opportunistic attempts to enforce patents used in information technology systems, which might affect our operations and results. Any claim of infringement, whether or not it has merit, could be time-consuming, result in costly litigation and harm our business.

We cannot ensure that franchisees and other third parties who hold licenses to our intellectual property will not take actions that hurt the value of our intellectual property.

**Changes in accounting standards or the recognition of impairment or other charges may adversely affect our future operations and results.**

New accounting standards or changes in financial reporting requirements, accounting principles or practices, including with respect to our critical accounting estimates, could adversely affect our future results. We may also be affected by the nature and timing of decisions about underperforming markets or assets, including decisions that result in impairment or other charges that reduce our earnings. In assessing the recoverability of our long-lived assets, we consider changes in economic conditions and make assumptions regarding estimated future cash flows and other factors. These estimates are highly subjective and can be significantly impacted by many factors such as global and local business and economic conditions, operating costs, inflation, competition, consumer and demographic trends, and our restructuring activities. If our estimates or underlying assumptions change in the future, we may be required to record impairment charges. If we experience any such changes, they could have a significant adverse effect on our reported results for the affected periods.

**A decrease in our credit ratings or an increase in our funding costs could adversely affect our profitability.**

Our credit ratings may be negatively affected by our results of operations or changes in our debt levels. As a result, our interest expense, the availability of acceptable counterparties, our ability to obtain funding on favorable terms, collateral requirements and our operating or financial flexibility could all be negatively affected, especially if lenders impose new operating or financial covenants.

Our operations may also be impacted by regulations affecting capital flows, financial markets or financial institutions, which can limit our ability to manage and deploy our liquidity or increase our funding costs. If any of these events were to occur, they could have a material adverse effect on our business and financial condition.

**Trading volatility and price of our common stock may be adversely affected by many factors.**

Many factors affect the volatility and price of our common stock in addition to our operating results and prospects. The most important of these factors, some of which are outside our control, are the following:

- The unpredictable nature of global economic and market conditions;

- Governmental action or inaction in light of key indicators of economic activity or events that can significantly influence financial markets, particularly in the U.S., which is the principal trading market for our common stock, and media reports and commentary about economic or other matters, even when the matter in question does not directly relate to our business;

- Trading activity in our common stock or trading activity in derivative instruments with respect to our common stock or debt securities, which can be affected by market commentary (including commentary that may be unreliable or incomplete); unauthorized disclosures about our performance, plans or expectations about our business; our actual performance and creditworthiness; investor confidence, driven in part by expectations about our performance; actions by shareholders and others seeking to influence our business strategies; portfolio transactions in our stock by significant shareholders; or trading activity that results from the ordinary course rebalancing of stock indices in which McDonald's may be included, such as the S&P 500 Index and the Dow Jones Industrial Average;

- The impact of our stock repurchase program or dividend rate; and

- The impact on our results of corporate actions and market and third-party perceptions and assessments of such actions, such as those we may take from time to time as we implement our strategies in light of changing business, legal and tax considerations and evolve our corporate structure.

**Events such as severe weather conditions, natural disasters, hostilities and social unrest, among others, can adversely affect our results and prospects.**

Severe weather conditions, natural disasters, hostilities and social unrest, terrorist activities, health epidemics or pandemics (or expectations about them) can adversely affect consumer spending and confidence levels and supply availability and costs, as well as the local operations in impacted markets, all of which can affect our results and prospects. Our receipt of proceeds under any insurance we maintain with respect to some of these risks may be delayed or the proceeds may be insufficient to cover our losses fully.