## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

VICTORIA GUSTER-HINES and
DOMINECA NEAL,

Plaintiffs,

v.

McDONALD'S USA, LLC,
McDONALD'S CORPORATION,
STEVEN EASTERBROOK,
CHRISTOPHER KEMPCZINSKI, and
CHARLES STRONG,

Defendants.

Case No. 20-cv-00117

Judge Mary M. Rowland

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Victoria Guster-Hines ("Guster-Hines") and Domineca Neal ("Neal") filed a fourteen-count, ninety-nine page, Second Amended Complaint (Dkt. 51, "the Complaint") against their employer and its parent company, the popular burger chain McDonald's, as well as several of its top executives. They allege disparate treatment on the basis of race (Counts I and II), creation of a hostile work environment (Counts III and IV) and retaliation (Counts V and VI) in violation of 42 U.S.C. § 1981, as well as discrimination based on disparate impact and disparate treatment (Counts VII, VIII, IX, and X), creation of a hostile work environment (Counts XI and XII), and retaliation (Counts XIII and XIV) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* Defendants McDonald's Corporation ("McDonald's"), McDonald's USA, LLC ("McDonald's USA"), Christopher Kempczinski ("Kempczinski"), Charles Strong ("Strong"), and Steven

Easterbrook ("Easterbrook") move to dismiss the Complaint in part or in its entirety. (Dkts. 56, 58, 60, 62, and 68 respectively). McDonald's, McDonald's USA, Kempczinski, and Strong have jointly filed a motion to strike certain allegations in the Complaint, (Dkt. 64), and Easterbrook has filed a separate motion to strike. (Dkt. 70). These motions are granted in part and denied in part.

## I. Background

The following factual allegations are taken from the Complaint (Dkt. 51) and are accepted as true for purposes of these motions. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). Plaintiffs Guster-Hines and Neal are or were executives at McDonald's USA, a subsidiary of the global parent company, McDonalds. McDonald's USA is a franchisor, and individual McDonalds restaurants are operated by private franchisees. Defendant Easterbrook is the former President and CEO of McDonald's, the parent company. He led the parent company from 2015 through 2019, when his employment was terminated. Defendant Kempczinski is the former President of McDonald's USA, a position he held from 2015 through 2019. He is the current President and CEO of McDonald's, having been hired to fill the vacancy left by Easterbrook in 2019. Defendant Strong is the former West Zone President of McDonald's USA. He supervised the Plaintiffs until he was promoted to Chief Field Officer in 2019.

Plaintiffs claim that Defendants discriminated against African Americans at every level of the operation: private franchisees, employees, and executives. For instance, white executives were promoted ahead of more qualified African American

colleagues. Less-qualified white colleagues were promoted ahead of Plaintiffs.[1] white employees with only high school diplomas attained Vice President-level positions while African American employees needed college degrees. And while White executives were regularly allowed to purchase desirable McDonald's franchises (as individuals not representatives of the corporation), African American executives were not offered this benefit on equal terms.

In addition, Defendants eliminated corporate policies that supported African American employees and replaced them with policies that prioritized a gender-balanced workforce. Kempczinski told a meeting of African American executives, for example, that the "numbers [of African Americans in the organization] don't matter." And during Easterbrook and Kempczinski's tenures the McDonald's African American Council, a group that had previously enjoyed a budget for activities, "went dormant."

During the same time period McDonald's lost one third of its African American franchisees, an attrition rate far above that of non-African American franchisees, because of its corporate policies. First, the loss of revenue from African American consumers in the wake of advertising cuts in that community both coincided with this loss of African American franchisees, and either intentionally or

---

[1] These include Doug Lorimer, Charles Newburger, Kristy Cunningham, Allyson Peck, Skye Anderson, Harish Ramalingam, Bill Garrett, Paulo Pena, Luis Quintiliano, Michelle Borninkhof, Karen Garcia, Medy Valenzuela, Gianfranco Cuneo, Jeff Wilfong, Scott Rockwell, and Gregg Erieo. Plaintiffs use McDonald's USA's own "score cards" as a proxy for relative qualifications of these individuals.

foreseeably caused that loss.[2] Second, required capital expenditures fell disproportionately on African American franchisees. Third, Defendants graded restaurants owned by African American franchisees unfairly. Plaintiffs voiced the concerns of African American franchise operators to Strong and other executives.

Finally, Easterbrook and Kempczinski are alleged to have "purge[d] African Americans from the ranks of senior leadership," both because they were unnecessary (since the corporation's focus had turned away from Black customers and Black franchisees), and because African American employees were resistant to these changes and might "blow the whistle." Between 2014 and 2019, McDonalds USA terminated 30 African American executives (Vice Presidents or higher) and demoted 6 more (including Guster-Hines and Neal) to Director positions. This brought the total number of African American executives at McDonald's USA down from 42 to 7,[3] a decrease of about 83%. (Dkt. 51, ¶ 21). White executives were not terminated or demoted at this rate. Many of these demotions and terminations were part of a 2018 reorganization of the executive ranks of McDonald's USA, the Field First Restructure ("FFR"). While Guster-Hines and Neal were both demoted during that reorganization, comparable white employees were not. (Dkt. 51, ¶¶ 84–88). Neal, Guster-Hines, and other African American executives brought these racial

---

[2] Defendants decreased advertising directed towards African Americans causing revenue from African American consumers to fall from 20% to 14% of total revenue.

[3] The Court notes that if there were 42 African American executives and 36 were terminated or demoted, there would be 6 remaining, not 7. Elsewhere in the Complaint, Plaintiffs allege that, between 2015 and 2018, 31 of the 37 African American officers of the company were fired or demoted. (Dkt. 51, ¶ 83).

disparities to the attention of Defendants Easterbrook and Kempczinski in 2018 and 2019.

## A. Victoria Guster-Hines

Guster-Hines began working at McDonald's USA in 1987 after receiving her MBA and holding various other positions in the business world. She rose through the ranks, but not as quickly as many less-qualified white colleagues. For example, Guster-Hines she was promoted to "Gatekeeper" (a term of art within the McDonald's organization) in 2009 while she was a Director-level employee. All previous "Gatekeepers" had been white men, and each of them had been a Vice President when they held that position, but she was not granted a similar title. In 2013, Guster-Hines was belatedly promoted to Vice President during the tenure of Easterbrook's predecessor, CEO and President Don Thompson (who is African American). She was not promoted beyond this position, however, while less qualified white men and women were.

During her tenure at McDonald's USA Guster-Hines witnessed and experience numerous acts of overt racism. In 2005 she and another African American employee were told by a white Vice President, Marty Ranft, that what black franchisees told the corporation was almost always a "goddamn lie." Ranft also told her that she was "a [N-word] like all the rest," and in 2005 he called her "stupid" in front of her team. On another occasion McDonald's Human Resources Director Laura Granger, told Guster-Hines that she had taken her daughter out of a

class at school because there were too many Black students.[4] When Guster-Hines complained to Granger's supervisor about this comment, she was ignored. Guster-Hines later learned Granger had made false and disparaging statements about an African American colleague to block him from a promotion. Sometime later Guster-Hines asked Granger to admonish a white franchise operator for making lewd and racist comments to another African American employee, but Granger did nothing. Granger would eventually be one of the decisionmakers who demoted both Guster-Hines and Neal in 2018, along with other African American executives.

Guster-Hines alleges that when a white franchise operator threatened her, she alerted white executives, including Strong, who did nothing to protect her. Strong separately told Guster-Hines that several of her African American colleagues were "angry Black women" who "always seemed to be mad about something." He asked her to explain what was making them angry on many occasions, once in the presence of another employee, Vice President Francisco Gonzalez. This treatment put Guster-Hines under stress and required her to take a prolonged medical leave.

She was demoted during the July 2018 reorganization from Vice President to Senior Director, but her responsibilities were not reduced. After that demotion Guster-Hines was also removed from two national teams, Franchising and Restaurant Improvement Process. Guster-Hines alleges that this demotion was because of her race, and as retaliation for her advocacy on behalf of herself, other African American employees, and African American franchise operators.

_____
[4] Granger is a white South African.

**B. Domineca Neal**

Neal joined McDonald's as a Director in 2012 after receiving an MBA, working as a certified public accountant, marketing executive, consultant, and owning her own Wendy's restaurant franchises. In 2015 she was promoted to Director of Operations for the Indianapolis Region, and in 2017 to Vice President of Franchising and Operations.

During her tenure white executives were "openly rude, abrasive, and disrespectful" to her. Neal alleges that Strong told her not to work with two African American employees he disliked, saying "[we] don't need any of that Black woman attitude. They are too angry and aggressive." He attempted to block the promotions of those women and to have forced one to transfer to another office. Another white executive, Vice President William McKernan, made "false and disparaging" statements about Neal because of racial animus that negatively affected her opportunities for advancement. When she asked her (non-African American) supervisor Luis Quintiliano for a raise he falsely accused her of yelling at him. He and Strong offered her a professional coach, which she accepted so as not to appear noncompliant. Strong later elicited negative feedback about Neal from the coach in order to drive her out of the corporation.

Neal was demoted in July of 2018 to Senior Director, but her responsibilities were not reduced. Quintiliano told her colleagues that she would be gone by 2019, even though by McDonald's USA's own metrics, she was a "top performer." At a 2019 nationwide meeting of executives, white "top performers" were publicly

acknowledged, but Neal was not. After Guster-Hines and Neal initiated litigation both were excluded from the McDonald's African American Counsel and colleagues were instructed not to communicate with them, making it difficult for either to be effective. In February of 2020 Neal's employment was terminated.

## II. Standard

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *See Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC,* 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *See Fortres Grand Corp. v. Warner Bros. Entm't Inc.,* 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual allegations," but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi.,* 835 F.3d 736, 738 (7th Cir. 2016) (citation and internal quotation marks omitted).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007). Deciding the plausibility of the claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)).

A motion to strike pursuant to Rule 12(f) may be granted if the complaint contains "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A district court has "considerable discretion" when ruling on a Rule 12(f) motion to strike. *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009). Motions to strike are "generally disfavored" because of the risk that they will merely cause delay. *See, e.g., Brady for Smith v. SSC Westchester Operating Co. LLC*, No. 20 CV 4500, 2021 WL 1340806, at *6 (N.D. Ill. Apr. 9, 2021) (citing *Olson v. McGinnis*, 986 F.2d 1424 (7th Cir. 1993)). The "movant bears the burden of demonstrating that the challenged allegations are so unrelated to plaintiff's claim as to be devoid of merit, unworthy of consideration, and unduly prejudicial." *Vakharia v. Little Co. of Mary Hosp. & Health Care Centers*, 2 F. Supp. 2d 1028, 1033 (N.D. Ill. 1998) (citing *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664 (7th Cir. 1992)).

## III.    Analysis

## A. Motions to Strike

Defendants' motions to strike are considered together. Defendants ask the Court to strike allegations about the treatment of African American franchisees and customers (Dkt. 51, ¶¶ 12–20, 42); allegations about the racial climate at McDonald's USA, the failure to promote African Americans, and the attrition of African American executives (Dkt. 51, ¶¶ 4–7, 11, 20–25, 43, 59, 61, 118–124); allegations outside of the relevant statute of limitations (Dkt. 51, ¶¶ 47–49, 51–52, 55, 59–66, 68, 82–83); and allegations that may embarrass or humiliate the individual Defendants. (Dkt. 51, ¶¶ 9–10, 19, 20, 38, 43 (b, c, and d), 78(c)). Each of these allegations are considered in turn.

Plaintiffs include allegations about African American franchisees and customers for two reasons. First, they say the poor treatment of those groups was an act of "psychological warfare" meant to show African American employees such as themselves that the corporation held them in "contempt." (Dkt. 51 at ¶ 19). In that way, the allegations support Plaintiffs' hostile work environment claims. Second, they say that the loss of African American customers and the resulting loss of African American franchisees made African American executives who liaised with them "less necessary." (*Id*. at ¶ 20). Plaintiffs say that this indirectly led their discriminatory demotion and termination. These allegations make the treatment of

African American customers and franchisees relevant to the claims.[5] The Court will not strike these allegations under Rule 12(f).

Next, Defendants object to allegations describing a failure to promote African Americans, disproportionate demotions and terminations of African Americans, and a corporate culture that undervalued African Americans. Defendants say that because the Plaintiffs use the phrase "pattern and practice" they are attempting to vindicate the rights of non-plaintiffs—a remedy reserved for class actions or actions brought by the EEOC. The Complaint is not the picture of clarity, but in the paragraphs in question Neal describes how she was demoted and terminated, and Guster-Hines describes how she was passed over for promotions and demoted. Moreover, Plaintiffs respond that allegations about a pattern of mistreating African American employees support the inference that Defendants *intentionally* discriminated against them, and will, after discovery, be introduced as Rule 404(b) evidence of "other bad acts." The Court will not strike the allegations framed as a "pattern and practice."[6]

The Complaint also contains certain allegations that fall outside of the four-year statute of limitations of a § 1981 claim. Plaintiffs argue that these allegations were part of a hostile work environment (Dkt. 77 at 9–12). *See Nat'l R.R. Passenger*

---

[5] Plaintiffs also argue that when intent to discriminate is an element, acts of racism directed at others are relevant. They rely on cases concerning admissibility of evidence at trial. *See Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 470 (6th Cir. 2009) ("The racial hostility was further evidenced [. . .] by [the employer's] less-than-favorable treatment of its black customers."); *Barber v. Cty. of Ventura*, 45 Fed. App'x. 725, 729 (9th Cir. 2002) ("The customer's testimony is relevant because it shows how the [employer] treated [the plaintiff] and other members of his race."). The Court need not consider admissibility decisions.

[6] The Court makes no determination about the admissibility of any alleged Rule 404(b) evidence.

*Corp. v. Morgan*, 536 U.S. 101, 122 (2002) ("A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."). Whether or not allegations will be admissible, the Court is unwilling to strike them at this time.

Finally, the Defendants argue that certain allegations were included only to embarrass or humiliate them. The paragraphs they point to are, by and large, generalized assertions that the individual Defendants intentionally discriminated on the basis of race. For example, Defendants are said to have "declared war" against African Americans, (Dkt. 51, ¶ 10); the "dream of racial equality" was "dead and buried" under their leadership, (*Id*. at ¶ 9); and the firings and demotions of African Americans are characterized as a "ruthless purge," (*Id*. at ¶ 20), and as "racial carnage," (*Id*. at ¶ 19). The Court questions the benefit of such evocative descriptions, but they are not so inflammatory as to require action on the Court's part. The only inappropriate allegation is that Easterbrook's employment was terminated for "violat[ing] company policy by having an alleged consensual relationship with an employee." (*Id*. at ¶ 38). This is irrelevant to the Plaintiffs' claims and "serves no purpose other than scandalizing." *Bd. of Educ. of Thornton Twp. High Sch. Dist. 205 v. Bd. of Educ. of Argo Cmty. High Sch. Dist. 217*, No. 06 CV 2005, 2006 WL 1896068, at *3 (N.D. Ill. Jul. 10, 2006). That portion of ¶ 38 is stricken. Defendants' motions to strike are otherwise denied.

**B. McDonald's USA's Motion to Dismiss**

McDonald's USA is named in all fourteen Counts and moves to dismiss the following: (1) Title VII claims that arose prior to March 5, 2019; (2) Title VII disparate impact claims; and (3) Title VII and § 1981 claims insofar as they depend on *respondeat superior* liability for the actions of Easterbrook, Kempczinski, or Strong.

### 1. Time-barred Title VII Claims

McDonald's USA argues that Plaintiffs raise some of their claims too late. (Dkt. 59 at 5). Title VII requires a plaintiff to exhaust her administrative remedies by filing a charge with the EEOC no more than 300 days after the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). Plaintiffs filed their original EEOC charges on December 30, 2019. (Dkt. 59, Ex. A), making March 5, 2019, the three-hundred-day cut-off.

#### a. Hostile Work Environment Claims

Plaintiffs misconstrue the continuing violation doctrine when they rely on *Natl. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002). Morgan, where the Court held that "[i]t does not matter, for purposes of [Title VII], that some of the component acts of the *hostile work environment* fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire period of the hostile environment may be considered by a court for the purposes of determining liability" (emphasis added), saves only Plaintiffs'

hostile work environment claims.[7] *See Watkins v. Chicago Housing Auth.*, 527 F. App'x 504, 506 (7th Cir. 2013) (the "doctrine of continuing violation does not revive discrete injuries falling outside of the limitations period, such as the discrimination [plaintiff] broadly describes throughout his complaint").

### b. Discrimination and Retaliation Claims

Plaintiffs seem to argue that conduct that took place before March 5, 2019 is actionable if it is "like or reasonably related" to the timely allegations in their EEOC charges. (Dkt. 75 at 4). They cite *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994) for this proposition. This misses the mark. There is no question that "a plaintiff can still bring claims not included in the EEOC charge if they are like or reasonably related to the allegations of the EEOC charge and growing out of such allegations." *Arce v. Chicago Transit Auth.*, No. 14 C 102, 2015 WL 3504860, at *3 (N.D. Ill. June 2, 2015), aff'd, 738 F. App'x 355 (7th Cir. 2018) (citations omitted). "But that principle applies only to *otherwise timely allegations*; [d]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* (citations omitted). *See also National Railroad Passenger Corp. v. Morgan*, 536 US 101, 113 (2002) ("discrete discriminatory acts are not actionable if time barred, even when they are related to

---

[7] Defendants counter that this doctrine "does not apply when the time-barred incident viewed alone should have triggered an employee's awareness of and duty to assert his or her rights." *Flowers v. City of Chicago*, No. 18 CV 7003, 2019 WL 1932587, at *3 (N.D. Ill. May 1, 2019) (quotations and citations omitted). None of the early incidents alleged here (use of racial slurs or racial stereotypes), when viewed alone, rose to the level of a hostile work environment. *See, e.g., Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) ("mere utterance of an [. . .] epithet which engenders offensive feelings in a[n] employee does [. . .] not sufficiently affect the conditions of employment to implicate Title VII").

acts alleged in timely filed charges. [. . .] [E]ach discrete act starts a new clock for filing charges alleging that act. [. . .] The charge must be filed within the 180– or 300–day time period after the [discriminatory] act occurred"); *Pruitt v. City of Chicago*, 472 F.3d 925, 927 (7th Cir. 2006) ("Claims about discrete employment actions [. . .] must be made within 300 days under Title VII or four years under § 1981 [. . .] [t]hat discrete acts may have been mixed with a hostile environment does not extend the time."). Plaintiffs have failed to exhaust claims of discrimination or retaliation that took place prior to March 5, 2019.[8]

### c. Disparate Impact Claims

Plaintiffs filed two sets of charges with the EEOC, one on December 30, 2019 and one on July 6, 2020. McDonald's USA argues that the later EEOC charges should control which of the Plaintiffs' disparate impact claims were timely, because the phrase "disparate impact" appeared only in the second EEOC charges. (Dkt. 59 at 7). The Court is not convinced. Plaintiffs need not use the label "disparate impact," or even allege a facially neutral policy to exhaust administrative remedies. *See, e.g., Lucas v. Gold Standard Baking, Inc.,* No. 13 C 1524, 2014 WL 518000, at *3 (N.D. Ill. Feb. 10, 2014) (motion to dismiss denied because "[p]laintiffs' EEOC charges could be read to encompass both disparate treatment and disparate impact"). The earlier EEOC charges include allegations that are later raised by the Plaintiffs in support of their disparate impact claims, such as the demotion of African American executives, the decision to stop promoting racial diversity in the

---

[8] This has little impact on the retaliation claims since all allegedly retaliatory conduct took place after March 2019. (Dkt. 51, ¶¶ 189, 203, 204).

workplace, and the mistreatment of African American franchisees and customers. (Dkt. 59, Ex. A). Therefore, Plaintiffs' December 30, 2019 EEOC charges preserved their disparate impact claims, and their administrative remedies were properly exhausted with respect to allegations of disparate impact from March 5, 2019 onwards.

### 2. Title VII Disparate Impact Claims

To allege disparate impact, a plaintiff must "establish that a particular employment practice causes a disparate impact on a member of a protected class." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012). Disparate impact claims involve employment practices that "fall more harshly on one group than another and cannot be justified by business necessity," but they do not require proof of discriminatory motive or intent. *Id.* at 716. McDonalds USA asserts Plaintiffs fail to identify a "specific employment practice" (Dkt. 59 at 8). The Court agrees in part.

Plaintiffs allege that between 2015 and December 2019 various employment practices disparately impacted African American employees. First, they say that McDonald's USA "abandon[ed] the goal of racial equality in employment [. . .] instead making gender the exclusive focus of its efforts to achieve diversity and inclusion." This focus on gender diversity was "an intentional slap in the face to African American senior executives," and sent the message "that the dream of racial equality was dead and buried." (Dkt. 51, ¶ 7, 9). The alleged impact of this policy shift was psychological; it did not change the terms or conditions of the Plaintiffs' employment. They have therefore failed to state that the policy constituted an

16

adverse employment action as required under Title VII. *See Chicago Teachers Union, Loc. 1 v. Bd. of Educ. of City of Chicago*, 419 F. Supp. 3d 1038, 1046 (N.D. Ill. 2020) (court considering disparate impact claims had to determine whether layoff notice impacted terms and conditions of employment enough to rise to the level of an adverse employment action and fall within the scope of Title VII); *Watkins v. City of Chicago*, No. 17 C 2028, 2018 WL 2689537, at *8–9 (N.D. Ill. Jun. 5, 2018) (dismissing plaintiff's disparate impact claim, which failed to allege "how the discrimination operates in practice, or even give anecdotal examples of the alleged disparities (apart from [plaintiff's] own experience)"); *Davis v. Precoat Metals*, 328 F. Supp. 2d 847, 855–56 (N.D. Ill. 2004) (requiring plaintiffs to "show that the challenged employment practice has a significantly adverse impact on a protected group").

Plaintiffs also rely on the treatment of African American franchisees (who were forced to make greater capital expenditures than their white counterparts, denied the benefits of advertising dollars, and graded unfairly) and African American customers (who received fewer advertising dollars). These are not employment practices cognizable under Title VII. *See Schutz v. W. Publ'g Co.*, 609 F. Supp. 888, 904 (N.D. Ill. 1985) (finding "the disparate impact model [was] not suitable for use" where the plaintiff's termination "did not result from any specific employment criterion, procedure or practice," but rather from "a complex set of business decisions and judgments which went into the reorganization of [Defendant's] sales force," including countless factors which "by their very nature,

17

were unique to each territory."). Title VII disparate impact claims based on these theories (shift is focus for diversity purposes; treatment of African American customers and African American franchisees) are dismissed with prejudice.

Finally, Plaintiffs say McDonald's USA had a policy of disproportionately terminating and demoting African Americans in a manner that "decimat[ed] the ranks of African American executives." (Dkt. 75 at 7). This properly alleges an employment practice resulting in adverse employment actions that fell disproportionately on African American executives. However, to the extent that this claim relies on the reorganization that took place in the summer of 2018, prior to March 5, 2019, it is barred for purposes of Title VII based on failure to timely exhaust administrative remedies.

### 3. Title VII and § 1981 Respondeat Superior Claims

McDonald's USA argues that Plaintiffs' discrimination, retaliation and hostile work environment claims under Title VII and § 1981 should be dismissed because the Complaint does not allege that its two employees, Kempczinski or Strong, engaged in any discriminatory, retaliatory, or harassing conduct with the requisite intent.[9] McDonald's USA's argument, which does not cite any relevant case law, is unpersuasive. First, as described below, the Complaint *does* allege that Kempczinski and Strong intentionally discriminated against Plaintiffs, and that Strong created a hostile work environment. Second, McDonald's USA's argument

---

[9] Plaintiffs do not respond to McDonald's USA's argument that Easterbrook was not its agent, so they have waived any argument to the contrary. *See, e.g., Odeluga v. PCC Cmty. Wellness Ctr.*, No. 12 CV 07388, 2013 WL 4552688, at *5 (N.D. Ill. Aug. 27, 2013) (absent an agency relationship, a defendant cannot be liable for the acts engaged in by other parties).

incorrectly assumes that its liability is limited to the liability of the named Defendants. Plaintiffs claim that various specified and unspecified McDonald's USA supervisory employees, in addition to Strong and Kempczinski, intentionally discriminated against them, retaliated against them, and subjected them to a hostile work environment. The fact that allegations like these are not attributed to *named* individual Defendants does relieve McDonald's USA of liability for the acts of its agents.[10] Finally, as Plaintiffs point out *James v. Get Fresh Produce, Inc.*, 18 C 4788, 2018 WL 6199003, at *4 (N.D. Ill. Nov. 28, 2018) ("it does not take much to state a claim for employment discrimination under Title VII [or § 1981]."); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) (describing the minimal pleading standard for simple claims of race or sex discrimination); *Luevano v. Wal–Mart Stores, Inc.*, 722 F.3d 1014, 1028 (7th Cir.2013) (observing that the pleading standard for race discrimination cases in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) survived *Twombly* and *Iqbal*). The Court will not dismiss claims against McDonald's USA on this basis.

## C. Strong's Motion to Dismiss

Plaintiffs' Complaint alleges that Strong discriminated against them (Counts I and II), created a hostile work environment (Counts III and IV) and retaliated against them (Counts V and VI) in violation of § 1981. Strong moves to dismiss each of these allegations.

---

[10] McDonald's USA fails to respond to this argument in its reply brief, so the issue is waived.

### 1. § 1981 Discrimination (Counts I and II)

To state a claim of racial discrimination under § 1981, Plaintiffs need allege that "the employer instituted a (specified) adverse employment action against the plaintiff[s] on the basis of [their] race." *Trent v. D.T. Chicagoland Express, Inc.*, No. 18 CV 5090, 2019 WL 498943, at *2 (N.D. Ill. Feb. 7, 2019) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008)). A supervisor such as Strong may be liable, so long as he "causes or participates in a constitutional deprivation." *Holmes v. Hous. Auth. of Joliet*, No. 14 CV 3132, 2014 WL 6564949, at *6 (N.D. Ill. Nov. 20, 2014) (citing *Smith v. Bray*, 681 F.3d 888, 889 (7th Cir. 2012)). The individual defendant must be "personally involved," which can mean "acquiesce[ing] in some demonstrable way to the alleged constitutional deprivation;" or if the "conduct causing the constitutional deprivation" occurred at his "direction or with [his] knowledge and consent." *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 901 (N.D. Ill. 2011) (citations omitted).

Strong asserts he did not personally cause, participate in, or acquiesce in any adverse employment actions against the Plaintiffs based on their race, but this is contradicted by the Complaint. According to the Plaintiffs, Strong "openly targeted [Neal] for elimination" before her termination. (Dkt. 51, ¶ 64). He also assigned a coach to Neal to both humiliate her and use against her professionally. (*Id.* at ¶¶ 95, 105). The Complaint also alleges Strong helped orchestrate the 2018 reorganization which resulted in the demotion of both Plaintiffs. (*Id.* at ¶ 85). The Complaint further states that Strong "unfairly blocked deserving African Americans from

advancement," (*Id*. at ¶ 73), instead "[going] to bat" for less qualified white employees during that reorganization (*Id*. at ¶ 85c). The Complaint states that, with respect to Counts I and II, Strong "knowingly discriminated against [Plaintiffs] based on race and knowingly treated comparable White Officers preferably." (*Id*. at ¶¶ 135, 150). Plaintiffs need not allege anything further, though Strong's numerous comments about their race, discussed at length below, lend unequivocal support to this allegation. Strong's motion to dismiss Counts I and II is denied.

### 2. § 1981 Hostile Work Environment (Counts III and IV)

A hostile work environment claim requires that the harassment Plaintiffs experience be "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005); *see also Little v. JB Pritzker for Governor,* No. 18 CV 6954, 2019 WL 1505408, at *4 (N.D. Ill. Apr. 5, 2019). In assessing whether a hostile work environment claim has been properly pled, courts consider "(1) the frequency of the conduct; (2) the objective offensiveness of the conduct; (3) whether the offenses were physical rather than verbal; (4) the degree of work interference; and (5) whether the conduct was directed at the Plaintiff." *Salgado v. Graham Enter. Inc.*, No. 18 CV 8119, 2019 WL 3555001, at *2 (N.D. Ill. Aug. 1, 2019). Contrary to Strong's assertions, a workplace *need not* be "hellish" in order to constitute a hostile work environment. *Compare Boniface v. Westminster Place*, No. 18 CV 4596, 2019 WL 479995, at *3 (N.D. Ill. Feb. 7, 2019) (citing *Whittaker v. Northern Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (only a "hellish" workplace is actionable as a hostile

work environment) *with Gates v. Bd. of Educ. of Chicago*, 916 F.3d 631, 637 (7th Cir. 2019) (noting the rejection of the "hellish" standard for hostile work environment claims) *and Salgado v. Graham Enter. Inc.*, No. 18 CV 8119, 2019 WL 3555001, at *3 (N.D. Ill. Aug. 1, 2019) (cited by Defendants, holding the same).

Here Plaintiffs have not necessarily alleged that Strong's harassment was severe, but they have plausibly alleged that his harassment was pervasive. To paraphrase the five relevant factors, it was frequent, objectively and subjectively offensive, interfered substantially with their work, and was directed towards them. The Complaint alleges that Strong ignored Neal's complaints about mistreatment by other managers, (*Id.* at ¶ 100), and allowed a white franchisee to threaten and harass Guster-Hines, (*Id.* at ¶ 69), two examples of acquiescence which "may suffice as personal participation." *Little v. JB Pritzker for Governor*, No. 18 C 6954, 2019 WL 1505408, at *3 (N.D. Ill. Apr. 5, 2019) (citing *Nanda v. Moss*, 412 F.3d 836, 843 (7th Cir. 2005)). He also told Neal not to collaborate with other black colleagues because they had an "angry and aggressive" "Black wom[an] attitude," instructions that were racially charged, insulting, and arguably made it more difficult for Plaintiffs to do their jobs. (*Id.* at ¶ 69b). Later, he assigned Neal a professional coach in an effort to stigmatize her and gather information to be used against her. (*Id.* at ¶ 95). And he referred to Plaintiffs and other employees as "angry black women" on at least three specific occasions, from March of 2018 onwards (*Id.* at ¶ 69d–f). This is the kind of conduct which, according to several cases *cited by Strong,* alleges a hostile work environment. *See, e.g., Easley v. Iberia Airlines*, No.

05 C 3760, 2007 WL 625515, at *5 (N.D. Ill. Feb. 23, 2007) (being "called names repeatedly on the basis of her race" and ostracized by supervisors may constitute harassment under § 1981 so hostile work environment claims were not dismissed); *Little v. JB Pritzker for Governor*, No. 18 C 6954, 2019 WL 1505408, at *4 (N.D. Ill. Apr. 5, 2019) (hostile work environment claims not dismissed where supervisor told plaintiff "not to be stupid," racial epithets were used in plaintiff's presence, complaints about discrimination were dismissed by a supervisor, and plaintiff was denied opportunity to ask questions). The remaining cases cited by Strong are easily distinguishable as they describe less severe and less pervasive conduct or insufficiently specific allegations. *See Boniface v. Westminster Place*, No. 18-CV-4596, 2019 WL 479995, at *3 (N.D. Ill. Feb. 7, 2019) (single "vague" allegation of a voodoo bag being used to intimidate plaintiff one a single occasion was not severe or pervasive, or even clearly race-related); *Salgado v. Graham Enter. Inc.*, No. 18 C 8119, 2019 WL 3555001, at *3 (N.D. Ill. Aug. 1, 2019) ("barebones" allegations of the use of racial slurs, which didn't specify what those slurs were or the frequency with which they were used, were too vague to be actionable); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (one-time use of racial epithet not directed at plaintiff himself was "second-hand" harassment and not severe or pervasive enough to survive summary judgment motion); *and see Triplett v. Starbucks Coffee*, No. 10-C-5215, 2011 WL 3165576, at *4-5 (N.D. Ill. July 26, 2011) (dismissing a hostile work environment claim involving a single racially insensitive

comment and two disciplinary actions). Strong's motion to dismiss Counts III and IV is denied.

### 3. § 1981 Retaliation (Counts V and VI)

To adequately plead a claim of retaliation under § 1981, Plaintiffs must allege that they "engaged in a statutorily protected activity and [were] subjected to materially adverse actions as a result of that activity". *Garza v. Ill. Inst. of Tech.*, No. 17-C-6334, 2018 WL 264198, at *3 (N.D. Ill. Jan. 2, 2018). Retaliation claims must involve personal participation in the retaliatory conduct by the individual defendant. *Nieman v. Nationwide Mut. Ins. Co.*, 706 F. Supp. 2d 897, 909 (C.D. Ill. 2010). Strong concedes that the Plaintiffs engaged in some protected activity but argues that the Complaint fails to allege (a) that he was aware of the protected activity and (b) that he participated in any materially adverse employment actions they suffered.

#### a. Protected Activity

Both Guster-Hines and Neal advocated on behalf of other African Americans. They supported the African American franchisees in NBMOA, and Neal "went to bat" for the son of an African American franchisee who was at risk of losing his late father's business. They were also active members of the McDonald's African American Counsel. But this advocacy was not protected activity, because protected activity must be undertaken in opposition to an unlawful employment practice prohibited by Title VII or § 1981.[11] *See Nolan v. City of Chicago*, No. 15 CV 11645,

---

[11] Plaintiffs also argue, creatively, that by complaining about policies that affected African American franchisees and customers they were in fact complaining about a hostile work environment, because

2017 WL 569154, at *3 (N.D. Ill. Feb. 13, 2017); *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008) (noting that a retaliation claim asserted under either Title VII or Section 1981 requires that a plaintiff first show that he or she engaged in a protected activity). By contrast, the Plaintiffs' complaints that the 2018 reorganization disproportionately targeted African Americans and their lawsuit (filed in October of 2019) were protected activity.[12]

### b. Strong's Knowledge

It is not clear from the Complaint that Strong knew of Plaintiffs' protests against the reorganization. Neal and Guster-Hines "protested to Easterbrook and Kempczinski the disproportionate reduction of African American senior executives was unacceptable," but apparently not to Strong. (Dkt. 51 at ¶ 92). Neal also "approached Kempczinski and Kersey to plead for herself and other African Americans" after the 2018 reorganization, but there is no indication that Strong was involved in these conversations. (*Id.* at ¶ 99). He cannot be said to have retaliated against the Plaintiffs *because* of their protests against the restructuring if he was unaware of their protests. The Complaint does allege, however, that "Strong, among others, retaliated against [Neal and Guster-Hines] when [their] counsel

---

those policies *created* that hostile work environment. This argument fails because while Plaintiffs complained about the treatment of franchisees and customers, they do not allege they complained about how the treatment of those franchisees and customers affected them. Because they did not allege that the polices created a hostile environment, they did not allege a protected activity.

[12] Plaintiffs also allege that they complained about Laura Granger, an HR Director, who allegedly discriminated against African American employees, and that they complained when an unnamed female African American employee was being sexually harassed by a franchisee because of her race and gender. The Plaintiffs do not, however, argue that these complaints (which were arguably protected activity) caused retaliation. (Dkt. 75 at 12).

notified McDonald's of [this lawsuit]." (*Id.* at ¶¶ 189, 203, 296, 310). This clearly implies knowledge of the lawsuit.

### c. Personal Participation in Retaliation

After filing suit, Plaintiffs were excluded from a meeting of the McDonald's African American Counsel. Assuming without deciding that this could constitute an adverse employment action, the Complaint does not suggest Strong was personally involved in that exclusion. Plaintiffs job duties were also decreased as colleagues stopped emailing them because "McDonald's placed targets on [their] backs" and "instructed their peers to exclude and isolate them" as "punishment for speaking out against racism." (*Id.* at ¶ 106). Eventually, Neal's employment was terminated. It is not clear to what extent Strong was involved in these adverse employment actions.

Plaintiffs allege that "Strong" in particular "carr[ied] out [the] ruthless humiliation and expulsion of highly qualified African Americans including [Guster-Hines] and [Neal]" but this appears to refer to their demotions during the reorganization, which were allegedly discriminatory but not retaliatory. (*Id.* at ¶ 10). Counts V and VI are therefore dismissed without prejudice as to Strong.

### D. Easterbrook's Motion to Dismiss

Defendant Easterbrook was CEO of the global parent company of McDonald's USA, McDonald's Corporation. McDonald's Corporation did not employ the Plaintiffs. Easterbrook, however, (1) handpicked the President of McDonald's USA, Kempczinski; (2) prioritized gender diversity at McDonald's over racial diversity; (3)

allowed a McDonald's USA employee working group called McDonald's African American Counsel to become inactive; (4) excluded African Americans from his inner circle of trusted advisors; (5) decreased advertising targeting African American consumers; (6) thereby reducing the profitability of African American-owned franchises and decreasing their overall number; and (7) refused to allow Human Resources employees to track the progress of African American women separately from the progress of all women. The Complaint also alleges that Easterbrook purged African American executives (including Plaintiffs) from the organization's executive level by demoting or firing them during a 2018 reorganization, while ignoring entreaties by the Plaintiffs describing the disproportionate effects this reorganization had on African American executives. It is not clear whether the executives in question were, like the Plaintiffs, employees of McDonald's USA, or whether they were employees of McDonald's Corporation. Nor is it clear precisely how Easterbrook was involved in these employment decisions. Easterbrook moves to dismiss these claims.

### 1. § 1981 Disparate Treatment (Counts I and II)

The vast majority of the allegations against Easterbrook were simply not adverse employment actions against the Plaintiffs, and therefore are not actionable. Plaintiffs have plausibly alleged, however, that Easterbrook was involved in their demotions during the 2018 reorganization. It is plausible that the CEO of McDonald's Corporation would be involved in an executive-level reorganization at McDonald's USA. *Compare Rainey v. Lipari Foods, Inc.*, No. 12 CV 9561, 2014 WL

4182662, at *2 (N.D. Ill. Aug. 20, 2014) (cited by Defendants, granting motion to dismiss § 1981 claim against CEO because it was not plausible to suggest he had been involved in hiring of a limousine driver). Moreover, Plaintiffs allege that they themselves told Easterbrook the reorganization was disproportionately impacting African American employees, so unlike in *Rainey*, the Complaint alleges that Easterbrook knew or knew of the Plaintiffs and was aware of their race and the races of the other employees being downsized. Plaintiffs have sufficiently pled that Easterbrook engaged in an adverse employment action against them.

The Complaint also pleads that Easterbrook *intended* to discriminate against the Plaintiffs on the basis of race. To begin with, they make the general claim that he "intended that McDonald's perpetrate a pattern and practice of discriminatory conduct against African Americans or in the alternative, he ratified that pattern and practice and failed to stop it." This is fairly conclusory, but at the motion to dismiss stage it is sufficient. *See Tate v. SCR Med. Transp.*, 809 F.3d 343, 346 (7th Cir. 2015); *see also Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). Moreover, Plaintiffs allege both Easterbrook and Kempczinski thought mid-level African American executives were no longer necessary given the demonstrable decrease in African American customers and franchisees. (Dkt. 51, ¶ 20). The fact that 83% of the African American executives working for McDonald's were negatively impacted during the reorganization compared to the impact on non-African American employees, there is circumstantial evidence that race was at least

one of the motivating factors behind this reorganization. These allegations of intent meet the minimal pleading requirements of a discrimination claim.

But, as the Defendants note, race must also be alleged as the *but-for cause* of an adverse employment action in order to qualify as an act of discrimination under § 1981. *Comcast Corp.*, 140 S. Ct. at 1014. The Complaint acknowledges the *stated* purpose of the reorganization that led to their demotions was to "be a more data driven company," which meant reducing the number of field executives supervising franchised restaurants. (Dkt. 51, ¶ 79). However, the Complaint also says that "[i]f the July 2018 [reorganization] had been free from racial bias, [Guster-Hines] and [Neal] would not have been demoted [and] the disparity in the percentage of African American Officers at the level of Vice President or higher that were terminated and demoted as opposed to the percentage of White Officers at those levels terminated and demoted would not have been so wide." (Id. at ¶ 88–89). This alleges but-for causation. Easterbrook's motion to dismiss Counts I and II is denied.

### 2. § 1981 Hostile Work Environment (Counts III and IV)

Easterbrook next argues that Counts III and IV should be dismiss both because Plaintiffs have failed to allege that they were subjected to conduct severe and pervasive enough to constitute a hostile work environment under § 1981, and because Easterbrook did not engage in any of the misconduct. For the reasons set forth above, the Plaintiffs have adequately plead that they experienced harassment amounting to a hostile work environment. But § 1981 countenances individual liability only where the individual was personally involved in the acts of

discrimination. *See, e.g., Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012) (partially overruled on other grounds); *Garner V. N.E.W. Indus., Inc.*, No. 13-C-0569, 2013 WL 6806186, at *1 (E.D. Wis. Dec. 19, 2013).

Easterbrook "omitted" African American's from McDonald's diversity goals in order to focus on gender, reduced advertising directed towards African American consumers, and allowed a working group dedicated to increasing racial diversity, the McDonald's African American Counsel, to go dormant. None of these actions constitute harassment. *See, e.g., Triplett v. Starbucks Coffee*, No. 10-C-5215, 2011 WL 3165576, at *4-5 (N.D. Ill. July 26, 2011) (dismissing a hostile work environment claim based on one racially insensitive comment made by her manager, a store policy requiring employees to buy goods before being permitted to use the restroom, and two racially based disciplinary actions). Moreover, nothing in the Complaint suggests Easterbrook was personally aware of or condoned the harassment Plaintiffs experienced. Counts III and IV are dismissed with prejudice as to Easterbrook.

### 3. § 1981 Retaliation (Counts V and VI)

Easterbrook argues that the Complaint fails to allege (a) that Plaintiffs engaged in protected activity, (b) that he was aware of any protected activity, or (c) that he participated in any materially adverse employment action in response to protected activity.

The Complaint alleges that the Plaintiffs engaged in protected activity. Easterbrook was allegedly aware of some of the Plaintiffs' protected conduct;

specifically, their opposition to the reorganization they believed was racially motivated. But there are no allegations that Easterbrook was aware of their lawsuit or of any of the alleged retaliatory actions that followed, much less that he condoned them or directed them. Therefore, Counts V and VI are dismissed with prejudice as to Easterbrook.

## E. McDonald's Corporation's Motion to Dismiss

### 1. Employer Relationship under Title VII

McDonald's Corporation argues that all claims against it should be dismissed because it did not employ the Plaintiffs. The Corporation may still be liable, for three reasons. First, a defendant may be considered a "de facto or indirect employer" if there is evidence that the defendant "controlled the plaintiff's employment relationship." *EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir. 1995); *see also, e.g., Betts v. Options Care Enters., Inc.*, No. 18 CV 4023, 2019 WL 193914, at *5–6 (N.D. Ill. Jan. 15, 2019). This depends on (1) the extent of the purported employer's control and supervision over the employee; (2) the kind of occupation and nature of skill required; (3) the employer's responsibility for the costs of operation; (4) the method and form of payment and benefits; and (5) the length of the job commitment. *See Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 702 (7th Cir. 2015). Plaintiffs have not adequately alleged any of these facts.

Second, a defendant may be an employer solely for purposes of Title VII liability if, through its agents, it "directed the discriminatory act, practice, or policy of which the employee is complaining." *See, e.g., Betts v. Option Care Enterprises,*

*Inc.,* No. 18 CV 4023, 2019 WL 193914, at *5 (N.D. Ill. Jan. 15, 2019) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1088 (7th Cir. 2008) and *Worth v. Tyer*, 276 F.3d 249, 260 (7th Cir. 2001)). Plaintiffs do not clearly distinguish McDonald's Corporation from McDonald's USA in their Complaint, but they do allege that the CEO of McDonald's Corporation, Easterbrook, was involved in discriminatory acts actionable under Title VII. To the extent the Complaint states a claim that Easterbrook discriminated against the Plaintiffs, McDonald's Corporation may be liable under Title VII for conduct that occurred after March 5, 2019. Because Easterbrook was not involved in any alleged retaliation or in the creation of a hostile work environment McDonald's Corporation cannot be said to have directed those actions for purposes of Title VII.[13] Therefore, Counts XI and XII (alleging a hostile work environment under Title VII) and Counts XIII and XIV (retaliation under Title VII) are dismissed with prejudice against McDonald's Corporation. Counts VII and IX (alleging discrimination under Title VII) remain, to the extent that they are not time-barred. Counts VIII and X (disparate impact) are dismissed to the extent described above: Plaintiffs have plausibly alleged a policy of racially discriminatory promotion, demotion, and termination (and Easterbrook was allegedly involved in it), but time-barred conduct prior to March 5, 2019 (such as the 2018 reorganization) cannot support their claims.

Third and finally, McDonald's Corporation may be liable for Easterbrook's actions under § 1981 on a *respondeat superior* theory, because they were his

---

[13] Whereas McDonald's USA may be responsible for the actions of numerous supervisory employees whose conduct is described in the Complaint but who are not named as Defendants, no McDonald's Corporation employees other than Easterbrook are mentioned in the Complaint.

employer until his termination in November of 2019. *See Odeluga v. PCC Cmty. Wellness Ctr.*, No. 12 CV 07388, 2013 WL 4552688, at *5 (N.D. Ill. Aug. 27, 2013) ("A § 1981 plaintiff may pursue a defendant for the civil rights liabilities of its agents under a *respondeat superior*, or vicarious liability, theory.). Section 1981 claims against McDonald's Corporation are dismissed to the same extent they were dismissed as to Easterbrook: Counts I and II (discrimination under § 1981) remain, Counts III and IV (hostile work environment under § 1981) are dismissed with prejudice, and Counts V and VI (§ 1981 retaliation) are dismissed with prejudice.

## F. Kempczinski's Motion to Dismiss

Kempczinski was the President of McDonald's USA, Plaintiffs' employer, until November 3, 2019 when he replaced Easterbrook as President and CEO of McDonald's Corporation. Six Counts are directed towards him: discrimination (Counts I and II), creation of a hostile work environment (Counts III and IV) and retaliation (Counts V and VI) in violation of § 1981. The Complaint alleges that Kempczinski told senior African American executives that "the number of African Americans" in upper management "don't matter." (Dkt. 51, ¶ 6). He also allowed a McDonald's USA employee working group called McDonald's African American Counsel to "[go] dormant" by reducing its budget and programming for developing talent, (*Id*. at ¶ 9) and excluded African Americans from his inner circle of trusted advisors. (*Id*. at ¶ 10). Moreover, he allegedly decreased advertising targeting African American consumers and thereby injured African American-owned franchises. (*Id*. at ¶ 18). Most relevant for purposes of this suit, Kempczinski

"purged" African American executives (including Plaintiffs) from the organization's executive level by demoting or firing them. (*Id*. at ¶ 20).

More generally, it is alleged that after "Kempczinski took the helm at McDonald's, incidents of overt hostility towards Blacks, for which white perpetrators suffered no consequence, increased in both frequency and severity." (*Id*. at ¶ 69). Although it is not clear to what extent Kempczinski was aware of these incidents, he knew that the 2018 reorganization was opposed by the Plaintiffs and other African American executives, because they lodged their complaints with Kempczinski and Easterbrook directly. (*Id*. at ¶ 92). Guster-Hines also met with Kempczinski and another executive, Melissa Kersey, to discuss the effects of the reorganization in February of 2019. (*Id*. at ¶ 98). Kersey agreed to track the success of African American women separately from the success of white women but told the Plaintiffs that Kempczinski would not give her permission to do so. (*Id*. at ¶ 99).

### 1. § 1981 Discrimination (Counts I and II)

Kempczinski is accused of essentially the same acts of discrimination as Easterbrook; namely, instituting the 2018 reorganization with the purpose of demoting and terminating African American executives (including the Plaintiffs). His motion to dismiss Count I and II is denied for the reasons enumerated above. Plaintiffs' description of the reorganization qualifies as an adverse employment action since it resulted in their demotions. Kempczinski is alleged to have "approv[ed]" and overseen that reorganization. (Dkt. 51, ¶ 123). Moreover, the Complaint alleges "Kempczinski *intended* that McDonald's perpetrate [this]

34

discriminatory conduct against African Americans." (*Id*. at ¶ 122). The Complaint alleges that "if the July 2018 FFR had been free from racial bias, [they] would not have been demoted." (*Id*. at ¶ 88). They also allege more specifically that Kempczinski believed the number of African American executives at McDonald's didn't matter, and that in light of the well-documented decisions to deprioritize advertising to African American customers and thereby reduce the number of African American franchisees, African American executives had become less necessary to the operations of the company. (*Id*. at 20).

### 2. § 1981 Hostile Work Environment (Counts III and IV)

Kempczinski next argues that the Plaintiffs have not adequately alleged harassment that is severe or pervasive enough to constitute a hostile work environment. Plaintiffs largely fail to respond to this argument, although given the number of redundant motions filed by the Defendants this is perhaps not surprising. For the reasons described elsewhere in this order they have plausibly alleged a hostile work environment.

Kempczinski is not, however, personally liable under § 1981 for the hostile work environment that Plaintiffs allege. While it is alleged that after "Kempczinski took the helm at McDonald's, incidents of overt hostility towards Blacks, for which White perpetrators suffered no consequence, increased in both frequency and severity," there is no indication that he caused this trend or knew of those incidents. (*Id*. at ¶ 69). Setting aside his participation in the reorganization, he is only alleged to have made one race-related comment: that the number of African American

executives at McDonald's didn't matter to him. This level of participation in the creation of a hostile work environment is not enough to give rise to personal liability. *See Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012). Counts III and IV are dismissed with prejudice as to Kempczinski.

### 3. § 1981 Retaliation (Counts V and VI)

Finally, Counts V and VI are dismissed as to Kempczinski. The Plaintiffs have plausibly alleged that he was aware of their protected activity; both Plaintiffs complained to him about the racial impact of the reorganization, (*Id*. at ¶ 92), and Guster-Hines even met with him in person. (*Id*. at ¶ 98). But there is no indication that Kempczinski knew of or authorized any retaliatory actions in response to this protected conduct or the filing of Plaintiffs' lawsuit, their other protected act. The allegation that "Kempczinski [. . .] among others, retaliated against [Neal] when her counsel notified McDonald's of the claims" is simply conclusory. Counts V and VI are dismissed without prejudice.

## IV. Conclusion

Defendants' Motions to Strike (Dkts. 64 and 70) are denied except as to the circumstances of Defendant Easterbrook's termination. Defendants' motions to dismiss (Dkts. 56, 58, 60, 62, and 68) are granted in part as follows. Counts I and II alleging disparate treatment on the basis of race in violation of § 1981 may proceed against all Defendants. Counts III and IV alleging hostile work environment in violation of § 1981 may proceed against McDonald's USA and Strong. These Counts are dismissed with prejudice as to the remaining Defendants. Counts V and VI

alleging retaliation under § 1981 may proceed against McDonald's USA. These Counts are dismissed without prejudice against Strong and Kempczinski. They are dismissed with prejudice against the remaining defendants.

As to the Title VII allegations, Counts VIII and X are limited to a theory of disparate impact based on firings and demotions after March 5, 2019 against both McDonald's USA and McDonald's Corporation. Counts VII and IX may proceed against both defendants based on conduct after March 5, 2019. Counts XI and XII alleging hostile work environment are dismissed with prejudice against McDonald's Corporation but may proceed against McDonald's USA. Finally, Counts XIII and XIV alleging retaliation are dismissed with prejudice against McDonald's Corporation but may proceed against McDonald's USA based on conduct after March 5, 2019.

E N T E R:

Dated: June 25, 2021

_____
MARY M. ROWLAND
United States District Judge