UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
VICTORIA GUSTER-HINES        )
and DOMINECA NEAL,           )
                             )
              Plaintiffs,    )
                             )
     vs.                     )  No. 20 C 117
                             )
McDONALD'S USA, L.L.C., a Delaware )
limited liability company, et al., )  Chicago, Illinois
                             )  October 4, 2023
              Defendants.    )  4:00 o'clock p.m.
```

TRANSCRIPT OF PROCEEDINGS -
Status/Motion Hearing
BEFORE THE HONORABLE MAGISTRATE SHEILA M. FINNEGAN

APPEARANCES:

```
For the Plaintiffs:     LOEVY & LOEVY
                        BY:  MS. HEATHER LEWIS DONNELL
                             MS. ANNIE D. PROSSNITZ
                        311 North Aberdeen Street, 3rd Floor
                        Chicago, Illinois  60607
                        (312) 243-5900


For the McDonald's      PROSKAUER ROSE, L.L.P.
Defendants:             BY:  MR. NIGEL F. TELMAN
                             MR. EDWARD C. YOUNG
                        Three First National Plaza
                        70 West Madison Street, Suite 3800
                        Chicago, Illinois  60602
                        (312) 962-3548

                        PROSKAUER ROSE, L.L.P.
        (via phone)     BY:  MS. ATOYIA S. HARRIS
                        650 Poydras Street, Suite 1800
                        New Orleans, Louisiana  70130
                        (504) 310-2027
```

1     APPEARANCES (Continued):

2

3     For Defendant              K&L GATES, L.L.P.
      Easterbrook (via phone):   BY:  MR. NELSON HUA
4                                70 West Madison Street, Suite 3300
                                 Chicago, Illinois  60602
5                                (312) 807-4312

6
      Also Present:              MS. VICTORIA GUSTER-HINES
7                                MS. DOMINECA NEAL

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
                  COLLEEN M. CONWAY, CSR, RMR, CRR
23                     Official Court Reporter
               219 South Dearborn Street, Room 1918
24                    Chicago, Illinois  60604
                          (312) 435-5594
25               colleen_conway@ilnd.uscourts.gov

1    (Proceedings heard in open court:)

2        THE CLERK:  Case 20 CV 117, Guster-Hines, et al.

3    versus McDonald's USA, et al.; here for status and motion

4    hearing.

5        THE COURT:  All right.  Good afternoon, everyone.

6        Could I have counsel for the plaintiffs please say

7    your names.

8        MS. DONNELL:  Good afternoon, Your Honor.  It's

9    Heather Lewis Donnell, D-o-n-n-e-l-l, on behalf of the

10   plaintiffs, Ms. Dominica Neal and Victoria Guster-Hines, who

11   are both present here in the courtroom, and my colleague.

12       MS. PROSSNITZ:  Annie Prossnitz on behalf of

13   plaintiffs, Your Honor.

14       THE COURT:  All right.  Thank you.  Good afternoon.

15       And counsel for the McDonald's group of defendants,

16   please say your names.

17       MR. TELMAN:  Good morning, Your Honor -- or good

18   afternoon.  Sorry.  Nigel Telman on behalf of the McDonald's

19   defendants.

20       MR. YOUNG:  Good afternoon, Your Honor.  Edward Young

21   also on behalf of the McDonald's defendants.

22       THE COURT:  All right.  And I don't know if we have

23   counsel for Defendant Easterbrook on the line.  If so, please

24   say your name.

25       MR. HUA:  This is Nelson Hua for Defendant

1   Easterbrook.

2          THE COURT:  Thank you.

3          All right.  I have, of course, reviewed the parties'

4   32-page joint status report filed on September 22nd.  It's

5   docket 370.  And then the five-page supplemental status report

6   filed yesterday, October 3rd.  That's docket 374.

7          Let me ask, are there any updates anyone wants to

8   share since the filing of that document?

9          I recognize it was just yesterday, but I -- it

10  doesn't hurt to ask.

11         MS. DONNELL:  Thank you, Your Honor.  This is

12  plaintiffs.

13         We do not have any additional updates at this time.

14  I think the issues that we presented to be resolved today are

15  still ripe for your resolution.

16         THE COURT:  All right.  And defense counsel,

17  anything?

18         MR. YOUNG:  We would agree with that.

19         THE COURT:  All right.  So let me just focus for a

20  minute on comparator discovery.

21         Obviously, that was what I really wanted to get done.

22  And I was a little surprised that we're not maybe quite done

23  with comparator discovery.  Though, I appreciate that the

24  parties have at least resolved, I think, disputes over it.

25         But, as I understand it from the supplemental report,

1    plaintiffs have provided a list of documents that they don't

2    believe were included in the productions of discovery.  And I

3    will tell you, I experienced deja vu when I read that.  But

4    McDonald's has agreed to review that list, confirm whether it

5    has looked for the identified documents in the locations where

6    the parties agreed McDonald's would search.

7             And let me just ask McDonald's, what is your timeline

8    to complete that?

9             MR. YOUNG:  Your Honor, I believe we should be able

10   to complete that by tomorrow.

11            I believe we'll be representing to plaintiffs that we

12   have exhausted our search and searched in the areas that we

13   agreed to.

14            I believe we have found one additional document that

15   we will be producing, but that will conclude our production of

16   comparator materials.

17            With respect to resumes specifically, you know, we

18   pulled personnel files, and to the extent resumes were there,

19   we produced them.  To the extent they were not, there would be

20   nothing to produce.

21            But to answer Your Honor's question, we think we

22   should be wrapped up by tomorrow.

23            THE COURT:  Great.

24            Another issue that came up is the -- plaintiffs are

25   requesting the -- it's an arbitration agreement -- or it's a

1    severance agreement with an arbitration provision in it between

2    Mr. Collins and McDonald's.

3          And I think at this point, my preliminary view, at

4    least, is that I don't know that the existence of that

5    agreement or any term in it requiring arbitration will really

6    bear on my ruling.  I think I'll be focused on whether Collins

7    has personal knowledge about various topics and whether those

8    topics are relevant and discovery proportional.

9          So I don't think I need to see that provision or that

10   agreement for my ruling.

11         I am going to allow Collins' counsel to speak to that

12   issue, I guess, at the hearing.

13         And, of course, if I decide that I'm going to look at

14   that, and my ruling is going to consider that provision, then I

15   would, of course, order that it be produced.

16         But it seems to me, you know, if I ordered Collins to

17   answer questions, that he's going to have to do it, and then it

18   will be up to him and McDonald's to figure out whether that

19   violates an agreement; and, if so, what the consequences are,

20   and who decides that, whether it's an arbitrator or someone

21   else.

22         But that's my preliminary view.  And I haven't looked

23   at that motion.  I haven't ruled on it.  I'm going to have a

24   hearing.  So maybe I will decide I really need to see that.

25   And if I rely on it, then, of course, plaintiffs would be able

1  to see it.

2  MS. DONNELL:  Your Honor, I -- Ms. Donnell for the

3  plaintiffs.

4  I spoke to Mr. Collins' attorney earlier today, and

5  she just asked that I represent that if there were going to be

6  any issues brought up at the -- that we do it at a hearing

7  where she can be present, because she was unable to be here

8  today.  And I would make that representation to the Court on

9  her behalf.

10  THE COURT:  All right.

11  MS. DONNELL:  So maybe we could just -- if we're

12  going to hold a hearing --

13  THE COURT:  Like I said, it's a preliminary view.

14  What I am going to do right now is at least strike

15  the portion of my prior order that requires McDonald's to

16  produce it.  I may or may not require them to produce it.  I'll

17  hear argument.

18  So they don't have to produce it to you now.

19  MS. DONNELL:  Okay.  And I would just be clear that

20  based on their own -- I want to be careful because I don't want

21  to get too far into it.  But based on McDonald's' own filing --

22  I believe it's page 4 of docket 360 -- I think there's really

23  two potential agreements at issue.  I think they said there's a

24  confidential settlement agreement and a separation agreement.

25  So I'm not sure which of those two agreements are at

1    play for the ruling -- or might be in play for that ruling.

2    And, again, we can hold that off to the hearing you have on

3    that motion.

4              THE COURT:  Right.

5              MS. DONNELL:  But I just reference that

6    representation by McDonald's in their response brief.

7              THE COURT:  All right.  Yeah.  And, again, I -- my

8    plan is just to look at the motion -- the briefs and rule.  And

9    so I don't expect I am going to rely on anything in any other

10   document.  And, you know -- but we'll see what happens.

11             Okay.  Let me turn to another topic.  Defendants have

12   requested -- you know, any request in a joint status report is

13   often, you know, a motion, but it's framed as a request.

14             But you're asking me to order plaintiffs to produce

15   two documents withheld on claim of privilege.

16             And my understanding is plaintiffs are asserting both

17   attorney-client privilege and work-product protection for those

18   two documents.  One is a "journal tracker," and the other is

19   described as a "spreadsheet."

20             I am going to want to review those documents *in*

21   *camera*.

22             And I understand plaintiffs have brought them today,

23   so you can tender those to the Court.  You don't have to do it

24   this second.

25             (Plaintiffs' counsel nods.)

1          THE COURT:  But let me ask this.

2          In relation to the waiver argument made by

3  defendants, I am told that the produced version of the

4  spreadsheet is different from the withheld version of the

5  spreadsheet.  And so I think, unless I have it already, I would

6  like to see the produced version of the spreadsheet as part of

7  my review.

8          And I understand McDonald's already has that.  But I

9  don't think I would have it, unless you give it to me.  And so

10  I'm asking for that.

11          I also have some questions that -- and I'm not saying

12  any -- the answer to any of these questions is dispositive, but

13  they come to my mind, and so I'm going to ask these.

14          You may or may not know the answers now.  Be prepared

15  to answer them.  Or maybe they will be provided to me later, or

16  you'll tell me why I shouldn't be asking this.

17          Now, for each document -- and it may be it will be

18  apparent from my *in camera* review -- I want to know who created

19  each document and when.  And I understand it was over time.

20  But the initial first -- you know, the creation of the

21  document, who created it and when.

22          I am going to want to know the earliest and latest

23  entries.  So first entry is probably going to be, you know, the

24  date it was created.  And then the latest entry.

25          I also would like to know, for the plaintiffs, who

1    created the document, when that plaintiff retained counsel.  In

2    other words, I don't know if this document was created after

3    counsel was retained, a year before.  I mean, I just don't

4    know.  And you all may know that from the timeline.

5         I want to know when the document was first provided

6    to counsel in some form.

7         And I want to know was either document shared with

8    anyone besides counsel.

9         It sounds like one of the documents maybe was shared

10   between Ms. Guster-Hines and Ms. Neal.  And, again, I don't

11   know at that point if they had counsel already and they're

12   represented by the same attorney.  But I am going to want to

13   know, you know, information about that.

14        And, of course, you know, was there anyone else with

15   whom it was shared.  And if it was shared with someone else,

16   when, when did that happen.

17        And I assume the defendants will be deferring the

18   re-deposition of the plaintiffs on some additional text

19   messages until after I rule on the privilege issues, because

20   you may have questions about those documents, if they are

21   produced, correct?

22        MR. TELMAN:  That makes sense, Judge.

23        THE COURT:  Okay.  And let me ask plaintiffs'

24   counsel, do you have any questions or a need for clarification

25   on anything I just asked you?

1    And let's talk about, you know, how you would provide

2  that information to me, unless you're prepared to provide it

3  now on the record.

4    MS. DONNELL:  Your Honor, I'm not prepared -- well,

5  first of all, thank you for that.  And thank you for the

6  clarifications.

7    I think the only -- there's one piece of information

8  you requested that I would like clarification on.  Otherwise, I

9  think it's quite clear what you would like.

10    And I don't have all of that information to provide

11  to you today.

12    So I think we could provide an *in camera* -- I do have

13  the documents, and I have a privilege log, but it doesn't

14  provide the sufficient information that you have asked for

15  today, so I think what we would need to do is resubmit that *in*

16  *camera* to you with the additional information.

17    The one piece of clarification that I think you

18  requested is -- I think you requested, I believe you said,

19  versions of the documents, or when it was created, and the

20  number of updates and dates it was updated.

21    THE COURT:  No, I don't think I said that.

22    The earliest and latest entry.

23    MS. DONNELL:  Oh.  Earliest --

24    THE COURT:  So I just wanted to know --

25    MS. DONNELL:  -- and latest entry.

1    THE COURT:  Yeah.

2    MS. DONNELL:  Okay.

3    THE COURT:  So I know the span.

4    MS. DONNELL:  Okay.  Got it.  So -- that's fine.  So

5    earliest and latest entry.

6        Thank you.  That's the only thing I wanted

7    clarification on.

8        And then would you like me to tender the documents or

9    just wait until we have that additional information for you and

10    tender it to the Court all at once?

11    THE COURT:  You know, I guess, since you're here,

12    maybe it's fine for you to give it to me and then you can

13    provide the other information.

14        The produced spreadsheet, I don't know, is that on

15    the record?  Has anybody filed it for some reason?

16    (Plaintiffs' counsel nod.)

17    THE COURT:  Okay.  You can just email that, I mean,

18    and copy counsel.

19    MS. DONNELL:  Sure.

20    THE COURT:  Opposing counsel.  It's not privileged,

21    so --

22    MS. DONNELL:  Yeah.

23    THE COURT:  And then with the questions, I don't know

24    that any of that information is privileged.  You can evaluate

25    that.  If you think it is, you'll, you know, redact some of it.

1          MS. DONNELL:  Sure.

2          THE COURT:  But I don't think it probably is.

3          MS. DONNELL:  Okay.  That's fine.  I think we can do

4    something.  And if there was, or happens to be, then we can

5    provide a redacted version, and you can make that

6    determination.

7          So we can provide that to you, to the Court.  I

8    think -- would either -- I think -- would Monday morning be

9    okay?

10          THE COURT:  Yeah, that's fine.

11          MS. DONNELL:  Okay.

12          THE COURT:  I think it probably should just be in a

13    supplemental joint status report, or status report by

14    plaintiff, I guess.

15          MS. DONNELL:  Sure.

16          THE COURT:  Plaintiffs.

17          MR. TELMAN:  I'm sorry, Your Honor.  Just for

18    clarification, are they going to be providing us a copy of that

19    as well?

20          THE COURT:  It's going to be filed.

21          MR. TELMAN:  Okay.

22          THE COURT:  But if they think there's privileged

23    information in it, then they'll have to discuss that with you,

24    and they'll tell me.  It will be redacted, and I guess I'll

25    just see the privileged part, and I may or may not agree.

1          All right.  But --

2          MS. DONNELL:  I mean --

3          THE COURT:  -- let's cross that bridge when we get to

4     it.

5          MS. DONNELL:  We think -- yes.  That's fine.

6          I think the information you requested probably

7     isn't -- I mean, the information was -- these two documents

8     were never shared with a third party other than the parties or

9     counsel.  So I think some of this we can, you know, make clear

10    right now.

11         THE COURT:  Okay.

12         MS. DONNELL:  And so -- and if you want to hear

13    argument, I'm prepared to argue some of the cases about the --

14         THE COURT:  I don't think it makes sense.

15         MS. DONNELL:  Sure.

16         THE COURT:  I may have questions --

17         MS. DONNELL:  Sure.

18         THE COURT:  -- after I go back over them.  And I

19    think it's better for me just to look at them and get this

20    other information and then I'll read the cases.  And, you know,

21    I may have questions for the parties.

22         MS. DONNELL:  Would you like me --

23         THE COURT:  Sure.

24         MS. DONNELL:  -- to tender this to you now?

25         THE COURT:  Go ahead.

1        THE CLERK:  Thank you.

2        (Documents tendered to Court.)

3        THE COURT:  All right.  And so Monday, just so we are

4    clear, that date is what?

5        THE CLERK:  That date is October 9th.

6        THE COURT:  And that's for plaintiffs to file a

7    supplemental status report.

8        MS. DONNELL:  Thank you, Your Honor.

9        THE COURT:  I think the produced spreadsheet -- I

10   don't know what it looks like.  I mean, I feel like -- I don't

11   like cluttering on the docket with things.

12           If I'm going to look at it, and it's merely like a

13   comparison, you know, I think at this point, don't file it.  If

14   everybody decides it really has to be filed based on my ruling,

15   you know, we can discuss that.

16           But just email it -- copy opposing counsel, and you

17   email that.

18       MS. DONNELL:  Thank you, Your Honor.

19       THE COURT:  And that can be done by email on Monday,

20   too.

21       MS. DONNELL:  Thank you, Your Honor.

22       THE COURT:  All right.  Next topic to cover is the

23   defendants' request, or you could say motion -- or, actually --

24   no.  Sorry.  Plaintiffs' request, or I could say motion, to

25   take twelve depositions, so two over the limit of ten.

1    They provided -- plaintiffs provided a lot of

2    information about Ms. Granger, who was a field people officer,

3    and who Plaintiff Guster-Hines alleges made racially

4    discriminatory comments to her.

5        There are a lot of allegations in the complaint at

6    paragraphs 80, 81, 91, and 97, which I reviewed.

7        I am going to allow the deposition of Ms. Granger.

8        On the other witness, Tory, T-o-r-y, Wozny,

9    W-o-z-n-y, he served as senior director of human resources and

10   was involved in executive coaching provided to Plaintiff Neal,

11   while she was at McDonald's USA, among other matters, I am

12   told.

13       And I am not really following -- you know, again, if

14   we were looking at individual depositions -- you know, you're

15   only going two over.  This is a case with a lot of discovery

16   over many years.

17       And I know you also changed the order, and Parolin

18   was one of the, you know, excess witnesses.

19       So why don't you tell me in more detail about Tory

20   Wozny.  And I'll hear from defense counsel on why that

21   deposition is necessary and what it bears on.

22       MS. DONNELL:  Plaintiff is seeking this deposition,

23   so is it all right if I -- would you like me to explain why we

24   would like that deposition?

25       THE COURT:  Yes.

1    MS. DONNELL:  Okay.  Thank you.

2    So Tory Wozny, you're right, Judge, was a senior

3  director of human resources.  Mr. Wozny is listed as one of the

4  witnesses on defendants' 26(a)(1)s.

5    And we would seek to depose Mr. Wozny on the topics

6  that defendants have identified him as having knowledge, which

7  was both plaintiffs' employments, including their job

8  responsibilities and work performance, the employment practices

9  at McDonald's, including their policies prohibiting

10  discrimination, as well as plaintiffs' alleged damages.

11    In addition, as you mentioned, Mr. Wozny was involved

12  in the procurement of executive coaching for Plaintiff Neal.

13  And that's part of our allegations, that that was used in a

14  discriminatory and unfair way towards Ms. Neal.

15    And he has -- was directly involved in finding that

16  executive coach and in overseeing it.

17    THE COURT:  Is this in the complaint?

18    MS. DONNELL:  That part --

19    THE COURT:  I mean, because it's a long -- a

20  hundred -- how many pages is it?  I mean, everything was in

21  that complaint.

22    MS. DONNELL:  The executive coaching is, but

23  Mr. Wozny's name is not mentioned.  I do think these --

24    THE COURT:  But the allegation that --

25    MS. DONNELL:  Yes.

1    THE COURT:  -- it was done in a discriminatory way is
2    in the complaint?
3         MS. DONNELL:  Yes.  Yes, Your Honor.
4         And we also know, from the deposition we took of
5    Mr. Luis Quintiliano last Friday, who was plaintiffs' direct
6    supervisor, as the vice president of the Dallas field office,
7    that Mr. Wozny was involved in a listening session for
8    Mr. Quintiliano.  Mr. Quintiliano is a comparator for the
9    plaintiffs.
10        And so we would like to explore also with Mr. Wozny
11   how Mr. Quintiliano was treated vis-a-vis, you know, the human
12   resources or the people office of McDonald's versus our
13   plaintiffs.
14        And these go directly to our claims with respect to
15   Ms. Neal's termination, in particular.  Our hostile work
16   environment claims.  And they've identified him as having
17   knowledge of plaintiffs' alleged damages, so we'd also like to
18   explore that topic.
19        THE COURT:  All right.  Thank you.
20        All right.  Let me hear from defense counsel.
21        MR. TELMAN:  Thank you, Your Honor.
22        With respect to the three -- the first issue that
23   plaintiffs' counsel raised in terms of wanting to talk to
24   Mr. Wonzy (phonetic) about plaintiffs' employment and
25   employment policies.

1    They have asked for, and we are putting up, a

2    30(b)(6) witness to talk about McDonald's' policies.

3    They've also asked for the deposition of the chief

4    people officer, Melissa Kersey, as well as Lorelie Parolin, who

5    is also a human resources individual who will have that

6    information.

7    So it's our position that Mr. Wonzy is not going to

8    add anything more.  It's going to be more cumulative with

9    respect to those pieces.

10    In terms of the procurement of the executive coach,

11    Mr. Quintiliano discussed during his deposition how that came

12    about and really talked about why the coach was necessary or

13    why the coach was offered to the plaintiff.

14    Mr. Wonzy's (phonetic) testimony will be cumulative

15    of that.  It won't be anything more than that.  Mr. Wonzy's

16    position as human resources manager; who's really just to

17    facilitate it and not to make a decision as to whether or not

18    it should happen or not.

19    And Mr. Quintiliano talked about who made that

20    decision.

21    So, again, we believe, given all the discovery that's

22    gone on in this case, and just the hope of trying to bring

23    discovery to an end within the discovery cutoff period, we just

24    don't see how Mr. Wonzy is going to -- testimony is going to

25    bear -- provide any additional information, and also bear on

1    the specific claims or defenses.

2         As Your Honor made clear almost two years ago, when

3    she cautioned the plaintiffs' counsel about coming forward and

4    asking for additional depositions, that given the scope of

5    discovery so far, you know, they should be very cautious about

6    it, very conservative about it, and be able to tell the Court

7    and to tell us, you know, how this is going to add or bear on

8    the specific claims, and I don't believe they've done that.

9         THE COURT:  When you're saying the name, it sounds

10   different than how it looks when it's written.

11        You were describing somebody with the last name W,

12   right?

13        MR. TELMAN:  Yes.

14        THE COURT:  And say that name --

15        MR. TELMAN:  Tory Wonzy.

16        THE COURT:  It's W-o-z-n-y.

17        MR. TELMAN:  I -- Wozny.

18        THE COURT:  Wozny.  Okay.

19        MR. TELMAN:  I apologize.

20        THE COURT:  And I have it here, Mr. Wozny, so I

21   was -- is it a Mr. or --

22        MR. TELMAN:  Yes.

23        THE COURT:  It is a Mr.  Okay.

24        MS. DONNELL:  Yes.

25        THE COURT:  Okay.  Mr. Wozny.  Okay.

1          And so let me ask plaintiffs' counsel.  Ms.

2    Parolin -- and I understand you took her -- made her one of the

3    ten.  But what is she going to testify about?

4          MS. DONNELL:  Sure.  Your Honor, I would -- may I --

5    I would love to --

6          THE COURT:  Sure.

7          MS. DONNELL:  -- answer that question, but may I

8    please just respond briefly --

9          THE COURT:  Yes.

10          MS. DONNELL:  -- with respect to Mr. Wozny?

11          So I -- Mr. Wozny is one of the seven witnesses that

12    McDonald's defendants have identified on their 26(a)(1)

13    disclosures.  So if his testimony is cumulative and has nothing

14    to add, you know, that's curious to me.  Because other than the

15    plaintiffs, there's only five witnesses listed, and he's one of

16    them.

17          I find it hard to believe that he's cumulative, just

18    on that.

19          THE COURT:  Does McDonald's want to take him off your

20    list and he won't be called?

21          MR. TELMAN:  Well, we made that -- Your Honor, we're

22    still evaluating that.  We asked --

23          THE COURT:  But, I mean, if it's only seven witnesses

24    -- I would have thought it'd be more.  So that makes me

25    think -- you know, if I were plaintiffs, I'd think I would want

1  to depose him.

2  MR. TELMAN:  Judge, given the length of the complaint

3  and all of the allegations in the complaint, we wanted to be,

4  in our disclosures, as truthful as possible at the time we made

5  those disclosures.

6  THE COURT:  Right.

7  MR. TELMAN:  Now, as we get closer, we may

8  reevaluate.  And we have actually had conversations with

9  counsel.  I mean, they have over 130 people on their disclosure

10  list.

11  And so, you know, if the thought is, who are we going

12  to depose -- I mean, we've already asked them to tell us who

13  they are going to be looking at or calling at trial.

14  THE COURT:  Well, yours is easier.  There's seven

15  people, so -- but let me ask Ms. Donnell, what is the -- Ms.

16  Parolin.  Is it Ms.?

17  MS. DONNELL:  Yes.

18  THE COURT:  Go ahead and tell me about her.

19  MS. DONNELL:  Yes.  I'd be happy to.

20  Well, and I -- just to put -- we are working on

21  reducing our 26(a)(1)s.

22  I will say, we've also asked McDonald's -- because in

23  addition to those specifically-named seven witnesses, they've

24  also identified any witness named in any document, in any

25  interrogatory.  So I have also asked them and I said we'll move

1    to bar if they're not named.

2           So we might be getting amended disclosures from them.

3    I think, depending on how big that list gets, that's going to

4    bump up against the fact that they want discovery and

5    depositions done by November 15th.  But I'll put that to the

6    side.

7           THE COURT:  I mean, frankly, a lot might also -- you

8    know, who gets called at trial is going to depend on a lot of

9    rulings on motions *in limine*.  So, you know, who knows.

10          MS. DONNELL:  Who knows.

11          THE COURT:  That will also, you know, dictate whether

12   this is going to be a six-month trial or, you know, three

13   months or so.  Who knows.

14          MS. DONNELL:  I do want to answer your question, Your

15   Honor.

16          So Ms. Lorelie Parolin, she was -- I'm going to say

17   the name potentially wrong, but a human resource person in the

18   Dallas field office.  And so she was directly involved in many,

19   many factual issues in this case regarding interactions with

20   both plaintiffs and Mr. Luis Quintiliano, as well as reports of

21   discrimination.

22          She was also involved in the termination of Ms. Neal.

23   And back-and-forth with the executive coach.  And

24   communications with Mr. Strong and Mr. Quintiliano related to

25   that.

1      So she's basically key.  I moved her on the list

2   because I think we have to depose her.  So she's within -- you

3   know, depending on how the Court rules, I wanted to make sure

4   that Ms. Parolin was somebody we get to depose.  And so --

5      THE COURT:  Okay.

6      MS. DONNELL:  I also -- I know, and I really do

7   appreciate -- and I appreciate this Court's patience -- this

8   has had a lot of ups and downs.

9      I, you know, recently entered my appearance in this

10   case probably in the beginning of September.  We appreciate

11   that we have to bring this to a close, and we really are

12   working to do that and endeavoring to do that.

13      And I will just -- for -- and we're really only

14   asking for a month before to complete all these depositions and

15   to wrap this up.  So I don't think it's -- twelve -- two extra

16   depositions in this case does not seem very extensive or too

17   beyond the scope of what's done in a case like this.  So I --

18      THE COURT:  I think what I'm going to do here, I'm

19   going to allow the depositions, but I'm going to cut the time

20   in half.  So instead of the normal seven hours, you'll be

21   limited to three-and-a-half for each, Granger and Wozny.

22      But I will allow those depositions.

23      MS. DONNELL:  Thank you, Your Honor.

24      THE COURT:  Okay.  So now we're going to turn to the

25   request over the -- disputes over the requests for production.

1    Because, to my delight, the parties are not having me -- or

2    don't need me to rule on the disputes over requests to admit.

3            My plan here is to ask you some questions, hear some

4    argument on the ones that are -- remain.  I am going to pick a

5    date soon to provide a bench ruling.  I'll probably just get

6    you on the phone, and I will give you my rulings.

7            And I'm doing that because, in considering

8    proportionality, I need to consider the totality of the

9    discovery in the case.  So I want to go back over the materials

10   and get a better grasp of that.  And if I am ruling as I go

11   through each request, it's too tempting to just focus on kind

12   of relevancy of that particular request or burden of that one

13   request.  And so I want to go back and understand the totality

14   before I rule.  So that's my plan.

15           So right now, let me turn to those topics.

16           And I am going to group them, I think, in the way you

17   have grouped them.  And so that means the first three are

18   requests for production 65, 66, and 67.

19           And plaintiffs have told me these concern documents

20   on the disproportionate impact of the Field First reduction on

21   black VPs of franchising and operations.  We call those, I

22   guess, QSC VPs.

23           And here, the plaintiffs are seeking documents that

24   confirm or contradict the reduction of 82% of African-American

25   officers as compared to white officers during this time.

1          And they argue that this is directly relevant to

2    their disparate impact claim regarding the disproportionate

3    reduction of African-American employees in officer positions.

4          And the defendants tell me that these requests are

5    seeking five years' worth of employment decisions about

6    officers all across McDonald's Corp. and McDonald's USA who

7    have no relation to plaintiffs' employment or their claims.

8          And they note that the requests are asking for

9    documents that are necessary and sufficient to confirm or

10   contradict, in whole or in part, the allegation that:  "Between

11   2014 and 2019, McDonald's dismissed or demoted 31 out of 38

12   African-American officers who were vice presidents or higher in

13   the time period."  And that white officers at the level of vice

14   president or higher were not demoted, dismissed, or otherwise

15   purged in anything close to the same or comparable numbers.

16         And so they say these are -- they don't think the

17   requests are appropriate for a number of reasons.  They think

18   it's a fishing expedition, and it will require production of

19   confidential and private information about separation decisions

20   of employees across two different companies for five years.  So

21   it could be hundreds of unnamed individuals who have no

22   involvement in this matter.

23         So I have some questions.  The -- I call it the FFR

24   for short.

25               MS. PROSSNITZ:  Yes.

1    THE COURT:  Field First, the restructuring.

2    So that was in 2018.  Plaintiffs' disparate impact

3    claim is limited, I believe, to March 5th, 2019 to July 6th,

4    2020, per Judge Rowland's ruling on a motion to dismiss.

5    So what is the basis for plaintiffs going back to

6    2014 on these requests?

7    MS. PROSSNITZ:  Yes, Your Honor.

8    So I think for that request, it would only be

9    between -- it would be limited in scope between those who were

10   demoted and terminated from March -- I believe the statute of

11   limitation begins March 1st, 2019 to the end of 2019.

12   But I would also add that this speaks to our

13   disparate treatment claim as well, because -- and we have a

14   case exactly on point on this; that a dramatic decrease at a

15   company of African-American executives can permit an inference

16   of discrimination where that's what an individual plaintiff is

17   alleging.

18   THE COURT:  And, I don't know, what does it mean,

19   "documents that are necessary and sufficient to confirm or

20   contradict, in whole or in part, an allegation"?

21   I mean, that's in the eyes of the beholder, isn't it?

22   MS. PROSSNITZ:  That's true, Your Honor.

23   And I would just add that our plaintiffs, essentially

24   with counsel, figured this out just by going through the

25   organizational chart.

1            And I think McDonald's has represented that there are

2     hundreds and hundreds of officers.  That's not our

3     understanding.  There's only between fifty and a hundred

4     officers that we need to look at between 2014 to 2019.  And

5     they literally just counted by hand how many of them they knew

6     who were terminated or demoted and who were African-American.

7     And McDonald's must have personnel files that show that as

8     well.

9            THE COURT:  And so you want to basically look at each

10     one and find out why they were -- left, right?  I mean -- and

11     then you're going to decide if it was racial or not racial?

12            Or, I mean, what -- it's going to be a -- I mean, we

13     can look at these two plaintiffs, right?

14            Let's assume they were -- this was a case of somebody

15     else, and now you ask for this.  And you get the files for Ms.

16     Neal and Ms. Guster-Hines.  What is it you would need for those

17     two individuals that would let you, you know, confirm or

18     contradict, in whole or in part, the allegation that they were

19     dismissing or demoting more -- 31 out of 38 African-American --

20     or I guess -- so it doesn't matter why they were demoted?  You

21     just want to know in pure numbers?

22            MS. PROSSNITZ:  Yes.

23            THE COURT:  So you just don't need any files?  You

24     just need to know how many were demoted?

25            MS. PROSSNITZ:  Yes.  Exactly, Your Honor.  How many

1    were demoted or terminated and what that would -- and if that

2    was proportional to the number of white officers who were

3    terminated or demoted in that same time period.

4         THE COURT:  So you have some kind of statistician or

5    somebody who's going to take this and say:  This is a valid

6    number, and we can draw some opinion from that -- these

7    documents, I guess?

8         MS. PROSSNITZ:  Yes, Your Honor.  Because I would say

9    if there's, you know, 31 African-Americans who were demoted or

10   terminated in that time as compared to one white officer --

11        THE COURT:  Without even looking at the documents,

12   though.  So it could be if you looked at the documents, you

13   know, it doesn't matter if they -- need to know if they were

14   demoted or dismissed, right?

15        MS. PROSSNITZ:  Yes.

16        THE COURT:  That you need to know.  So they would

17   have to have been terminated or demoted.

18        MS. PROSSNITZ:  Yes.

19        THE COURT:  Demoted, I don't know, is that an easy --

20   is that, like, in the personnel file?  Somebody -- it says the

21   word "demoted"?  That's easy?

22        MS. PROSSNITZ:  I would believe so, I think, because

23   it's a matrix organization.  It's easy to tell, after that FFR

24   period, if their title has changed to a non-officer title and

25   the pay has decreased.

1    THE COURT:  And so without knowing whether they're

2    dismissed or demoted, whatever -- without knowing the reason --

3    or at least the ostensible reason, you're just going to -- just

4    based on the numbers, that's all you're going to use.  And then

5    you'll make whatever argument you want to make to Judge

6    Rowland, whether you could admit this or not?

7    MS. PROSSNITZ:  Yes.  Exactly, Your Honor.

8    And I would just like to put on the record the case

9    that's on all fours with this, *Downing versus Abbott Labs*, 2019

10   WL 421 --

11   THE COURT:  Is that in your --

12   MS. PROSSNITZ:  -- 3229.

13   THE COURT:  -- longer joint status report?

14   MS. PROSSNITZ:  I believe it is.  Yes, Judge.

15   THE COURT:  Okay.  Just so I don't have to write it

16   down right now.

17   MS. PROSSNITZ:  Yes.

18   THE COURT:  The *Abbott* case.  Okay.

19   And then you say you're interested in the QSC VPs,

20   but what you're really asking for are all officers across

21   McDonald's Corporation and McDonald's USA?

22   MS. PROSSNITZ:  Yes.  I think the better

23   representation is all African-American vice presidents.

24   THE COURT:  Well, you don't just need

25   African-American.  You need white, too, right?

1      MS. PROSSNITZ:  Yes.  You're right, Your Honor.

2      THE COURT:  And so, just so I understand -- I mean,

3  because, again, your clients worked at McDonald's for many

4  years -- in your view, what are documents that are necessary

5  and sufficient to confirm or contradict the allegation in

6  paragraph 25 of the third-amended complaint?

7      MS. PROSSNITZ:  I could imagine it would take the

8  form of an organizational chart for each year of people in

9  those positions, with race identified, and then a note next to

10  it saying "demoted" or "terminated."

11      THE COURT:  And does McDonald's indicate on your

12  personnel records of what someone's race is?

13      MR. TELMAN:  I'm not sure.

14      MR. YOUNG:  I'm not sure.

15      MR. TELMAN:  I'm not sure we do that, Judge.

16      MS. PROSSNITZ:  Our clients are representing yes,

17  because they place you in affinity groups based on your race.

18      THE COURT:  All right.  And what -- do we have to

19  put -- you're asking for Latino, Black, Caucasian, whatever?

20      Whatever the race is, you want them to note the race

21  of each person?

22      MS. PROSSNITZ:  Yes.  I think that would be -- yes.

23  That's what we're looking for.

24      THE COURT:  All right.  And then you're comparing,

25  though?  You're just going to be comparing the

1  African-Americans and the Caucasians and leaving out the other

2  races?

3  　　　　MS. PROSSNITZ:  Yes.  I think we would need to wait

4  to decide and see what the statistician would make of it.

5  　　　　THE COURT:  Okay.  All right.  Well, I think this

6  one -- you know, it's unlikely I'm going to be granting this,

7  but I'm going to -- as I said, I'm taking these under

8  advisement.  I'm trying to understand what the argument is.

9  I'll certainly look at the *Abbott* case.

10  　　　　Are there any arguments -- and I let -- I asked a

11  bunch of questions.  I didn't ask defendants anything, except

12  do you have the race information readily available.

13  　　　　Is there any other argument defendants want to make

14  on these requests?

15  　　　　MR. YOUNG:  Yes, Your Honor.  And if I --

16  　　　　THE COURT:  If you made it in this document -- I'm

17  not really looking for you to repeat what's in the joint status

18  report.  So if you could bear that in mind, that's helpful.

19  　　　　MR. YOUNG:  Understood.  So for the sake of not

20  repeating that, but just briefly pointing it out, I will just

21  -- generally speaking, because it will apply to all of these

22  document requests, the fact that Your Honor will recall, we

23  spent a lot of time and effort in motion hearings and status

24  hearings trying to work through plaintiffs' requests, and

25  ultimately led to us presenting certain compromised proposals

1    last November.  And plaintiffs never responded to that until

2    August of this year, despite now having thirteen counsel of

3    record.  So completely, from our perspective, dropping the ball

4    on the progress that we had made.  So we ask the Court to look

5    at these requests through that lens.

6              But with respect to this specific -- or these set of

7    requests, Your Honor is precisely right.  The disparate impact

8    period is a period with -- from 2019 to 2020.

9              And this request is a pure fishing expedition.  For

10   example, it's seeking documents regarding African-American

11   officers who were demoted or terminated during this time

12   period.

13             During this disparate impact time period, plaintiffs

14   were not officers of the company.  They were also not demoted

15   during this time period.

16             THE COURT:  I mean, they might quarrel with that.

17             MR. YOUNG:  They don't dispute that they were not

18   demoted during this time period --

19             THE COURT:  Okay.

20             MR. YOUNG:  -- of 2019 to 2020.  Their allegation is

21   that they were demoted in the Field First restructure in 2018.

22             THE COURT:  Okay.

23             MR. YOUNG:  Ms. Guster-Hines was never terminated

24   from the company.

25             So this request that seeks information across two

1    different companies for -- I believe it's actually a six-year

2    period, for officers, regardless of the department, regardless

3    of their decision-maker, and whether they left for any reason,

4    voluntary, involuntary, mutually, is just completely unrelated

5    to --

6            THE COURT:  All right.  I mean, I think you have made

7    these arguments in the document, so -- about the decision-maker

8    and the time period and what have you.

9            MR. YOUNG:  Understood, Your Honor.  I would just say

10   two final points.

11           First, plaintiffs' counsel proposing that we produce

12   org charts with notes next to them about what happened to these

13   individuals is essentially asking us to create documents, which

14   is beyond the scope of a request for production of documents.

15           And two, to answer --

16           THE COURT:  I mean, that was just a suggestion.

17           MR. YOUNG:  Sure.

18           THE COURT:  They're leaving it to you, right, by

19   saying documents that are necessary and sufficient to confirm

20   or contradict, in whole or in part, which is --

21           MR. YOUNG:  Sure.

22           THE COURT:  -- some terminology.  But at least

23   completely leaves it up to you --

24           MR. YOUNG:  Right.

25           THE COURT:  -- what you think does that.

1        MR. YOUNG:  Just a final point with respect to the

2   burden and relevance.

3        You know, we would essentially have to go back and

4   conduct interviews to make sure we understand the reason why

5   people left.  And then that's only as good as it is.  If we

6   give -- turn over just pure numbers --

7        THE COURT:  I mean, if it was termination only, you

8   still would need to do that?  Why is that?

9        Because they're doing pure numbers, which may mean

10  it's never going to see the light of day at a trial.

11       But why is it burdensome?  Demotion may be.  I mean,

12  I don't know.  Depends on if you have to start pulling

13  personnel files.

14       MR. YOUNG:  Right, exactly.  We'll have to start

15  pulling personnel files.  Movements from different positions,

16  whether or not that's truly a demotion, and from whose lens.

17  Just largely the reasons for -- you know, people are leaving.

18       But if we go through all of that exercise and we just

19  give the numbers, that still doesn't bear on whether or not the

20  plaintiffs were denied a promotion to a specific position.

21       THE COURT:  Right.  That goes back to, you know, your

22  argument about relevancy.

23       MR. YOUNG:  Exactly.  So we do -- our position would

24  be we would do all of this and it would ultimately have no

25  relevance to the claims and result in a sideshow in the

1    litigation regarding what happened to these individuals.

2            THE COURT:  I mean, this is discovery, so -- I don't

3    typically deny discovery based on -- reasonable minds can

4    differ about relevancy.  But I do when it's broad discovery,

5    and if it's not proportional.

6            And so, again, here, this may be one that I'm not

7    going to allow, but I'm taking it under advisement and I'll

8    look at everything.

9            All right.  Let's turn to --

10           MS. PROSSNITZ:  Your Honor, if I could just add

11   one --

12           THE COURT:  Sure.

13           MS. PROSSNITZ:  -- last point on that?  Which is that

14   Judge Rowland specifically said that she -- or she denied the

15   motion to strike and her ruling on the motion to dismiss,

16   saying that the pattern and practice of demoting or terminating

17   numerous African-American officers supports the inference that

18   defendants intentionally discriminated against our clients.

19           THE COURT:  But now I have the discovery, right?

20   So --

21           MS. PROSSNITZ:  Yeah, I understand.

22           THE COURT:  Okay.  All right.  So --

23           MR. YOUNG:  Your Honor, I apologize.  If I could just

24   add one point to your question about the terminations?

25           THE COURT:  Uh-huh.

1          MR. YOUNG:  If we were to go back and find the number

2    of just pure terminations, it still wouldn't necessarily give

3    us the answer of whether the termination was voluntary or

4    involuntary, whether someone voluntarily left to go to a

5    different company or whether someone was terminated for cause.

6    That would certainly require extra steps.

7          THE COURT:  Well, when you say if it was voluntary --

8    is somebody terminated voluntarily?  I guess you could be if

9    you know you're going to be fired or something, and it'd be,

10   say --

11         MR. YOUNG:  Resigning from the company is technically

12   an involuntary termination.  And that distinction isn't called

13   for in these requests.

14         THE COURT:  All right.  I'm going to group now

15   requests for production 69, 70, 71, 72, and 73.

16         These, the plaintiffs say, seek documents concerning

17   the shareholder derivative complaint.

18         MR. YOUNG:  Your Honor -- I apologize.  I think these

19   requests are off the table.

20         THE COURT:  Oh, okay.

21         MR. YOUNG:  Is that correct?

22         MS. DONNELL:  They are, Your Honor.  I think in the

23   updated joint status, we've limited it down to just seven.

24         THE COURT:  Good.  So mine says that the written

25   discovery issues that are -- where the parties are not at

1    impasse, No. 6 and No. 58, 59.  And I don't see -- I mean, I'll

2    take your word for it, for sure.  I'm not going to -- but I

3    just -- did I miss it?

4              MS. PROSSNITZ:  It's page 4.

5              THE COURT:  Page 4.  Okay.

6              MS. PROSSNITZ:  Plaintiffs' request for production,

7    outlining the ones we are still at impasse.

8              THE COURT:  Oh, I'm sorry.  It was in the original.

9    I was looking at the -- oh, okay.  Got it.  Thank you.

10             Okay.  So good.  We're out of that.

11             So let's turn to, I think, 86, 87, 88, and 89.

12             MR. YOUNG:  I'm sorry, Your Honor.  I think it's 88

13   and 89.

14             I'll direct the Court to the joint supplemental

15   status report, ECF 374, at page 4.

16             THE COURT:  Uh-huh.

17             MR. YOUNG:  The second bullet point.

18             THE COURT:  Okay.

19             MS. DONNELL:  I just -- I would say, Your Honor, I

20   think this goes to our efforts to really narrow the issues for

21   you.  And we're really working to focus in on just the ones

22   that we would find relevant to our claims, and that we think we

23   can -- that are, you know, important to our claims.

24             So we really worked hard to -- even without

25   compromise from the other side, to narrow down these requests

1  for production to just these seven.

2         THE COURT:  Okay.  So 86 and 87, there's no dispute.

3  The ones I need to turn to are 88 and 89 and then 102, 103, and

4  104.

5         MS. PROSSNITZ:  Yes.

6         THE COURT:  All right.  So 88 and 89, these are

7  seeking, for the time period January 1, 2014 to present, all

8  communications sent or received by Guster-Hines in which

9  Guster-Hines advocated on behalf of an African-American

10  owner-operator to Charles Strong and/or Luis Quintiliano,

11  Q-u-i-n-t-i-l-i-a-n-o.

12         And 89 is the same, but it's for Ms. Neal.

13         And here, let me ask plaintiffs.  This is a nine-year

14  period.  Are you asking for every single communication about a

15  franchisee sent -- or between the plaintiffs and these two

16  individuals, Mr. Strong and Mr. Quintiliano?  I'll call him

17  Luis.  That will be easier.

18         What is plaintiffs' position on what you are seeking

19  here?

20         MS. PROSSNITZ:  Your Honor, we should have updated

21  this to 2016 so that it's in the relevant

22  statute-of-limitations period.

23         But we're seeking any communications between

24  plaintiffs and their supervisors in which they advocated for an

25  African-American owner-operator.

1      THE COURT:  And you're -- I think you argued that

2  this would require really just a search of custodial files

3  associated with plaintiffs themselves.

4      Did you already do that?

5      MS. PROSSNITZ:  Yes.

6      THE COURT:  And what do you mean by that?

7      So this is going to be easy to do, but I want to make

8  sure, because that's a big factor.

9      Did you provide search terms?  I mean, clearly, you

10  can limit it to -- one of the plaintiffs has to be in an email,

11  so that brings it down.  But you're talking about -- so 16, 17,

12  18, 19, 20, 21, 22, 23.  They -- it wouldn't be too present

13  because they haven't been -- so what's the ending -- it's 2016

14  till their last day of employment?

15      MS. PROSSNITZ:  Yes, that's right.

16      THE COURT:  And so what -- remind me when that is.

17      MS. PROSSNITZ:  That would be February 28th, 2020.

18      THE COURT:  2020.

19      MS. PROSSNITZ:  For Ms. Neal.

20      THE COURT:  All right.  And then for Ms.

21  Guster-Hines, it would be longer?

22      MS. PROSSNITZ:  October 2021.

23      THE COURT:  Okay.  So four years and a couple months

24  for Ms. Neal.  And then for Ms. Guster-Hines, almost six years,

25  just shy of two months.

1          So what would the search terms be?

2          It's easy to isolate emails between these

3   individuals, I would think, but then how do you -- why is it so

4   easy?

5          There must be a lot of emails between the plaintiffs

6   and their supervisors over a four- or six-year period.

7          MS. PROSSNITZ:  Yes.  We could provide the names of

8   the owner -- the African-American owner-operators that our

9   clients remember sending emails about and advocating for to

10  defendants.

11         THE COURT:  So the recipients -- senders/recipients

12  would have to be the plaintiffs or Strong or Luis Quintiliano.

13  They -- that's -- and then the subject matter would have to

14  have the name of one of these franchise -- African-American

15  owner-operators in it?

16         MS. PROSSNITZ:  Yes, exactly.

17         THE COURT:  And how many -- and I have no idea what

18  the volume is of emails where they might have mentioned them.

19  Where they're not advocating, but they're just mentioning them

20  for other reasons.

21         What's their sense of that?

22         MS. PROSSNITZ:  Our sense is it wouldn't be

23  voluminous.  Like I -- and I should have clarified that,

24  actually, once our clients were placed on leave of absence in

25  December 2019, they weren't allowed to email.  So that timeline

1  I gave you is too expansive.

2          THE COURT:  All right.  So it would be 2016 to 2019.

3          MS. PROSSNITZ:  Yes.

4          THE COURT:  All right.  And so let me ask defense

5  counsel, limiting it to -- when did they go on a leave of

6  absence?

7          MS. PROSSNITZ:  December 2019.

8          THE COURT:  So 16, 17, 18 -- so four years.

9          MS. PROSSNITZ:  Yes.

10         THE COURT:  Right?  So for a four-year period, given

11 the way they have now defined this, where you would only be

12 actually reviewing emails that have a hit on the names of

13 specific owner-operators who will be identified, and the emails

14 have to be between plaintiffs and the two supervisors, how

15 burdensome is it for you to run that search to tell me how many

16 hits you get, so I can decide if this is going to be burdensome

17 or not?

18         MR. YOUNG:  We could run the search to get hits.

19 I'll reserve our response to their substantive arguments.  But

20 we could run that search.

21         THE COURT:  Okay.  And how long would it take you to

22 do that?

23         MR. YOUNG:  If plaintiffs are able to provide or

24 confirm the name of the franchisees, we could likely do that

25 with -- you know, a few days thereafter.

1          THE COURT:  All right.  And how much time do

2    plaintiffs need to provide those names?

3          MS. PROSSNITZ:  I would say till the end of the week,

4    a few days.

5          THE COURT:  Okay.  Can you give me a ballpark of how

6    many we're talking about?

7          I hope it's not 50 or a hundred.  I hope it's a small

8    -- relatively small number.

9          MS. PROSSNITZ:  Less than 50 combined.

10          THE COURT:  Less than 50?  Okay.

11          All right.  I'll have you do that by Monday.

12          MS. PROSSNITZ:  Okay.

13          THE COURT:  I understand there are arguments here

14    about why it's not relevant, but I at least want to know what

15    the burden is of doing this.  So I will -- you know, you would

16    just provide those directly to defense counsel.

17          (Plaintiffs' counsel nod.)

18          THE COURT:  And then we'll get an update.  And we'll

19    set a date at the end of this hearing for when I get that

20    update.

21          All right.  And then the last ones are 102, 103, and

22    104.

23          MS. PROSSNITZ:  Yes.

24          THE COURT:  All right.  And 102 is asking for all

25    written complaints made by Ms. Neal concerning Joe Kraft, who

1   is a field service operations director for McDonald's USA.

2          And these would be -- the time period is between --

3   is it between 2014 and '15?  So we're talking about two years?

4          MS. PROSSNITZ:  Yes.  That's correct.

5          THE COURT:  And the argument is that these are

6   relevant to the retaliation claim because Ms. Neal complained

7   about her treatment to Mr. Kraft, who, in turn, communicated

8   those complaints to decision-makers, including defendants.

9          MS. PROSSNITZ:  Yes.  That's right, Your Honor.

10         And I would also add, it's relevant to our hostile

11  work environment claim.

12         THE COURT:  So I guess one question.

13         There's going to be a lot of emails in a two-year

14  time period that Ms. Neal sent.  But you're talking about

15  emails just -- who would these complaints be made to?  I mean,

16  how do they find these?

17         That's -- again, I'm looking at burden.

18         MS. PROSSNITZ:  Yes.  So we've identified specific

19  recipients, four specific recipients that Ms. Neal sent these

20  emails to.  I would --

21         THE COURT:  So it'll be an email to one of four

22  people.

23         MS. PROSSNITZ:  Yes.

24         THE COURT:  And the word "Kraft" would have to be in

25  it.

1        MS. PROSSNITZ:  Yes.

2        THE COURT:  And they don't think there will be a lot

3    of emails that they sent over a two-year period to these four

4    people with the word "Kraft" in it?

5        MS. PROSSNITZ:  No.

6        THE COURT:  All right.  So, again, same question.

7        And does defense counsel have the names of the four

8    people?

9        MR. YOUNG:  I would ask plaintiffs' counsel to

10    provide.  There's been a lot of back-and-forth on these.

11        MS. PROSSNITZ:  Yes.  It's in the request, but we can

12    definitely reiterate that.

13        THE COURT:  So I would be asking McDonald's to,

14    again, just find out the number of hits by running emails

15    between the plaintiffs and the four individuals.  And it has to

16    have the word "Kraft" in the content or the Subject line.  I

17    guess it's one or the other.

18        Would the word "Kraft" be in the Subject line if it's

19    a complaint about Kraft?

20        MS. PROSSNITZ:  Not necessarily, Your Honor.

21        THE COURT:  All right.  So you'd have to look in the

22    body of the email.  Would have to search for the word "Kraft."

23        And then 103 and 104.  Each of these asks, since

24    January 1, 2014, all communications between the plaintiff and

25    certain other individuals, five individuals, discussing or

1    referencing the plaintiffs' complaints about treatment of
2    African-American franchisees, the NBMOA, the MA2C, and/or
3    African-American employees.

4         And so 103 is for Plaintiff Guster-Hines, and 104 is
5    for Plaintiff Neal.

6         And plaintiffs argue these are critical to proving
7    the disparate treatment, hostile work environment, and
8    retaliation claims.

9         Again, here, it seems a little more difficult to find
10   these.  What is the search term that would be easy to narrow
11   the number of emails to review?

12        It's got to be an email exchange between the
13   plaintiff and these specific individuals.

14        There won't be many emails between Guster-Hines and
15   Kempczinski or Easterbrook, probably.  With the others, I don't
16   know.  One of them's a supervisor.  There might be a lot.

17        But here, it's complaints -- what is the search term
18   that will make it easy?

19        And I'm asking plaintiffs this question because it's
20   your clients that were sending the emails.

21        And it's got to be not burdensome to do the search or
22   it's just not going to happen.

23        MS. PROSSNITZ:  Your Honor, we could provide both
24   names and a more tailored list of keywords that we believe
25   would come up, like their complaints on behalf of MA2C, NBMOA.

1  MAC2 (phonetic), yeah.

2  THE COURT: Yeah. I mean, my concern is now we're

3  getting into -- there's going to be a back-and-forth on -- I

4  don't know how many terms you're going to have.

5  If it's easy, you can -- you're going to have a much

6  better chance of getting it. But if we start getting into a

7  debate about search terms -- you know, this should have been

8  done months ago.

9  I'll let you provide that. I want you to send it to

10  me as well on Monday, when you email the other documents, just

11  so I can keep a handle on this.

12  MS. PROSSNITZ: We can do that, Your Honor.

13  MR. YOUNG: Your Honor, if I may address that point?

14  Because I see where this may --

15  THE COURT: Oh. One other question, sorry, before we

16  go on.

17  What is the time period here?

18  It can't be January 1, 2014 to present. So are you

19  narrowing this like you did the other one?

20  MS. PROSSNITZ: Yes.

21  THE COURT: And is it -- so 2016 to 2019?

22  MS. PROSSNITZ: Yes.

23  THE COURT: Okay. All right. Go ahead, counsel.

24  MR. YOUNG: Just to get ahead of any potential

25  issues.

1                    In plaintiffs' August 29th correspondence to us,

2      which is on the docket at 370-2, they had, I believe, detailed

3      out their requests in respect to this.  102, 103 which differed

4      significantly from the original requests.  And we counted out

5      that it would require searching, approximately, ESI from 33

6      different custodians, if you were to act on that.

7                    So if, ultimately, there --

8                    THE COURT:  Why would that be?  I mean, here, we've

9      got the two plaintiffs and then one, two, three, four, five

10     names.

11                   MR. YOUNG:  Yeah.  This was the product of

12     meet-and-confer --

13                   THE COURT:  Okay.

14                   MR. YOUNG:  -- correspondence where they had detailed

15     specifically --

16                   THE COURT:  Right.  But now we're not.  We're talking

17     about now seven custodians, I think, right?

18                   MR. YOUNG:  I believe so.

19                   But to the extent they are conferring about specific

20     complaints and they're going to come back with a list that

21     mirrors what they presented to us about a month and a half

22     ago -- you know, it may require, without looking at the names

23     specifically, us obtaining, uploading ESI from various

24     custodians that we don't have.

25                   THE COURT:  Right.

1    MR. YOUNG:  That is going to be an additional burden.
2    I just wanted to flag that.
3            THE COURT:  Yeah.  Let me know if that's the case.
4            MR. YOUNG:  Uh-huh.
5            THE COURT:  I will take that into consideration.
6            All right.  So I think on Monday, then, I'll be
7    getting some things.  Defense counsel will be getting some
8    things.
9            I would like to try and resolve 103 and 104 pretty
10   quickly to know what those terms are.
11           So once I get them, you should talk as quickly as you
12   can and let me know if you -- and subject to my ruling, at
13   least you -- what I really want to know from defendants is,
14   have you already uploaded for these custodians.
15           And, you know, I would think, then, if we're only
16   talking about seven custodians and a reasonable number of
17   search terms that aren't going to hit on a lot of things --
18   maybe they will be, and you will know if they do -- we'll get
19   that information quickly.  That will let me, at least, assess
20   burden pretty quickly.
21           All right.  So let's turn to the discovery deadline.
22           You know, on the topic of written discovery.  The
23   current deadline for all discovery is October 16.  Plaintiffs
24   are asking me to have a deadline of November 15, 2023 to
25   complete written discovery and then December 15, 2023 to

1  complete depositions.

2  And defendants have asked that I keep December -- or,

3  sorry, October 16 as the current fact deadline for written and

4  then extend for completion of depositions till November 15,

5  2023.

6  I don't want any new written discovery to be issued

7  after October 16.

8  I understand something unexpected could come up at a

9  deposition, or you get a document, but that's -- you know, it

10 shouldn't be discovery that you could have served, should have

11 known about.  You know, there's so much discovery that was

12 issued here, I can't imagine that would happen.

13 So I am not going to extend written discovery till

14 November 15 to issue discovery.

15 But in terms of just finishing, I've got to rule; and

16 then based on my ruling, McDonald's is going to perhaps be

17 running some searches or producing some documents.

18 I assume -- it sounds like plaintiffs have finished,

19 as you just recently produced the remainder of the text

20 messages from -- you might be producing the privileged

21 documents, but you have to wait on a ruling.

22 From defendants' position, is there any written

23 discovery you are waiting on from plaintiffs?

24 MR. YOUNG:  We are looking at that, but I don't

25 believe so, Your Honor.

1    THE COURT:  All right.  And so plaintiffs may be,

2  obviously -- based on the disputes presented to me, they may

3  be -- you may be producing some additional documents to them.

4  And I will allow a reasonable time to produce that.

5    But I am not extending written discovery for the

6  purpose of issuing new written discovery.

7    So if you -- if some unusual situation comes along

8  after October 16, and you think you have -- on either side, if

9  there's some written discovery that you didn't ask for because

10  you couldn't have anticipated it, and you learned something at

11  a deposition -- you know, the usual -- talk to one another.  If

12  you can't agree, you can seek leave of Court.  But it's going

13  to be unlikely I would allow more written discovery.

14    And, of course, if you already sought that and it

15  wasn't produced, then you can -- you know, a party's obligated

16  to produce it at that point.

17    In terms of timing to finish written -- to finish the

18  depositions.  You know, there are, as I see it, right now

19  you've got depositions scheduled on October 10th for Ms.

20  Granger; the 13th for Kersey; the 17th for Garrett; the 25th

21  for the 30(b)(6) deposition of a McDonald's corporate rep; the

22  27th for Strong; and November 2nd -- getting into November

23  now -- for Parolin.

24    And then you have the Collins deposition on written

25  questions, after I rule.

1          The Kempczinski, K-e-m-p-c-z-i-n-s-k-i.  If you have

2     a dispute, I will need to rule on that.  But that deposition

3     would have to happen.

4          And I understand defendants are going to seek a few

5     depositions.  You recently noticed two, depositions of two

6     former employees.  They must have been subpoenaed, not noticed.

7          (Defense counsel nods.)

8          THE COURT:  Okay.  And those are going to be taken on

9     November 9th and November 10th.

10          And then you will be deposing Ms. Neal and Ms.

11     Guster-Hines after I rule on the privilege issues.

12          So I -- you know, it seems to me, December 15 is not

13     unreasonable.  And I fear, if I set it on November 15, you're

14     just going to be coming back to me.

15          How many of these people are nonparties that you're

16     going to be deposing, where you have to work with them or their

17     attorneys?  Or are they all -- except for the two that

18     McDonald's has recently issued subpoenas to, they're all within

19     your control, so there's not going to be a problem with

20     scheduling?

21          What's plaintiffs' view on that, if you know the

22     answer?

23          MS. DONNELL:  Well, I think the depositions that we

24     have remaining and requested -- although, maybe I should -- I

25     think McDonald's will produce them.  Mr. Wozny and Ms. Granger,

1  we have a date for next week, so that should be fine.

2  And I think they -- I don't know what the status is.

3  Ms. Simpson and Ms. Hayes are former employees they've

4  subpoenaed.  I don't know if they've confirmed those dates.

5  We've confirmed them on our end.

6  But I think Mr. Collins does have representation, so

7  we'll have to find time with his attorney.  And then they'll

8  obviously produce --

9  THE COURT:  But that one's a little bit different,

10  right?

11  MS. DONNELL:  Yeah.

12  THE COURT:  Because that's a --

13  MS. DONNELL:  It'll be limited, yeah.

14  THE COURT:  It's on -- and it isn't on written

15  questions, right?

16  MS. DONNELL:  No.  It's --

17  THE COURT:  No.  This will be --

18  MS. DONNELL:  -- to be reproduced to answer the

19  questions, yeah.  So I -- but, again, that would be limited.

20  And we could do it over Zoom -- I think he's located in

21  Texas -- and he does not have to travel for that.

22  But I guess, to your point, I don't think an

23  additional month to get all these in is unreasonable.

24  THE COURT:  I mean, what I would want to do is get

25  all of you to give me a confirmed date so that you all have

1    cleared the decks for these, and the witnesses have confirmed

2    dates, and lawyers, if they have lawyers. Just so there's no

3    danger that you're going to come back and say: We have a

4    conflict.

5           So I would want them scheduled now, even if I'm

6    allowing that they would be taken till the 15th. And maybe,

7    you know, based on the scheduling, you'll be done before the

8    15th with the confirmed dates.

9           So that's what I'm going to do. And let me ask the

10   parties, what's a reasonable amount of time for you to get back

11   to me with confirmed dates for these depositions, after you --

12   you can't do it with -- I mean, I think you should reserve a

13   date for Kempczinski and Collins, you know, one that's

14   reasonable, toward the end of the calendar, so you make sure

15   you have my ruling.

16          Let me ask plaintiffs, what's your view on that?

17          MS. DONNELL: I think it -- because I think most of

18   the folks are really in McDonald's' control, and/or it's the

19   two witnesses that they've subpoenaed that I think they must

20   have reached out to. So I think maybe they are in a better

21   position to say how long they need to provide those dates.

22          THE COURT: All right. What's your view?

23          MR. TELMAN: We --

24          THE COURT: And, again, I'm just asking you to give

25   me a reasonable amount of time where it gives you time to go

1  back and come up with dates in consultation with plaintiffs'

2  counsel and your clients and the witnesses.

3  MR. TELMAN:  Excuse me, Your Honor.  We are ready for

4  these dates that we've provided them?

5  THE COURT:  Uh-huh.

6  MR. TELMAN:  We've confirmed with the witnesses.  So

7  as far as we're concerned --

8  THE COURT:  All right.

9  MR. TELMAN:  -- those are locked in.

10  THE COURT:  Okay.  And then Wozny, you're going to

11  provide a date for him.

12  MR. TELMAN:  Uh-huh, right.  But --

13  THE COURT:  And you'll need to provide a date for

14  Kempczinski.

15  Collins has a lawyer, so -- but you all should clear

16  a date with Collins' lawyer, you know, for that deposition.

17  And put it toward the -- closer to the end, because I have to

18  rule still.  And same with Kempczinski.

19  But let's get a date before December 15th when you're

20  all free and these witnesses are free.

21  So I'm sure it's easy to get Mr. Kempczinski to give

22  you those dates and lock that in.  But a couple weeks?

23  MR. TELMAN:  Yeah.  Yes, Your Honor.

24  THE COURT:  Okay.  All right.  So 14 days.

25  THE CLERK:  Fourteen days will be Wednesday, October

1     18th.

2                THE COURT:  Are there any other depositions that the

3     parties haven't highlighted that may be on it?

4                MS. DONNELL:  There's one, Your Honor, that's getting

5     teed up.  It's a discovery issue that's getting teed up.

6                We are in a meet-and-confer process that we just

7     recently began regarding Ms. Grace Speights, who was the

8     attorney with Morgan Lewis who conducted an investigation.

9                She was actually deposed, but she -- McDonald's

10    asserted an attorney-client privilege over whether Ms.

11    Guster-Hines was investigated and didn't answer questions and

12    then, in June, produced a memorandum where they did actually

13    investigate her prior in February -- I think the memo is

14    February 26, 2020 -- that was given to Melissa Kersey.

15               And because of that, we think the privilege has been

16    waived.  Or there was no privilege.  And even if there was a

17    privilege, it's been waived.

18               That issue isn't quite teed up, but we probably will

19    be seeking, depending on where that goes, a limited

20    re-deposition of Ms. Speights.

21               THE COURT:  Okay.

22               MS. DONNELL:  And I just wanted to ask one question

23    about Collins, because I'll reach out to Mr. Collins' attorney

24    to get a date.

25               But are you going to schedule it, just so I know --

1  are there -- is there going to be a hearing before then?

2          THE COURT:  I will schedule one.

3          MS. DONNELL:  Okay.  Thank you.

4          THE COURT:  Yes.  Let me ask McDonald's, any other

5  witnesses that may be noticed or subpoenaed for deposition that

6  nobody has flagged?

7          MR. YOUNG:  I can respond to the Ms. Speights issue,

8  if you would like, Your Honor.  But with respect to your

9  specific question, we are currently looking at that.  There may

10 be one or two.

11         THE COURT:  All right.

12         MR. YOUNG:  But a part of that is a process of

13 waiting to see plaintiffs', and then the disclosures -- they've

14 agreed to give us a list -- and trying to understand from their

15 list of 120 witnesses who might be true witnesses.

16         THE COURT:  All right.  And then, you know, on

17 Speights, I don't know, I'm not going to rule on it.  I assume

18 you're going to confer.  And you're probably not going to reach

19 agreement that there's been a waiver, and I'm going to have to

20 rule on that.

21         But if you want to say anything, I'm not stopping

22 you.

23         MR. YOUNG:  Yes, Your Honor.

24         So we received a letter last night, at about 11:30,

25 so we haven't actually spoken on this.

1           You know, from our perspective, this issue was long

2    wrapped up.  You know, I think there might be a

3    misunderstanding with respect to the document that they're

4    looking at and the waiver of privilege.  So we'll have those

5    conversations.

6           But the document that they're referring to we

7    produced back in June of this year, so months ago.  They're

8    just now bringing it up.

9           Ms. Speights was deposed in September of last year.

10   We went through a whole process of her answering written

11   questions.

12          You know, they could have asked her questions at that

13   point in time.  They didn't do so.

14          So we'll address that.  We'll talk with each other

15   and come back to the Court if there's an issue.

16          But we were surprised to receive the letter late last

17   night.

18          THE COURT:  Okay.  So looking at the calendar, why

19   don't I schedule you for a telephone status.

20          So Monday, I will get some things.  How about -- is

21   everyone free on October 12th in the -- at 3:00 o'clock?  Or I

22   could do it at 4:00 or -- that settlement conference, I think,

23   is going to be moved.

24      (Court conferring with her clerk.)

25          MS. DONNELL:  Your Honor, I'm free, but after 4:00

1  p.m., or before 2:00 p.m.

2           THE COURT:  So after 4:00 or before 2:00?

3           MS. DONNELL:  2:00, uh-huh.

4           THE COURT:  Okay.  And let me ask defense counsel,

5  what's your schedule that day?  Does it matter what time I set

6  the hearing?

7           MR. TELMAN:  We could make ourselves available, Your

8  Honor, either both of us or Mr. Young.

9           I tentatively have a deposition that day, but we

10  haven't confirmed it yet.

11           THE COURT:  Okay.  I think I'm going to -- I have to

12  go out to Great Lakes Naval Base for the Naturalization.

13           Let me set it at 4:00, if that's okay.  It will be

14  not in person.  It will be a telephone.

15           I am going to hope to rule on everything at that

16  time.

17           If I do have any questions that I think I need

18  answered for any of my rulings, I will be in touch with you

19  about that -- and probably tell you in advance -- and you can

20  address them during that hearing by phone.

21           All right.  Anything further from plaintiffs?

22           MS. DONNELL:  Oh.  I just wanted to respond to your

23  question about additional depositions.

24           I believe, also in our letter, we would ask a limited

25  re-dep of Luis Quintiliano, because they asserted an

1 attorney-client privilege over his interview with Ms. Speights.

2         So that would maybe be a small --

3         THE COURT:  So that would be tied into the Speights

4 ruling?

5         MS. DONNELL:  That'd be tied into the Speights issue,

6 but it's an additional witness.

7         And then I believe there might be a possibility that

8 McDonald's is amending their disclosures, which right now just

9 has seven witnesses.  And so depending on if that list included

10 people that we haven't already deposed or -- I would just

11 reserve the right to seek an additional witness depending on

12 what happens with their disclosures.

13         THE COURT:  Okay.  And the date -- you gave us that

14 date.  Fourteen days to give us the confirmed dates for

15 depositions, which I think was October --

16         MS. DONNELL:  18th, I believe.

17         THE COURT:  October 18.  I can't read my own writing.

18         THE CLERK:  October 18.  That's correct, Judge.

19         THE COURT:  Okay.  Good.

20         Okay.  Anything further from McDonald's?

21         MR. TELMAN:  No, Your Honor.

22         THE COURT:  Mr. Easterbrook.  Counsel, anything

23 further from you?

24         MR. HUA:  No, Your Honor.

25         THE COURT:  Okay.  Thanks, everyone.  Have a good

1    evening.

2           MS. DONNELL:  Thank you, Your Honor.

3           MR. YOUNG:  Thank you, Your Honor.

4           MR. TELMAN:  Thank you, Judge.

5           MS. PROSSNITZ:  Thank you, Your Honor.

6           THE CLERK:  This hearing is adjourned.

7       (Proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4

5          I, Colleen M. Conway, do hereby certify that the

6  foregoing is a complete, true, and accurate transcript of the

7  Status/Motion Hearing proceedings had in the above-entitled

8  case before the HONORABLE SHEILA M. FINNEGAN, one of the

9  Magistrate Judges of said Court, at Chicago, Illinois, on

10 October 4, 2023.

11

12

13    */s/ Colleen M. Conway, CSR, RMR, CRR*      *10/09/2023*

14         Official Court Reporter              Date
          United States District Court
15       Northern District of Illinois
              Eastern Division

16

17

18

19

20

21

22

23

24

25