**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **VICTORIA GUSTER-HINES and DOMINECA NEAL,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **No. 20 C 117** |
| **v.** ) | |
| ) | **Judge Mary M. Rowland** |
| **McDONALD'S USA, LLC, a Delaware** ) | **Magistrate Judge Finnegan** |
| **limited liability company,** ) | |
| **McDONALD'S CORPORATION, a** ) | |
| **Delaware corporation, STEVEN** ) | |
| **EASTERBROOK, CHRISTOPHER** ) | |
| **KEMPCZINSKI, and CHARLES** ) | |
| **STRONG,** ) | |
| ) | |
| **Defendants.** ) | |

**ORDER**

Plaintiffs Victoria Guster-Hines and Domineca Neal are former employees of McDonald's USA, LLC ("McDonald's USA"), a subsidiary of parent company McDonald's Corporation. In this lawsuit, Plaintiffs charge McDonald's Corporation, McDonald's USA, and three current and former McDonald's executives (Steven Easterbrook, Christopher Kempczinski, and Charles Strong) with race discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Currently before the Court is Plaintiffs' motion to compel non-party witness James Collins to testify at deposition on certified questions. (Doc. 350). For reasons set forth here, the motion is granted in part and denied in part.

**BACKGROUND[1]**

---

[1] This opinion assumes the reader's familiarity with the allegations in the case and addresses relevant facts only as necessary to resolve the instant motion. *See, e.g., Guster-Hines v. McDonald's USA, LLC*, No. 20 C 117, 2021 WL 2633303 (N.D. Ill. June 25, 2021).

This dispute arises from a Rule 45 deposition subpoena that Plaintiffs served on non-party witness James Collins, a former Vice President and General Manager of McDonald's USA.  Upon receipt of the subpoena, Collins' attorney advised Plaintiffs that when Collins left McDonald's USA in August 2018, he entered into written non-disparagement and confidentiality agreements that "provide[] for consequences against Mr. Collins should he violate these provisions."  (Doc. 211-3, at 7, Email from Tuckey to Caruso and Telman dated 7/8/2022).  As a result, though Collins would appear for his deposition, absent "an adequate abrogation of the contract – for example, . . . bring[ing] certified questions from the deposition to the court for an order," the attorney intended to "instruct Mr. Collins not to answer questions that may violate the contract and trigger those consequences."  (*Id.*).

Plaintiffs filed a motion asking the Court to compel Collins to answer "any question that is otherwise proper under the Federal Rules of Civil Procedure and to further hold that McDonald's USA cannot seek any form of sanction against Mr. Collins for testifying at deposition under subpoena in response to any question that is otherwise proper under the Federal Rules of Civil Procedure."  (Doc. 211, at 8).  After McDonald's USA responded to the motion (Doc. 227), Collins' attorney moved to appear in the case and was allowed to do so (Docs. 228, 234).  Following a hearing, this Court denied the motion given the uncertainty of the questions to be posed, and indicated that Plaintiffs should proceed with Collins' deposition and certify any questions that required a ruling.  (Doc. 250; Doc. 255, Tr. of Hearing on 9/14/2022, at 35).

Plaintiffs moved forward with Collins' deposition and he provided testimony on multiple topics over the course of approximately five hours.  As expected, however,

Collins declined to answer a series of questions on the grounds that it would potentially violate his non-disparagement and confidentiality agreements. Those questions were certified for the Court's review and are now the focus of Plaintiffs' renewed motion to compel. Plaintiffs seek an order requiring Collins to answer the certified questions at a supplemental deposition, and barring McDonald's USA from seeking "any form of sanction against Mr. Collins for testifying at deposition under subpoena." (Doc. 350, at 14).

In support of the motion, Plaintiffs argue that the agreements Collins signed with McDonald's USA do not confer any legal privilege releasing him from his obligation to answer relevant questions pursuant to the subpoena, and any concerns about confidentiality are adequately addressed by the parties' Agreed Confidentiality Order in this case. Collins objects that answering the certified questions, many of which he says are irrelevant, would expose him to potential severe financial penalties such that the additional testimony sought is unduly burdensome and not proportional to the needs of the case. McDonald's USA echoes Collins' concerns about relevance and proportionality, and argues that Plaintiffs lack standing to challenge the terms of Collins' agreements.

## DISCUSSION

### A. Standard of Review

Under Rule 45, "[a] party has a general right to subpoena any person to appear at a deposition." *Thayer v. Chiczewski*, 257 F.R.D. 466, 469 (N.D. Ill. 2009). Such a subpoena, however, must be "reasonable in the circumstances," *Mosely v. City of Chicago*, 252 F.R.D. 421, 427 (N.D. Ill. 2008), and will be quashed or modified if it "subjects a person to undue burden." *Thayer*, 257 F.R.D. at 469 (quoting FED. R. CIV. P.

45(d)(3)(A)(iv)).  *See also McKevitt v. Pallasch*, 339 F.3d 530, 533 (7th Cir. 2003).  "[N]on-party status is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue."  *Little v. JB Pritzker for Governor*, No. 18 C 6954, 2020 WL 1939358, at *2 (N.D. Ill. Apr. 22, 2020) (quoting *U.S. v. Amerigroup Ill., Inc.*, No. 02 C 6074, 2005 WL 3111972, at *4 (N.D. Ill. Oct. 21, 2005)).  This is because non-parties "have a different set of expectations than parties. . . While parties to a lawsuit must accept the invasive nature of discovery, non-parties experience an unwanted burden."  *Id.* (quoting *HTG Capital Partners, LLC v. Doe(s)*, No. 15 C 2129, 2015 WL 5611333, at *3 (N.D. Ill. Sept. 22, 2015)).  Accordingly, "the court should be particularly sensitive when weighing the probative value of the information sought against the burden of production on the non-party."  *Id.* (quoting *Martin v. United States*, No. 13 C 3130, 2015 WL 7783516, at *2 (C.D. Ill. Dec. 3, 2015)).

Other factors to consider in assessing the reasonableness of, and burden imposed by, a subpoena include: "the likelihood that compliance will result in production of the information, whether the discovery is unreasonably cumulative or duplicative, whether the information sought is readily obtainable from another, more convenient, less burdensome (but equally reliable) source, and whether the burden of the proposed discovery outweighs its likely benefit."  *Mosely*, 252 F.R.D. at 427 (citing *Northwestern Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004)).  This mirrors the considerations under Rule 26(b)(2)(c).  *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002).  The party opposing the subpoena bears the burden of establishing that it is unduly burdensome.  *See Ramirez v. Palisades Collection, LLC*, No. 07 C 3840, 2008 WL

4

7506560, at *3 (N.D. Ill. Jan. 7, 2008); *Donald v. Outlaw*, No. 2:17-CV-32-TLS-JPK, 2019 WL 3335031, at *1 (N.D. Ind. July 24, 2019).

Finally, and as with any discovery matter, the Court has wide discretion in resolving the disputes before it. *See, e.g., Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 365 (7th Cir. 2017) ("Trial courts retain broad discretion to limit and manage discovery under Rule 26 of the civil rules.") (internal quotations and brackets omitted); *Thermal Design, Inc. v. Am. Soc'y of Heating, Refrigerating and Air-Conditioning Eng'rs., Inc.*, 755 F.3d 832, 839 (7th Cir. 2014) ("District judges enjoy broad discretion in settling discovery disputes and in delimiting the scope of discovery in a given case.") (internal quotations omitted); *DSM Desotech Inc. v. 3D Sys. Corp.*, No. 08 C 1531, 2008 WL 4812440, at *1 (N.D. Ill. Oct. 28, 2008) ("District courts enjoy extremely broad discretion in controlling discovery.").

## B.    Burden

The primary burden Collins identifies in answering the certified questions concerns the fact that when he left McDonald's USA in August 2018, he signed a Separation Agreement and General Release ("Separation Agreement") and a Confidential Settlement Agreement and General Release ("Settlement Agreement") in exchange for certain consideration.[2]  Under these agreements, Collins is not prohibited from testifying about McDonald's and his employment there, as he did in response to numerous questions at his deposition; however, in both documents, he agreed to refrain from verbal or other conduct that could disparage or damage the reputation, good will and standing of McDonald's or past or present employees and directors.  The Separation Agreement

---

[2]    This Court ordered McDonald's to provide both documents for *in camera* review, and the company complied.  In this opinion, portions of the agreements are generally described if the Court considered them. In light of this, Plaintiffs' request for a copy of those documents is denied.

further provided that Collins would not disclose confidential, proprietary or trade secret information concerning the business, customers or employees that he obtained while working at the company. Notably, Collins agreed that in the event of a breach of either agreement, McDonald's USA would be entitled to recover a significant percentage of any consideration paid to Collins under those agreements, as well as its attorneys' fees and costs incurred due to the breach.

In opposition to the motion to compel, Collins argues that responding to the certified questions will be unduly burdensome because his answers are likely to violate the terms of the Separation and Settlement Agreements. Collins notes that the agreements "do not contain exceptions for disclosures required by Court order," and says that as a retiree, the significant financial penalties he faces in the event of a breach would be "life-altering" and "devastating." (Doc. 361, at 1-2, 6). Plaintiffs respond that the parties' agreed Confidentiality Order suffices to protect Collins from any penalties identified in the Separation and Settlement Agreements. (Doc. 350, at 13-14). But even if the parties were to designate the entirety of Collins' deposition as confidential, there is no basis to conclude that his testimony would remain so. Undoubtedly any portions determined to be relevant and helpful in proving Plaintiffs' claims would be offered into evidence (if admissible) and so become public. And even if none of his testimony was deemed admissible, Collins would still have disclosed the information to Plaintiffs and their counsel. Hence McDonald's USA could still potentially argue (depending on the testimony given) that Collins disparaged or damaged the reputation of the company or current or past employees, or revealed confidential information. If so, McDonald's USA

could conceivably opt to assert a breach of contract claim and seek the imposition of financial penalties on Collins.

Plaintiffs assert that Collins' concern about financial penalties is too speculative, noting that "one claiming undue burden must do more than intone the phrase." (Doc. 365, at 11) (quoting *Papst Licensing GmbH & Co. KG v. Apple, Inc.*, No. 17 C 1853, 2017 WL 1233047, at *3 (N.D. Ill. Apr. 4, 2017)). In support, Plaintiffs point out that McDonald's USA has "taken no action against Mr. Collins and has not alleged that Mr. Collins breached any provision of the relevant contracts." (*Id.*) (quoting Doc. 360, at 2). Of course, Plaintiffs filed this motion because Collins declined to answer any questions that he and his attorney thought might trigger consequences under the agreements. And McDonald's USA expressly stated that it would not waive its contractual rights prior to hearing Collins' specific testimony. (Doc. 211-3, at 5, Email from N. Telman to C. Caruso dated 7/12/2022).

Similarly unpersuasive is Plaintiffs' assertion that if McDonald's USA *did* seek "damages or other relief from Mr. Collins for providing truthful testimony," the Court "can prevent any harm to Mr. Collins by ordering that Mr. Collins's non-disparagement provision is not enforceable as to any truthful testimony he provides in his deposition or at trial." (Doc. 365, at 11). As an initial matter, Plaintiffs assume without discussion or supporting caselaw that this discrimination action would be the proper forum for non-party Collins and McDonald's USA to litigate a breach of contract claim if one were ever asserted in relation to the deposition testimony. In this Court's view, any such claim would necessarily be litigated in the forum agreed to by Collins and McDonald's USA in their

contracts.[3]  So even assuming a claim were to be filed during the pendency of Plaintiffs' discrimination lawsuit, this Court would have no authority to preside over the new action, supervise the discovery and decide factual disputes (e.g., was deposition testimony "truthful"?), interpret the contract language, and ultimately rule as to whether a breach occurred, and if it did, whether to award damages or declare the contracts to be unenforceable.

For these reasons, the Court denies Plaintiffs' motion to the extent it asks for an order declaring that McDonald's USA is barred from ever asserting a breach-of-contract claim premised on the unknown deposition testimony of Collins.  This Court lacks both the authority and the factual and legal basis to enter such an order.  Moreover, regardless of the forum, no one can guarantee the outcome of future litigation prior to a hearing or trial, as the outcome necessarily depends on the decision-maker's determination of the facts and law.  Given this, there is no way to eliminate the potential financial exposure that Collins faces here by proceeding with his deposition and answering the certified questions pursuant to a court order.[4]  This potential financial exposure alone constitutes a burden on Collins above and beyond those typically attendant to any deposition.

---

[3]     In those contracts, they agreed to resolve any claim of breach through mediation and, if unsuccessful, through binding arbitration.

[4]     While the Court doubts McDonald's would assert a breach-of-contract claim if Collins were required to violate the contracts to comply with a court order (i.e., truthful answers to certified questions disparaged McDonald's or required disclosure of confidential information), Collins would appear to have a viable affirmative defense based on illegality or contravention of public policy.  Restatement (2d) of Contracts, § 178.  That issue, however, must be litigated in the agreed-upon forum.  Even if this Court were to declare the contracts to be unenforceable – whether prior to Collins' testimony and any hearing (as Plaintiffs request) or later – this would at most be an advisory opinion not binding on the ultimate decision-maker in the agreed-upon forum.  And since Plaintiffs have no connection to the contracts, it is questionable whether they even have standing to raise enforceability challenges.  *See Kaplan v. Shure Bros., Inc.*, 266 F.3d 598, 602 (7th Cir. 2001) ("Under Illinois law, a cause of action based on a contract may be brought only by a party to that contract, by someone in privity with such a party, . . . or by an intended third-party beneficiary of the contract.").  In any event, the cases Plaintiffs cite are largely inapposite since the contracts here do not prohibit Collins from reporting possible violations of law to governmental bodies and agencies and from cooperating in investigations brought by them.

*Compare Jakes v. Boudreau*, No. 19 C 2204, 2021 WL 7543868, at *2 (N.D. Ill. Dec. 2, 2021) (burdens not undue where they "are attendant to every deposition – depositions require deponents to take time out of their day and work, and a deponent's counsel typically chooses to spend additional time preparing the deponent.").

At the same time, Plaintiffs are entitled to discovery of non-privileged information relevant to their claims and proportional to the needs of the case under Rule 26(b)(1). Collins and McDonald's USA contend that the 55 certified questions are also unduly burdensome because they seek testimony on irrelevant topics and/or would require Collins to speculate about matters that are beyond the scope of his personal knowledge, and for other reasons. But Collins does not deny that he has at least some relevant knowledge about the topics raised in the certified questions. In addition, though Collins is correct that Plaintiffs may be able to obtain certain information from other witnesses (Doc. 361, at 9-13), Plaintiffs note that most of the individuals Collins identifies are "entrenched employees" whom Plaintiffs fear "will tell the story the way McDonald's wants." (Doc. 365, at 11-12).

Given the competing interests at stake, including the obligation to be "particularly sensitive" to Collins' burden as a non-party relative to the probative value of his testimony (*Little*, 2020 WL 1939358, at *2), the Court declines to grant Plaintiffs' motion in its entirety by ordering Collins to answer all of the 55 certified questions. Instead, Collins is ordered to answer only a subset of the questions identified below where the Court is persuaded that Plaintiffs' claimed need for the information sought outweighs the burden Collins faces in answering. And given that this non-party already has answered many questions during

a prior five-hour deposition, the duration of the continued deposition will be limited to 2 hours.

## C.    The Certified Questions

Plaintiffs have divided the 55 questions into seven categories that the Court examines in turn.  As noted, Plaintiffs argue that these questions are relevant to their "claims against Defendants for racially disparate treatment, disparate impact, hostile work environment, and unlawful retaliation."  (Doc. 350, at 5) (citing Third Amend. Compl. ¶¶ 61-109).[5]

### a.    Collins' Knowledge of the FFR and Departure from McDonald's USA

Plaintiffs seek to ask Collins numerous questions about his knowledge of the Field First Restructure ("FFR") in June 2018, and the circumstances surrounding his departure from McDonald's around that time.  The certified questions are:

* How did you first learn about the FFR, if you remember?
* From whom did you first learn about the FFR?
* Did anybody ever explain to you the reasoning behind the FFR?
* Do you think that the decisions regarding the FFR were made by Mr. Kempczinski?
* Do you think Mr. Strong had any role in making the decisions associated with the FFR?
* Do you think Melissa Kersey had any role in the decisions associated with the FFR?
* Were you retired or terminated, Mr. Collins?
* Do you know why McDonald's terminated you?
* Do you believe that your race had anything to do with your termination?
* [D]id you want to continue to remain employed by McDonald's?
■ Did you pursue any legal remedies against McDonald's, in connection with your departure from McDonald's?
■ If [Mr. Collins pursued legal remedies], what were the results of those remedies that you sought?
* If McDonald's had asked you to return after your separation, would you have?
* Following your departure from McDonald's, did you have a desire to return to McDonald's?

---

[5]     For ease of reference, questions that are allowed are denoted by an asterisk, while questions that are disallowed are denoted by a square.

(Doc. 350, at 6-7).

Plaintiffs argue that the answers to these questions may support their claim that the FFR had a disproportionate impact on African Americans at the company and create an inference that were it not for that racially biased FFR, they would not have been demoted.  (*Id.* at 7).  Collins and McDonald's USA object that Collins had no role in the FFR so he lacks personal, first-hand knowledge about any related decisions.  (Doc. 360, at 7; Doc. 361, at 8) (citing (Doc. 350-1, at 103, Collins Dep., at 102) ("Q. You said you had no role in the FFR being implemented, correct? A. Uh-huh. That is correct, yes.").  If that is true, it would not be burdensome for Collins to simply testify that he does not know the answer to a specific question; there is no requirement that he speculate.

McDonald's USA insists that Collins still faces an unacceptable burden given that the questions relate to a topic that is irrelevant.  As McDonald's USA notes, the district court held in her June 25, 2021 Memorandum Opinion and Order that to the extent Plaintiffs' disparate impact claim is based on the FFR that "took place in the summer of 2018, prior to March 5, 2019, it is barred for purposes of Title VII based on failure to timely exhaust administrative remedies."  (Doc. 360, at 7-8) (quoting Doc. 90, at 18).  But Plaintiffs also allege that Defendants retaliated against them in part because they expressed their concerns about the FFR's impact on African Americans "at least up until 2019, during the relevant time period."  (Doc. 365, at 9).  As Plaintiffs explain, any discrimination Collins experienced may help "substantiate[] [their] concerns and make[] it more likely that McDonald's retaliated against [them]."  (*Id.*).  Moreover, neither McDonald's USA nor Collins offered any argument in opposition to the certified questions regarding Collins' own departure from McDonald's.

On balance and with two exceptions, the Court finds that the information sought in these certified questions about the FFR and Collins' termination is sufficiently probative of Plaintiffs' retaliation claims that the need for answers outweighs the burden Collins faces in testifying. Collins need not answer the questions about whether he pursued legal remedies against McDonald's in connection with his departure, and, if so, what those legal remedies were. As to the remainder of the questions, Plaintiffs' motion to compel as to this category of questions is granted.

**b.   Expressed Abandonment of Racial Equality**

The next category of questions concerns "whether Defendants expressly abandoned racial equality under the leadership of Defendants Kempczinski and Easterbrook." (Doc. 350, at 7). The certified questions are as follows:

■    After Mr. Kempczinski became president of McDonald's U.S.A., did you observe whether there was a shift in the importance of racial diversity at McDonald's?

*    [D]o you recall, whether, at that meeting [NBMO meeting in Jamaica], Mr. Easterbrook stated that McDonald's DEI policies were focusing on gender diversity only, in ---at the exclusion of racial diversity?

*    Do you have any knowledge about how that role [chief diversity officer for McDonald's Corporation] changed when Ms. [Pat] Harris retired?

(*Id.*).

McDonald's USA denies that information about diversity and inclusion efforts has any relevance to "whether Plaintiffs were subjected to race-based discrimination or harassment during their employment." (Doc. 360, at 11). McDonald's USA directs the Court to Judge Rowland's June 25, 2021 Opinion where she made clear that the alleged policy shift away from racial diversity and towards gender equality "was psychological; it did not change the terms or conditions of Plaintiffs' employment" and so did not constitute an adverse employment action for purposes of Title VII. (Doc. 90, at 16-17). McDonald's

USA further cites Judge Rowland's conclusion that Easterbrook's decision to focus on gender goals at the expense of racial equality did not qualify as "harassment." (*Id.* at 30).

Plaintiffs argue that the answers to the questions may demonstrate that "the company became overly hostile to African Americans under the leadership of Defendants Easterbrook and Kempczinski," and may "shed light on the workplace environment at McDonald's, and [Collins'] knowledge about the impact on employees." (Doc. 350, at 8). In Plaintiffs' view, the fact that Defendants deliberately de-emphasized the promotion and support of African American employees "supports the inference that Defendants intentionally targeted Plaintiffs." (Doc. 365, at 6). Plaintiffs point out that "if the evidence showed that Defendants maintained or even increased their DEI and anti-discrimination efforts, Defendants would presumably use those facts to argue that Defendants' executives did not target Plaintiffs because of their race." (*Id.*).

The Court recognizes that the probative value of Collins' testimony on these issues is somewhat questionable given that Plaintiffs are women who arguably would benefit from a shift towards gender equality. Nevertheless, the burden Collins faces in answering two of the three questions is sufficiently outweighed by Plaintiffs' claimed need for the testimony that Collins must answer them. Collins need not answer the first question which in essence seeks a lay opinion (not factual information) from a non-party in response to a broad and vague question requiring the witness to draw a conclusion. Specifically, Plaintiffs will not be permitted to seek Collins' opinion as to whether "After Mr. Kempczinski became president of McDonald's U.S.A." (so any time after January 2015 until Collins left the company in summer 2018), he observed a "shift" in the "importance"

of "racial diversity."  Plaintiffs' motion to compel as to this category of questions is granted only as to the second and third questions.

### c. Discriminatory Treatment of African American Employees

Plaintiffs have certified several questions related to "McDonald's treatment of the African American Council ('MA2C'), a network of African American employees at the company that developed African American leadership talent."  (Doc. 350, at 8).  These questions include:

- ■ Did you feel like MA2C was supported by the senior leadership at McDonald's U.S.A. at the time?
- ■ Did there come to be a time, Mr. Collins, when you felt the senior leadership of McDonald's U.S.A. did not support MA2C?
- \* Do you know how MA2C was funded during your time at McDonald's?
- \* Do you know if, during your time at McDonald's, whether McDonald's corporate staff funded MA2C?
- ■ [W]hat can you tell me about that meeting [MA2C meeting in March or April of 2018 in Orlando]?
- \* And do you recall what was discussed at the meeting [MA2C meeting in March or April of 2018 in Orlando]?
- \* Do you recall if at that [MA2C meeting in March or April of 2018 in Orlando] meeting you personally raised concerns about the treatment of Black employees at McDonald's?

(*Id.*).  Plaintiffs argue that Collins' testimony "may establish facts that, after Defendants Easterbrook and Kempczinski arrived, the company reduced funding, programs, and support for African American employees at the corporation."  (*Id.*; Doc. 365, at 5). According to Plaintiffs, this in turn "may support Plaintiffs' disparate treatment claims by direct or indirect evidence of discriminatory intent, and whether African Americans suffered an 'adverse employment' action because of their race."  (Doc. 350, at 9; Doc. 365, at 5).

McDonald's USA argues that information about the MA2C organization "has no relevance as to whether or not Plaintiffs were personally subjected to discriminatory or

retaliatory treatment" and so amounts to an improper fishing expedition. (Doc. 360, at 10). The company notes that Judge Rowland already ruled that Plaintiffs' involvement with the MA2C does not constitute protected activity, and that Easterbrook's decision to allow the organization to go "dormant" was not actionable harassment. (Doc. 90, at 24, 30).

Like the previous question that was disallowed, the first and second questions under this category are also ambiguous and seek not facts but a lay opinion from Collins concerning whether MA2C was "supported" by "senior leadership" in the company. Collins need not answer these questions since they are overly burdensome to him as a non-party. In addition, Collins need not answer the question "[W]hat can you tell me about that meeting [MA2C meeting in March or April of 2018 in Orlando]?" since it is entirely unfocused and so overbroad and unduly burdensome to answer. As for the remaining questions that seek factual information, the motion to compel is granted because the burden of answering them is outweighed by Plaintiffs' claimed need for the testimony.

### d. Intentional Effort to Purge African American Executives by Reducing African American Operators and Customers

Plaintiffs say the next set of questions is relevant to their contention that Defendants "intentionally sought to 'purge' the company's African American executives, including Plaintiffs, by undertaking a massive initiative around 2017 to reduce its number of African American franchisees and African American customer base." (Doc. 350, at 9; Doc. 365, at 4). The certified questions include:

- After Mr. Kempczinski became president of McDonald's U.S.A., did you observe any change in how Black owner-operators were treated in the McDonald's system?
- After Mr. Kempczinski became president of McDonald's U.S.A., did you have any experience with Black-owner operators being forced out of the system?
* [D]o you recall whether Ms. Neal raised concerns about unfavorable treatment of

Black-owner operators?

\* [D]o you recall whether Ms. Guster-Hines raised such concerns [about the unfavorable treatment of Black-owner operators].

\* Do you recall if there were concerns raised…at that meeting NBMOA [National Black McDonald's Operators Association Meeting in Jamaica] regarding the treatment of Black owner-operators?

\* Do you recall whether you personally paid for yourself to get to that meeting, or whether McDonald's paid to get you to that meeting?

■ Did you observe whether the BBV [Big Bolder Vision] plan had an effect on Black owner operators?

\* Do you recall having any conversations with McDonald's executives regarding the effect of BBV on Black owner-operators?

\* And do you recall if at that meeting [MA2C meeting in March or April of 2018 in Orlando] you personally raised questions about the treatment of Black-owner operators?

■ Mr. Collins, based on your experience at McDonald's, do you believe that there were rent gaps between what relief Black owner-operators were provided and what white owner-operators were invited (sic)?

\* Do you recall whether Ms. Neal ever raised concerns about these rent gaps?

\* Do you recall whether Ms. Guster-Hines ever raised concerns about these rent gaps?

■ After Mr. Kempczinski became president of McDonald's U.S.A., do you know if McDonald's lessened the amount that it spent on marketing to Black customers?

(*Id.* at 9-10).

Plaintiffs argue that the answers to these questions may not only support their intentional discrimination claims, but also "establish facts on whether the company retaliated against Plaintiffs for protesting the company's treatment of African Americans, including raising concerns about the rent gaps between what rent relief African American owner-operators were provided and what White operators were provided." (*Id.* at 10). McDonald's USA objects that "general information related to the alleged treatment of African American franchisees and customers . . . is not relevant to [Plaintiffs'] employment-related claims." (Doc. 360, at 8). The company also notes that pursuant to Judge Rowland's June 25, 2021 Opinion, Plaintiffs' alleged advocacy on behalf of African American franchisees "was not a protected activity, because protected activity must be

16

undertaken in opposition to an unlawful employment practice prohibited by Title VII or § 1981." (*Id.* at 9-10) (quoting Doc. 90, at 24-25).

Plaintiffs' motion is denied as to five of the certified questions because they seek a lay opinion from Collins (not factual information) in response to broad and ambiguous questions regarding the treatment of black owner operators as a group: did their treatment "change" after Kempczinski became CEO; were they "forced out"; and did the Big Bolder Vision plan have an "effect" on them.  Similarly vague is Plaintiffs' question whether, "based on [Collins'] experience at McDonald's, do you believe that there were rent gaps between what relief Black owner-operators were provided and what white owner-operators were invited (sic)?"  Even the question whether, after Kempczinski became president of McDonald's USA, the company "lessened the amount that it spent on marketing to Black customers," is ambiguous: what counts as "marketing to Black customers" and at what points in time is the "amount" to be compared?  In essence, this question too asks non-party Collins to render an opinion (to the extent he could even do so) rather than provide factual information.[6]  Collins is not required to answer any of these five questions.

As for the remaining questions in this category, the motion to compel is granted.  These questions do not seek lay opinions on ambiguous topics but rather ask Collins about his recollection of his specific conversations with Plaintiffs and others, and his own statements on a particular topic at a meeting.  While the probative value of the information

---

[6]     The Court is aware of the complexity of this topic from the parties' prior disputes over written discovery seeking, for example, documents related to the national and regional spending on advertising, marketing campaigns, or programs intended to generate patronage by African American consumers in various years, and any specific advertising or marketing campaigns or other programs intended to attract patronage by African American consumers that were cancelled or not renewed in various years, whether nationally or regionally.  (Doc. 224-8, at 21).

sought in these questions is subject to debate, the Court is satisfied that Plaintiffs' articulated need for the testimony outweighs Collins' burden in providing it.

### e. Defendant Strong's Racial Discrimination Towards Plaintiffs and Other African American Employees

Plaintiffs have certified three questions about whether Collins personally observed Strong discriminate against Plaintiffs and other African American employees:

\* And in what way did you indirectly hear Charles Strong using that phrase ("angry black woman") (subsequent question to Collins affirming at his prior deposition that he had indirectly heard Charles Strong use the phrase.).
■ Did you ever observe Mr. Strong take any discriminatory actions toward anybody?
■ Did you ever observe Mr. Strong say anything that you personally considered to be racist?

(Doc. 350, at 10). Plaintiffs believe the answers to these questions may establish "facts about the hostile work environment that Plaintiffs and other African American women were subjected to at the company, or the 'employer's discriminatory animus' that motivated an adverse employment action." (*Id*. at 11) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012)). Guster-Hines alleges that Strong asked her to explain why "angry Black women . . . always seemed to be mad about something," and Neal alleges that Strong warned her to "watch [her] delivery and be 'softer,'" and told staff and franchisees that she was "angry." (*Id*.).

Collins and McDonald's USA first object that Collins has no personal knowledge about Strong's alleged comments since he heard them indirectly. (Doc. 360, at 8; Doc. 361, at 8) (citing Doc. 350-1, at 72, Collins Dep., at 71) ("Q. Did you ever hear Charles Strong use that phrase [angry black woman]? A. Not directly. Q. Indirectly? A. I would say yes, indirectly."). Yet indirect knowledge does not necessarily equate to a lack of first-

hand or personal knowledge.[7]   And Neal has identified Collins as someone she complained to directly about Strong's comment.  (Doc. 365, at 9).  In such circumstances, Plaintiffs' need for the information sought in the question outweighs the burden imposed on Collins to answer it.

This is not so as to the remaining two questions, seeking Collins' opinion as to whether (in his 30 plus years at McDonald's), he ever observed Charles Strong take "discriminatory actions" or say anything "racist."  These questions are not only grossly overbroad in time and subject matter ("discriminatory actions" is not limited to those motivated by race), but also would require the non-party to draw conclusions and provide lay opinions.  Since Plaintiffs' need for the information is outweighed by the burden to the non-party, the motion to compel is denied as to these two questions.

### f.   Collins' Knowledge and Attempts to Prevent Defendants' Discriminatory Practices Towards African Americans

The next category of questions concerns "Defendants' employment practice of racial discrimination toward Plaintiffs and other African Americans and Plaintiffs' disparate impact claims."  (Doc. 350, at 11).  The questions are as follows:

- During the time that you were an officer at McDonald's, did you ever witness any racial discrimination directed at other McDonald's employees?
- During the time that you were an officer at McDonald's, did you ever witness racial discrimination directed at other officers?
- Do you know whether or not Charles Strong prevented that [Mr. Collins hiring of Plaintiff Neal] from happening?
- During the time that you were an officer at McDonald's, did you ever witness racial discrimination directed at owner-operators?
- During the time that you were an officer at McDonald's, did you ever attempt to stop discrimination directed at employees?
- During the time that you were an officer at McDonald's, did you ever attempt to stop discrimination directed at other officers?

---

[7]      If offered to prove the truth of the matter asserted, the testimony may be hearsay and so inadmissible.  FED. R. EVID. 801(c).  But evidence need not be admissible to be discoverable.  FED. R. CIV. P. 26(b)(1).

- During the time that you were an officer at McDonald's, did you ever attempt to stop discrimination directed at other owner-operators?
- During the time that you were an officer at McDonald's, were you ever aware of complaints of discrimination directed at employees?
- During the time that you were an officer at McDonald's, were you ever aware of complaints of discrimination directed at other officers?
- During the time that you were an officer at McDonald's, were you ever aware of complaints of discrimination directed at owner-operators?
- Do you know what happened to her [Debbie Roberts] employment at McDonald's?

(*Id.* at 11-12).

Plaintiffs say that Collins' testimony on these issues is relevant because "it may establish facts related to Plaintiffs' disparate treatment claims and the individual Defendants' discriminatory practices against various African American stakeholders." (*Id.* at 12). Plaintiffs note that they have identified Debbie Roberts as an African American executive who was adversely affected by and terminated as a result of the allegedly discriminatory FFR. (*Id.*). McDonald's USA views this as nothing more than a fishing expedition and insists that "[t]he discovery process is not meant to be an opportunity to allow Plaintiffs to engage on a boundaryless hunt for information related to any discrimination that is alleged to have taken place at McDonald's USA, regardless of time period, location, individuals allegedly involved or, in many cases with respect to the questions at-issue, even the kind of discrimination that is alleged to have taken place." (Doc. 360, at 11-12) (citing *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, No. 15 C 10340, 2018 WL 946396, at *4 (N.D. Ill. Feb. 20, 2018)) ("Not surprisingly, the courts are unanimous in prohibiting discovery from being used as a 'fishing expedition'" to seek information that "ultimately is not 'relevant.'").

The Court agrees with McDonald's USA that most of these questions are overly broad and improper. Six are not even limited to race discrimination, the only type alleged

in this lawsuit, and all cover at least a 17-year period. (Doc. 350-1, at 36, Collins Dep., at 35) (stating that Collins became senior director of operations for the Great Lakes division in 2001). Many of the questions also require non-party Collins to offer lay opinions as to whether particular conduct was "racial discrimination" or "discrimination." Tellingly, Plaintiffs do not repeat any of these questions in their reply brief or explain how they are proportional and not burdensome in light of the arguments raised by McDonald's USA and Collins. The motion to compel Collins to answer this category of questions is denied in its entirety.

### g. Collins' Knowledge About the Employee Investigatory Procedures at McDonald's

Plaintiffs finally seek to question Collins about McDonald's USA's investigation of Neal, as follows:

- [A]t the time that you left McDonald's, if there had been an investigation into Ms. Neal do you think that it would've been pertinent to hear from Jonathan Foster regarding Ms. Neal.
- Same question [whether it would have been pertinent to hear Denny Varghese regarding Ms. Neal].
- Same question [whether it would have been pertinent to hear from Erika Zentino regarding Ms. Neal].
- Same question [whether it would have been pertinent to hear Carlos Mendoza regarding Ms. Neal].

(Doc. 350, at 12). Collins and McDonald's USA argue that this line of inquiry is improper because Collins testified that he was unaware that the Neal investigation even took place. (Doc. 350-1, at 80, Collins Dep., at 79 (Q. Are you aware that at some point in time, McDonald's conducted an investigation of Ms. Neal? A. No.")). Plaintiffs respond that Collins, a high-level executive, received training on "how human resources investigations were supposed to be conducted." (Doc. 350, at 12). This is an overstatement, as Collins merely testified that over the course of his lengthy career, he was generally "aware of"

HR investigations "of folks who reported to [him]," but he did not receive any formal training on how to conduct them and did not recall any in particular. (Doc. 350-1, at 89, Collins Dep., at 79).

Plaintiffs insist that since Collins was based out of Dallas, where Plaintiffs worked, he still would know the relevant people to interview. (Doc. 365, at 8). They also cite an April 14, 2008 article stating that Collins oversaw "marketing, finance, operations, training and human resources for the [Southwest] region." (Doc. 365-1, at 3). These arguments might be persuasive if Collins had indicated that he was familiar with the Neal investigation. But Plaintiffs want Collins to answer hypothetical questions and offer lay opinions as to whether McDonald's properly handled an investigation he knows nothing about. Whatever minimal probative value his testimony may have in helping to establish that the investigation was pretextual or retaliatory is outweighed by the burden Collins faces in answering the questions, and is not proportional to the needs of the case. Plaintiffs' motion to compel is therefore denied as to this category.

## D. Parameters of the Deposition

The parties are to meet and confer to schedule a mutually agreeable time and location in Texas for Collins to answer questions consistent with this order.[8] As noted, Collins already gave testimony for approximately five hours, so the re-deposition is limited to two hours. McDonald's USA's request to have Collins answer questions via written interrogatory (Doc. 360, at 12), is denied.

---

[8] Plaintiffs have agreed to "accommodate Mr. Collins, including traveling to his home state." (Doc. 365, at 11).

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion to Compel Third-Party Witness James Collins to Testify at Deposition on Certified Questions [350] is granted in part and denied in part.

ENTER:

Dated: May 21, 2024

SHEILA FINNEGAN
United States Magistrate Judge