**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VICTORIA GUSTER-HINES[1] and DOMINECA NEAL, | |
| Plaintiffs, | Case No. 20-CV-00117 |
| v. | Judge Mary M. Rowland |
| McDONALD'S USA, LLC, a Delaware limited liability company, McDONALD'S CORPORATION, a Delaware corporation, STEVEN EASTERBROOK, CHRISTOPHER KEMPCZINSKI, and CHARLES STRONG, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Victoria Guster-Hines[1] and Domineca Neal ("Plaintiffs") sued McDonald's USA, LLC, McDonald's Corporation, Steven Easterbrook, Christopher Kempczinksi, and Charles Strong ("Defendants"), alleging various forms of employment-based discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq*. Each Defendant has filed separate motions for summary judgment. But before the Court can reach the parties' summary judgment briefing, it must first turn to the cornucopia of motions that both parties have filed to exclude in whole or in part various fact or expert witness testimony from

---

[1] The parties intermittently refer to Guster-Hines as "Guster-Hines" or simply "Hines." To be consistent with the case caption, the Court refers to her as "Guster-Hines."

1

consideration at summary judgment and at trial. The motions the Court considers now are outlined below:

- Plaintiffs' Motion to Exclude Five Untimely-Disclosed Witnesses [742, 743]

- Plaintiffs' Motion to Exclude Late-Disclosed Facts in Quintiliano Affidavit [639, 644]

- Plaintiffs' Motion to Exclude the Parolin Affidavit [740, 741]

- Defendants' Motion to Exclude Plaintiffs' Expert Goldberg [648, 655]

- Plaintiffs' Motion to Exclude Certain Testimony from Defendants' Expert Moore [640, 645]

- Defendants' Motion to Exclude Plaintiffs' Expert Finkelman [650, 657]

- Plaintiffs' Motion to Exclude Certain Testimony from Defendants' Expert Reid [641, 647]

- Defendants' Motion to Exclude Plaintiffs' Expert Kucsma [652, 659]

- Plaintiffs' Motion to Exclude Certain Testimony from Defendants' Expert Guay [642, 646]

## I. Background

The Court recounts only the limited background necessary to resolve the motions it now considers.[2]

Guster-Hines began working for McDonald's in 1987. [727] ¶ 14. She was promoted approximately fifteen times throughout her career. [727] ¶ 14. In January 2013, Guster-Hines was promoted to Quality, Service, and Cleanliness Vice President ("QSC-VP").

---

[2] All facts herein are drawn from the parties' statements of fact submitted in support of or opposition to Defendants' motions for summary judgment. The Court notes that of the 393 statements of fact the parties submitted in their summary judgment briefing, the parties agree on only 26. *See* [727]; [791]. The Court notes any relevant disputes below.

2

Neal began working for McDonald's in 2012. [727] ¶ 17. Neal was promoted to the role of QSC-VP in 2017. [727] ¶ 21.

In 2018, McDonald's USA implemented a corporate restructure referred to as the Field First Restructure ("FFR"). [791] ¶ 14. Both Plaintiffs held the title of QSC-VP at the time of the FFR. [727] ¶ 6. As a part of the FFR, QSC-VPs, including both Plaintiffs, were given the opportunity to either (i) continue their employment with McDonald's USA in the newly created Operations Officer role; or (ii) exit the company with a severance package. [727] ¶ 41. Both Plaintiffs accepted the offer to join the Dallas Field Office as Operations Officers, where they reported to Luis Quintiliano [727] ¶¶ 52-53.

On September 23, 2019, counsel for Plaintiffs sent a demand letter to McDonald's complaining of various forms of discrimination. [727] ¶ 97. Following the letter, McDonald's USA and Plaintiffs mutually agreed that Plaintiffs would take a paid leave of absence effective December 3, 2019. [727] ¶ 97.

While Neal was on leave, several employees who reported to her expressed to McDonald's leadership that they were nervous about Neal's return. [727] ¶ 99. In response to the concerns raised by those employees,[3] McDonald's USA retained Grace Speights, a partner at the law firm Morgan, Lewis & Bockius LLP ("Morgan Lewis") to review[4] these concerns. [727] ¶ 100. Speights determined that Neal had created "a

---

[3] Plaintiffs dispute that Speights was retained in response to employee complaints, arguing that her investigation was a pretext to retaliate against Neal complaining about discrimination. *See generally* [722].

[4] The parties dispute whether Speights's review was an "investigation" or an "assessment," and whether Speights was retained to review both Plaintiffs or only Neal. [727] ¶ 100. The Court's use of either term in this memorandum does not indicate any judgment or opinion regarding which term more accurately describes Speights's work.

very toxic workplace" and "toxic culture." [727] ¶ 103. Following Speights's report, McDonald's USA leadership terminated Neal's employment on February 28, 2020. [727] ¶ 108. Guster-Hines resigned on October 31, 2021, while still on paid leave. [791] ¶ 194.

Plaintiffs bring claims alleging (1) disparate treatment premised on their alleged demotions as part of the FFR, their alleged non-promotion to over 60 positions, Neal's termination, and (2) a hostile work environment.

## II.    Motions to Exclude

### A.  Plaintiffs' Motion to Exclude Defendants' Untimely-Disclosed Witnesses

The Court first turns to Plaintiffs' motion to exclude Defendants' untimely-disclosed witnesses. Plaintiffs' motion arises out of Defendants' November 28, 2023 amended Rule 26(a) disclosures where Defendants identified 40 potential witnesses as possessing information relevant to Plaintiffs' non-promotion claims. Defendants attached affidavits from five of those 40 witnesses in support of their motion for summary judgment: Ian Borden, Jeff Wilfong, Gregg Ereio, Skye Anderson, and Mario Barbosa.[5] Plaintiffs now move to exclude those five witnesses pursuant to Rules 26 and 37.[6]

Rule 26 requires that parties disclose "each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses,"

---

[5] As noted *infra*, Defendants also disclosed Parolin as a witness for the first time in this November 28, 2023 disclosure.

[6] Plaintiffs' motion is titled "Motion to Exclude Summary Judgment Declarations of Untimely-Disclosed Witnesses," but their briefing makes clear that they seek to exclude each of the five witnesses from testifying at trial, as well. [743] at 8.

4

Fed. R. Civ. P. 26(a)(1)(A)(i), and to supplement the disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," Fed. R. Civ. P. 26(e)(1)(A). Rule 37 provides that "[i]f a party fails to provide information or identify a witness as required by Rule [26], the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "Whether a failure to comply with Rule 26(a) or (e) is substantially justified or harmless is left to the broad discretion of the district court." *G&G Closed Cir. Events*, 2016 WL 3551634, at *6 (citing *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 514 (7th Cir. 2011)).

To fully consider Plaintiffs' argument, it is necessary to recap the discovery process in this action.

Discovery in this case began in July 2021. [95]. Written discovery closed on October 16, 2023, and oral discovery was set to close on December 15, 2023. [382]. Defendants' first Rule 26(a)(1) disclosures, dated August 23, 2021, identified six individuals as having discoverable information that Defendants may call to support their claims. [743-1] at 3. A year later, Defendants supplemented their disclosures and added the name of one more potential witness. [743-2] at 3-4.

Defendants did not further supplement their disclosure until November 28, 2023. There, Defendants disclosed an additional 40 witnesses; this amended disclosure is

5

the subject of Plaintiffs' motion. Plaintiffs never sought to depose any of newly-disclosed witnesses. Plaintiffs argue that because fact discovery was set to close two weeks later, each witness was untimely disclosed, and Defendants thus cannot rely on them either at summary judgment or trial.

But fact discovery did not close two weeks later. On December 12, 2023, the parties filed a joint status report before Magistrate Judge Finnegan stipulating that they needed more time to conduct certain depositions (and in some cases to re-depose various witnesses). [422]. Judge Finnegan ordered that discovery be continued to allow the parties to conduct six additional depositions. [424]. In a status report, Defendants requested leave to take additional depositions beyond the six the parties agreed to; Judge Finnegan required a motion before any further depositions could be taken. *Id.*

Defendants took Judge Finnegan up on their offer almost immediately, moving to compel additional depositions on December 15, 2023. [428]. Specifically, Defendants sought to re-depose both Plaintiffs (each of whom had already been deposed twice) in part because Plaintiffs had belatedly produced hundreds of pages of discoverable material in September 2023, shortly before the close of written discovery. [428] at 5. Judge Finnegan granted the motion on June 17, 2024, and each Plaintiff was re-deposed shortly thereafter. *See* [522].

Then, on December 10, 2024, Defendants filed *another* motion to compel each Plaintiff to sit for a fourth deposition. [536]. Defendants argued that these depositions were necessary because, on November 11, 2024, Plaintiffs' counsel advised

6

Defendants that they were in possession of an additional 7,916 unproduced documents. *See id*. Judge McNally (to whom the case was reassigned on December 16, 2024,) granted Defendants' motion. [571]. Ultimately, the last deposition of a fact-witness in this case took place on March 10, 2025. [587].

Against this backdrop, the Court cannot see how Defendants' down to the wire supplemental disclosure caused Plaintiffs undue prejudice. When Plaintiffs belatedly served untimely discovery materials, Defendants responded by moving to take additional depositions as necessary, and those requests were granted. But when *Defendants* supplemented its disclosures two weeks prior to the close of discovery, Plaintiffs did nothing. Fact witness depositions continued for a full *16 months* after Defendants' final disclosure, and Plaintiffs never moved to depose any of the newly-disclosed witnesses. Plaintiffs argue that this was because Defendants' improper objections to Plaintiffs' interrogatories prevented them from learning what the witnesses would testify to. [778] at 7. That may be true. But the time to challenge Defendants' objections was *during discovery*, not two and a half years later on the eve of summary judgment. *See Lakeshore Sail Charters, LLC v. Acadia Ins. Co.*, 168 F. Supp. 3d 1048, 1056 (N.D. Ill. 2016).

Plaintiffs' failure to depose any of the witnesses disclosed at the eleventh hour is all the more striking given Plaintiffs identified four of the five witnesses — Wilfong, Ereio, Anderson, and Barbosa — as individuals likely to have knowledge relevant to Plaintiffs' claims in their own initial disclosures served on August 23, 2021. [773-5]. And Plaintiffs themselves independently produced a document demonstrating that

7

the fifth witness, Borden, oversaw a department that Plaintiffs allege they should have been promoted into. [773-14].

The record reveals that Plaintiffs knew of each of the five witnesses in advance of Defendants' November 28, 2023 disclosure. And even if they did not, Plaintiffs had ample time to seek their depositions. Accordingly, Plaintiffs' motion to exclude the five witnesses [742, 743] is denied.

### B. Plaintiffs' Motion to Exclude Late-Disclosed Facts in the Quintiliano Affidavit

The Court next turns to Plaintiffs' motion to exclude an affidavit from Luis Quintiliano (the "Quintiliano Affidavit"), which was served and filed on May 16, 2025. During the relevant timeframe, Quintiliano was a Field Vice President in the McDonald's Dallas Field office. [644-1] ¶ 2. Plaintiffs deposed Quintiliano in September 2023. Plaintiffs argue that the Quintiliano Affidavit should be excluded because it contains new information and contradicts the testimony he provided in his September 2023 deposition.

As a general matter, parties are permitted to use an affidavit to support or oppose a motion for summary judgment. Fed. R. Civ. P. 56(c)(4). Plaintiffs invoke the sham affidavit rule to exclude Quintiliano's affidavit. Under the sham affidavit rule, the nonmoving party opposing summary judgment is prohibited "from creating an issue of fact by submitting a[n]" affidavit that contradicts the affiant's prior deposition testimony. *Craig v. Wrought Washer Mfg., Inc.*, 108 F.4th 537, 543 (7th Cir. 2024). An affidavit is properly excluded under this doctrine where it contains "contradictions so clear that the only reasonable inference [is] that the affidavit was a sham designed

to thwart the purpose of summary judgment." *Neita v. City of Chicago*, 148 F.4th 916, 928 (7th Cir. 2025) (quoting *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015)). "Changes in testimony normally affect the witness's credibility rather than the admissibility of the testimony and thus the sham-affidavit rule applies only when a change in testimony 'is incredible and unexplained,' not when the change is 'plausible and the party offers a suitable explanation such as confusion, mistake, or lapse in memory.'" *Neita*, 148 F.4th at 928 (quoting *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016)). As such, the doctrine can only be used to exclude testimony "with great care." *Castro*, 786 F.3d at 571.

The parties vigorously contest whether this doctrine applies to affidavits brought by a party moving for summary judgment, rather than only those brought by a party seeking to defeat summary judgment. The Court declines to resolve this dispute because Plaintiffs' motion fails for a much simpler reason: Plaintiffs do not identify *any* contradictory facts in the Quintiliano Affidavit, let alone any contradictions that would warrant application of the sham affidavit rule.

The Quintiliano Affidavit is 23 paragraphs long, and in their opening motion, Plaintiffs argue that Paragraphs 4, 6, 7, 10, 13, and 14 contain statements that contradict Quintiliano's deposition testimony.[7]

---

[7] In their reply brief, Plaintiffs assert that these six are only *examples* of contradictions, and that they move to strike contradictions not identified in the opening motion. [763] at 1. The Court does not consider excluding any statements identified for the first time in Plaintiffs' reply brief. *See Perdue v. RBC Mortg. Co.*, 156 F. App'x 824, 826 (7th Cir. 2005) (arguments brought for the first time on reply are waived).

9

The Court turns to each purported contradiction.[8] Paragraph 4 of the Quintiliano Affidavit provides:

> As I stated to my supervisor, Charlie Strong, that I believed Ms. Neal's employment with McDonald's should be terminated due to what I perceived as significant leadership deficiencies that impacted Ms. Neal's ability to effectively lead her team and which also impacted her ability to productively collaborate with me. I viewed the way that she interacted with her peers, her team and me as inappropriate and toxic to the work environment. **Prior to giving my recommendation to Mr. Strong, employees expressed concerns to me about working with Ms. Neal and the poor treatment they were experiencing from Ms. Neal.**

[644-1] ¶ 4 (emphasis added). Plaintiffs contend that the last sentence of Paragraph 4 is contradicted by Quintiliano's deposition. But in his deposition, Quintiliano testified to the same thing — that employees had complained to him about Ms. Neal prior to his recommendation — *at least four times*. [707-3] at 9-10. There is no contradiction between Quintiliano's deposition and his statements in Paragraph 4 of the affidavit.

Paragraph 6 of the Quintiliano Affidavit provides:

> I had several discussions with Ms. Neal after she began to receive coaching about developing her leadership skills, including the importance of maintaining productive relationships as well as ensuring that she was engaging in positive interactions with her colleagues. **It was my sincere hope that Ms. Neal could turn this aspect of her performance around.**

---

[8] Plaintiffs attached only excerpts of Quintiliano's deposition testimony in support of their motion. Those excerpts, when read in isolation, occasionally support Plaintiffs' argument that the Quintiliano Affidavit contradicted his deposition testimony. But in at least three instances, Plaintiffs failed to include complete excerpts of Quintiliano's deposition that *affirmatively foreclose* their arguments. This is a waste of the Court's time and detracts from the strength of Plaintiffs' other arguments.

10

[644-1] ¶ 6. Plaintiffs contend that Quintiliano's assertion that he "sincerely hope[d] that Ms. Neal could turn this aspect of her performance around" is contradicted by his deposition testimony. [644] at 5. But in a portion of his deposition that Plaintiffs did not attach to their motion, Quintiliano testified ". . . after [Defendants] made the decision to give her the executive coach, of course, *I wanted to see it work*. And when I would see those points of improvement, I would be happy and a little optimistic . . . ." [707-3] at 40. Plaintiffs have thus not identified any contradiction in Paragraph 6.

Paragraph 7 of the Quintiliano Affidavit provides:

> Notwithstanding the coaching provided to Ms. Neal, Ms. Neal's leadership deficiencies continued throughout 2019.

[644-1] ¶ 7. Plaintiffs believe this is contradicted by Quintiliano's deposition where he testified that Ms. Neal did in fact improve in some respects after she received coaching. But these two ideas — that Ms. Neal both improved in some respects and also continued to have leadership deficiencies — do not contradict one another to the point of qualifying for exclusion as a sham affidavit.

Paragraph 10 of the Quintiliano Affidavit provides:

> Lorelie Parolin (People Officer - US Human Resources) and I met with Ms. Neal on August 27, 2019, to discuss the progress of Ms. Neal's coaching. It is my understanding, based on a discussion I had with Ms. Parolin, that a few days prior to this meeting, Ms. Parolin received an additional complaint about Ms. Neal from another employee.

[644-1] ¶ 10. When asked during his deposition if he remembered a meeting with Parolin and Neal regarding Neal's coaching, Quintiliano answered: "I don't remember specifically, but it's likely that at some point in time, we did that." [707-3] at 23.

11

Plaintiffs argue his recollection of the meeting in his affidavit contradicts that testimony. But later in the deposition, Plaintiffs' counsel *refreshed Quintiliano's recollection* regarding the meeting by telling him the date of the meeting and showing him an email between Neal, Parolin, and Quintiliano that recapped the events of the meeting. *See* [707-3] at 38:20 – 39:2. ("Q. Okay. Well, let's see. I will find it. I believe you met with Ms. Neal -- I believe it was August 27, 2019 to go over the coaching. Let's see. Yes, August 27th in Chicago with Lorelie Parolin. Do you remember that? A. I -- I actually think I do remember having a meeting in Chicago with [Ms. Neal] and [Ms. Parolin]."). When the Quintiliano Affidavit is viewed in light his full deposition testimony there is no inconsistency.

Paragraph 13 of the Quintiliano Affidavit provides:

> In December 2019, I became aware that Ms. Neal would be taking an agreed leave of absence from McDonald's. **After Ms. Neal went out on leave, several employees came forward to express their concerns about the negative work environment that Ms. Neal had created in the Dallas Field Office, including how much it had improved since Ms. Neal was on leave. They also expressed concern about her return to the office.** These comments regarding the work environment created by Ms. Neal were consistent with the behavior I had personally observed from Ms. Neal since as early as the end of 2018 and which had continued on to the present. I believed that having Ms. Neal continue her employment would be detrimental to the team's overall performance, which was the reason I had previously recommended the termination of her employment and which now further validated my belief that Ms. Neal's employment should be terminated. As a result, to the best of my recollection I escalated these more recent complaints to the Company's attention; however, I do not recall at this time to whom I escalated those complaints.

[644] ¶ 13 (emphasis added).

Plaintiffs contend that Quintiliano's affidavit testimony wherein he discussed employees' concerns after Ms. Neal went on leave is contradicted by his deposition. But he testified consistently in his deposition. *See* [644-2] at 252:5–7 ("Q. And they expressed anxiety and concern about Neal's possible return to the office, right? A. Yeah . . . ."). No contradiction exists here.

Paragraph 14 of the Quintiliano Affidavit provides:

> As the Field VP of the Dallas Field Office, I am aware that in January 2020, an outside law firm was retained by McDonald's Legal Department to conduct investigations about the above-referenced comments that had been raised by employees within the Dallas Field Office.

[644-1] ¶ 14. Plaintiffs claim that Quintiliano's affidavit testimony that he is "aware" of the investigation is contradicted by his deposition, where he testified that "there was not a lot communicated to me about the investigation." [644-2] at 8. There is no contradiction between testifying that "not a lot was communicated to" him regarding the investigation and that he is "aware" that the investigation took place.

Because Plaintiffs failed to identify any contradictions in the Quintiliano Affidavit, the motion to strike [639, 644] is denied.

### C. Plaintiffs' Motion to Exclude Late-Disclosed Facts in the Parolin Affidavit

Plaintiffs move to exclude the late-disclosed facts contained in an affidavit from Defendants' fact witness Parolin (the "Parolin Affidavit"). During the relevant timeframe, Parolin worked at McDonald's as a Senior Director in Human Resources. [688-1] ¶ 2. Plaintiffs argue that the Parolin Affidavit contains new or contradictory information beyond what Parolin testified to during her deposition, and that it should

13

be stricken under the sham affidavit rule. Plaintiffs contend that Parolin included two contradictory statements in her affidavit.

In her deposition, Parolin was asked about Neal's employment ratings in the following exchange:

> Q. Oh, okay. Did you think -- do you know her ratings -- her employment ratings she was getting?
>
> A. No, I don't remember them.
>
> Q. Okay.
>
> A. [Neal] always got very high operational results. There's a difference between operational results and leadership. So I would've seen ratings, but I don't remember. I've seen hundreds of people's ratings.
>
> Q. Okay.
>
> A. So I don't recall.
>
> Q. . . . So when you say you would've seen hundreds of people's ratings, in what role would you have been seeing ratings?
>
> A. I would've seen all of my team's ratings. In the course of 17 years of being at McDonald's, I've seen -- that was what I was referencing. I don't remember specific ratings.

[741-3] at 126-27. In her affidavit, Parolin offered substantially more detail regarding how employees were evaluated during their annual review process and how they were assessed to determine their eligibility for promotions. Parolin's Affidavit provides:

> "I regularly attended talent discussion meetings. The purpose of those meetings was to have a collaborative discussion to assess the potential and readiness of employees for promotion . . . An assessment of whether someone is "ready now" for promotion is separate and apart from an annual performance review rating of one's performance in their current role . . . While I don't recall the specific annual performance review ratings that [Neal and Guster-Hines] received during their employment at McDonald's, . . . I do recall [that] Neal was consistently assessed as

14

not being 'ready now' for promotion after she became a QSC-VP . . . [and that] Guster-Hines was consistently assessed as not being 'ready now' promotion.

[688-1] ¶¶ 4-10. Parolin's Affidavit thus distinguishes between "annual performance review ratings" and readiness for promotion evaluated during "talent discussion meetings." Plaintiffs contend that Parolin's explanation and testimony regarding Neal's "readiness for promotion" is contradicted by her deposition testimony that she did not remember Neal's "employment ratings." Defendants respond Plaintiffs are trying to conflate the two different review processes to create a contradiction where none exists.

In response, Plaintiffs claim that they could not have asked questions distinguishing between "annual performance review ratings" and "talent discussion meetings" because Defendants' discovery gamesmanship prevented Plaintiffs from learning about the talent review process altogether.

The Court agrees that Defendants (intentionally or otherwise) obfuscated the talent review process during discovery. In response to a request for documents regarding Neal's "performance rating[s]", Defendants objected and refused to produce documents on the basis that the term "talent discussions" was "vague and ambiguous" and "fail[ed] to specify with reasonable particular[ity] the information sought." [780-3] at 120. Given Defendants' current position — that talent discussion meetings were a regular practice in which several executives, including at least one of Defendants' key witnesses, regularly participated in — Defendants' objection to the term "talent

15

discussions" as vague and ambiguous appears disingenuous. Defendants hid the ball and that decision prevented Plaintiffs from asking the rights questions of Parolin.

Although Parolin's Affidavit may not explicitly contradict her prior deposition testimony as contemplated by the sham affidavit rule, Rule 37 nonetheless precludes Defendants from relying on the affidavit to explain facts that Defendants hid from Plaintiffs during discovery. Accordingly, Plaintiffs' motion to exclude the Parolin Affidavit [740, 741] is granted, and the Court does not consider the facts contained in the Parolin Affidavit in its review of Defendants' motion for summary judgment.

## III. Daubert Motions

### A. Legal Standard

The admissibility of expert evidence is governed by Federal Rule of Evidence 702, as well as *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, (1993) and its progeny. Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based upon sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. *Daubert* requires a district court to exercise a "gatekeeping" function to ensure that expert testimony is both reliable and relevant pursuant to

16

Rule 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). To gauge reliability, a district court must "determine whether the expert is qualified in the relevant field and ... examine the methodology the expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). But "[a] court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter.... [T]he court's gatekeeping function [also] focuses on an examination of the expert's methodology." *Id*. Accordingly, "[an] expert['s] work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir.2000). Further, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact[;]" a district court is not to consider such factors in its gatekeeping role. *Smith*, 215 F.3d at 718.

*Daubert*'s principles extend to both scientific and non-scientific expert testimony. *Kumho*, 526 U.S. at 150. A court's *Daubert* analysis should be "flexible to account for the various types of potentially appropriate expert testimony." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citations omitted).

Expert testimony "is not unreliable simply because it is founded on [a witness's] experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting Fed. R. Evid. 702)

17

(emphasis added in *Metavante*). The relevant question is if "an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

### B. Defendants' Motion to Exclude Plaintiffs' Expert Goldberg

#### i. Overview

The Court first turns to Defendants' motion to exclude Plaintiffs' Expert Caren Goldberg. Goldberg's expert report opines that (1) McDonalds's investigations were inadequate and (2) the investigations were not full fact-finding missions. [656-2]. In rendering the first opinion, Goldberg opines:

> (a) McDonalds did not meaningfully investigate many discrimination complaints,
>
> (b) the investigations contravened standard practice for investigations,
>
> (d) Speights's methodology in conducting the investigation contravenes McDonalds's written policy requirements, and
>
> (e) Neal's termination contravenes standard HR practice and McDonalds's own requirements regarding investigations.

Defendants contend that Goldberg's report (1) fails to meet *Daubert* reliability standards in assessing Speights's qualifications, (2) fails to adhere to Goldberg's own stated methodology, (3) is overly prejudicial under Federal Rule of Evidence 403, and (4) otherwise does not satisfy the *Daubert* standard for relevance and would not assist the jury. Based on these failures, Defendants argue that Goldberg must be excluded as an expert witness altogether.

18

### ii. Plaintiffs agree that Goldberg may not testify as to Speights's qualifications.

Defendants first contend that Goldberg fails to satisfy *Daubert*'s reliability standards because Goldberg (1) opined that Speights was insufficiently qualified to conduct the investigations into Guster-Hines or Neal, but (2) did not independently evaluate Speights's qualifications herself. Plaintiffs concede this argument and agree not to introduce testimony from Goldberg that Speights lacked any relevant qualifications. [698] at 1 n.1. Goldberg is thus not permitted to testify as to Speights's qualifications.

### iii. Goldberg adhered to her own stated methodology.

Defendants next argue that Goldberg must be excluded because she failed to adhere to her own stated methodology. In her report, Goldberg wrote that she "us[ed] the case study method," which "involve[s] in-depth analyses of a single or multiple cases using rich and varied sources of data . . . rel[ying] on established research or theory to evaluate the data presented." [656-2] at 5-6. Defendants contend that Goldberg failed to adhere to that methodology when offering three opinions: "1) the absence of an engagement letter [between Speights and McDonalds] indicates a departure from standard practice; 2) there were 'irregularities in the investigations and production of related documents'; and 3) e-mails and text messages would have provided contemporaneous accounts of the workplace environments Speights was investigating." [767] at 9. Defendants claim that Goldberg failed to cite any "scholarly sources" to support each of the three opinions, and that each opinion thus fails to adhere to the case study method. [757] at 8-10.

19

The Court disagrees. There is nothing in Goldberg's definition of a "case study" that suggests that every sentence offered must be supported by some scholarly source. Further, in explaining her methodology, Goldberg explained that she also relied on her "deep expertise" in the field of human resources. [656-2] at 7. That Goldberg relied on a "case study" method does not mean she is unable to offer opinions based on her own experiences, as Defendants' argument suggests. Indeed, Rule 702 "contemplates the admission of testimony by experts whose knowledge is based on experience," and "extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert." *Trs. of Chicago Painters v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007) (internal quotation marks omitted).

### iv. Goldberg's testimony is not subject to exclusion under Rule 403

Defendants next argue Goldberg's opinions must be excluded under Rule 403 because they rely "on misleading and prejudicial characterizations of the factual record." [656] at 9-12. Rule 403 excludes evidence whose probative value is "substantially outweighed by a danger of . . . unfair prejudice." Fed R. Evid. 403.

As an example of Goldberg's purportedly misleading characterization of the record, Defendants note that Goldberg asserted "that *many* complaints raised by Black employees fell on deaf ears," while in actuality, Goldberg is referring to just *two* complaints. [656] at 11 (citing [656-2] at 14) (emphasis added). Defendants further complain that Goldberg's report misrepresents various fact witnesses' deposition testimony.

20

Defendants may be correct that Goldberg's report misstates the factual record. But when a party wishes to attack the "factual underpinnings of expert testimony," the proper vehicle is cross-examination, not exclusion of the witness altogether. *Walker v. Soo Line R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based.").

> ### v. With one exception, the remainder of Goldberg's disputed testimony is admissible under *Daubert*.

Defendants contend that various other ancillary opinions of Goldberg's do not satisfy *Daubert* because they would not assist the jury in determining any issues of fact. [656] at 13-15.

First, Defendants take issue with Goldberg's assessment of whether Speights conducted an "investigation" or an "assessment." Defendants argue that this is a "semantical" distinction that would only confuse the jury. The Court does not agree. Stated briefly, part of Plaintiffs' argument is that (1) the investigation into Plaintiffs was a pretext and (2) a jury may be able to infer that the investigation was pretextual because it failed to adhere to the relevant industry standards governing workplace investigations. *See* [722] at 11-12. Defendants argue that Speights conducted an *assessment* rather than an investigation, and that the industry standards governing an investigation thus do not apply. *See* [645-1]. Goldberg's testimony may help the

21

jury resolve a material fact in this litigation: whether Speights's assessment was only a pretext meant to cloak the retaliatory purpose of Neal's termination.

Next, Defendants argue that Goldberg's opinions comparing McDonald's practices with standard human resources guidance will not help the jury because they are based on a misunderstanding of the factual record. But again, if Goldberg misstated the relevant factual record, Defendants' remedy is cross-examination, not exclusion.

Finally, Defendants argue that Goldberg should not be able to testify to whether McDonald's investigation and termination of Neal contravened their *own* internal policies. [656] at 14 (citing *Langley v. International Business Machines Corporation*, No. A-18-CV-443-DAE, 2019 WL 7285263, at *3 (W.D. Tex. Dec. 23, 2019) ("Determining whether [defendant's] actions aligned with its policies, or whether [defendant] ignored its own policies, is simply not a matter requiring expertise."). Plaintiffs do not respond to this argument[9], and the Court cannot see why expert testimony would be required to convey that Defendants failed to adhere to their own policies. In any event, because Plaintiffs failed to respond, the Court considers the point waived. *Gray v. Rockford Hous. Auth.*, No. 22 C 50098, 2022 WL 22962589, at *1 (N.D. Ill. July 19, 2022) ("Failure to respond to an argument waives any opposition to it.") (citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)).

Accordingly, Defendants' motion to exclude Goldberg [648, 655] is denied except to the extent that Goldberg may not (1) testify as to Speights's qualifications or (2)

---

[9] Plaintiffs appear to have not realized that Defendants made the argument. *See* [698] at 13 (incorrectly describing Goldberg's opinion that Speights's investigation departed from Defendants' policies as one that "Defendants do not challenge.").

testify that Defendants (or Speights) failed to adhere to Defendants' own internal policies.

### C. Plaintiffs' Motion to Exclude Certain Testimony from Defendants' Expert Moore

#### i. Overview

Plaintiffs next move to exclude certain testimony from Defendants' Expert Moore. Moore is a rebuttal expert who filed an expert report in response to Goldberg's report.

Specifically, Plaintiffs seek to bar testimony on what Plaintiffs characterize as (1) Moore's credibility testimony, (2) Moore's mental state testimony, (3) Moore's legal opinions, (4) Moore's testimony regarding "employment assessments," and (5) Moore's testimony that is premised on the Quintiliano Affidavit.

#### ii. Plaintiffs fail to identify any impermissible credibility determinations in Moore's report.

Plaintiffs first argue that Moore impermissibly opined on witnesses' credibility, identifying several examples what Plaintiffs describe as "credibility testimony." "Of course, an expert may not opine on the credibility of another witness," *Davis v. Duran*, 276 F.R.D. 227, 236 (N.D. Ill. 2011), but Plaintiffs fail to identify any actual opinions regarding another's credibility.

For example, Plaintiffs take issue with a part of the report where Moore notes that *Speights* "found to be credible" various employees who complained about Neal. [645] at 9 (citing [645-1] at 37). But in the cited-to portion of the report, Moore is not weighing anyone's credibility; she is recounting that *Speights* found other employees credible. More is permitted to reference evidence in the record to support her

23

conclusions. *See Crawford Supply Grp., Inc. v. Bank of Am., N.A.*, No. 09 C 2513, 2011 WL 4840965, at *3 (N.D. Ill. Oct. 12, 2011).

Plaintiffs next argue that Moore made impermissible credibility determinations by "includ[ing] a long list of facts [Moore] think is important." [645] at 9 (citing [645-1] at 52-52). But again, the cited-to portion of the report makes no mention of anyone's credibility, and there is nothing impermissible about recounting facts from the record.

### iii. Plaintiffs fail to identify any impermissible mental state testimony in Moore's report.

Plaintiffs next argue that Moore impermissibly testified regarding witnesses' mental state testimony in her report. As with credibility, an expert witness is not permitted to testify about another witness's mental state or intent. *United States v. Pansier*, 576 F.3d 726, 738 (7th Cir. 2009). Plaintiffs again identify a handful of examples in Moore's report where they claim she testified to another's mental state, but none of those examples support Plaintiffs' argument.

For example, Plaintiffs take issue with a portion of the report where Moore refers to Speights's deposition and writes that that Speights "appear[ed] to be clarifying her earlier testimony." [645] at 10. Plaintiffs object that Moore's assessment of whether Speights was clarifying her testimony is impermissible mental state testimony. But the relevant portion of Speights's deposition shows that, in the answer Moore cited, Speights is responding to a question where Plaintiffs' counsel in fact did ask her to clarify her prior testimony. *See* [705-6] at 5:12-18 ("Q. Ms. Speights, just a couple more questions. ***I wish to be clear that you understood*** from the e-mail . . . ."). Moore did not impermissibly opine about Speights's or anyone else's mental state.

Separately, Plaintiffs take issue with Moore opining that Speights's decision to include certain information in the Speights Memorandum demonstrates that Speights found that information relevant. [645] at 10 (citing [645-1] at 51). But the complained-of portion of Moore's report makes clear that she is only describing, as a matter of Human Resources practice, what a "person in Ms. Speights's position" would include in a similar memorandum. [645-1] at 52. If Plaintiffs believe Moore lacks an adequate foundation for her opinions, they are free to challenge Moore during cross-examination, but the opinions are not subject to exclusion under *Daubert*.

### iv. Moore can testify about whether Speights acted reasonably in the standards of her profession, but she may not opine about what caused Neal's termination.

Next, Plaintiffs argue Moore provided impermissible legal opinions in her report. Expert testimony on ultimate issues in a case are not categorically impermissible, but an expert cannot "merely tell the jury what result to reach." *United States v. Brown*, 871 F.3d 532, 539 (7th Cir. 2017) (quoting *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009)).

Plaintiffs first complain that Moore's report impermissibly opines that Speights (and McDonald's) acted "reasonably" in conducting their investigation into Neal.[10] But "[t]here is no doubt that under Rules 702 and 704, an expert may testify about applicable professional standards and the defendants' performance in light of those

---

[10] *See, e.g.,* [645-1] at 48 (testifying that Speights's assessment "was reasonably done"); *id.* at 53 (testifying that Speights's actions were "appropriate and reasonable"); *id.* at 65 (". . . [T]he steps that McDonald's took in performance managing Ms. Neal were reasonable and consistent with standard HR practices.").

25

standards." *Richman v. Sheahan*, 415 F.Supp.2d 929, 945 (N.D. Ill. 2006); *Crawford Supply Grp., Inc. v. Bank of Am., N.A.*, No. 09 C 2513, 2011 WL 4840965, at *2 (N.D. Ill. Oct. 12, 2011) ("The reasonableness of a party's conduct is a common subject of expert testimony[.]") (collecting cases).

Moore's testimony regarding the degree to which Speights and McDonalds acted reasonably in light of the relevant human resources guidelines is permissible because it is based on Moore's expertise and may help the jury resolve an issue of material fact. Indeed, elsewhere in their briefing Plaintiffs concede that Moore may "testify about whether the investigative process did (or did not) follow industry standards." [645] at 12. That Moore in some instances used the word "reasonable" to describe *how* the investigative process followed industry standards does not render the testimony inadmissible.

What Moore may *not* testify to, however, is the *cause* of Neal's termination. Moore closes her expert report by writing: "In sum, it is my opinion that McDonald's engaged in reasonable efforts to try to help Ms. Neal succeed prior to the assessment by Ms. Speights, *which directly led to the termination decision.*" [645-1] at 82 (emphasis added). The cause of Neal's termination lies at the very heart of her retaliation claim.

Moore has no special knowledge or expertise that would enable her to answer the critical question of what caused Neal's termination. That opinion from Moore is inadmissible. *See United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996) (expressing skepticism of expert "opinions about legal issues that will determine the outcome of [the] case").

26

> **v.     Moore can testify about industry standards regarding "cultural assessments."**

Plaintiff next argues that Moore should be barred from testifying about industry standards regarding "cultural assessments." Plaintiffs claim that Moore conceded in her deposition that such assessments have no industry standards, and thus it cannot satisfy Rule 702's requirements.

Plaintiffs are correct insofar as Moore conceded in her deposition that standards governing assessments "are much more amorphous than the protocols and guidelines that are very well established with regard to workplace investigations." [645-2] at 133. But when pressed in her deposition about what sources she relied on to determine the standards that govern an assessment, she referred to (1) publications from two different law firms,[11] and (2) short articles published by the Society for Human Resource Management ("SHRM") and Forbes, which both discuss when assessments may be appropriate.[12] *See* [645-2] at 132-33. Moore also explained that she relied on her personal expertise in the field, clarifying that she herself has been retained to conduct between ten and twenty workplace assessments on behalf of an employer. [645-2] at 60-61.

---

[11] *Climate Surveys and Assessments*, Oppenheimer Investigations Group, LLP, https://oiglaw.com/service/climate-surveys/ (last visited January 12, 2026); *Workplace Climate Surveys*, Van Dermyden Makus, https://www.vmlawcorp.com/workplace-climate-surveys (last visited January 12, 2026).

[12] Kathryn Mayer, *It's Likely You Have a Toxic Workplace. Now What?*, SHRM, Feb. 10, 2025, https://www.shrm.org/topics-tools/flagships/all-things-work/you-likely-have-a-toxic-workplace-now-what (last visted January 12, 2026); Benjamin Laker, *Understanding the Distinctions Between Culture and Climate*, FORBES, July 16, 2024, https://www.forbes.com/sites/benjaminlaker/2024/07/16/understanding-the-distinctions-between-culture-and-climate/ (last visited January 12, 2026)

Plaintiffs' argument ignores the flexibility that the law extends to evaluating testimony from non-scientific experts. Expert testimony "is not unreliable simply because it is founded on [a witness's] experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting Fed. R. Evid. 702) (emphasis added in *Metavante*). The relevant question is if "an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (quoting *Kumho Tire Co.*, 526 U.S. at 152). In her report, Moore sets forth the standards by which she believes an assessment should be judged, explains from where she draws those standards, and assesses how Defendants' conduct comported with those standards. That Moore does not identify a formal, standardized source of guidelines governing assessments does not require excluding her testimony. *See Demouchette v. Dart*, No. 09 C 6016, 2012 WL 6568232, at *5 (N.D. Ill. Dec. 14, 2012) ("[A]s a non-scientific expert, Dr. Greifinger is not required to cite specific standards he based his opinions on . . .").

### vi. Moore can testify about matters contained in the Quintiliano Affidavit.

Finally, Plaintiffs argue that Moore should be barred from testifying about the Quintiliano Affidavit, echoing their earlier-discussed claim that the Quintiliano Affidavit should be excluded. Because the Court has already rejected that argument, it rejects this argument, too.

28

Accordingly, Plaintiffs' motion [640, 645] to exclude portions of Moore's expert report is denied except to the extent that Moore may not testify as to the cause of Neal's termination.

### D. Defendants' Motion to Exclude Plaintiffs' Expert Finkelman

Defendants next move to exclude Plaintiffs' Expert Finkelman. Finkelman offered the following five opinions in his report:

1. McDonald's failure to provide paperwork to Ms. Neal during her termination and to document the steps leading to her termination is inconsistent with standard Human Resources Management ("HRM") practices and McDonald's own practices.

2. From an HRM perspective, McDonald's did not follow a standard process in terminating Neal.

3. It is significant that McDonald's presented the offer of an executive coach to Ms. Neal as an option for professional development, rather than as a mandatory measure to avoid termination, thus providing Ms. Neal insufficient warning that termination was likely if she did not improve.

4. McDonald's termination of Neal was a business decision not a legal decision.

5. McDonald's did not follow best Human Resource Management practices in their treatment of Neal.

[658-1]. Defendants move to exclude Finkelman because, among other things, they contend that Finkelman's opinions are not based on any reliable methodology. The Court agrees.[13]

For starters, Finkelman's report nowhere identifies or describes any methodological approach. When asked about his methodology during his deposition, Finkelman answered that his "methodology was reviewing the documents that were

---

[13] Because the Court agrees that Finkelman's opinions must be excluded for failing to apply any reliable methodology, the Court declines to consider Defendants' other arguments.

provided, and using [his] background, experience, and the many articles that I've reviewed or written . . . and taking the principles from them and comparing them to situation-specific circumstances that are relevant to the instant matter." [658-2] at 22 (cleaned up).

But Finkelman did not identify any actual, specific sources of any "principles" he relied on in his deposition. *E.g.*, [658-2] at 4-5 ("Q . . . In preparing your report was there a specific SHRM document that you relied upon? A. No . . . ."); *id.* at 5 ("Q. . . . I need to understand [] everything you utilized and relied upon to form your opinion. So were there any SHRM guidelines that you specifically looked at in document form? A. No."). In his report, Finkelman referred only to a single non-record source, which he cites for the proposition that disciplinary actions should be documented to decrease the likelihood of litigation. [658-1] at 8. Further, Finkelman expressly confirmed in his deposition that in forming his opinions, he did not rely on any sources beyond those identified in his report. [658-2] at 5.

The result is an expert report which makes multiple perfunctory conclusions with no apparent basis or support other than Finkelman's own expertise. *See, e.g.*, [658-1] at 8 ("[I]t is best HRM practice to have any deficiencies in an employee's performance documented . . . ); *id.* at 9 ("It is best practice to document all complaints . . . "); *id.* at 13 ("In best HRM practices, employers are obligated to communicate feedback to an employee who is at risk of termination . . . ); *id.* at 10-11 ("Typically, during a termination process, I would expect to see evidence of objective performance feedback [and] coaching and guidance from supervisors or more senior management. . . .").

30

Plaintiffs contend that testimony from an expert who relies on his specialized knowledge, like Finkelman, is routinely found admissible. [696] at 5 (collecting cases). Indeed, the Court reviewed this caselaw in its consideration of Plaintiffs' motion to exclude Moore's testimony regarding workplace assessments. But the cases Plaintiffs rely on do not support admission of Finkelman's testimony here.

For example, Plaintiffs cite to *Jiminez v. City of Chicago*, where the Seventh Circuit held that the plaintiff's expert on police misconduct was properly permitted to testify regarding an officer's departure from professional standards. 732 F.3d 710, 721 (7th Cir. 2013). But in *Jiminez*, the Seventh Circuit only considered (and rejected) defendants' argument that such testimony offered impermissible legal conclusions; there is no indication that the parties contested the expert's reliability or his methodology. Plaintiffs' reliance on *Nelson v. Pace Suburban* also falls flat. There, the district court approved the methodology of an HR expert who "compar[ed] [defendants'] practices to the standards in the industry" and whose "report and deposition make clear that she reached her conclusions the same way she advises her clients—by comparing their practices to the standards in the industry and the recommendations of the EEOC." 2022 WL 1401529, at *3-5 (N.D. Ill. Mar. 21, 2022) And the *Nelson* expert rendered his opinion by comparing the defendants' practices to specific guidance and documents from the EEOC. *Id*. at *4. Here, Finkelman's report and deposition make clear that he did *not* compare McDonalds's policies to *any* specific policies, principles, or guidelines.[14]

---

[14] The other cases Plaintiffs cite to fail to persuade for similar reasons. *Shampine v. US Foods, Inc.*, No. 3:20-CV-380, 2022 WL 17098731, at *6 (E.D. Tenn. Nov. 21, 2022) (admitting HR expert who

31

The Court notes that in at least one case, a district court allowed Finkelman to testify while relying solely on his experience. *Humphreys v. Regents of Univ. of California*, No. C 04-03808 SI, 2006 WL 1867713, at *3 (N.D. Cal. July 6, 2006).[15] In *Humphreys*, Finkelman was called to testify about downsizing, and upon reviewing Finkelman's qualifications and experiences, the Court found that Finkelman had specialized knowledge in the area such that his testimony was sufficiently reliable. *Id*. at *2-3. Here, Finkelman is being called primarily to testify about Neal's termination. During his deposition, Finkelman explained that throughout his career, he has terminated only three executive-level employees, and the most recent termination occurred more than 20 years ago. [658-2] at 17-18. The Court does not see how his reliance on this experience alone could render his methodology reliable. *Compare Bogathy v. Union Pac. R.R.*, No. 17-cv-4290, 2020 WL 419406, at *4 (N.D. Ill. Jan. 24, 2020) (finding expert lacked sufficient experience to offer an opinion on defendant's "complaint and disciplinary process" of non-union employees where expert had only disciplined one non-union employee during his forty-eight year career) *with Demouchette,* 2012 WL 6568232 (allowing expert who worked for 20

---

explicitly relied on documents including "EEOC Guidance, the AWI Journal, and the Association of Corporate Counsel's InfoPak on Internal Investigations"); *Saldana v. Texas Dep't of Transp.*, No. A-14-CV-282-LY, 2015 WL 3952328, at *4 (W.D. Tex. June 29, 2015) (admitting HR expert who compared defendant's policies with those promulgated by the EEOC and citing to guidance from SHRM); *Castrillon v. St. Vincent Hosp. & Health Care Ctr., Inc.*, No. 1:11-CV-430-WTL-DML, 2015 WL 3448947, at *3 (S.D. Ind. May 29, 2015) (parties did not dispute expert's methodology).

[15] In at least two other cases, courts have excluded Finkelman due to the same deficiencies present here. *See Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 300 (D.D.C. 2018) (excluding Finkelman because he did not "identif[y] any particular principles or methodology he used in forming his opinions," or "cite a single study, report, or other source for his opinions related to appropriate human-resources policies and practices."); *Hirata v. S. Nevada Health Dist.*, No. 213CV02302LDGVCF, 2017 WL 1073358, at *3 (D. Nev. Mar. 21, 2017) (excluding Finkelman where Plaintiffs failed to demonstrate that his testimony was the product of reliable principles and methods or that Finkelman applied his experience and knowledge to the case).

32

years in the field of correctional medicine to testify based solely on his experience about correctional medicine practices).[16] As in *Bogathy*, Finkelman cannot rely solely on his specialized knowledge to testify about executive-level terminations because he has not demonstrated that he *has* specialized knowledge about such terminations.

Plaintiffs assert that Finkelman is not relying solely on his experience but also his knowledge and familiarity of "the literature." But absent any meaningful degree of specificity as to what literature Finkelman relies on, the Court cannot say that his opinions are anything more than his own *ipse dixit*.

In short, Plaintiffs seek to call Finkelman to testify about the ways in which Neal's termination deviated from HR best practices, but Finkelman (1) does not identify any discernible source of the best practices from which Neal's termination purportedly deviated and (2) has not demonstrated he has meaningfully relevant experience. The Court cannot say that Plaintiffs have established that Finkelman's testimony has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek*, 689 F.3d 802, 805 (7th Cir. 2012). The deficiencies in Finkelman's report plague each of his opinions. Accordingly, Defendants' motion to exclude Finkelman [650, 657] is granted.

### E. Plaintiffs' Motion to Exclude Defendants' Expert Reid

---

[16] As a point of comparison, Moore testified that she has conducted between ten and twenty workplace assessments in her career. [645-2] at 60-61. Likewise, Goldberg relied on her expertise and specialized knowledge in rendering her opinions.

Defendants retained Canetta Reid as a rebuttal expert in response to Finkelman's report. Plaintiffs moved to bar her testimony in its entirety. Because the Court has granted Defendants' motion to exclude Finkelman, however, there is no remaining expert testimony for Reid to rebut. Accordingly, Plaintiffs' motion to exclude Reid is denied as moot. *See Zimmer, Inc. v. Stryker Corp.*, No. 3:14-CV-152 JD, 2018 WL 276324, at *6 (N.D. Ind. Jan. 3, 2018) (denying as moot motion to strike rebuttal expert report where the underlying report was struck by the Court); *Great Am. Ins. Co. of New York v. Vegas Const. Co., No. 2:06-cv-911, 2007 WL 2375056*, * 4 (D. Nev. Aug 15, 2007) (same). Reid will not be permitted to testify at trial.

### F. Defendants' Motion to Exclude Plaintiffs' Expert Kucsma

### i. Overview

Plaintiffs retained Kristin Kucsma to testify regarding each Plaintiffs' economic loss because of Defendants' alleged wrongdoing. Kucsma considers four components in her economic loss estimates: (1) adjusted earnings in past years, (2) adjusted earnings in future years, (3) cost of health insurance, and (4) compensation for excess taxes. Kucsma's analysis relied in part on the base pay for three comparators at McDonald's. *See* [660] at 3.

Defendants move to exclude Kucsma from testifying about both Plaintiffs entirely, arguing that her testimony is insufficiently reliable because it is based on incomplete and erroneous information and is unreliably speculative. In the alternative, Defendants move to exclude her testimony regarding (1) Guster-Hines' purported economic losses following her resignation in October 2021; (2) Plaintiffs' purported

34

lost Rule of 68 retirement benefits; and (3) estimates from comparator data for the specific positions that (a) fall within the statute of limitations period; or (b) are not specifically referred to in Kucsma's expert reports.

### ii. Defendants' arguments for excluding Kucsma altogether are properly addressed during cross examination.

Defendants argue that Kucsma should be excluded because she relies on incomplete and unreliable information provided by Plaintiffs' counsel. For example, Defendants criticize Kucsma's comparator analysis because Plaintiffs' counsel chose the comparators that Kucsma used. [660] at 7-8. But "[a]n expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him—information of which he lacks first-hand knowledge and which might not be admissible in evidence." *Matter of James Wilson Assocs.*, 965 F.2d 160, 172 (7th Cir. 1992) (citing Fed. R. Evid. 703)). Defendants cannot attack "the quality of the data used in applying the methodology or the conclusions produced" in an attempt to exclude Kucsma at the *Daubert* stage. *Manpower*, 732 F.3d at 808-09.

Defendants also argue that Kucsma's opinions are inadmissible because she relied on an exhibit the parties call the "Jobs Band" document, which Kucsma assumes for her analysis contains salary ranges for various positions at McDonald's during the relevant timeframe. *See* [660] at 8-9. Defendants contend that Kucsma's assumption is wrong, and that (1) there is no evidence in the record suggesting that this document was ever used to set compensation at McDonald's, (2) Defendants have never

35

admitted the document's authenticity, and (3) an employee at McDonald's testified that the document is not used to set compensation. If Defendants are correct, it may be that "factual underpinnings of [Kucsma's] analysis" are unsound. *Gopalratnam*, 877 F.3d at 781. But as the Court has noted many times already, that evaluation is properly in the province of the jury. *See id.* ("The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed."); *Tilstra v. BouMatic LLC*, 791 F.3d 749, 753 (7th Cir. 2015) ("[A]n expert witness is not required to verify all the facts on which he relies . . . ."); *La Playita Cicero, Inc. v. Town of Cicero, Illinois*, No. 11-CV-1702, 2017 WL 1151066, at *4 (N.D. Ill. Mar. 28, 2017) ("[I]t is well established that an expert witness may base an opinion on otherwise inadmissible facts, including hearsay.").

Defendants also contend that Kucsma's opinions must be excluded because she made improper assumptions about how bonuses would be awarded. Again, these challenges go to Kucsma's factual underpinnings; they are not a basis to exclude her opinions entirely.

### iii.   Defendants' arguments in the alternative

Defendants argue in the alternative that Kucsma should be prohibited from testifying as to specific topics. [660] at 14-15. The Court addresses each.

First, Defendants argue that Kucsma's should be precluded from opining about Guster-Hines's purported front pay and back pay damages going back to her resignation on October 31, 2021. Contemporaneous with this Opinion, the Court has

36

granted Defendants judgment as to Guster-Hines's claims for disparate treatment, disparate impact, and retaliation. Only her hostile work environment claims remain. In light of this changed landscape and in the interest of fairness, the Court thinks Defendants' argument is better resolved in a pre-trial motion in limine. Accordingly, the motion is denied without prejudice as to Defendants' contention that Kucsma should be precluded from opining about Guster-Hines's front and back pay damages.

Defendants next argue that if the Court rules at summary judgment that Neal's termination was not discriminatory or retaliatory, Kucsma should be precluded from testifying regarding Neal's damages after her termination. This argument is moot because the Court held that Neal's retaliation claim premised on her termination survives summary judgment.

Finally, Defendants argue that Kucsma should be limited to testifying only to (1) the promotion schedules reflected in her reports and (2) damages stemming from alleged misconduct that occurred within the statute of limitations. Plaintiffs do not contest this point. Concurrently with this opinion, the Court granted Defendants' motions for summary judgment on Plaintiffs' claims based on non-promotions. This argument is thus moot. As with Kucsma's proposed testimony regarding front and back pay, Defendants can re-raise this in a pre-trial motion in limine.

Accordingly, Defendants' motion [652, 659] to exclude Kucsma is denied. It is denied without prejudice as moot as to Defendants' arguments regarding Guster-Hines's front and back pay and as to the relevant promotion schedules, and it is otherwise denied with prejudice.

37

### G. Plaintiffs' Motion to Exclude Certain Testimony from Defendants' Expert Guay

#### i. Overview

Plaintiffs move to exclude certain testimony from Professor Wayne Guay. Defendants retained Guay as a rebuttal expert to respond to Kucsma's report. In his expert report, Guay opines that Kucsma's analyses are unreliable because they (1) fail to consider "promotion uncertainty," meaning that Kucsma failed to consider the possibility that Plaintiffs would not receive certain promotions; (2) are based on a "risk-free discount rate;" (3) inappropriately undercounted Plaintiffs' actual earnings; (4) inappropriately used COBRA to determine the cost of Plaintiffs' health insurance, and (5) with respect to Neal, made unreasonable and contradictory assumptions regarding Neal's future income. *See generally* [646-1]. For portions of his opinion, Guay relied on an affidavit from Brian Czerwinski (the "Czerwinski Affidavit"), who has served as an Executive Compensation Manager at McDonald's since 2020. [646-3]. Czerwinski testified in his affidavit that the Job Bands Document is not used to set salary ranges at McDonald's.

Plaintiffs seek to exclude only certain of Guay's report and eventual testimony at trial. Specifically, Plaintiffs move to prevent Guay from (1) testifying about promotion uncertainty, (2) testifying about adjusted discount rates, and (3) relying on the Czerwsinski Affidavit.

#### ii. Because Defendants are awarded judgment on Plaintiffs' non-promotion claims, Guay is not permitted to testify about promotion uncertainty.

As with Kucsma, Plaintiffs' arguments regarding Guay's testimony on promotion uncertainty are moot. Because Defendants are entitled to judgment on Plaintiffs' non-promotion claims, Plaintiffs' argument that Guay cannot testify about promotion uncertainty is rejected without prejudice. Plaintiffs may re-raise this argument in a pre-trial motion in limine if necessary.

### iii. Guay is permitted to testify about adjusted discount rates.

Plaintiffs next argue that Guay should be prevented from testifying about adjusted discount rates because such testimony would "flout" the Supreme Court's holding in *Jones & Laughlin Steel Corp. v. Pfeifer*, which Plaintiffs describe as "instruct[ing] that a risk-free discount rate should be used." [646] at 8-9 (citing 462 U.S. 523 (1983)).

Plaintiffs' reading of *Pfeifer* is misguided. There, the Supreme Court considered a damages award to a plaintiff who successfully brought a claim for negligence under § 5(b) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 904. *Pfeifer*, 462 U.S. at 526. The district court awarded damages based on a then-recent decision from the Supreme Court of Pennsylvania, which instructed that for purposes of calculating damages courts should assume that future interest rates and future inflation would offset one another. *Id*. at 526-27. The Supreme Court held ***only*** that the district court erred in assuming it was bound by the Pennsylvania Supreme Court's rule, and it expressly "limit[ed] [its holding] to suits under §5(b) of the [the Longshoremen's and Harbor Workers' Compensation Act]." *Id*. at 547, 552-53. *Pfeifer* does not establish the kind of categorical rule that Plaintiffs assert.

39

Guay is thus permitted to testify about adjusted discount rates.

### iv. Guay is permitted to testify about his opinions that are based on the Czerwinski Affidavit

Finally, Plaintiffs argue that Guay should be prevented from relying on the Czerwinski Affidavit. In his expert report, Guay relies on Czerwinski's testimony explaining that the Jobs Band document was not used to set salary rates at McDonald's. To appreciate Plaintiffs' argument, some background is required.

The parties appear to agree that, prior to serving both of Kucsma's expert reports, Plaintiffs never indicated that they intended to rely on the Jobs Bands document to calculate their damages. *See* [623] at 7-11. During her deposition on April 25, 2025, Kucsma testified that she did not know whether McDonald's used the document to set compensation, or whether McDonald's created the document, or whether the document accurately reflected McDonald's actual organizational structure. [660-3] at 20-22.

Then, on May 16, 2025, two months after the close of fact discovery, Defendants identified and disclosed Czerwinski for the first time through his affidavit. *See* [615] at 2. As noted, Czerwinski testified in his affidavit that the Jobs Band document is not used to set compensation.

Plaintiffs moved to exclude the Czerwinski Affidavit on June 2, 2025. [615]. Following a status hearing, Magistrate Judge McNally granted in part and denied in part Plaintiffs' motion. Specifically, Judge McNally ruled that Defendants may not use the Czerwinski Affidavit in support of their motion for summary judgment, but "denied [the motion] to the extent permitted by Federal Rule of Evidence 703."

40

Plaintiffs argue that (1) Guay should be precluded from introducing his opinions based on the Czerwinski Affidavit because it relies on inadmissible hearsay that would circumvent the rules of evidence, and (2) they argue it runs afoul of Rule 703 prohibition on disclosing facts unless the facts' probative value substantially outweighs their prejudicial effect. [646] at 10.

Both arguments miss the mark. As to the first, Plaintiffs rely on *Baker v. Obaisi*, No. 16 CV 7668, 2024 WL 1300484, at *12 (N.D. Ill. Mar. 27, 2024)), But *Baker* stands only for the proposition that in deciding a motion for summary judgment, a court may only consider evidence that would be admissible at trial. *Id*. at 11-12. Here, Defendants do not intend to use the relevant portions of Guay's report at summary judgment, so *Baker* is inapposite.

Plaintiffs' second argument misunderstands the framework of Rule 703. The rule provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. Rule 703 thus describes the admissibility of two different kinds of evidence. The first, summarized in the first two sentences of Rule 703, concern expert opinions that are based on inadmissible evidence. Rule 703 provides that such opinions may be admitted if experts in the field would reasonably rely on the relevant facts or data. *See also Tilstra v. BouMatic LLC*, 791 F.3d 749, 753 (7th Cir. 2015).

41

The second kind of evidence Rule 703 contemplates is the disclosure of otherwise-inadmissible evidence that an expert *relies on* in forming his opinions. The rule instructs that such evidence can only be disclosed to the jury subject to a balancing of its prejudicial effects and probative values.

Plaintiffs are correct that (1) the Czerwinski Affidavit is inadmissible, and (2) under Rule 703, Defendants could only disclose the Czerwinski Affidavit to the jury subject to Rule 703's balancing test. But this argument says nothing about whether *Guay's opinion itself* — the first kind of evidence contemplated by Rule 703 — is admissible. And there is no indication that Defendants *want* to disclose the Czerwinski Affidavit to the jury. Rather, Defendants intend for Guay to testify to an opinion based on the facts contained in the Czerwinski Affidavit. Under Rule 703, Guay may do so if other experts in his field "would reasonably rely on [the] kinds of facts or data contained" in the Czerwinski Affidavit. Plaintiffs make no arguments regarding that critical inquiry. Instead, they argue that disclosure of the affidavit itself would be unduly prejudicial. But this is irrelevant to whether Guay can testify to opinions *based* on the affidavit.

For their part, Defendants argue that the factual circumstances here mirror the court's analysis in *Greene v. Sears Prot. Co.*, No. 15 CV 2546, 2018 WL 4716189, at *8 (N.D. Ill. Mar. 8, 2018), *report and recommendation adopted*, No. 15-CV-2546, 2018 WL 3104300 (N.D. Ill. June 25, 2018). There, plaintiffs moved to exclude an opinion from the defendant's economic damages expert based in part on the expert's reliance on an untimely declaration from one of the defendant's employees, arguing that the

42

expert "should not be entitled to rely on the allegedly untimely and undated declaration without independently verifying the facts." *Id.* at *7. The court disagreed, reasoning that because of the declarant's role within the company, it was reasonable for the defendants' expert to rely on his declaration. *Id.*

The same follows here. Czerwinski testified in his affidavit that he has been a member of the McDonald's Executive Compensation team since 2020, and he further testified as to the practices of that team since 2020. The only relevant question is whether experts in Guay's field would reasonably rely on such an affidavit, and neither Plaintiffs' opening brief nor their reply address this question.[17] Guay is thus permitted to rely on that affidavit in assessing the reliability of Kucsma's expert report.

Accordingly, Plaintiffs' motion to exclude certain testimony from Guay [642, 646] is denied without prejudice as moot as to Guay's proposed testimony regarding promotion uncertainty, and it is otherwise denied with prejudice.

## IV. Conclusion

For the stated reasons: Plaintiffs' motion to exclude the five witnesses [742, 743] is denied;

Plaintiffs' motion to strike the Quintiliano Affidavit [639, 644] is denied;

Plaintiffs' motion to exclude the Parolin Affidavit [740, 741] is granted;

---

[17] Plaintiffs also argue that the Czerwinski Affidavit is not credible because Czerwinski is a current employee at McDonald's and his statements are thus "self-serving." [646] at 10. But "[a] *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). The proper place to attack Czerwinski's credibility is at trial before the jury, not in a motion to exclude an expert who relied on Czerwinski's sworn statements.

Defendants' motion to exclude Goldberg [648, 655] is denied except to the extent that Goldberg may not (1) testify as to Speights's qualifications or (2) testify that Defendants (or Speights) failed to adhere to Defendants' own internal policies;

Plaintiffs' motion [640, 645] to exclude portions of Moore's expert report is denied except to the extent that Moore may not testify as to the cause of Neal's termination;

Defendants' motion to exclude Finkelman [650, 657] is granted;

Plaintiffs' motion [641, 647] to exclude Reid is denied as moot;

Defendants' motion [652, 659] to exclude Kucsma's report is denied without prejudice as moot as to Defendants' arguments regarding Guster-Hines's front and back pay and as to the relevant promotion schedules, and it is otherwise denied with prejudice;

Plaintiffs' motion to exclude certain testimony from Guay [642, 646] is denied without prejudice as moot as to Guay's proposed testimony regarding promotion uncertainty, and it is otherwise denied with prejudice.

E N T E R:

Dated: March 17, 2026

_Mary M Rowland_
_____

44