**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VICTORIA GUSTER-HINES and DOMINECA NEAL, | |
| Plaintiffs, | Case No. 20-cv-00117 |
| v. | Judge Mary M. Rowland |
| McDONALD'S USA, LLC, a Delaware limited liability company, McDONALD'S CORPORATION, a Delaware corporation, STEVEN EASTERBROOK, CHRISTOPHER KEMPCZINSKI, and CHARLES STRONG, | |
| Defendants. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Victoria Guster-Hines[1] and Domineca Neal ("Plaintiffs") sued McDonald's USA, LLC, McDonald's Corporation, Steven Easterbrook, Christopher Kempczinksi, and Charles Strong ("Defendants"), alleging various forms of employment-based discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq*. Before the Court now is each Defendants' motions for summary judgment. For the reasons herein, Kempczinski and McDonald's Corp.'s motions are granted in full, and Strong and McDonald's USA's motions are granted in part and denied in part.

### I.   Background

---

[1] The parties intermittently refer to Guster-Hines as "Guster-Hines" or simply "Hines." To be consistent with the case caption, the Court refers to her as "Guster-Hines."

1

### A. Local Rule 56.1

At the onset, the Court notes that Plaintiffs repeatedly violated Local Rule 56.1. "Local Rule 56.1 statements serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019). The Seventh Circuit has "consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019) (quotation omitted). "We have frequently said that it is within the district court's discretion to strictly enforce local rules regarding summary judgment by accepting the movant's version of facts as undisputed if the non-movant has failed to respond in the form required." *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014).

Plaintiffs' responses to Defendants' Rule 56.1 statement and their own statement of facts are replete with violations that made the Court's task in evaluating the instant motions substantially more challenging and time consuming. Plaintiffs' statement of additional facts includes purported facts with no citation to the record, *e.g.,* [791] ¶¶ 44, 54, 57, 67, 117, 149, 152, 155, includes citations to the record that are unrelated to the facts the citations are purported to support, *e.g.,* [791] ¶¶ 72, 106, 107, 113, includes purported facts that rely on misrepresentations of evidence in the record, *e.g.,* [791] ¶¶ 2, 28, 37, 116, 121, and includes improper legal arguments [791] ¶¶ 15, 125, 149, 155, 188, 190, 194. Even more troubling, in multiple instances

Plaintiffs' briefing distorts their already-improper statements of fact to make arguments that are fully unsupported by evidence in the record.

And both parties' objections to facts frequently run near (or over) a full page in length. By the Court's count, just 26 of the parties' combined 393 statements of fact are not subject to some dispute or objection. Local Rule 56.1(e) contemplates that a party may controvert a purported statement of fact by "cit[ing] specific evidentiary material that controverts the fact and . . . concisely explain[ing] how the cited material controverts the asserted fact." Many of both parties' purported objections are thinly-veiled attempts to put forward new facts that they think help their argument, rather than citations that controvert the specific fact in question. Finally, at times Plaintiffs object to Defendants' statements of fact on bases that frustrate the Rule's purpose of streamlining resolution of summary judgment motions.[2]

As it recounts the facts below, the Court does not attempt to address all the parties' purported objections or disputes. Instead, unless otherwise noted, the facts described below are accepted as true.

### B. The Parties

#### i. Plaintiffs

Plaintiff Guster-Hines began working for McDonald's in 1987. [727] ¶ 14. She was promoted approximately fifteen times throughout her career at McDonald's. [727] ¶

---

[2] For example, Defendants state as fact that both Plaintiffs "were employed by McDonald's USA until their respective departures from the Company." [727] ¶ 13 Plaintiffs object to this statement because "it uses the phrase 'respective departures' without defining the phrase." *Id.* There is no rule requiring that parties define words of common use whose meaning is easily understood in their Rule 56 statements. In another instance, Defendants state as fact that none of the individuals hired to a particular position were white males. [727] ¶ 44. Plaintiffs deny this statement on the basis that *one* of the individuals promoted was a *Black male. Id.* That fact does not controvert Defendants' statement.

3

14. In January 2013, Guster-Hines was promoted to Quality, Service, and Cleanliness Vice President ("QSC-VP"). [727] ¶ 14. Following a 2018 corporate restructuring, Guster-Hines held the position of Operations Officer and began working at McDonald's Dallas Field Office. [727] ¶ 41. After 32 years of service, and after the alleged instances of harassment and discrimination described *infra*, on December 3, 2019, Guster-Hines and McDonald's USA mutually agreed that she would go on paid leave. [727] ¶ 97. Guster-Hines remained on paid leave until she voluntarily resigned on October 31, 2021. [791] ¶ 194.

Plaintiff Neal began working for McDonald's in 2012. [727] ¶ 17. Neal was promoted to the role of QSC-VP in 2017. [727] ¶ 21. Like Guster-Hines, following the 2018 restructuring, Neal held the position of Operations Officer and worked at the Dallas Field Office. [727] ¶ 41. Further like Guster-Hines, Neal and McDonald's USA mutually agreed that Neal would go on paid leave on December 3, 2019. [727] ¶ 97 After Neal went on leave, McDonald's hired a third party to investigate Neal's workplace conduct.[3] [727] ¶ 101. Following the investigation, Neal was terminated on February 28, 2020. [72] ¶¶ 105-06.

### ii. Defendants

McDonald's Corporation ("McDonald's Corp") is a separate and distinct legal entity from its subsidiary, McDonald's USA. [727] ¶ 1. During the relevant time, McDonald's Corp. had two CEOs — Stephen Easterbrook[4] and Defendant

---

[3] As the Court describes *infra*, the scope and subject of the investigation, and whether it was an investigation at all, is vigorously contested.

[4] Easterbrook was a named Defendant in this action, but Plaintiffs voluntarily dismissed their claims against him on April 3, 2025. [598].

4

Kempczinski. [727] ¶¶ 13-15, 17, 23. Plaintiffs were never employed by McDonald's Corp. *See* [727] ¶ 13.

McDonald's USA is a subsidiary of McDonald's Corp. [727] ¶ 1. Plaintiffs were employed by McDonald's USA. [727] ¶ 13.

Kempczinski was the President of McDonald's USA from October 2016 until November 2019, when he became President and Chief Executive Officer of McDonald's Corp. [727] ¶ 11.

Strong worked for McDonald's USA for over 50 years. [727] ¶ 12. Relevant to the instant action, Strong worked as President of McDonald's USA West Zone from 2018 through 2020, and Chief Field Officer from January 2020 until his retirement in March 2020. [727] ¶ 12.

### C. The Field First Restructure

In late 2017, McDonald's USA began to plan and execute a restructure of McDonald's field organization that came to be known as the "Field First Restructure," or the "FFR." [727] ¶ 27. An FFR planning committee was responsible for developing a new field organizational structure, managing its implementation, and recommending employees to serve in certain roles after the FFR. [727] ¶ 29. McDonald's USA executed the FFR in part because it sought to reduce the number of layers within its organizational structure to allow it to act more quickly. [727] ¶ 36.

As a part of the FFR, McDonald's decreased the number of McDonald's USA "regions" from 21 to 10 and renamed them "Field Offices." [727] ¶ 34. The FFR Planning Committee recommended re-leveling and eliminating certain positions.

5

[727] ¶ 35. Relevant here, the FFR eliminated the positions of Vice President-General Management ("VP GM") and QSC-VP and replaced them with positions called Field Vice President ("FVP") and Operations Officer. [727] ¶ 35. Under this structure, each Field Office would have only one FVP. [727] ¶ 35. This resulted in demotions and departures from the company. *See* [727] ¶ 40.

At the time of the FFR, there were 21 QSC-VPs at McDonald's, the majority of whom were not Black. [727] ¶ 40. Each QSC-VP — other than one, a Black male — was given the choice to either (1) continue working with McDonald's USA in the newly created Operations Officer role, or (2) exit the company with a severance package. [727] ¶ 41. Plaintiffs were given this offer. [727] ¶ 41. Both Plaintiffs accepted the offer to join the Dallas Field Office as Operations Officers, where they reported to Luis Quintiliano, the Dallas Field Office FVP. [727] ¶¶ 52, 53. Quintiliano reported to Strong. [727] ¶ 53.

### D. Neal's Employment Assessments, Executive Coaching, and Big Six Reports

As early as April of 2015, Plaintiff Neal began receiving negative feedback from her management team regarding her teamwork and relationship-building capabilities. [727] ¶ 58.[5] Joseph Kraft, McDonald's USA's then-Director of Field

---

[5] Plaintiffs dispute multiple statements of fact regarding Neal's employment reviews by noting that various individuals at McDonald's USA *also* gave her positive feedback. *See* [727] ¶ 58 (purporting to dispute statement that Neal received negative feedback in 2015 by noting that in 2018, she was assessed as "welcome[ing] feedback for professional development."). That Neal received positive feedback does not make it untrue that she received negative feedback.

Services, wrote to Strong a list of concerns he had about Neal, including that she was "not open to feedback," and "not committed to an the [sic] overall team objective."[6]

Neal also received feedback in the form of "Velocity Talent Plans," which were formal evaluations that assessed an employee's strengths and development needs. [727] ¶¶ 9, 60. Neal's Velocity Talent Plans from 2017 and 2018 evaluated that Neal needed to improve how she communicated with her staff and needed to build better relationships, among other things. [727] ¶ 60.

In July 2018, Neal began working in the Dallas Field Office and reporting to Quintiliano. [727] ¶¶ 62, 63. Quintiliano testified that although Neal produced positive business results, the way that she communicated and interacted with her peers and with Quintiliano himself was inappropriate. [727] ¶ 63. Quintiliano further testified that in meetings, Neal would not let other people talk and become frustrated if others disagreed with her position. [727] ¶ 64. Quintiliano received complaints from at least six people who expressed concerns about working with Neal; at least two told Quintiliano that they planned to resign because of Neal's conduct. [727] ¶¶ 66-67.

In late October 2018, McDonald's USA developed a new model for assessing certain employees called the "BEST Assessment." [727] ¶ 77. The BEST Assessment found that Neal had "opportunities to develop her listening and consensus-building skills, and to adopt a more open and empathetic leadership demeanor." [727] ¶ 78.

---

[6] Plaintiffs object to statements of fact regarding Neal's employment reviews as impermissible hearsay. *E.g.* [727] ¶ 58. But McDonald's does not use these statements regarding Neal's employment reviews to establish the truth of the matter asserted. Accordingly, each relevant statement is accepted as true for its non-hearsay purpose.

7

At some point in 2018, Quintiliano recommended Neal's termination to his then-supervisor Strong. [727] ¶ 68. Instead of terminating her, McDonald's USA offered Neal an executive career coach. [727] ¶ 71.[7] Multiple witnesses, including Quintiliano and Strong, testified that they wanted the career coach to help Neal improve. [727] ¶¶ 72-75. By 2019, Neal began working with the coach. [727] ¶ 76.

On February 1, 2019, Quintiliano emailed Strong to share examples of the complaints Quintiliano had received about Neal. [727] ¶ 84. Quintiliano told Strong that Neal was "driving [other employees] to the edge," and that he was "afraid if we don't act quickly and remove her from the team we will end up in a position where we will continue to lose talent and cripple" the team's ability. [727] ¶ 85. Strong responded by urging Quintiliano not to "build up steam" and to provide daily feedback to Neal. [727] ¶ 86.

On August 27, 2019, a human resources director named Lorelie Parolin and Quintiliano met with Neal to discuss the progress of her coaching. [727] ¶ 91. Following the meeting, Parolin wrote in an email to Neal that it was "very important that [Neal] make immediate and sustained improvements" with respect to her leadership style and professional relationships. [727] ¶ 92. Between July 1, 2018 and February 28, 2020, at least 17 different employees raised concerns or complaints about Neal's workplace conduct. [727] ¶ 109.

Separately, McDonald's USA tracked various operational performance metrics through a scorecard called the "Big Six Reports." [791] ¶ 48. From 2018 through 2019,

---

[7] Plaintiffs dispute this fact with more than a page of largely irrelevant objections. None of the evidence that Plaintiffs cite creates a dispute of fact; it is thus accepted as true.

8

Neal was regularly ranked at or near the top among her peers throughout the country in the Big Six Reports. *See* [791] ¶¶ 48-53.

### E. Guster-Hines's Workplace Assessments and Big Six Reports

From 2015 through 2018, Guster-Hines was assessed as achieving strong "operations and franchising results," and as "an exceptional person" who was "strong operationally." *See* [727] ¶¶ 111-15. After the FFR, Guster-Hines reported to Quintiliano, and Quintiliano reported that he believed Guster-Hines was a strong performer. [727] ¶ 118. Various evaluations from 2015 through 2018 indicated that Guster-Hines had the opportunity to improve her "strategic thinking and planning," and "develop [a] long term strategic view." [727] ¶¶ 111-15. Like Neal, Guster-Hines was at or near the top among her peers in the Big Six Reports. [791] ¶¶ 48-53.

### F. Allegations of Race-Based Harassment

Plaintiffs describe stray harassment in the earlier parts of their careers. For instance, in 2005, a white Vice President and General Manager at McDonald's USA called Guster-Hines "stupid" in front of her team. [791] ¶ 62. Years later, in 2016 and early 2017, William McKernan[8] told Neal that she needed to be more "sympathetic" when dealing with a white franchise owner. [791] ¶ 65. When Neal spoke out, she was labeled as a "troublemaker."[9] [791] ¶ 65. Furthermore, on April 16, 2018, Guster-Hines reported to Human Resources that a white franchise owner told another Black female employee that he wanted to have sex with her and that he supported "cross breeding." [791] ¶ 55.

---

[8] Neither party indicates who McKernan is or what role he held during the relevant time.
[9] It is not clear who labeled Neal a troublemaker or how Neal was aware of this statement.

9

The focus of the harassment took place during and after the FFR reorganization. Guster-Hines testified that on March 18, 2018, Strong referenced several Black women employees at McDonald's USA (including Neal) and asked Guster-Hines why they were "angry Black women." [791] ¶ 58. Guster-Hines testified that Strong repeated the question, again using the same language regarding "angry Black women," the next day in a meeting with Guster-Hines. [791] ¶ 59. That same month, Strong told Neal that she should not use two other female Black executives as benchmarks for career advancement, saying something to the effect of: "you don't need any of that Black woman attitude. They are angry." [791] ¶ 61. Strong denies using this language. [791] ¶ 58. In August 2019, Guster-Hines told Neal about Strong referring to her as an angry Black woman. [791] ¶ 60.[10]

In February 2019, during a meeting of the U.S. Leadership Extended Team, Bill Garrett presented the five top performers in the United States but did not mention Neal by name. [791] ¶ 65. During that time Neal was regularly ranked at or near the top among her peers in the Big Six Reports. See [791] ¶¶ 48-53, 65.

Both Plaintiffs were members of McDonald's African American Council for Black Employees, which was referred to as "MA2C." [791] ¶ 54. In an April 2019 meeting with MA2C leadership, Guster-Hines asked Kempczinski about the lack of Black executives on his leadership team. [791] ¶ 67. Neal (who was also present at the meeting) testified that Kempczinski responded that the number of Black executives

---

[10] Plaintiffs argue that they were "repeatedly called . . . other racial slurs." [722] at 8. This argument is not supported in the record. Plaintiffs do not cite to evidence that (1) any other racial slur was used to describe Plaintiffs or anyone else, (2) that Guster-Hines was ever the subject of *any* slur, or (3) that Neal was called any slur more than the single instance in March 2018.

10

on his leader team did not matter. [791] ¶ 67. Guster-Hines testified that Kempczinski further said at this meeting that most of the members of the MA2C should have been at the manager level, rather than the director (and above) level that each were at. [791] ¶ 68. After the meeting, the Vice President of Franchising, a Black man, told Guster-Hines, Neal, and others that the National Black McDonald's Owners Operators Association had become "an embarrassment." [791] ¶ 70.

### G. Allegations Related to Plaintiffs' Non-Promotion Claims

Plaintiffs argue that they were wrongly denied promotions to four roles: FVP, U.S. VP of Franchising ("VPF"), U.S. VP GM of McOpCo, and Zone President. The Court considers each parties' statements of fact regarding those promotions below.[11]

**FVP -** Plaintiffs argue that they were both qualified for the FVP position following the FFR[12] and were wrongly denied a promotion into that role. *See* [722] at 62. There is a genuine dispute of fact as to whether either Plaintiff was qualified for the role of FVP. [791] ¶¶ 84-85.[13] Four non-Black candidates — Medy Velez-Valenzuela, Jeff Wilfong, Skye Anderson, and Jorge Ferraz — were promoted to the role of FVP.

---

[11] Plaintiffs assert that "Defendants repeatedly passed over [Plaintiffs] for promotions in favor of less-qualified, non-African American candidates." [791] ¶ 76. In support, they rely on a string cite containing 14 exhibits which reference a combined total of at least *60* promotions which Plaintiffs apparently believe they were wrongfully denied. These citations standing alone do not support Plaintiffs' representation that they were passed over for promotions in favor of less-qualified non-Black candidates. In any event, because Plaintiffs argue in their briefing that they were wrongly denied only four promotions, any purported facts regarding other non-promotions are immaterial and fail to create a disputed material fact.

[12] In their brief, Plaintiffs do not argue that they were discriminated against by being denied a promotion into the FVP role *as a part of the* FFR, only that they were wrongly denied promotion into the role *after* the FFR.

[13] Defendants put forth evidence that demonstrate that neither Plaintiff was qualified for the FVP role. *See* [791] ¶ 84. To create a genuine dispute of fact, Plaintiffs rely on their deposition testimony, where each testified that Strong indicated to both Plaintiffs that they were qualified for the role. Defendants object, arguing that their testimony regarding Strong's statements is inadmissible hearsay. [791] ¶¶ 82, 84. But as an agent of Defendant McDonald's, Strong's statements are admissible

**VPF** – Plaintiffs argue that they were both qualified for the VPF role and were wrongly denied a promotion into that role. [722] at 63. There is a dispute of fact as to whether Guster-Hines was qualified for this role. [791] ¶ 105. Plaintiffs have not identified any evidence upon which a jury could find Neal was qualified for this role.[14] During the relevant timeframe, McDonald's USA promoted two non-Black individuals — Karen Garcia and Alvaro Bonta — into the position. [791] ¶¶ 104, 109.

**VP GM of McOpCo** – Plaintiffs argue that they were both qualified for the U.S. VP GM of McOpCo and were wrongly denied promotions into that role. [722] at 63. Plaintiffs identify no evidence in the record upon which a jury could find that either was qualified for this role.[15] In 2016 or 2017, Paulo Pena, a non-Black man, was hired from outside of the company into this role. [791] ¶ 116. Prior to his hiring, the role did not exist, and no then-current employees were considered for the role. [727] ¶ 173. Pena left the role in 2018, and Gregg Ereio, who previously worked as a VP GM and in a separate temporary VP role, was promoted to take his place. [727] ¶¶ 148, 169, 174. Only those who had worked at least at the VP GM level were considered for this role. [727] ¶ 174.

---

for their truth. Fed R. Evid. 801(d)(D). On summary judgment, where the Court is required to draw all reasonable inferences in favor of the non-moving party, the Court is satisfied that Plaintiffs demonstrated a genuine dispute of fact as to their qualifications for the FVP role.

[14] Plaintiffs cite only to an excerpt from Bill Garret's deposition to support their contention that Neal was qualified. [791] ¶ 106. But the cited-to portion of the testimony says nothing about Neal's qualifications for this role or any other. *See* [720-13] at 177:22–178:6. It is thus insufficient to create a dispute of fact.

[15] Plaintiffs cite to excerpts from both Plaintiffs' deposition testimony to establish that both were qualified for the role. [791] ¶¶ 114, 116. But the cited-to testimony contains only Plaintiffs' speculation that they were qualified for the job, and speculation cannot create a dispute of fact that defeats summary judgment. *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

12

**Zone President** – Plaintiffs argue that they were both qualified to for the Zone President role. [722] at 63. There is no evidence in the record upon which a jury could find that either Plaintiff was qualified for this role.[16] Mario Barbosa, a non-Black man, was promoted into the role in 2018. [727] ¶ 183.

### H. Plaintiffs Issue a Demand Letter; McDonald's Hires an Investigator

On September 23, 2019, counsel for Plaintiffs sent a demand letter to McDonald's USA, alleging much of the misconduct that is at issue before the Court now. [727] ¶ 97. McDonald's USA and Plaintiffs mutually agreed that both Plaintiffs would take a paid leave of absence effective December 3, 2019. [727] ¶ 97. Guster-Hines testified that when she and Neal were on leave, they "were not supposed to have conversations with anyone" at McDonald's USA. [791] ¶ 196.

While Neal was on leave, several employees shared with Quintiliano their concerns about the negative environment Neal created and that they were concerned about her return to the office. [727] ¶ 98.

On January 7, 2020, Plaintiffs filed the original complaint in this action. [1]. On January 10, 2020, McDonald's USA hired Grace Speights, a partner at Morgan, Lewis & Bockius LLP, to investigate concerns raised by other employees about Neal (the

---

[16] Plaintiffs' attempts to establish their qualifications (or otherwise dispute their non-qualification) for the Zone President role fail. As to Guster-Hines, Plaintiffs cite to her deposition testimony that she managed a region that was twice as large as the person who was ultimately hired into the role. [791] ¶ 107. But Plaintiffs identify no evidence suggesting that the size of the region that Guster-Hines managed in her role as QSC-VP was relevant to her qualifications as Zone President. As to Neal, Plaintiffs cite to Neal's response to Defendants' First Interrogatory Number 10 in support of her qualifications. [791] ¶ 107 (citing [720-4]). But interrogatory No. 10 asks whether Neal had ever been a party or witness in any prior legal matters. [720-4] at 35. Neither the interrogatory, Neal's response, nor any other piece of evidence identified by Plaintiffs suggests that Neal was qualified to for the Zone President role.

"Speights Investigation"). [727] ¶ 100. The parties dispute whether Speights conducted an "investigation" or an "assessment." [727] ¶ 100.[17] Speights investigated both Neal and Guster-Hines. [727] ¶ 100; [791] ¶ 149. Defendants dispute that Speights was retained to investigate Neal and Guster-Hines, arguing that the investigation was only a "workplace cultural assessment" of the Dallas Field Office. [727] ¶ 101. But it is undisputed that regardless of who Speights was *retained* to investigate, her investigation resulted in two memoranda that separately evaluated various employees' views of Guster-Hines and Neal and the effects that their return would have on the office. *See* [727] ¶¶ 102-104.

With respect to Neal, Speights interviewed several employees who regularly worked with her. [727] ¶ 101. Speights determined that Neal had created "a very toxic workplace," that the atmosphere in the office had improved since she left, and that employees were afraid to have their statements about Neal attributed to them for fear of retaliation if Neal returned. [727] ¶¶ 101-104. Speights memorialized her findings in a memorandum dated February 18, 2020. [727] ¶ 102. This memorandum concluded by advising that allowing Neal's return would create potential legal risks to McDonald's USA stemming from Neal's inappropriate interactions with employees. *See* [727] ¶ 104.

With respect to Guster-Hines, Speights interviewed the same witnesses and summarized her findings in a memorandum dated February 25, 2020. *See* [720-51].

---

[17] The Court's uses the word "investigate" or "investigation" is only for simplicity's sake and does not suggest any factual determination regarding whether Speights's work is more accurately characterized as an investigation or assessment.

14

Witnesses reported to Speights that Guster-Hines was "a good leader" who did not "micro-manage," and that she was "easy to deal with." [720-51] at 3. Two witnesses reported they felt that Guster-Hines was a "bully," [720-51] at 3. One reported that she "made inappropriate racial comments," including that McDonald's USA was full of "racist[] white men." [720-51] at 3. The same witness also reported that Guster-Hines had referred to other Black leaders at the McDonald's USA as "Uncle Toms." *Id*. Speights ended her report by concluding that the workplace environment and employee morale in the office had improved since Guster-Hines was on leave. [791] ¶ 152. Speights further reported that "Morgan Lewis does not believe that Guster-Hines's return to the office will have a significant negative impact on the employee morale or workplace environment." [791] ¶ 152. The report also concluded that "Morgan Lewis recommends that Guster-Hines be placed in a non-operator facing role if she returns to the office." [791] ¶ 153.

### I. Neal is terminated.

Quintiliano reviewed Speights's memorandum regarding Neal on February 24, 2020. [727] ¶ 105. Strong was consulted and supported the recommendation to terminate Neal's employment. [727] ¶ 106. Shortly thereafter, someone — either Strong or Parolin — instructed Quintiliano to communicate to Neal that she had been terminated. [727] ¶ 107. On February 28, 2020, Quintiliano and Parolin met with Neal and informed her that her employment was being terminated. [727] ¶ 108. Kempczinski was not involved with the decision to terminate Neal. [727] ¶ 110.[18]

---

[18] This fact is based on declarations from Kempczinski and Strong. [72] ¶ 110. Plaintiffs dispute this fact on two bases. First, they argue that they moved to strike Kempczinski's and Strong's declarations.

15

### J. Guster-Hines Resigns

On September 15, 2021, while still on paid leave, Guster-Hines notified McDonald's USA that she was "elect[ing] to retire." [727] ¶ 192; [688-38]. She advised that she would retire with an effective date of March 15, 2022, "or sooner, if permitted." *Id*. After Guster-Hines submitted her resignation, counsel for Defendants advised Plaintiffs' counsel that "if [Guster-Hines] wishes withdraw her notice of retirement, the company will honor that request and she can come back to work immediately." [688-39] at 3.

Guster-Hines and McDonald's USA subsequently agreed that the effective date of her retirement would be October 31, 2021. [727] ¶ 192.

### K. Plaintiffs' Claims

The operative complaint contains the following claims:[19]

| Count | Claim | Plaintiff | Defendant(s) |
|---|---|---|---|
| I | Disparate treatment in violation of § 1981 | Guster-Hines | All Defendants |
| II | Disparate treatment in violation of § 1981 | Neal | All Defendants |
| III | Hostile work environment in violation of § 1981 | Guster-Hines | McDonald's USA and Strong |
| IV | Hostile work environment in violation of § 1981 | Neal | McDonald's USA and Strong |
| V | Unlawful retaliation in violation of § 1981 | Guster-Hines | McDonald's USA |
| VI | Unlawful retaliation in violation of § 1981 | Neal | McDonald's USA[20] |

---

*See* [727] ¶ 110. *There is no motion to strike these two declarations in the docket.* Next, Plaintiffs point to Kempczinski's deposition testimony that he was not aware if he had authority to terminate Neal's employment. *See id*. But Kempczinski's knowledge (or lack thereof) of his authority to terminate Neal says nothing about whether he in fact was involved in the decision to terminate her. Accordingly, this fact is accepted as true.

[19] Plaintiffs concede that Defendants are entitled to summary judgment on their disparate impact claims in Count VIII and X. [722] at 74.

[20] Kempczinski and Strong were named as Defendants in Counts V and VI but were subsequently dismissed from both claims. [166].

16

| Count | Claim | Plaintiff | Defendant(s) |
|---|---|---|---|
| VII | Race discrimination (disparate treatment) in violation of Title VII | Guster-Hines | McDonald's USA and McDonald's Corp. |
| VIII | Race discrimination (disparate impact) in violation of Title VII | Guster-Hines | McDonald's USA and McDonald's Corp. |
| IX | Race discrimination (disparate treatment) in violation of Title VII | Neal | McDonald's USA and McDonald's Corp. |
| X | Race discrimination (disparate impact) in violation of Title VII | Neal | McDonald's USA and McDonald's Corp. |
| XI | Hostile work environment in violation of Title VII | Guster-Hines | McDonald's USA |
| XII | Hostile work environment in violation of Title VII | Neal | McDonald's USA |
| XIII | Unlawful retaliation in violation of Title VII | Guster-Hines | McDonald's USA |
| XIV | Unlawful retaliation in violation of Title VII | Neal | McDonald's USA |

## II.  Analysis

### A.  Disparate Treatment (Counts I, II, VII, IX)

#### i.  Overview

The Court first addresses Plaintiffs' claims of disparate treatment under Section 1981 and Title VII. Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts, ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Title VII makes it unlawful for employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The analysis under both statutes is the same. *Yanick v. Hanna Steel Corp.*,

17

653 F.3d 532, 544 (7th Cir. 2011) ("We analyze § 1981 discrimination claims in the same manner as claims brought pursuant to Title VII of the Civil Rights Act.").

Multiple frameworks exist to evaluate employees' claims for race discrimination. Under the *McDonnell Douglas* framework, a plaintiff must "establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class, (2) he was meeting the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably." *Reives v. Illinois State Police*, 29 F.4th 887, 891 (7th Cir. 2022) (citing *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). If a plaintiff establishes a *prima facie* case, the burden "shift[s] to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Simpson*, 827 F.3d at 661 (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)).

But the Seventh Circuit has explained that "[a]lthough there are many tests and rubrics for viewing discrimination claims . . . they are all merely convenient ways to organize [a court's] thoughts." *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022). Under what is called the *Ortiz* framework, a district court simply asks "whether a reasonable factfinder could conclude that a plaintiff's protected characteristic caused an adverse employment action." *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir.), *cert. denied*, 146 S. Ct. 328, 223 L. Ed. 2d 163 (2025).

18

Because Plaintiffs must have suffered an adverse employment action to survive summary judgment under either framework, the Court begins its analysis there.

### ii.   Adverse Employment Actions

Plaintiffs argue that they were subjected to three categories of adverse employment actions: (1) Guster-Hines's "sidelining" after she went on leave, (2) both Plaintiffs' non-promotions to various roles, and (3) Neal's termination. "Adverse employment actions include a broad array of actions such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or some other action causing a significant change in benefits.'" *McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 625 (7th Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). To be actionable, an adverse employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002).

Defendants do not contest that Neal's termination was an adverse employment action. They do contest whether Guster-Hines's sidelining and Plaintiffs' non-promotions constitute adverse employment actions.

### 1.  Guster-Hines's "Sidelining"

Plaintiffs contend that Guster-Hines was sidelined while on leave by "sever[ing] her from all work-related communications," "terminat[ing] her participation in any work related calls," "restrict[ing] her physical and remote access to her work, email, and projects," and "perhaps worst of all, . . . banish[ing] her from communicating or

19

working with [staff] that she had developed relationships with over 30-plus previous years." [722] at 35.[21]

As Plaintiffs point out, sidelining can constitute an adverse employment action when an employer "'***prevent[s]*** [an employee] from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted,'" *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1069 (7th Cir. 2012)) (emphasis added). The problem for Plaintiffs is twofold.

First, Plaintiffs' characterization of the restrictions, terminations, and banishment that Guster-Hines suffered while on leave is almost entirely unsupported by the record. Plaintiffs cite paragraphs 195-97 of their statement of additional facts to support that characterization. The only *relevant* fact from those paragraphs is that Guster-Hines learned from another employee that Quintiliano instructed McDonald's staff not to communicate with Plaintiffs while they were on leave. And while this is relevant, it is inadmissible hearsay. Moreover, it says nothing of her access to her work, her email, her projects, or her being "banished."

Second, Plaintiffs identify no evidence in the record suggesting that Defendants *prevented* Guster-Hines from using her skills or experience, or that they *caused* her skills to atrophy such that her career is likely to be stunted. Instead, the undisputed facts show that Defendants and Guster-Hines *mutually agreed* that she would go on

---

[21] Defendants argue that Guster-Hines's "sidelining" theory is improper because (1) it is not identified in the operative complaint, (2) it is just a repackaging of her previously dismissed constructive discharge claim, and (3) Guster-Hines did not identify being sidelined in response to an interrogatory asking her to list all adverse employment actions she suffered. *See* [788] at 6. The Court declines to resolve these arguments because this theory fails for other reasons.

paid leave beginning December 3, 2019, and that she remained on paid leave until she affirmatively notified Defendants of her intent to resign. [727] ¶¶ 97, 192. Plaintiffs identify no evidence in the record suggesting that Defendants ever prevented Guster-Hines from returning from leave, or even that she ever *sought* to return from leave. To the contrary, the undisputed facts show that after she tendered her notice of resignation, Defendants told Guster-Hines that they "would honor that request and she [could] *come back to work immediately.*" [688-39] at 3 (emphasis added). To the extent Guster-Hines's skills atrophied or her career was stunted, it was because of her voluntary decision to go on paid leave and her subsequent decision to resign. *Trahanas v. Nw. Univ.*, 64 F.4th 842, 853 (7th Cir. 2023) (holding that an employee's "voluntary decision not to return to work or extend leave does not amount to a tangible employment action."); *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 722, 786-787 (7th Cir. 2007) (officer who was placed on paid administrative leave pending the conclusion of an investigation did not suffer a materially adverse action); *Oszust v. Town of St. John*, 212 F. Supp. 3d 770, 777 (N.D. Ind. 2016) ("[P]lacement on paid leave is not a materially adverse employment action . . . .").

Accordingly, the Court declines to find that Guster-Hines's "sidelining" constitutes an adverse employment action.

### 2. Non-Promotions

#### a. Plaintiffs' Qualifications

Plaintiffs' non-promotions claims are substantially more complicated but ultimately do not fare better. "Failure to promote can be an adverse action giving rise to liability." *Hill v. Potter*, 625 F.3d 998, 1003 (7th Cir. 2010). But to succeed, a Plaintiff must demonstrate that they are qualified for the position sought. *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001).

As discussed *supra*, Plaintiffs argue that their non-promotion claims survive summary judgment with respect to four positions: FVP, VPF, U.S. VP GM of McOpCo., and Zone President (the "Disputed Roles").[22]

Before addressing each specific role, it bears noting that Plaintiffs have identified no evidence suggesting that they conducted any discovery into (1) the required qualifications of *any* of the roles they claim they should have been promoted into or (2) how potential candidates for those roles were evaluated. It is clear from the record that Plaintiffs did not depose any relevant ultimate decision-maker with respect to *any* challenged non-promotion. Instead, Plaintiffs rely largely on their own assessments of their qualifications. *See* [788] ¶¶ 104-17. But an employee's own perception of his performance "cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities," *Olsen*, 267 F.3d at 602, and so says nothing about an employer's liability. *See also Bennett v. Roberts*, 295

---

[22] Plaintiffs assert that these Disputed Roles are just "a few key examples" of promotions Plaintiffs were unlawfully denied, referring the Court to the Plaintiffs' statements of fact and responses to review details of other positions. [722] at 60 n.20. The Court declines Plaintiffs' invitation. Any argument with respect to promotions other than those Plaintiffs identify in their 76-page brief is waived. *See Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts."); *Betco Corp., Ltd. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017) (underdeveloped arguments in response to summary judgment are waived).

22

F.3d 687, 696 (7th Cir. 2002) (affirming summary judgment where plaintiff failed to identify the qualifications for the vacancies plaintiff was not hired into); *Ekekhor v. AON Serv. Corp.*, No. 05C99, 2006 WL 2349982, at *6 (N.D. Ill. Aug. 9, 2006) (employees' own assessments of their qualifications "of course cannot cast doubt on the sufficiency of the employer's proffered reasons for its decision."); *Daniels v. Fed. Rsrv. Bank of Chicago*, No. 98 C 1186, 2006 WL 861969, at *6 (N.D. Ill. Mar. 31, 2006), *aff'd sub nom. Baylie v. Fed. Rsrv. Bank of Chicago*, 476 F.3d 522 (7th Cir. 2007) (granting employer summary judgment where plaintiff failed to identify job requirements for positions he was not promoted into).

Aside from their own speculation, Plaintiffs rely on their evaluations in the "Big Six Reports" to establish their qualifications. As discussed *supra*, Big Six reports were used to evaluate "metrics . . . around operational performance." [791] ¶ 48. And indeed, the Big Six Reports show that Plaintiffs were high performers. *See, e.g.*, [791] ¶ 1. But Plaintiffs identify no evidence in the record suggesting that the metrics evaluated in the Big Six Reports were dispositive to Defendants' consideration of who should be promoted to each of the four disputed roles.

With that aside, the Court addresses what the record *does* contain as to each role. With respect to the Zone President and U.S. VP GM of McOpCo roles, Plaintiffs identify no evidence in the record other than their own assessments of their qualifications and the Big Six reports to argue that they were qualified for each role. For the reasons discussed, that is insufficient to survive summary judgment.

23

With respect to the VPF role, there is similarly no sufficient evidence in the record to establish that Neal was qualified for this role. But Guster-Hines testified that Quintiliano told her that she would be a "good fit" for the role. [791] ¶ 105. Taking all inferences in the non-moving party's favor, the Court finds that Guster-Hines's testimony is sufficient to create a dispute of fact as to whether she was qualified for the VPF role.

With respect to the FVP position, both Plaintiffs testified that Strong indicated to them that they were qualified for the role. [791] ¶¶ 82, 84. Again taking all inferences in the non-moving party's favor, the Court finds that Plaintiffs' testimony is sufficient to create a dispute of fact as to whether each was qualified for the FVP role.

The Court thus finds that, for the purposes of surviving summary judgment, there is a dispute of fact as Guster-Hines's qualifications for the FVP and VPF roles, and as to Neal's qualifications for the FVP role. As to each of the other roles, the Plaintiffs have failed to present any evidence that they were qualified for the position.

### b. Plaintiffs fail to identify any relevant comparators.

To demonstrate a *prima facie* case of discrimination regarding their non-promotions into the FVP and VPF positions, Plaintiffs must present evidence that Defendants gave the at-issue promotions to someone outside of the protected group who was not better qualified. *Grayson v. City of Chi.*, 317 F.3d 745, 748 (7th Cir. 2003). Such a showing normally entails establishing that "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would

distinguish their conduct or the employer's treatment of them." *Snipes v. Illinois Dep't of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002). Plaintiffs fail to identify any relevant comparators for either the FVP or VPF roles.

Taking the FVP position first, Plaintiffs argue that four individuals (1) Medy Velez-Valenzuela, an Asian-American woman, (2) Jeff Wilfong, a white male, (3) Skye Anderson, a white woman, (4) Jorge Ferraz, a non-Black male — are similarly situated comparators who were promoted into the FVP role and were not more qualified than either Plaintiff. [722] at 62. Of the four, only Velez-Valenzuela and Ferraz held the same position as Plaintiffs at the time of their promotion; Wilfong and Anderson held more senior positions. They thus cannot be considered similarly situated. *See, e.g., Enriquez v. Johnson*, No. 07 C 4589, 2008 WL 4671715, at *4 (N.D. Ill. Oct. 22, 2008) (employee with a higher rank than plaintiff not similarly situated); *Turner v. Health Care Serv. Corp.*, No. 06 C 2399, 2009 WL 1210624, at *4 (N.D. Ill. May 4, 2009) (employees with different positions not similarly situated).

Velez-Valenzuela reported to a different supervisor than Plaintiffs. Velez-Valenzuela reported to Anderson at the time of her promotion, and Anderson chose Velez-Valenzuela as her replacement. *See* [688-64]. This distinction forecloses Plaintiffs' argument that Velez-Valenzuela was similarly situated to either Plaintiff at the time of Velez-Valenzuela's promotion. *See Snipes v. Illinois Dep't of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002) ("Requiring that the plaintiff establish these similarities is simply common sense, as different employment decisions, concerning different

employees, made by different supervisors ... sufficiently account for any disparity in treatment, thereby preventing an inference of discrimination.") (cleaned up).

And Ferraz was promoted into the role in October of 2020, *after* Guster-Hines agreed to go on paid leave and after Neal's termination. [688-64] ¶ 3. At the time of his promotion, Ferraz was an operations manager who had managed the entirety of McDonald's Portugal market. [688-64] ¶ 11. The Court does not believe a reasonable factfinder could determine that Ferraz, an active employee who had managed an entire country's market, was similarly situated to Neal, who had been terminated and was not a McDonald's employee, or Guster-Hines, who was on paid leave at the time of the promotion.

With respect to the VPF position, Plaintiffs argue that "(1) a non-Black male, and (2) Karen Garcia, a non-Black woman" are similarly situated comparators who were promoted into the role and were not more qualified than either Plaintiff. [722] at 63. The Court strains to see how it can compare either Plaintiffs' qualifications with those of an *unidentified* non-Black male and accordingly declines to find that he is similarly situated in any relevant respect to either Plaintiff.[23] For her part, Garcia held the role of VP GM — a more senior position than QSC-VP or Operations Officer — for 9 years before her promotion, so she is not a similarly situated comparator.[24]

---

[23] Plaintiffs' brief cites to paragraph 104 of their statement of facts, which describes only an unnamed "non-Black male." [791] ¶ 104.

[24] Plaintiffs argue that Garcia was *less* qualified than they were because, at some point prior to her appointment to the VPF position, she was terminated by McDonald's. *See* [722] at 63. But Plaintiffs nowhere argue that the reasons for her termination have any bearing on her qualifications for the VPF role, nor do they identify facts in the record that would allow a reasonable factfinder to make that inference. And it is uncontested that for 9 years prior to her promotion Garcia held a more senior position than Plaintiffs.

26

Accordingly, Plaintiffs have failed to establish their *prima facie* case for their non-promotion claims.

### c. Evidence of Non-Discriminatory Intent

Even if Plaintiffs had established a *prima facie* case as to their non-promotions, Defendants provided ample evidence to rebut any presumption of discrimination. With respect to each of the Disputed Roles, the undisputed evidence shows that each promotion was made for non-discriminatory reasons.

To wit, Defendants provided affidavits from the individuals who were responsible for promoting or hiring Plaintiffs' purported comparators. For example, Defendants provided an affidavit from Skye Anderson, who made the decision to promote Velez-Valenzuela. *See* [688-84]. Anderson testified that she chose Velez-Venezuela because of her "deep experience in understanding and working and leading in the state of California," where the job was based, and because Velez-Valenzuela's "outstanding performance as Operations Officer." [688-84] ¶ 6. Likewise, Defendants attached an affidavit from Charles Robeson, who was involved in the decision to hire Pena as VP MD McOpCo. *See* [727] ¶ 172. Robeson explained that the VP MD McOpCo role did not exist prior to Pena's hire, and indeed that it was created specifically to entice Pena to leave his then-current position at a separate company and begin working for McDonald's. [688-60] ¶¶ 6-8. Pena was hired because of his significant operations and leadership experience as President and Management Director over the other company's Latin America and Caribbean regions, and there is no evidence that someone with Plaintiffs' credentials would have been considered for the role. *See* [688-

27

60] ¶ 7. Defendants provided similar evidence of their non-discriminatory intent with respect to the other two roles. *See, e.g.*, *id.* (explaining the basis for hiring Bonta into the VPF role); [688-84] (affidavit from Anderson explaining the bases for promoting three purported comparators into the FVP role); [688-46] (affidavit from Kempczinski explaining the rational for hiring Mario Barbosa, who had managed McDonald's Spain and Portugal region for over a decade, into the Zone President role).

Plaintiffs' only serious objection[25] to the facts contained in these affidavits is that they were belatedly disclosed, and Plaintiffs claim they moved to exclude the affidavits on that basis. But despite claiming to have moved to exclude the affidavits filed by Kempczinski, Robeson, and Anderson, Plaintiffs only ever moved to exclude Anderson's. *See* [742]. For the reasons discussed in the Court's order on the parties' motions to exclude, that motion was denied. And because Plaintiffs never moved to exclude Kempczinski's or Robeson's affidavits, the facts contained in each remain undisputed. Plaintiffs did not depose any of these individuals (or anyone else with relevant knowledge) regarding how each promotion was decided, and they thus do not identify any evidence that could controvert each affiant's testimony.

Assuming *arguendo* that Plaintiff had established a *prima facie* case, Plaintiffs could rebut this evidence by submitting evidence of their own that the promotion decisions were pre-textual. *Simpson*, 827 F.3d at 661. To do so, Plaintiffs are required

---

[25] Plaintiffs also claim that Guster-Hines was more qualified than Barbosa for the Zone President role because Guster-Hines testified that she ran a region that was "twice the size of Barbosa's region in Spain and Portugal." [727] ¶ 183. But Plaintiffs fail to identify any facts in the record suggesting that the size of a region was a factor in deciding who to hire for the Zone President role, nor do they reckon with the undisputed facts demonstrating that QSC-VPs were not considered for the role.

to offer evidence that "(1) the employer's non-discriminatory reason was dishonest *and* (2) the employer's true reason was based on a discriminatory intent." *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010) (emphasis added).[26] As it relates to Plaintiffs' non-promotion claims, they identify evidence of neither. Accordingly, under the *McDonnell Douglas* framework, Defendants are entitled to summary judgment as to Plaintiffs' disparate treatment claims premised on their non-promotions.[27]

### d. Under the more holistic *Ortiz* standard, Defendants are entitled to judgment.

As noted *supra*, the Court may also consider Plaintiffs' claims under the *Ortiz* framework, which requires the Court to ask "whether a reasonable factfinder could conclude that a plaintiff's protected characteristic caused an adverse employment action." *Napier*, 137 F.4th at 892. The answer is no. At bottom, Plaintiffs' non-promotion claims are premised on a belief that they were wrongfully denied positions for which either (1) Plaintiffs identified no evidence indicating they were qualified, (2) were filled by individuals who were *more* qualified, and/or (3) were filled by individuals who, unlike Plaintiffs, were not either terminated or on paid leave at the time of their promotions. Plaintiffs identify no evidence that Defendants are lying about their stated reasoning, nor do they identify evidence that the promotions were

---

[26] Plaintiffs quote *Stockwell* when describing their burden, but Plaintiffs replace the word "and" with "or." [722] at 65.

[27] Kempczinski is separately entitled to summary judgment as to Plaintiffs' claims regarding the FVP and VP GM of McOpCo roles because Plaintiffs identified no evidence of his involvement in those promotions. For the same reasons, Strong is entitled to summary judgment as to Plaintiffs' non-promotion claims for all of the Disputed Roles.

29

based on race or any other protected characteristic. Under either framework, then, Defendants are entitled to summary judgment as to Plaintiffs' disparate treatment claims premised on their non-promotions.

### iii. Neal's Termination

The Court turns next to Neal's disparate treatment claim premised on her termination. Neal makes no effort to establish a *prima facie* case related to this claim. Despite acknowledging that she "must show evidence" that she was "meeting [her] employer's legitimate expectations" at the time of her termination and her employer "treated similarly situated employees not in the protected class more favorably," [722] at 58, Neal identifies no evidence and presents no argument relevant to either element. *See* [722] at 58-71. She does not identify any purported comparator, and she does not respond to Defendants' argument that she was *not* meeting her employer's legitimate expectations. Other than identifying her termination as an adverse employment action, Neal does not make any argument that her termination was because of her race under the more holistic *Ortiz* standard, either. *See* [722] at 58-71.

She argues that Kempczinski should nonetheless be held liable because "a reasonable jury could find him responsible for the decision to terminate" Neal. [722] at 69. Neal contends that Defendants engaged in a "hot potato" defense, where "[e]veryone that could have possibly made the decision to terminate Ms. Neal—i.e., Mr. Quintiliano, Ms. Parolin, and Defendant Strong—all testified that they did not make the ultimate decision to fire her." *Id*. at 70. Neal characterizes this as a "truly extraordinary fact." [722] at 3.

30

In support, Plaintiffs cite two cases. The first is *Peterkin v. Taco Bell*, No. 3:95-CV-694RM, 1996 WL 939573 (N.D. Ind. Nov. 20, 1996). There, a terminated employee at Taco Bell brought a Title VII claim because when he asked why he was fired, a shift manager named Lilly responded with a racial epithet. *Id*. at *2-3. Lilly (and every other manager) denied being responsible for the decision to terminate the plaintiff. *Id*. at *5. The court held that the decision-maker's identity was a material fact because if Lilly made the decision, a jury could conclude she was motivated by racial discrimination based on her use of a racial epithet. *Id*. at *5-6.

The court's reasoning in *Taco Bell* is not relevant here. Plaintiffs' argument analogizes Lilly's role in *Taco Bell* to Kempczinski's role in Neal's termination. But Neal has not identified any evidence that (1) Kempczinski was involved in Neal's termination, or (2) that even if he were, his involvement or decision-making was motivated by race. The upshot of *Taco Bell* is not that any uncertainty around who made the termination decision gets a plaintiff past summary judgment, as Plaintiffs' argument suggests. Rather, it is that *if* the identity of the decision-maker is unknown and one of the possible decision-makers was clearly motivated by racism, the identity of the decision-maker is a material fact.

The second case is *Reed v. Tetra Tech, Inc.*, No. CIV-13-542, 2014 WL 931426, (W.D. Okla. Mar. 10, 2014). There, a supervisor who signed a plaintiff's termination paperwork later denied having any involvement in the decision to terminate the employee. *Id*. at *5. After finding the Plaintiff established a *prima facie* case of discrimination, the *Reed* court explained that the incongruency between the

31

supervisor's signature on the termination paperwork and his claim that he was not involved in the termination was evidence of pretext. *Id*.

Again, this case says little about the facts before the Court now. Unlike *Reed*, Neal has not established (and did not try to establish) a *prima facie* case related to her disparate treatment claim. And even if she had, unlike the supervisor in *Reed*, Plaintiffs have not identified any incongruent evidence suggesting that Kempczinski was involved in the decision to terminate Neal. Indeed, Kempczinski was no longer employed by McDonald's USA at the time of Neal's firing. [727] ¶ 11.

But this argument fails for a more basic reason. Contrary to Plaintiffs' representations, it is clear who terminated Neal. According to *Plaintiffs' own statement of facts*, Quintiliano was (a) one of the decision-makers who (b) could not decide to terminate Neal on his own but (c) recommended her termination to Strong. [791] ¶ 127. And Plaintiffs argue in response to Defendants' statement of facts that Strong was a decision-maker who approved the termination decision. [727] ¶ 106.

Plaintiffs' attempt to manufacture an ambiguity to survive judgment as to Kempczinski thus fails because (1) there is no ambiguity as to who fired Neal, (2) even if there were, Plaintiffs identify no evidence Kempczinski had any involvement in the decision, and (3) even assuming Kempczinski was involved, Plaintiffs do not argue he would have been motivated by Neal's membership in a protected class. Accordingly, all Defendants are entitled to judgment as to Plaintiffs' disparate treatment claim related to Neal's termination. And because Plaintiffs do not identify

any other adverse employment actions related to their disparate treatment claims, all Defendants are entitled to judgment as to Counts I, II, VII, and IX.

## B. Retaliation (Counts V, VI, XIII, XIV)[28]

The Court turns next to Plaintiffs' retaliation claims. An employer is prohibited from "from retaliating against employees who engage in activity protected by the statute." *Castro v. DeVry Univ.*, Inc., 786 F.3d 559, 564 (7th Cir. 2015).[29] The parties agree that the Court's inquiry comes down to one question: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the materially adverse action?" [679] at 19; [722] at 17 (citing *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (citation omitted)).

Defendants do not dispute that Plaintiffs engaged in a protected activity by filing this lawsuit on January 7, 2020. [1]. Three days later, McDonald's USA legal counsel contacted Speights, which led to her investigation. *See* [791] ¶ 149. Plaintiffs argue that they both suffered adverse actions — in Neal's case, termination, in Guster-Hines's, sidelining — as a form of retaliation for filing their lawsuit. Plaintiffs do not attempt to establish a *prima facie* case under the *McDonnell Douglas* framework and instead argue under the *Ortiz* standard that a reasonable fact finder could find retaliation as to both events.

### a. Neal's Termination

---

[28] Each Count for retaliation is brought only against McDonald's USA.
[29] The inquiry is the same for retaliation claims brought under Title VII and Section 1981. *Stephens v. Erickson*, F.3d 779, 787 (7th Cir. 2009).

Defendants argue that Neal was terminated not because of her lawsuit but instead because of her leadership deficiencies, the significant complaints raised by other employees (both before and after Neal agreed to go on leave), and her lack of sustained improvement even after being given an executive coach. [788] at 15-16.

Neal does not meaningfully dispute those underlying facts but argues there is enough evidence of pretext to survive summary judgment. Specifically, Neal argues the following give rise to pretext: (1) evidence that the investigation did not follow relevant industry standards, (2) evidence that Defendants ignored their own procedures, (3) evidence that Defendants shifted their explanations as to the nature of the investigation, and (4) the mere 3-day window between Plaintiffs' filing of the complaint and the initiation of the Speights Investigation. [722] at 18-30.

Neal's arguments regarding the first three categories of evidence largely redound to a battle of experts over what industry and internal standards might have governed Speights's investigation and how significant deviations from those standards might be. The Court does not and cannot resolve those disputes at the summary judgment stage. Taking all reasonable inferences in Neal's favor, Neal has provided enough evidence to survive summary judgment.

In particular, the suspicious timing between Plaintiffs' filing the present complaint and the onset of the Speights Investigation may give rise to an inference of retaliation. "[F]or a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that

34

the person who decided to impose the adverse action knew of the protected conduct." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (internal citations and quotations omitted). There is "no set legal rule" for determining how closely an adverse action must follow after the protected activity to give rise to an inference of causation. *Id*.

Defendants argue that a workplace investigation itself is not an adverse employment action. That is true; "[a]n investigation by an employer, without more, is not an adverse action." *Ludlow v. Nw. Univ.*, 79 F. Supp. 3d 824, 834 n.5 (N.D. Ill. 2015) (citing *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885–86 (7th Cir. 2012)). But here, there *is* something more. The investigation culminated in Neal's termination. Indeed, the Seventh Circuit has explained that an investigation can constitute an adverse employment action where the investigation results in disciplinary action. *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) (finding an adverse employment action where employee was suspended and terminated after workplace investigation).

Defendants argue that Neal was terminated for the same reason that Quintiliano had been recommending her termination since 2018: because she was difficult to work with and was driving other employees to quit. They argue that the Speights Investigation only confirmed Quintiliano's belief and buttressed his termination recommendation. That may well be true. But McDonald's USA leadership, including Neal and Strong, had already received numerous complaints about Neal *before* she alleged that Defendants discriminated against her. For whatever reason, they only

decided to investigate and terminate Neal *after* she engaged in a protected activity. A reasonable factfinder may assess this timeline and determine that Neal was fired not because of her workplace conduct but instead because she filed a discrimination lawsuit against her employer.

This inference is further enforced by the fact that, although Defendants claim Speights was retained to review complaints about *Neal*, she assessed or investigated *both* Plaintiffs. *See* [727] ¶¶ 100-01. It is not clear why Speights prepare a memorandum on *Guster-Hines* if she was retained in response to complaints about *Neal's* conduct and not in response to *both Plaintiffs'* lawsuit. Neal's retaliation claim premised on her termination survives summary judgment as to McDonald's USA.

### b. Guster-Hines's Sidelining

Guster-Hines's retaliation claim fails because, as discussed *supra*, she did not suffer an adverse employment event when she agreed to go on paid leave and voluntarily resigned. The timing of the Speights Investigation remains suspicious. But in the end, Defendants took no employment actions — adverse or otherwise — against Guster-Hines as a result of the investigation.

Guster-Hines analogizes her situation to that of Colin Kaepernick, who was blacklisted from the NFL after protesting racial injustice by taking a knee during the national anthem after he became a free agent in 2017. [722] at 35 n.8. Despite leading the San Francisco 49ers to the Super Bowl just a few years prior, no NFL team was willing to sign Kaepernick as a quarterback once he began protesting. But unlike Guster-Hines, Kaepernick never agreed that he would take a leave from playing

36

football; he *repeatedly sought to play* for other teams during his free agency.[30] Guster-Hines does not address these critical differences.

She further likens her situation to that of a lawyer who is forced by her employer "to just sit in her office and was barred from writing briefs, taking depositions, or otherwise being part of a litigation team [, and whose] skills and career would significantly diminish while sidelined." [722] at 34. Such a lawyer may well prevail at summary judgment on a sidelining theory. But if instead of being *forced* to sit in her office while her skills languished, the lawyer *agreed* to do so, *never asked* to be reinstated into her prior role, and *rejected her employer's offer* to rejoin the trial team, she would not have a Title VII or 1981 claim against her employer. To hold otherwise would be to penalize *only* Defendants for the parties' mutual decision that Guster-Hines go on leave.

Plaintiffs cite a small handful of cases where an employee survives summary judgment on the basis that they lost employment opportunities after taking part in a protected activity. *See* [722] at 33-38. But each of these cases fail to compel a different outcome for the same reason that Plaintiffs' analogies fail: unlike here, they involve employees who lost opportunities because of the *employers' actions* rather than the employee's decision to stop working. *See Lewis v. City of Chicago*, 496 F.3d 645, 649-50, 653 (7th Cir. 2007) (denying summary judgment where employer forced employee to transfer to a department with fewer opportunities for advancement and overtime;

---

[30] *See* Louisa Thomas, *Colin Kaepernick's Contested Workout and the Power Plays of the N.F.L.*, THE NEW YORKER (Nov. 18, 2019), https://www.newyorker.com/sports/sporting-scene/colin-kaepernick-contested-workout-and-the-power-plays-of-the-nfl.

37

employer later rejected employee's request to transfer to a more favorable department); *Geraty v. Vill. of Antioch*, 941 F. Supp. 2d 918, 932 (N.D. Ill. 2013) (denying summary judgment where employer failed to promote employee to position that offered more opportunity for overtime pay).

The Court is cognizant of the seeming incongruency of this holding. Neal's retaliation claim survives despite multiple employees complaining about her conduct over a period of years, while Guster-Hines's is defeated despite every indication she was an excellent employee. But the fact remains that Defendants took *no action* based on the investigation. Guster-Hines's failure to point to an adverse employment action that occurred as a form of retaliation for her lawsuit (or any other protected activity) is fatal to her claim.

Accordingly, Defendant McDonalds USA is entitled to judgment on Guster-Hines's retaliation claims.

### C. Hostile Work Environment (Counts III, IV, XI, XII)[31]

To establish a hostile work environment claim, Plaintiffs must show that (1) they were subject to unwelcome harassment; (2) the harassment was based on their race; (3) the harassment was severe or pervasive so as to alter the conditions of their work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *Cole v. Bd. of Trs. of N. Illinois Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) (citing *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 634 (7th Cir. 2009).

---

[31] Counts III and IV are against Defendants Strong and McDonald's USA; Counts XI and XII are against only McDonald's USA. [94] at 2.

Plaintiffs identify several distinct instances of harassment that they believe were based on their race.[32] The Court begins there.

### i.    Instances of Harassment

First, Plaintiffs point to an incident in 2005, when a white VP GM called Guster-Hines "stupid." [722] at 41; [791] ¶ 62. Outside of the fact that the VP GM was white, Plaintiffs present no argument or evidence that this comment was made on the basis of Guster-Hines's race.

Next, Plaintiffs point to an incident in December 2016 where a white owner-operator, Dan Carmichal told Guster-Hines that he would "hurt[]" and "ruin[]" her. *See* [791] ¶ 63. This conversation happened after Guster-Hines told Carmichal that McDonald's USA would exercise its right of first refusal to prevent Carmichal from purchasing a franchise. *See id.* Again, Plaintiffs present no evidence suggesting Carmichal made these comments because of her race.

Plaintiffs also highlight that "in 2016 and early 2017," Neal was labeled a "troublemaker" after William McKernan[33] told Neal that she was not "sympathetic enough" to white males but wanted her to be more aggressive with black employees. *See* [791] ¶ 65. Plaintiffs do not explain who labeled Neal a troublemaker or how she came to learn of this label. Absent any information about who was calling Neal a

---

[32] The Court declines to consider any instances of alleged harassment that Plaintiffs failed to reference in their briefing. *Betco Corp., Ltd. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017) (underdeveloped arguments in response to summary judgment are waived).
Further, Plaintiffs argue that they were called "goddam liars" because of their race. [722] at 8. Plaintiffs' statement of facts contains no evidence establishing that this ever happened. The Court thus declines to consider the comment in its evaluation of Plaintiffs' hostile work environment claims.
[33] Plaintiffs offer no evidence regarding who William McKernan is or what relationship he had with Neal.

troublemaker, no reasonable jury could conclude this label was given to her because of her race.

Next, in 2018, a white employee made several racially and sexually inappropriate comments to another black employee, including that he supported "cross breeding." [797] ¶ 55; *see also* [720-25]. The employee reported the incident later that day to Guster-Hines, and an investigation began the next day. [720-25] at 3. Because Plaintiffs provide no evidence that the comments were directed at Guster-Hines, the Court does not consider it evidence that she was subject to unwelcome harassment.

Plaintiffs next point to a series of instances where Strong used the phrase "angry Black women" or "Black woman attitude." Specifically, in March 2018,[34] Strong told Neal not to use two Black executives as "benchmarks" for career advancement because they had "Black woman attitude" and were "angry." [791] ¶ 61. The same month, Strong was talking to Guster-Hines and referred to several Black female executives, including Neal, as "angry Black women." [791] ¶ 58. Both comments clearly rise to the level of unwanted harassment on the basis of race. *See Dochee v. Methodist Hosps, Inc.*, No. 2:21-cv-275, 2024 WL 4345774, at *2–3 (N.D. Ind. 2024).

Next, Neal points to a February 2019 meeting of the U.S. Leadership Extended Team where Bill Garrett presented the five top performers in the United States. [791] ¶ 65. Neal's name was listed on a slide that Garret was reviewing, but Garret did not mention Neal by name. *Id.*

---

[34] There is a dispute of fact as to when Strong made the relevant comments to Neal. Plaintiffs claim they came in March 2018; Defendants argue that the evidence shows it was in early 2017. [791] ¶ 44.

40

Finally, Plaintiffs take issue with Kempczinski's comments during a 2019 meeting with a Black employee leadership group, Kempczinski stated that (1) McDonald's was not committed to racial diversity and (2) most of the people in the audience deserved to have a lower-ranking position than the ones they actually held. *See* [791] ¶¶ 67-68. Plaintiffs would be justified in taking offense at Kempczinski's statements that they and the other members of the Black leadership group did not deserve their positions, and that the McDonald's leadership had no commitment to equity.

After that meeting, the then-VPF Matt Ajayi, a Black male, told Plaintiffs that the leadership of the National Black McDonald's Owners Operators Association ("NBOOA") had become "an embarrassment." [791] ¶ 70. Ajayi made this comment after the NBOOA accused McDonald's USA of systemic racism. *Id.* Because the comment was directed towards leaders of a Black organization and made in response to the organization's complaints of discrimination, the Court is satisfied that Ajayi's comment was a form of unwanted discrimination based on race.

Plaintiffs have thus established that they were subjected to harassment on the basis of their race as to (1) Strong's use of the term "angry Black women" and "Black woman attitude" in March 2018, (2) Kempczinski's April 2019 comments, and (3) Ajayi's statement that the leadership of the NBOOA were "an embarrassment."

### ii. Severity and Pervasiveness of Harassment

To survive judgment, it is not enough for a plaintiff to be harassed on the basis of their race. The harassment must also be severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive

41

situation. *Cole*, 838 F.3d at 896 (7th Cir. 2016). The environment must be one that is "both objectively and subjectively offensive," that is, "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "In evaluating the objective offensiveness of a plaintiff's work environment, we consider all of the circumstances, including frequency and severity of the conduct, whether it is humiliating or physically threatening, and whether it unreasonably interferes with an employee's work performance." *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 677–78 (7th Cir. 2005).

Plaintiffs argue primarily that Strong's March 2018 comments regarding "angry Black women" and "Black woman attitude[s]" are sufficient to get them to a jury. The Court agrees with Plaintiffs that these comments are racist and offensive. *See* [722] at 40-44. The question is whether a reasonable jury could find that these comments were subjectively and objectively severe enough to alter the conditions of Plaintiffs' work. The answer is yes.

Courts confronted with accusations regarding "angry Black women" have noted that this epithet carries significant harm with it. *See McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 413 (4th Cir. 2022) ("[W]hen an African American woman asserts herself, she is often tagged by her supervisors and coworkers as an 'angry Black woman,' a harmful and well-rooted racial stereotype." (Motz, J., concurring in the judgment); *Curry v. Devereux Found.*, 541 F. Supp. 3d 555, 561 (E.D. Pa. 2021) ("[W]hen Black women engage in assertive or forceful behavior, their conduct is

42

tagged as threatening or deviant, even when it would be tolerated in an employee of a different gender or race. Out of a desire to avoid this stereotype, Black women may adopt a passive attitude that impairs their chances for advancement or renders them unable to object to discrimination."). And as Plaintiffs' supervisor, Strong's comments bear more weight than those made by a coworker. *See Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("[A] supervisor's use of the term impacts the work environment far more severely than use by co-equals.").

Defendants argue that Plaintiffs' own statements and actions belie any offense they claim to have taken. For example, Defendants highlight that both Plaintiffs chose to report to Strong as a part of the FFR *after* he made the March 2018 comments as evidence that they did not take offense. But Defendants ignore that as a part of the FFR, Plaintiffs *had* to report to Strong or else leave the company. [727] ¶ 41. To survive judgment, Plaintiffs do not need to establish facts that the harassment they faced was so bad that they were forced to resign, as Defendants' argument suggests. Rather, the harassment must be only severe so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation. *Cole*, 838 F.3d at 896 (7th Cir. 2016). That Plaintiffs chose to report to Strong over taking the severance package does not mean they were not subjected to a hostile work environment.

Defendants also point to statements both Plaintiffs made praising Strong and Kempczinski after their respective instances of harassment. *See* [679] at 17. For example, after the April 2019 meeting, Guster-Hines emailed Kempczinski to thank

43

him for his "excellent leadership." *Id*. Defendants may persuade a jury that such statements show Plaintiffs viewed Defendants' conduct as harmless. But another plausible interpretation is that Plaintiffs treated Defendants with such deference because they believed that Defendants were prejudiced against Black executives and they wanted to curry favor with their bosses. It will be up to the jury to make that determination.

Accordingly, Defendants' motions for summary judgment as to Plaintiffs' hostile work environment claims are denied.

## CONCLUSION

For the foregoing reasons, Kempczinski's [665, 668, 684] and McDonald's Corp.'s [674, 680] motions for summary judgment are granted in their entirety. Strong's [672, 682] and McDonald's USA's motions [667, 670, 678] for summary judgment are granted in part and denied in part. Strong and McDonald's USA are awarded judgment as to Counts I and II; Counts III and IV survive as to both Defendants. Additionally, McDonald's USA is awarded judgment as to Counts V and VII, VIII, IX, X, and XIII; Counts VI, XI, XII, and XIV survive as to McDonald's USA. Because Kempczinski and McDonald's Corp. are awarded judgment as to all claims against them, they are dismissed from the litigation.

E N T E R:

Dated: March 17, 2026

Mary M Rowland
_____

44